8/6/2021 5:29 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 56092398
By: Brianna Denmon
Filed: 8/6/2021 5:29 PM

CAUSE NO. _____

| | |
|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC, as Trustee of the Furie Litigation Trust, | IN THE DISTRICT COURT OF |
| Plaintiff, | |
| v. | |
| KAY RIECK, LARS DEGENHARDT, THEODOR VAN STEPHOUDT, DAVID HRYCK REED SMITH LLP, THOMAS E. HORD, MICHAEL ANTHONY NUNES, STONE PIGMAN WALTHER WITTMAN LLC, in its own capacity and as successor by merger to COGAN & PARTNERS LLP, DAVID ELDER, BRUCE GANER, SIERRA PINE RESOURCES INTERNATIONAL, INC. and HELENA ENERGY, LLC, | HARRIS COUNTY, TEXAS |
| Defendants. | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Clingman & Hanger Management Associates, LLC, as Trustee of the Furie Litigation Trust ("Trustee"), alleges:

### INTRODUCTION

1.     Defendants, all officers and control parties of Cornucopia Oil and Gas, LLC and its wholly owned subsidiary Furie Operating Alaska, LLC (together, "Furie"), and their respective companies, touted grand plans for the company: major infrastructure and drilling plans, and the anticipated production of hundreds of billions of cubic feet of gas and millions of barrels of oil.  But after building out the initial infrastructure for Furie's first production well, Furie had incurred so much debt that neither its equity owner, owned in large part and controlled

by Defendant Kay Rieck ("Rieck"), nor the Defendant managers hereto would be likely to ever recover significant personal profits from Furie's operations.

2.      Rather than continuing to operate Furie in a manner intended to maximize its value, Rieck and certain Defendants implemented a brazen scheme to divert Furie's cash (provided by its outside lenders) to entities secretly owned by them.  Together, they caused Furie to drill for fictitious gas using a company they secretly owned, sell gas at a loss to Rieck-owned entities and pledge/transfer valuable tax credits to Rieck-owned entities without consideration. At the same time, the Defendants artificially inflated Furie's "proved" gas reserves estimates so they could continue drawing compensation from Furie.  Once their malfeasance came to light, Furie predictably collapsed into bankruptcy, and its assets—previously valued at hundreds of millions of dollars—were sold for a mere $5 million.

3.      By this action, the Trustee seeks to recover over $100 million on account of Defendants' breaches of fiduciary duty, receipt of fraudulent transfers and other wrongdoing.

## THE PARTIES AND SERVICE OF CITATION

4.      Plaintiff is the Trustee of a litigation trust established by Furie's chapter 11 plan confirmed by Order dated June 12, 2020 entered by the United States Bankruptcy Court for the District of Delaware (Case No. 19-11781), to which Furie's causes of action against Defendants were transferred.

5.      Furie maintained its corporate headquarters in League City, Galveston County until November 2016.  Following that date, numerous Furie executives and critical service providers continued to work from the Houston area, including but not limited to the counterparties discussed herein.

6.      From its inception until January 25, 2018, Furie was a Texas limited liability company.  On that date, Furie converted itself to a Delaware limited liability company.

2

7.     Non-party Deutsche Oel und Gas, S.A. ("DOGSA") is a Luxembourgian company and the putative owner of Deutsche Oel und Gas, A.G. ("DOGAG"), a now-dissolved German company, which was the putative member of Furie.   At all times relevant hereto, DOGSA and DOGAG were controlled by Defendant Rieck.

8.     Rieck was the ultimate control person for most other entities described herein, and functioned as the *de facto* head of Furie.  Rieck is a German national residing in Dubai, United Arab Emirates.

9.     Rieck is a foreign individual.  At all times material hereto, Rieck was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction.  Rieck, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause.  The causes of action asserted herein against Rieck arose from purposeful transactions entered by Rieck and consummated in Texas and the agreements were to be performed in whole or in part in Texas or, alternatively, Rieck committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below.  Rieck travelled to Houston to meet with Furie's executives and counterparts and with attorneys, including with Furie's general counsel Tony Nunes.  In addition, Rieck used and maintained agents in Texas.  All of the foregoing give rise to Plaintiff's causes of action asserted herein. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Rieck may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall

forward process to Rieck at his home of Maurya Penthouse, Grandeur Residence, West Crescent, Palm Jumeirah, P.O. Box 29193 A 502, Dubai, 2772, United Arab Emirates.

10.     Defendant Lars Degenhardt ("Degenhardt") was Furie's President from September 2014-June 2017, while he simultaneously served as CFO of DOGSA. Degenhardt resides in Frankfurt, Germany.

11.     Degenhardt is a foreign individual.  At all times material hereto, Degenhardt was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction.  At the time of the actions discussed herein, Degenhardt maintained an office at Furie's headquarters in League City, Texas and travelled to Texas in connection with his work for Furie.  Degenhardt, however, no longer maintains a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause.  The causes of action asserted herein against Degenhardt arose from purposeful transactions entered by Degenhardt and consummated in Texas.  Degenhardt committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below.  In addition, Degenhardt used and maintained agents in Texas.  All of the foregoing give rise to Plaintiff's causes of action asserted herein.  Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Degenhardt may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Degenhardt at his home office of LDG Venture, Westendstr. 49 60325 Frankfurt, Germany, Biocybernaut Institute Europe Ehrhafts 4, 88167 Maierhöfen, Germany, or wherever he may be found.

4

12.     Defendant Theodor van Stephoudt ("van Stephoudt") was Furie's President from June 2017-March 2018.  Stephoudt was also an economist at Defendant Reed Smith LLP, who handled tax matters for Furie, Rieck, DOGSA, and other entities controlled by Rieck.  Upon information and belief, van Stephoudt resides in New York City, New York.

13.     At all times material hereto, van Stephoudt was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction.  Van Stephoudt, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause.  The causes of action asserted herein against van Stephoudt arose from purposeful transactions entered by van Stephoudt and consummated in Texas.  In this regard, van Stephoudt entered the agreements that made the basis of this suit with Texas residents and the agreements were to be performed in whole or in part in Texas or, alternatively, van Stephoudt committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below.  In addition, van Stephoudt used and maintained agents in Texas.  All of the foregoing give rise to Plaintiff's causes of action asserted herein.  As part of Reed Smith's engagement with Furie, van Stephoudt also oversaw tax matters for a wide variety of Rieck's entities, including Texas entities Furie, Furie Petroleum Company, and Furie Oil & Gas V (and at least VII, VIII, X, and XII), LLC.  To do so, van Stephoudt was in regular contact with Furie's controller, a Texas resident (and controller for the other Texas entities as well), Furie's accountants, based in Houston, Texas, Furie's lawyers, as discussed herein and Furie's Texas reserve auditors, in addition to Furie's Texas personnel.  Van Stephoudt also travelled to Texas in connection with his work for Furie.  Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE §

17.044(a)(1), van Stephoudt may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to van Stephoudt at his home office of Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086.

14.    Defendant Reed Smith LLP ("Reed Smith") is a limited liability partnership organized and existing under the laws of the State of Delaware, which represented Furie and other entities controlled by Rieck.  Reed Smith routinely advises Texas companies like Furie on all manner of legal issues, including litigation, transactional work, tax and oil and gas matters.

15.    Reed Smith is a law firm that engages in business in Texas, including the operation of law offices in Dallas, Austin and Houston.  At all times material to this action, Reed Smith was registered to transact business in Texas and maintained a registered office and a registered agent in Texas.  Reed Smith may be served with citation in this cause by serving its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Dallas County, Texas.  Alternatively, Reed Smith has allowed its registration to transact business in Texas to expire and, as a result, though required to do so, Reed Smith has not maintained a registered agent for service of process.  Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Reed Smith may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Reed Smith at its home office of 20 Stanwix Street, Suite 1200, Pittsburgh, Pennsylvania 15222.

16.    Defendant David Hryck ("Hryck") was the engagement partner at Reed Smith, who executed the engagement letter providing for van Stephoudt and himself to provide tax

assistance and legal services to Furie on an hourly basis.  Upon information and belief, Hryck resides in New York City, New York.

17.     At all times material hereto, Hryck was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction.  Hryck, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause.  The causes of action asserted herein against Hryck arose from purposeful transactions entered by Hryck and consummated in Texas. In this regard, Hryck entered the agreements made the basis of this suit with Texas residents and the agreements were to be performed in whole or in part in Texas or, alternatively, Hryck committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below.  In addition, Hryck used and maintained agents in Texas.  As part of Reed Smith's engagement with Furie, Hryck oversaw tax and other legal matters for a wide variety of Rieck's Texas entities.  To do so, Hryck was in regular contact with Texas residents.  All of the foregoing give rise to Plaintiff's causes of action asserted herein. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Hryck may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Hryck at his office of Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086.

18.     Defendant Thomas E. Hord ("Hord") was Furie's COO, and at all relevant times was responsible for its drilling activities.  Hord resides in Galveston County.  Pursuant to an

employment agreement between Hord and Furie dated July 1, 2013, Hord agreed to submit all employment-related disputes to Courts in Houston, governed by Texas law.

19.     Hord may be served with citation in this cause at his residence address of 912 Forest Rd., Clear Lake Shores, Galveston County, Texas 77565, or wherever he may be found.

20.     Defendant Michael Anthony (Tony) Nunes ("Nunes") was Furie's General Counsel under agreements pursuant to which he was partially-seconded by the law firms that employed him; first Cogan & Partners LLP, a Houston law firm, and then its successor by merger, Stone Pigman Walther Wittman LLC.

21.     Nunes resides in Harris County.  Nunes may be served with citation in this cause at 712 Main Street, Suite 110, Houston, Harris County, Texas 77002 or at 2601 S. Broadway Street, No. 51, La Porte, Harris County, Texas 77571-6574, or wherever he may be found.

22.     Defendant Stone Pigman Walther Wittman LLC is a Louisiana law firm, and the successor by merger in January 2017 to Cogan & Partners LLP, a Texas law firm (collectively with Cogan & Partners LLP, "Stone Pigman").   Stone Pigman is a professional limited liability company organized and existing under the laws of the state of Louisiana.  Stone Pigman engaged in business in Texas, including the operation of law offices in Houston, Harris County, Texas. At all times material to this action, Stone Pigman was registered to transact business in Texas and maintained a registered office and a registered agent in Texas.  Effective June 8, 2021, Stone Pigman filed with the Texas Secretary of State a certificate of withdrawal of registration thereby surrendering its authority to transact business in Texas.  In its certificate of withdrawal, Stone Pigman consented that service of process in any action, suit, or proceeding stating a cause of action arising in Texas during the time Stone Pigman was authorized to transact business in Texas may be made upon Stone Pigman by serving the Texas Secretary of State.  Stone Pigman

further agreed in its certificate of withdrawal that the Texas Secretary of State may mail a copy of any process against Stone Pigman to 1001 McKinney, Suite 1600, Houston, Texas 77002.  As the causes of action asserted herein against Stone Pigman arose in Texas during the time Stone Pigman was authorized to transact business in Texas, Stone Pigman may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Stone Pigman by mailing to 1001 McKinney, Suite 1600, Houston, Texas 77002.

23.     Defendant David W. Elder ("Elder") was Furie's CFO and resides in Harris County. Elder served as CFO and manager for a wide variety of Rieck related entities, including at least Furie Drilling, LLC, Furie Operating, LLC, Furie Petroleum Company, LLC, and Advanced Capital Funding LLC, and assisted Rieck's enterprise in financial matters.  Elder resides in Harris County.  Pursuant to an employment agreement between Elder and Furie dated February 15, 2015, Elder agreed to submit all employment-related disputes to Courts in Houston, governed by Texas law.

24.     Elder may be served with citation in this cause at 18153 Bal Harbour Drive, Houston, Harris County, Texas 77058.

25.     Defendant Bruce Ganer ("Ganer") is the owner and manager of Sierra Pine Resources International, Inc. ("SPRI").  Ganer served as Furie's internal geologist and testified that he was Chief Technical Adviser to Rieck.  In that role, he reported directly to Rieck, gave instructions to lower-level Furie employees/consultants and oversaw Furie's strategic decisions. He was also held out as Furie's internal lead geologist to third parties. Ganer resides in Harris County.

26.     Ganer may be served with citation in this cause at 3118 Ivy Falls Dr., Houston, Harris County, Texas 77068-1413 or at 110 Cypress Station Dr., Suite 105, Houston, Harris County, Texas 77090, or wherever he may be found.

27.     Defendant SPRI is a corporation organized and existing under the laws of the state of Texas owned by Ganer, with its principal office in this state in Harris County.  SPRI may be served with citation in this cause by serving its registered agent, Ira D. Weizel, at 700 Louisiana St., Suite 1200, Houston, Harris County, Texas 77002.

28.     Defendant Helena Energy LLC ("Helena") is a Delaware limited liability company that, according to its website, was founded as a natural gas marketing arm to Furie, but which has been engaged in oil production in Southwest Texas (specifically, Dimmit County) since 2016.  Helena is owned by Rieck and employs Ganer as its geologist-operator.  Helena is registered to transact business in Texas and maintains a registered office and registered agent in Texas.  Helena may be served with citation in this cause by serving its registered agent, Gary W. Miller, at 2925 Richmond Avenue, 14th Floor, Houston, Harris County, Texas 77098.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

30.     A substantial part of the events or omissions giving rise to the claims asserted herein occurred in Harris County, Texas.  Accordingly, venue is proper in Harris County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(1)(Vernon 1995).  Furthermore, at the time the cause of action accrued, Defendants Nunes, Ganer, Hord, and Elder resided in Harris County, Texas.  Accordingly, venue is proper in Harris County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(2)(Vernon 1995).  In addition, SPRI maintains its principal office

in this state in Harris County, Texas.  Accordingly, venue is proper in Harris County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(3)(Vernon 1995).  All claims asserted herein arise from the same transaction or occurrence, or series of transactions or occurrences, and venue of all claims and causes of action as to all defendants is therefore proper in Harris County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.005 (Vernon 1995).

<b><u>RULE 47 STATEMENT</u></b>

31.     Pursuant to TEX. R. CIV. P. 47, Plaintiff states that it seeks monetary relief over $1,000,000 and demand judgment for all other relief to which they show themselves entitled.

<b><u>FACTS</u></b>

**I.     GENERAL BACKGROUND**

    **A.     Rieck's Enterprise and Defendants' Role Therein**

32.     Rieck oversaw a panoply of related corporate entities in multiple states and countries.  Each had the loosest of organization and corporate form and Rieck, together with the Defendants hereto, constantly formed new entities and changed the entities' names, so as to keep ahead of creditors and regulators.  Still, the basic structure of Rieck's enterprise was as follows:

- Oil and gas mineral rights in Alaska were owned by Furie, and financed by hundreds of millions of dollars from secured lenders;

- Oil and gas mineral were rights in Texas owned by other Rieck companies, overseen by Furie's executives using Furie's personnel and infrastructure;

- Marketing entities in Germany and Luxembourg, which raised monies from primarily German investors to invest in the Alaska and Texas projects;

- Corporate entities formed in numerous jurisdictions (e.g., Texas, Wyoming, Louisiana, Delaware, Malta, Germany, United Arab Emirates) for the purpose

of extracting funds from the above-referenced activities and distributing those

funds to Rieck and his insiders.

33.     The Defendants hereto assisted him in that enterprise.

34.     The attorney and attorney-related defendants, Nunes, Stone Pigman, van

Stephoudt, Hryck and Reed Smith, assisted Rieck in structuring and representing the dozens of

corporations involved in the enterprise.  In addition, they handled inquiries from federal, state

and international regulators as to the problems that developed with the enterprise.

35.     Reed Smith, led by Hryck and Van Stephoudt, represented and performed work

for numerous entities owned and controlled by Rieck for many years, including:  Furie, DOGSA,

DOGAG, Furie Petroleum Company (another Texas Rieck entity which Rieck used as a fund to

pay himself and his associates), Rieck Oil Inc. (the parent of Aurora, discussed below), Helena,

Nordic (discussed below), many Texas and German fund entities also named Furie, German

banking entities named IARI and SAAG (discussed below) and served as the designated Tax

Expert for a bond issued by a DOGSA affiliate (also discussed below).  In addition, Reed Smith

advised Rieck, Hord and Nunes on how to structure their interests in the entities involved in

chartering the Randolph Yost, discussed below.

36.     Between June 2017 and March 2018, van Stephoudt also served as the President

of Furie.  Reed Smith began billing Furie for work beginning in February 2016.  On December

14, 2017, Hryck submitted an engagement letter to Furie signed by him, purporting to

"memorialize[] the intent of the parties starting on June 1, 2017."  The letter stated that Reed

Smith would provide general tax advice and legal assistance on an hourly basis.  It also provided

that van Stephoudt, a non-lawyer, would be Furie's principal contact.  The letter contained a

boilerplate disclaimer of representations with counterparties of Furie with no other specific or general conflicts waiver.

37.     In addition to serving as Furie's General Counsel, Nunes also represented Rieck personally.  In addition, Nunes was the engagement partner for Stone Pigman to represent Furie, Rieck, DOGSA, DOGAG, Advanced Drilling and numerous of Rieck's other entities.  In this capacity, Stone Pigman created, structured and negotiated contracts for a wide variety of Rieck-controlled entities, including the Randolph Yost entities, discussed below.

38.     Per his secondment agreement, Nunes served as "special legal consultant for Kay Rieck [and Furie] half days (up to a maximum of 80 hours per month) and the remainder of his time he will continue to work for other clients of, and will remain a partner of, Cogan & Partners, LLP."  This relationship continued when Cogan & Partners LLP merged into Stone Pigman Walther Wittman LLC.

39.     In addition to his role as CFO of Furie, Elder served as manager and CFO of numerous Rieck entities, including at least Furie Drilling, LLC, Furie Operating, LLC, Furie Petroleum Company, LLC, and Advanced Capital Funding LLC, and assisted Rieck's enterprise in financial matters.  His role included moving funds, reporting transactions and working with van Stephoudt, Hryck and Reed Smith to respond to tax regulators.  Pursuant to a 2015 employment agreement with Furie, Elder received a salary of $250,000 per year, and would also receive more than $750,000 if Rieck sold Furie.

40.     In addition to his role as COO of Furie, Hord served as manager and CEO of numerous Rieck drilling entities and handled other oil and gas projects for Rieck.  Pursuant to a 2013 employment agreement with Furie, Hord received a salary of $500,000 per year, and would also receive more than $1,000,000 if Rieck sold Furie.

41.   Ganer served as Technical Adviser to Rieck for his enterprise activities and received millions of dollars from Rieck through various entities wholly-owned and controlled by him each named Sierra Pine.  Ganer worked on over 30 projects for Rieck and Rieck-related entities accounted for the majority of Sierra Pine's income.  Beginning in 2016, Ganer and/or his wholly-owned companies served as operator, and executed documents as attorney-in-fact, for Helena.  Rieck employed Ganer's inflated reserve reports and other mineral reporting documents in the enterprises' bond offerings, prospectuses and other money raising documents.   Ganer issued numerous reserve reports describing Furie's mineral reserves, falsely stating that he was independent.

### B.   Background Facts Concerning Furie

42.   The State of Alaska designated an 84,000-acre area located in the Cook Inlet as the Kitchen Lights Unit ("KLU") and leased gas drilling rights therein to Furie.

43.   In the summer of 2011 and 2012, Furie drilled two exploratory wells in the KLU, but failed to discover commercial quantities of gas.

44.   In the summer of 2013, Furie drilled a third exploratory well ("KLU #3") and discovered commercial quantities of gas.

45.   Following the discovery, Furie commissioned several reserve and future revenue reports from SPRI and other reserve auditors.

46.   In its report, dated August 23, 2013, independent reserve auditor Netherland Sewell & Associates, Inc. ("NSAI") estimated there were 59.4 billion cubic feet ("BCF") in proved, undeveloped gas reserves at KLU #3 as of June 30, 2013, having a net present value of approximately $54 million.

47.     By contrast, SPRI issued a report, dated September 3, 2013, estimating 276.3 BCF in proved, undeveloped gas reserves as of June 30, 2013, having a net present value of approximately $315 million.

48.     In contemplation of negotiating terms for loans to develop infrastructure needed to produce gas, Furie procured additional reports estimating proved reserves at KLU #3 as of December 31, 2013.

49.     NSAI issued such a report, dated February 26, 2014, estimating the roughly the same amount of proved, undeveloped reserves (59.5 BCF) as it had in its prior report, as of December 31, 2013, having a net present value of $121 million.

50.     DeGolyer and MacNaughton, another independent reserve reporter, issued a draft report, dated March 24, 2014, projecting a similar amount of proved, undeveloped gas reserves (59 BCF).

51.     In July 2014, Furie entered into a secured term loan agreement with Energy Capital Partners ("ECP"), pursuant to which ECP agreed to loan Furie $160 million to build infrastructure needed to produce gas; specifically, a drilling platform at the location of KLU #3, an onshore gas processing facility, an undersea pipeline connecting the two.

52.     Furie failed to build the infrastructure on budget, or on schedule.  It spent about $175 million more than budgeted and could not complete the planned infrastructure until November 2015.

53.     Furie financed the shortfall with additional loans from ECP, and a separate loan from ING Bank ("ING") collateralized by projected tax credit receipts from the State of Alaska.

54.     Furie also used borrowed funds to drill two more exploratory wells; however, like the first and second, these new wells both failed to yield commercial quantities of gas.

## II.   DISLOYAL TRANSACTIONS

55.    Once the infrastructure was built out, Furie experienced greater-than-projected operational costs, principally resulting from production of greater-than-projected volumes of water produced at wells located in zones known to be composed of loose sand (i.e. "wet"), and further, failed to discover additional gas.

56.    Furie's insiders responded to these issues, not by operating the company in a manner designed to maximize value for the benefit of the company, but rather, by diverting value to themselves through insider transactions.

### A.    Randolph Yost Rig Charter

57.    As set forth below, Furie's owners and managers siphoned funds from Furie, through various entities owned by them, in connection with the chartering of the Randolph Yost drilling rig from Shelf Drilling Offshore Resources Limited II ("Shelf II"), a company organized under the laws of the Cayman Islands.

58.    After initially negotiating directly with Shelf II's parent to charter the rig on Furie's behalf, Rieck, Hord, Degenhardt, Nunes and Elder worked in concert to charter the rig through a series of insider-controlled entities and then to sub-charter it to Furie at a substantially marked-up rate.

59.    Even before any of the charter agreements had been executed, Hord and Rieck had privately agreed that Hord would receive 20% of any revenue generated by the related entities.  On May 17, 2015, Hord forwarded to his attorney emails discussing the preliminary structure of the related entities and asked him to "take a look at this, this is a new start up company in Dubai [Offshore Dilling Solutions, Ltd., discussed below] to operate [the Randolph Yost] in [Alaska]. Which I will own 20 percent of that it has a possibility of earning 150 ml. Over a three year period." On July 4, 2015, Offshore Drilling Solutions Ltd. ("ODS"), an entity

organized under the laws of Dubai, chartered the rig from Shelf II for $20,000/day, pursuant to a Bareboat Charter Agreement.

60.     ODS was purportedly owned by Reinhardt Martin Schuster ("Schuster"), a known front man for and longtime associate of Rieck.  In any event, Rieck was the ultimate owner of ODS and Rieck made all business decisions for ODS.

61.     On November 2, 2015, with Shelf II's consent, ODS assigned all of its rights and obligations under the Bareboat Charter Agreement to Kadmas Ltd. ("Kadmas"), an entity organized under the laws of Malta and 99% owned by Schuster.  The assignment instrument stated Kadmas is a "wholly owned subsidiary" of ODS.

62.     On the same date, Kadmas in turn (a) agreed to pay Advanced Drilling Solutions, LLC ("Advanced Drilling") $55,000/day to manage the rig under a Drilling Vessel Management Agreement and (b) entered into a Sub-Time Charter of the rig with Nordic Overseas Drilling & Services, GmbH ("Nordic"), a German company.

63.     On December 1, 2015, Furie agreed to pay Nordic $220,000/day to charter the rig, pursuant to an Offshore Daywork Drilling Contract.

64.     Under Nunes' direction, Stone Pigman organized Advanced Drilling under the laws of the State of Louisiana, and its charter named Nunes as its member and manager.  Stone Pigman billed Furie for its work for Advanced Drilling.

65.     Hord became CEO of Advanced Drilling and Doy Dugan, a financial analyst at Furie, became its CFO.

66.     Nevertheless, Advanced Drilling's executives took direction from Rieck and Degenhardt.

67.     As Elder, Hord, Degenhardt, Nunes and Rieck knew, Advanced Drilling shared employees and contractors with Furie (who Furie continued to pay).  Its personnel continued to use their Furie email addresses to conduct business for Advanced Drilling.  Furie invoiced Advanced Drilling $2,500 a month for "shared expenses" but Advanced Drilling did not pay.

68.     Advanced Drilling was lucrative for Hord in other ways as well.  Whereas Furie's finances were audited and subject to numerous restrictions by lenders and regulators, Advanced Drilling's finances were not.  For example, in December 2015, Hord sold rig equipment to Advanced Drilling for $1.8 million that he had recently purchased for just $135,000.

69.     In addition, Nunes and Hord caused Advanced Drilling to pay Hord a monthly consulting fee plus a car allowance.  In January 2017 alone, Hord's monthly invoice came to $40,000.  This was while he was still being paid $500,000 a year by Furie.

70.     Nordic was purportedly owned by Andreas Sasdi, another known front man for and longtime attorney for Rieck.  As Elder, Degenhardt, Hord and Nunes knew, Rieck was the ultimate owner of Nordic and Rieck made all business decisions for Nordic.

71.     On December 1, 2015, Furie agreed to pay Nordic $220,000/day to charter the rig, pursuant to an Offshore Daywork Drilling Contract.

72.     Elder subsequently admitted that "none of these entities [referring to Advanced Drilling, Kadmas, Nordic and ODS] was previously known or recognized in the industry as a drilling contractor"; and that the "Randolph Yost-related transactions created a complicated and expensive series of contractual relationships, which appeared to be detrimental to Furie, and beneficial to Rieck, Hord and Nunes."

73.     Nevertheless, Elder was intimately involved in the creation of these entities and authorized the payments from Furie to Nordic.

74.     In addition, as manager of FPC, Elder knew or should have known that Nordic was cycling funds back to Rieck through FPC, with approximately $2 million paid in November and December 2015.

75.     Similarly, Elder knew Reed Smith was charging Furie for van Stephoudt's time doing tax work for Nordic.

76.     Between February and April 2016, while Reed Smith had been engaged by Furie, Hryck, acting as Rieck's lawyer, prepared a draft profit-sharing agreement between Kadmas and Hord's solely-owned company, Tom Hord Management Services, LLC, a Texas limited liability company.  That agreement specifically included an "example" calculation that illustrated the scheme: Hord would be paid 20% of the profits that Kadmas made on the rig sub-charter to Furie, calculated as the day rate Furie paid, minus Kadmas' actual expenses. The included example provided for a $220,000 day rate to Furie (the price Furie had already then agreed to pay Nordic); $75,000 in actual costs and expenses (the actual day rate ODS (and then Kadmas) was paying Shelf II for the rig of $20,000/day, plus the $55,000/day Kadmas agreed to pay ADS to manage the rig); which resulted in $145,000/day profit to Kadmas ($220,000 minus $75,000); with $29,000/day profits going to Hord (20% of $145,000).  In short, the plan hinged on charging Furie $220,000 per day for just $75,000 worth of daily services and costs.

77.     ECP balked at the steep rate that Nordic had then proposed to charge Furie. However, Degenhardt falsely assured ECP that "we did prove that we do not have a [sic] affiliate/related transaction," and the transaction was ultimately approved, albeit under false pretenses.

78.     Between late 2015 and 2016, Furie recorded expenses paid to Nordic of $82 million.

79.     Despite the significant cash paid, ODS and Kadmas defaulted on their payment obligations to Shelf II related to chartering the rig.

80.     Nevertheless, in August 2017, Elder, working together with van Stephoudt (then President of Furie) and another Rieck associate, caused Furie to pay Shelf II $1.5 million even though Furie had no direct obligation to Shelf II, and the funds were used to offset existing balances owed by Kadmas and ODS.

81.     Rieck, Elder, Degenhardt, Hord, Nunes and Hryck all knew the above-described transactions were disloyal and took steps to try to hide them.

82.     For example, on December 7, 2015, Rieck's attorney Harald Plewka (of the Dubai firm HPL Plewka & Coll. LLP) sent Furie a "Verification Note" which claimed that ODS, Kadmas, Nordic and Furie were all "independent and unrelated companies" despite the fact that Rieck ultimately controlled all of them, and that ODS and Kadmas had signed agreements acknowledging that the latter was wholly owned by the former.

83.     By way of another example, on February 10, 2016, Nunes, Rieck, Hryck, Hord, and Degenhardt collaborated to draft a message for Elder so that Elder could avoid reporting Advanced Drilling as an affiliate or related party to Furie or Rieck.  Working together, they created an idea that Hryck would form a trust with himself as trustee which would own enough of Advanced Drilling to make Hord a minority owner, which could then give Elder plausible deniability that Advanced Drilling was not related.

84.     Also, in February 2016, James Cogan, Nunes' law partner, organized a new entity named Offshore Management Holdings LLC ("OMH") to serve as Advanced Drilling's new sole member and manager in place of Nunes.  OMH's principal place of business was listed as Furie's Texas headquarters in League City.  OMH was initially set up to be owned 51%/49% by

20

Hord and Nunes; but was then changed to 20% owned by Hord, 20% owned by Nunes and 60% owned by a trust, of which Reed Smith attorney Hryck was Trustee. Regardless, as was known by all of Nunes, Hord, Cogan and Hryck, OMH was ultimately owned and controlled by Rieck.

85.     On May 23, 2016, van Stephoudt emailed a draft letter on Hryck's letterhead to Elder and Degenhardt, as a first draft of a statement confirming the independence of Advanced Drilling. The letter addressed to Degenhardt at his Texas address stated "We, Reed Smith LLP, hereby state that we have reviewed the ownership structure of [Furie]."

86.     Towards the end of 2015, Furie made payments of over $9 million to Nordic.

87.     In early 2016, Hord, Nunes, Rieck, ODS, Kadmas, Nordic and Furie circulated (and partially executed) a "Memorandum of Agreement" purporting to release Hord and Nunes from any conflict of interest that may arise as a result of their employment by Furie and their ownership/management of Advanced Drilling.

88.     Even though Rieck and Nunes signed the Memorandum of Agreement document, they were unable to convince Plewka, the attorney-in-fact for ODS, Kadmas and Nordic, to agree to release Hord and Nunes. Nunes continued to acknowledge the conflict, writing to Hord and Hord's attorney on May 5, 2016: "I feel I definitely need to get [Plewka] to sign something regarding my role as attorney and manager for the companies." Nunes further wrote on May 19: "[t]o protect myself I believe I need to get Harald [Plewka] to sign something in my favor along the lines of [the Memorandum of Agreement]."

**B.     Gas "Sales"**

1.     Aurora

89.     Rieck, Degenhardt, Nunes, Webb, and Elder caused Furie to enter into gas "sales" transactions with Aurora Gas, LLC ("Aurora"), another company which they all knew was owned by Rieck and managed by him and Bruce Webb ("Webb"), Furie's Senior Vice President.

90.     In March 2016, Rieck, with the knowledge of Elder, Degenhardt and Nunes, agreed to sell Furie gas to Aurora, which in turn sold Furie's gas to Rieck-owned Helena (which was managed by Rieck, Webb and Furie executive Mark Slaughter), which then sold the gas to Helena's customers for Rieck's and Webb's benefit.

91.     After Aurora was forced into involuntary bankruptcy in early May 2016, Elder asked internally if Furie could continue selling gas to Aurora.  Webb replied: "One consideration is that the commercial customers (Kay's investors / Helena Energy) get their gas from Aurora - which they purchase from us."   Unsurprisingly, Furie continued providing gas to Aurora, ultimately writing off more than $900,000 in Aurora sales as uncollectible.

92.     As Furie's lenders became hesitant to continue gas deliveries to Aurora, in January 2017, Mark Slaughter (an executive of both Furie and Helena) impressed upon Nunes, Elder and Webb the need to execute a gas supply contract directly between Furie and Helena to keep Rieck (and his customers) satisfied: "We want to get this to Jen at ECP so we can cut off sales to Aurora. Currently if we cut sales off to Aurora we cut the sales to Kay's Helena customers and we can't do that. With this contract we'll remove Aurora from being the middle man."

93.     Even after the bankruptcy, Furie continued to provide gas to Aurora at Rieck's direction, for which Furie was never fully compensated.

2.      <u>Helena</u>

94.     As discussed above, Helena was receiving Furie gas (through Aurora) beginning in April 2016, which it then sold to its customers. Helena and Furie also shared multiple executives, including Bruce Webb, Mark Slaughter, and Bruce Ganer (who served as Helena's project manager and operator for Helena's wells in Dimmit County), and Furie's office staff

performed administrative functions for Helena (which also shared Furie's office space). Helena did not compensate Furie for these services.

95.    At Rieck's direction, Elder, Webb, Degenhardt, Nunes and Slaughter put together a draft gas sales agreement with Helena, which Elder presented to Furie's lenders for approval on June 30, 2017. After the Aurora bankruptcy, ECP balked at a contract with another Rieck affiliate and requested additional assurances before it would further consider the proposed transaction. Nonetheless, Webb instructed Slaughter later that day to "[t]ake the gas anyway. We have no choice[,]" and the gas was delivered to Helena. Furie's records do not reflect any payment received by Furie for said gas.

### C.    Tax Credit Transfers

96.    Despite Furie having pledged its Alaska tax credits to its lenders ECP and ING in 2014 and 2015, Rieck also purported to pledge Furie's Alaska tax credits to various related entities. For example, in March 2016, DOGSA, through a special purpose vehicle DOG TC-2016 SA, made a bond offering of up to $170 million. The offering memorandum provided that the obligations were secured by inter alia a "global security right over all Tax Credits granted by [Furie]."

97.    Reed Smith's van Stephoudt (Furie's future President) is named the "Tax Credit Expert" in the memorandum, purportedly validating the underlying tax credit collateral.

98.    Furie received no proceeds from the bond offering, despite DOGSA having placed more than $16 million of the bonds.

99.    Reed Smith applied to BaFin, the German Federal Financial Supervisory Authority, on behalf of a Rieck-controlled German bank, IARI Internationale Aktien Und Rohstoff Ivest GmbH ("IARI"), and its subsidiary Süddeutsche Aktienbank A.G. ("SAAG"), for permission to include the March 2016 DOGSA bond in SAAG's equity by including it in its

capital reserve.  After BaFin questioned the liquidity and reasonable value of the DOGSA bonds, Reed Smith withdrew the request and announced that SAAG would increase its equity through the direct purchase of tax credits.

100.   Immediately thereafter, in December 2016, Rieck caused Furie to transfer $18.4 million in Alaska state tax credits to IARI, which then purportedly transferred $4 million of the tax credits to SAAG.  Furie received no consideration for these transfers.

101.   Rieck used those transfers as equity at his banks.  However, to be validly perfected, these tax credit transfers would need to have been recorded with the appropriate Alaskan authorities.  But they were not so recorded.

**D.     Other Compensation**

102.   As long as they were members in good standing of Rieck's enterprise, the Defendants could and did receive a host of additional benefits.

103.   Hord put friends and family members on Furie's payroll (like his cousin Ricky Bell, for whom Furie also rented an apartment). Webb complained to Rieck and Furie's then-President van Stephoudt about Hord wasting Furie's money, noting that Hord's "relatives and friends … get paid all year for doing almost nothing.  That could have changed, but went nowhere."

104.   Elder received wire transfers between August and September 2015 from Rieck-owned Furie Petroleum Company totaling $150,000.

105.   Nunes received $600,000 per year from Furie for his general counsel services and directed Furie and Rieck's legal work to his law firms, generating additional legal fees for Stone Pigman.

### III.    INFLATION OF ESTIMATED PROVED RESERVES

106.    To keep drawing benefits from Furie, the Defendants needed to demonstrate mineral reserves sufficient to keep Furie's lenders and counterparties at bay, or to obtain new sources of funding to take their place.

107.    ECP's loans were secured by substantially all of Furie's assets, principally its leases in the KLU, and each of funding availability and defaults (or rather the absence thereof) was premised upon the existence of significant, "proved" reserves as estimated by its independent auditor, NSAI.

108.    Per NSAI's reports, "proved reserves are those quantities of oil and gas which, by analysis of engineering and geoscience data, can be estimated with reasonable certainty to be commercially recoverable; probable and possible reserves are those additional reserves which are sequentially less certain to be recovered."

109.    As noted above, NSAI's reserve report, dated February 26, 2014, like its prior reserve report, estimated that Furie had proved, undeveloped reserves of 59.5 BCF, as of December 31, 2013, having a net present value of $121 million; and the draft reserve report from DeGolyer and MacNaughton, dated June 3, 2014, estimated a similar amount of proved reserves.

110.    In contemplation of providing regular reporting services to Furie for the benefit of ECP (its loan agreement called for Furie to furnish annual, independent reports by NSAI), Furie engaged NSAI to provide such services pursuant to an engagement letter, dated November 24, 2014.

111.    NSAI's first post-engagement reserve report, dated March 25, 2015 and estimating gas reserves as of December 31, 2014 ("2015 Report"), estimated Furie to have 56.3 BCF in "total proved" reserves, having a total net present value of $243 million, broken up into

"proved developed producing" (7.5 BCF), "proved developed non-producing" (21.6 BCF) and "proved undeveloped" (27.2 BCF).

112.    NSAI's next reserve report, dated February 29, 2016 and estimating gas reserves as of December 31, 2015 ("February 2016 Report"), estimated Furie to have the same gas reserves, having an identical net present value.

113.    However, when efforts to find commercial quantities of gas other than in the immediate vicinity of KLU #3 failed, Defendants began manipulating and concealing the data passed to NSAI, including with respect to the underlying pay maps, upon which NSAI's reserve reports were premised.

114.    In early July 2016, Furie failed to discover gas at yet another well, now drilled by Advanced Drilling using the Randolph Yost rig.  On July 6, 2016, one of Furie's working interest holders wrote to all the officers of Furie, including Rieck, Degenhardt, Elder, Hord and Nunes:

> I think it's time for Kay to reassess and make a lot of changes. This present operation is the most unprofessional I have ever witnessed. The cost overruns are more than huge, the geology pitiful, this is as far as a company can get from being a well run prudent operation. This is amat[eur] hour at its worst. The cost overruns of this well are enormous and each month we are upside down in regard to income from production and outrageous LOE'S. When this debacle of a well is done, we are required to drill another, how can Kay keep letting this happen. There must be a way these insane operations can be corrected. Something is very wrong here, it must be fixed. If there has ever been a pre Chapter 11, this sure looks like one to me. Kay is this what you[r] final intention is for Furie?

115.    Instead of rectifying the problem, Ganer undertook to vastly inflate Furie's reported reserves, and soon after convinced NSAI to issue a preliminary report, dated September 9, 2016, estimating gas reserves as of July 31, 2016 ("September 2016 Report"), tripling Furie's proved reserves.  Rieck and Ganer instructed NSAI to hide this report from Elder.

116.    NSAI did not issue a year-end 2016 report as it had done in previous years and that was contractually mandated by Furie's various counterparties. To comply with Furie's reporting obligations, Elder instead relied on a February 1, 2017 report issued by Ganer, which predictably showed more than 204 BCF in proven reserves.

117.    Each of the executive Defendants had additional reasons not to trust Ganer.

118.    Among other things, Nunes, Elder, Rieck and Degenhardt all knew that Ganer did not consider himself bound by the ordinary rules of oil and gas reserve estimation. For example, as Ganer told them why he enjoyed not having a petroleum engineering (PE) certification:

> The rules, regulations and process I think are confining and counterproductive in the execution of work in the sense that there is no room for interpretation in the technical work that allows for innovations or going beyond pure facts to project what is really expected or possible. Technically that statement is probably not entirely correct but in practice it seems to overshadow or overly discount representations of project evaluations and I think is a disservice to those relying on the results to make decisions. That is, the sideboards that come with the PE significantly limit what the engineer really thinks and can represent of the possibilities of his project evaluations.

119.    Among other things, they knew that Ganer had issued a series of inflated and implausible reports under his own name since 2013, showing vast quantities of gas and oil that never came to fruition.

120.    Among other things, they knew that Ganer was not disinterested, serving as Rieck's technical adviser on numerous projects and getting paid by Rieck.

121.    In or about June 2017, Degenhardt resigned from DOGSA and ceased being Furie's President. In his place, van Stephoudt became President of Furie. Nevertheless, Reed Smith continued to bill Furie for van Stephoudt's time and van Stephoudt continued using his

Reed Smith email address to conduct business for Furie. Furie did not pay van Stephoudt directly.

122.    By the summer of 2017, Rieck and Furie's management, including van Stephoudt and Elder, were soliciting new outside investors to replace Furie's lenders and provide additional capital to keep Furie operating as a billion-dollar company.  However, at least one such potential investor (PJT Partners) required a current reserve report prior to committing funds, to ensure that the value of its collateral exceeded the value of loans anticipated to be extended.

123.    This presented a predicament.  As Ganer explained to Elder and van Stephoudt in August 2017, if the truth as to the above-described water problems and water remediation costs were disclosed, they would likely be unable to convince NSAI to keep proved reserves and their estimated net present value at the levels reported in the September 2016 Report.  As Ganer put it, "[w]e (!) are stuck between a ROCK and a Hard Place."   To accomplish this plan Ganer suggested continuing with NSAI for reserve reporting services but "staying under the radar and keeping this quiet". Van Stephoudt, copying Elder, agreed: "Unfortunately, that is the only way forward."

124.    At the same time, Ganer explained to both Elder and van Stephoudt: "our mission is to keep reserves at the 200 Bcf mark."

125.    For his part, Ganer inflated Furie's reserves by providing misleading, inaccurate, partial and/or reckless information to NSAI in order to reflect significant, additional proved reserves.

126.    By way of example only, Ganer caused Furie's gas pay maps to inaccurately reflect Furie's expected reserves.  For example, Ganer reported significant, proved reserves in a large zone that begins far from KLU #3.  However, Furie had never drilled any exploratory wells

28

in that zone. The nearest two wells closed decades prior and without ever having yielded commercial quantities of gas.

127.    For example, Ganer also purportedly added seismic data to the pay maps resulting in significant additional reserves therein and in other locations, despite later acknowledging that seismic data is an insufficient basis on which to project such reserves.

128.    In addition, van Stephoudt, Elder and Ganer also took steps to inflate the net present value of Furie's reserves, by reducing the annual costs included in the financial projections, all of which resulted in relatively higher net present value estimates for Furie in the 2017 Report (defined below).

129.    On September 23, 2017, for example, van Stephoudt noted to Elder that "I think that [PJT Partners] start to understand that with the costs of the rig added to the deal the deal will be difficult at best."  On September 27, Elder provided NSAI's Burton with Furie financial plans and projections that did not include about $5 million annually in traditional general and administrative (G&A) costs.   Although Burton responded that those expenses are typically included in a reserve report, Elder convinced NSAI to omit the G&A from the 2017 Report in early October.

130.    By way of another example, on October 4, 2017, Elder confided in van Stephoudt his doubts as to whether Furie could really produce the gas called for by the plan being evaluated by NSAI, and whether Furie had enough money to complete the four wells called for by the plan. Van Stephoudt agreed with Elder that Furie was unlikely to produce the gas or complete a fourth well. Nevertheless, van Stephoudt advised Elder to proceed: "Let's get the money to finish well three and get it producing. Then we will take it from there as we will have more leverage."

131.    At the time that van Stephoudt was overseeing the procurement of the 2017 NSAI reserve report, he was not only acting as Furie's President, but was also wearing many other hats. He maintained his position at Reed Smith representing Furie. He continued to represent DOGSA and Rieck's other entities, which he had represented separately for years. And, as discussed above, he served as the designated Tax Expert for DOGSA affiliate's $170 million bond offering, where he was charged with validating Furie's tax credits.

132.    NSAI's next report, dated October 30, 2017 and estimating gas reserves as of December 31, 2016 ("2017 Report"), perpetuated the major increase in the September 2016 Report by relying on the fabricated reserves, as follows:

| Category | Gross Gas Reserves (Bcf) | | | |
| --- | --- | --- | --- | --- |
| | 2015 Report | Feb. 2016 Report | Sept. 2016 Report | 2017 Report |
| Proved Developed Producing | 7.5 | 7.5 | 22.8 | 14.1 |
| Proved Developed Non-Producing | 21.6 | 21.6 | 20.6 | 117.7 |
| Proved Undeveloped | 27.2 | 27.2 | 107.8 | 23.5 |
| Total Proved | 56.3 | 56.3 | 151.2 | 155.2 |

133.    Thomas Walsh, a partner of Petrotechnical Resources of Alaska, LLC ("PRA"), which ECP engaged in 2018 to provide a technical and commercial review of the KLU, testified after the fact that, "the truth was revealed that the zone [added to the 2017 Maps] had not been tested [by Furie] because it was not expected to flow gas."

134.    He further testified that his own analysis "revealed that the prior reserves estimate [referring to that in the September 2016 and 2017 Reports] had been grossly inflated, and that gas column thickness associated with individual sands were thin or non-existent in sands that had been promoted as holding the vast majority of reserves in the KLU."

## IV.   GAS SUPPLY CONTRACTS FIXING UNREALISTIC PRODUCTION REQUIREMENTS

135.    The "base case projections" in the ECP loan agreement projected realization of substantial revenues from gas sales under supply agreements with third parties.

136.    Although Furie had barely enough production capacity to meet its supply requirements under its 2014 gas supply agreement with Homer Electric Association ("Homer"), Furie nevertheless entered into a second such contract with Enstar Natural Gas Company ("Enstar") in March 2016 calling for Furie to sell and Enstar to purchase 18.6 billion cubic feet of gas over three years (6.2 billion cubic feet per year).

137.    The Enstar GSA was principally negotiated by Mark Slaughter and Defendant Nunes (with input from Elder)—and was approved by Rieck and Degenhardt—to keep outside funding from Furie's lenders flowing.

138.    But the Enstar GSA—which Rieck, Elder, Degenhardt and Nunes knew at the time far exceeded Furie's production capacities—provided the Defendants with an additional short-term benefit: it would be used (in part) to justify Furie's future revenue projections that formed the basis of the NSAI 2017 Report described above.

139.    The Enstar GSA also came with significant mid- and long-term risks:  if Furie was unable to produce the gas called for by the Enstar contract (beginning in April 2018), it was required to purchase gas from third parties at the then-current market prices to supply Enstar.

140.    In addition, the contract called for Furie to "have at least three wells that can be used to produce the volumes of gas contemplated under the [gas supply agreement]" by December 31, 2016, which Furie would begin delivering on April 1, 2018.

141.    The well completion deadline was extended to July 31, 2017.  However, two days prior to the deadline, Furie advised Enstar that it would not meet it.  As a result of this, and other

defaults, Enstar negotiated for a material reduction in the price to be paid upon the commencement of gas deliveries on April 1, 2018.

142.    When Furie was unable to meet its supply obligations beginning April 2018, it was forced to buy gas on the spot market to cover minimum delivery amounts, and took substantial losses supplying Enstar with purchased gas—but not before obtaining the critical NSAI 2017 Report.

## V.    FURIE'S COLLAPSE

143.    In 2018, pursuant to an agreement between Rieck and ECP, Furie ceded control to an outside management firm, Ankura Consulting Group, LLC ("Ankura"); and as noted above, PRA was engaged to undertake a technical review of Furie's business.

144.    By November of that year, PRA and Ankura discovered Furie's reserves and business prospects were not as had been represented to lenders.

145.    NSAI's next reserve report, dated June 21, 2019 and estimating gas reserves as of December 31, 2018, estimated that Furie had only 20,367 BCF as of said date, roughly one-third the amount projected in the 2015 and February 2016 Reports, and zero "proved undeveloped" reserves.

146.    Less than two months after the release of this reserve report, Furie filed voluntary petitions for bankruptcy relief.

147.    Furie sold substantially all of its assets for roughly $5 million, in the resulting chapter 11 cases.

**<u>FIRST CAUSE OF ACTION</u>**
**Breach of Fiduciary Duty**
**(Against Rieck, Hord, Nunes, Stone Pigman, van Stephoudt, Hryck, Reed Smith, Degenhardt, Elder and Ganer)**

148.    The Trustee restates the preceding paragraphs as though fully set forth herein.

32

149.     Rieck owed fiduciary duties to Furie by virtue of his ownership interests in and control of Furie.

150.     Hord, Nunes, van Stephoudt, Degenhardt, Elder and Ganer were either named officers, or *de facto* officers, of Furie (collectively with Rieck, the "Officer Defendants"), and so likewise had fiduciary duties to the company.

151.     Reed Smith had fiduciary duties to Furie because it was both counsel to the company and supplied its President pursuant to its engagement letter.

152.     Stone Pigman had fiduciary duties to Furie because it was both counsel to the company (and successor to company counsel) and supplied its GC.

153.     Said fiduciary duties included duties of loyalty, good faith, care and obedience. The duty of loyalty requires Defendants to put Furie's interest ahead of their individual interests and to avoid the use of any corporate position to further their individual interests.

154.     Rieck, Hord and Nunes breached their duties of loyalty and good faith by chartering the Randolph Yost rig from entities they secretly owned, overcharging Furie and retaining the resulting benefits for themselves.

155.     Rieck also breached his duties of loyalty and good faith by pledging Furie's tax credits to DOGSA without consideration; and also by selling Furie's gas to Aurora and Helena without fair process and fair price.  Said gas sales were made without any consideration, let alone reasonably equivalent value, and served to deprive Furie of gas required to supply Homer and Enstar, for whom Furie was contractually required to buy gas at then-current rates at a loss to Furie.

156.    Defendants Hord, Nunes, van Stephoudt, Degenhardt, Elder and Ganer breached their fiduciary duties of loyalty, good faith, care and obedience, by operating Furie in a manner so as to solely benefit themselves and causing material harm to Furie.

157.    In addition, van Stephoudt acted in the course and scope of his employment at Reed Smith.  Throughout his tenure as President, he used his @reedsmith.com email address to conduct Furie business and continued his employment with the firm; he was not on Furie's payroll; rather, Reed Smith invoiced Furie for van Stephoudt's time (oftentimes for full 8-hour days), which Furie then paid to Reed Smith; and from 2016-18, Furie paid Reed Smith over $1.1 million.

158.    Hryck, the Reed Smith engagement partner, failed to properly oversee van Stephoudt—a non-attorney listed as the principal client contact in the engagement letter with Furie, which called for the provision of tax advice—and breached his own fiduciary obligations by providing legal advice in furtherance of transactions he knew to be disloyal to Furie.

159.    Hryck's and van Stephoudt's tortious conduct was undertaken in furtherance of Reed Smith's principal client, Rieck, and to generate fees for the firm.

160.    Stone Pigman breached its own fiduciary obligations due to Furie by conduct undertaken for the benefit of its principal client Rieck, and its partner Nunes, and so as to generate fees for the firm.

161.    Ganer breached his fiduciary duties of loyalty, good faith and care, by participating in a scheme to artificially inflate independent reserve report estimates by among other things manipulating the 2017 Maps in a manner that does not comport with industry norms, in order to procure a false and misleading report.

162.     As a direct and proximate result of such breaches of fiduciary duty, the above-named Defendants profited, and Furie sustained actual and consequential damages which the Trustee is entitled to recover.  In addition, the named Defendants should be required to disgorge all compensation and other benefits and to forfeit all fees and funds received by them in connection with the above-referenced acts.

163.     Judgment should be entered against Rieck, Hord, Nunes, Stone Pigman, van Stephoudt, Hryck, Reed Smith, Degenhardt, Elder and Ganer, jointly and severally, on the Trustee's breach of fiduciary duty claim against them, in an amount to be determined at trial, plus pre-judgment interest and attorneys' fees.

## SECOND CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Ganer and SPRI)

164.     The Trustee restates the preceding paragraphs as though fully set forth herein.

165.     Ganer and SPRI knowingly and induced and/or aided and abetted the Officer Defendants in breaching their fiduciary duties to Furie.

166.     Ganer and SPRI knew of the fiduciary relations and participated in the breaches of fiduciary duties.  Ganer and SPRI also knew the other officer Defendants were breaching their fiduciary duties to Furie in the manner set forth herein.

167.     In this regard, Ganer and SPRI, among other things, materially participated in the scheme to artificially inflate the reserve report estimates and implemented the scheme at Furie to continue drilling for fictitious gas reserves.

168.     Ganer and SPRI knowingly benefited from the breaches and accepted and retained the benefits of those breaches.

169.     As a direct and proximate result of such breaches of fiduciary duties, aided and abetted by Ganer and SPRI, Furie sustained actual and consequential damages which Plaintiff is

entitled to recover from Ganer and SPRI. Ganer and SPRI should be required to disgorge all compensation and other benefits and to forfeit all fees and funds received by them in connection with the above-referenced acts.

170.    Judgment should be entered against them, jointly and severally, in an amount to be determined at trial, plus pre-judgment interest and attorneys' fees.

### THIRD CAUSE OF ACTION
**Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1)
and Texas Bus. & Com. Code § 24.005(a)(1)
(Against Rieck, van Stephoudt, Hryck, Reed Smith, Hord,
Elder, Nunes, Stone Pigman, Ganer and SPRI)**

171.    The Trustee restates the preceding paragraphs as though fully set forth herein.

172.    During the 4-year period preceding the commencement of Furie's bankruptcy case:

- Van Stephoudt, Hryck or their firm Reed Smith received more than $1.1 million in total fees from Furie between 2016 and 2018, including during van Stephoudt's roughly nine-month tenure as President.  To the extent payments were made to Reed Smith, van Stephoudt or Hryck received origination credit and compensation based thereon.

- Furie's COO, Hord, through his now-dissolved company Tom Hord Management Services, LLC, was paid $500,000/year by Furie, and total compensation of over $3.9 million from Furie; plus a daily fee from Advanced Drilling for managing Furie's drilling operations.

- Furie's CFO, Elder, was paid $250,000/year by Furie, for total compensation of over $1 million from Furie.

- Furie's GC, Nunes, was paid $50,000/month by Furie to work "half days (up to a maximum of 80 hours per month)" and was free to use the rest of his time to work for his firms' clients.  Furie also paid Cogan & Partners (and then Defendant Stone Pigman) approximately $12,000-$12,500/month while Nunes was working for Rieck and/or Furie.  In total, Furie paid Nunes and his law firms over $4.4 million.

- Furie's geologist and Chief Technical Advisor, Ganer, received over $3.8 million from Furie, individually or through his firm SPRI.

- Rieck received substantial payments as a result of transfers to affiliates in connection with the above-described chartering of the Randolph Yost rig, gas sales to affiliates Augusta and Helena and tax credit transfers to DOGSA, as set forth above.

(Together, the "Challenged Transfers").

173.    Each Challenged Transfer was made in an effort to hinder, delay or defraud Furie's creditors.

174.    The Challenged Transfers bear many badges of fraud, in that they were to or for the benefit of insiders; many of the transfers, most significantly those to Rieck, were concealed; Furie had been advised by both of its lenders ECP and ING that it was in default under their respective credit agreements before the overwhelming majority of the transfers were made; and Furie was insolvent when the transfers were made or became insolvent shortly thereafter.

175.    Judgment should be entered against Rieck, van Stephoudt, Hryck, Reed Smith, Hord, Elder, Nunes, Stone Pigman, Ganer and SPRI, avoiding and recovering the Challenged Transfers made to them, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

### FOURTH CAUSE OF ACTION
**Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)(I)-(III)
and Texas Bus. & Com. Code § 24.005(a)(2)(A)-(B) and § 24.006
(Against Rieck, van Stephoudt, Hryck, Reed Smith, Hord,
Elder, Nunes, Stone Pigman, Ganer and SPRI)**

176.    The Trustee restates the preceding paragraphs as though fully set forth herein.

177.    Furie received less than reasonably equivalent value in exchange for each Challenged Transfer.

178.    At the time each Challenged Transfer was made: Furie was balance sheet insolvent or became balance sheet insolvent as a result of the transfer; Furie was engaged in a

business for which its remaining assets were unreasonably small in relation to the business; and Furie's management intended to incur, or believed or reasonably should have believed that Furie would incur, debts beyond its ability to pay as they became due.

179.    Judgment should be entered against Rieck, van Stephoudt, Hryck, Reed Smith, Hord, Elder, Nunes, Stone Pigman, Ganer and SPRI, avoiding and recovering the Challenged Transfers made to them, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

## FIFTH CAUSE OF ACTION
### Insider Fraudulent Transfer under Texas Bus. & Com. Code § 24.006(b)
### (Against Rieck, van Stephoudt, Hord, Elder, Nunes and Ganer)

180.    The Trustee restates the preceding paragraphs as though fully set forth herein.

181.    Each Challenged Transfer was made to an insider of Furie, on account of an antecedent debt, while Furie was balance sheet insolvent and the insider had reasonable cause to believe that Furie was insolvent.

182.    Judgment should be entered against Rieck, van Stephoudt, Hord, Elder, Nunes and Ganer, avoiding and recovering the Challenged Transfers made to them, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

## SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (Against Helena)

183.    The Trustee restates the preceding paragraphs as though fully set forth herein.

184.     Through its common ownership by Rieck, Defendant Helena secured multiple benefits from Furie that would be unconscionable to retain.  For instance, Helena and Furie shared multiple executives, including Bruce Webb and Mark Slaughter, who upon information and belief were principally compensated by Furie.

185.     Helena received Furie gas from Aurora (both before and after Aurora was forced into involuntary bankruptcy) for which Furie was never fully compensated, and for which Furie wrote off more than $900,000 in uncollectible gas sales.

186.     Helena also received gas directly from Furie, for which Furie either received no compensation or less than fair compensation.

187.     Helena accepted the above-described benefits in such circumstances as reasonably notified Helena that Furie, in rendering such benefits, reasonably expected to be paid by Helena for same.  It would be unconscionable and against the fundamental principles of justice, equity and good conscience for Helena to retain such sums unlawfully obtained by it.

188.     Judgment should be entered against Helena for the fair value of Furie's executives' time devoted to work for Helena, the fair value of all Furie gas received by Helena (either directly or through Aurora) for which Furie was not compensated, and any other benefit received by Helena from Furie, in an amount to be determined at trial but not less than $900,000, plus pre-judgment interest.

### SEVENTH CAUSE OF ACTION
**Civil Conspiracy**
**(Against Rieck, Hord, Degenhardt, Nunes, Elder,**
**van Stephoudt, Hryck, Reed Smith, Ganer and SPRI)**

189.     The Trustee restates the preceding paragraphs as though fully set forth herein.

190.     Rieck, Hord, Degenhardt, Nunes, Elder and Hryck worked in concert to charter the Randolph Yost rig through a series of insider-controlled entities from entities secretly owned

39

by Rieck, Hord and Nunes, for the express purpose of overcharging Furie up to $145,000 per day between 2016 and 2017 permitting them to retain the surcharge personally. These Defendants entered an agreement among themselves for the unlawful purpose of breaching their fiduciary duties and effecting the fraudulent transfers to themselves by the means set forth above. They reached a meeting of the minds among themselves to accomplish a common purpose and as to the course of action pursued, and committed overt acts in furtherance thereof, including establishing a series of shell companies in multiple jurisdictions and causing them to contract with one another. Such conduct by these Defendants constitutes concerted action and/or conspiracy which proximately caused the occurrence and the injuries made the basis of this suit.

191.    Rieck, van Stephoudt and Reed Smith worked in concert to raise cash through a bond offering by a Rieck affiliate (DOGSA) premised on the pledge of Furie's already-pledged tax credits without consideration. These Defendants entered an agreement among themselves for the unlawful purpose of breaching their fiduciary duties and raising cash by the means set forth above. They reached a meeting of the minds among themselves to accomplish a common purpose and as to the course of action pursued, and committed overt acts in furtherance thereof, including Rieck's and Reed Smith's serving as tax credit expert for the offering.

192.    Van Stephoudt, Elder, Ganer, and SPRI worked in concert to make misrepresentations and hide material information from their reserve auditor, in order to procure a favorable reserve report; and Rieck, Elder, Degenhardt and Nunes caused Furie to enter into or approved the Enstar GSA, which they knew called for production that far exceeded Furie's capacity, in order to justify future revenue projections that formed the basis for those in said reserve report. These Defendants entered an agreement among themselves for the unlawful purpose of breaching their fiduciary duties and to misrepresent and hide material information

from their reserve auditor and to misrepresent Furie's reserves by the means set forth above. They reached a meeting of the minds among themselves to accomplish a common purpose and as to the course of action pursued, and committed overt acts in furtherance thereof, including Ganer's furnishing maps which he knew contained false information and did not comport with industry standards, and preparing, approving and causing Furie to enter into the Enstar GSA.

193.    Each of these conspiracies, and the above-described conduct in furtherance thereof, damaged Furie as a proximate result.

194.    Judgment should be entered against the members of each conspiracy, jointly and severally, for all actual, special and consequential damages sustained in an amount to be determined at trial, plus pre-judgment interest.  In addition, by engaging in these conspiracies, Defendants Rieck, Hord, Degenhardt, Nunes, Elder, Hryck, van Stephoudt, Reed Smith, Ganer, and SPRI are liable for exemplary damages.

**EIGHTH CAUSE OF ACTION**
**Exemplary Damages**
**(Against Rieck, Hord, Degenhardt, Nunes, Elder,**
**van Stephoudt, Hryck, Reed Smith, Ganer and SPRI)**

195.    The Trustee restates the preceding paragraphs as though fully set forth herein.

196.    The above-described conduct of Defendants Rieck, Hord, Degenhardt, Nunes, Elder, Hryck, van Stephoudt, Reed Smith, Ganer, and SPRI was intentional, willful and wanton. Such conduct was committed by such Defendants with malice, with evil intent to harm Furie and its creditors and with gross indifference to the rights of Furie and its creditors.  Plaintiff is therefore entitled to recover punitive damages from Defendants Rieck, Hord, Degenhardt, Nunes, Elder, Hryck, van Stephoudt, Reed Smith, Ganer, and SPRI.

197.    There is no limit on the amount of exemplary damages that may be awarded because the conduct by Defendants Rieck, Hord, Degenhardt, Nunes, Elder, Hryck, van

Stephoudt, Reed Smith, Ganer, and SPRI was committed knowingly and intentionally and constituted one or more felony offenses enumerated in Tex. Civ. Prac. & Rem. Code § 41.008(c). Accordingly, the jury will be asked to assess exemplary damages in an amount sufficient to deter such conduct in the future.

### NINTH CAUSE OF ACTION
**Attorneys' Fees**
**(Against Rieck, Hord, Degenhardt, Nunes, Elder,**
**van Stephoudt, Hryck, Reed Smith, Ganer and SPRI)**

198.    The Trustee restates the preceding paragraphs as though fully set forth herein.

199.    As a result of the forgoing, it has been necessary for Plaintiff to employ counsel to file and prosecute this suit.  Plaintiff's attorneys have expended and will expend considerable time and effort in bringing this suit.  Accordingly, Plaintiff is entitled to recover from Defendants, jointly and severally, reasonable attorneys' fees for the services required and expenses involved.

### CONDITIONS PRECEDENT

200.    All conditions precedent to the right of Plaintiff to recover herein have been performed or have occurred.

### REQUEST FOR JURY TRIAL

201.    Pursuant to TEX. R. CIV. P. 216, Plaintiff hereby demands a trial by jury in this cause, having heretofore paid the required fee.

### RULE 194 REQUEST FOR DISCLOSURE

202.    Pursuant to TEX. R. CIV. P. 194, Defendants Kay Rieck, Lars Degenhardt, Theodor Van Stephoudt, David Hryck, Reed Smith LLP, Thomas E. Hord, Michael Anthony Nunes, Stone Pigman Walther Wittman LLC, in its own capacity and as successor by merger to Cogan & Partners LLP, David Elder, Bruce Ganer, Sierra Pine Resources International, Inc., and

Helena Energy, LLC are requested to disclose within fifty (50) days of service of this request the information or materials described in TEX. R. CIV. P. 194.2 (a) through (l).

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff pray that Defendants be cited to appear and answer herein; that Plaintiff have judgment according to the law and the facts as determined by this Honorable Court; that upon final trial and hearing hereof, Plaintiff recover from Defendants, jointly and severally; (i) actual, special, consequential, exemplary and/or punitive damages; (ii) attorneys' fees and expenses incurred herein; (iii) pre-judgment interest at the highest lawful rate; (iv) post-judgment interest at the highest lawful rate from the date of judgment until such judgment is fully and finally paid; (v) disgorgement; (vi) expert witness fees; (vii) all costs of court incurred herein; and (viii) such other and further relief, both general and special, legal and equitable, to which Plaintiff may show itself justly entitled.

Respectfully submitted,

_/s/ Robert M. Corn_

Robert M. Corn
State Bar No. 04828600
3131 Eastside St., Suite 440
Houston, Texas 77098-1947
Telephone:  713-229-0055
Facsimile:   713-229-0057
Email: rcorn@corn-law.com

OF COUNSEL:

AMINI, LLC
Bijan Amini
Avery Samet
Amini LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Telephone: (212) 490-4700
asamet@aminillc.com

ATTORNEYS FOR PLAINTIFF CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC, as Trustee of the Furie Litigation Trust

43