IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CLINGMAN & HANGER MANAGEMENT,    § CASE NO. 4:21-CV-02698
ASSOCIATES, LLC                  § HOUSTON, TEXAS
                                 § TUESDAY,
VERSUS                           § JUNE 14, 2022
                                 §
KAY RIECK, ET AL                 § 2:31 P.M. TO 5:14 P.M.


MOTION HEARING DAY ONE

BEFORE THE HONORABLE CHARLES ESKRIDGE
UNITED STATES DISTRICT JUDGE



APPEARANCES:                              SEE NEXT PAGE

COURTROOM ERO:                            JACQUELINE MATA




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX  77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

FOR CLINGMAN & HANGER                ATTORNEY AT LAW
MANAGEMENT ASSOCIATES, LLC:          Robert M. Corn, Esq.
                                     3131 Eastside Street
                                     Suite 440
                                     Houston, TX 77098
                                     713-229-0095

                                     AMINI, LLC
                                     Avery D. Samet, Esq.
                                     131 W. 35th Street, 12th Floor
                                     New York, NY 10001
                                     917-647-8950

FOR STONE PIGMAN WALTHER             VINSON ELKINS, LLP
WITTMANN, LLC:                       George M. Kryder, III, Esq.
                                     2001 Ross Avenue, Suite 3900
                                     Dallas, TX 75201
                                     214-220-7719

FOR MICHAEL A. NUNES:                FOGLER BRAR O'NEILL & GRAY, LLP
                                     Murray J. Fogler, Esq.
                                     909 Fannin Streeet
                                     Suite 1640
                                     Houston, TX 77002
                                     713-481-1010

FOR DAVID HRCYK AND                  GIBBS BRUNS, LLP
THEODOR VAN STEPHOUDT:               Barrett H. Reasoner, Esq.
                                     1100 Louisiana Street
                                     Suite 5300
                                     Houston, TX 77002
                                     713-650-8805

FOR REED SMITH, LLP:                 GIBSON DUNN & CRUTCHER, LLP
                                     Kevin Rosen, Esq.
                                     333 S. Grand Avenue
                                     Suite 4600
                                     Los Angeles, CA 90071
                                     213-229-7635

FOR DEFENDANT DAVID ELDER:           COZEN O'CONNOR
                                     Julia Gandara Simonet, Esq.
                                     1221 McKinney Street
                                     Suite 2900
                                     Houston, TX 77010
                                     832-214-3941

1          **HOUSTON, TEXAS; TUESDAY, JUNE 14, 2022; 2:31 P.M.**

2              THE COURT:  Okay.  Everyone be seated.  Get me

3      organized here.

4              All right.  Motion hearing for Cling & Hangar --

5      Clingman & Hangar Management Associates, LLC versus Kay Rieck,

6      et al, 21-2698.

7              Can I get appearance of counsel, please?

8              MR. SAMET:  Good afternoon, Your Honor.  My name is

9      Avery Samet of AMINI, LLC.  I represent the Plaintiff.  And

10     with me today --

11             MR. CORN:  Robert Corn also representing the

12     Plaintiff.

13             THE COURT:  Thank you, Mr. Corn.

14             And who else do you have with you at counsel table?

15     Not with them?

16             MS. SIMONET:  Julia Simonet, I represent Defendant

17     David Elder, I'm just -- I'm in the chair over there --

18             THE COURT:  Okay.

19             MS. SIMONET:  Yeah.

20             THE COURT:  All right.  Thanks.  Welcome.

21             MR. KRYDER:  George Kryder and Jordan Lou with

22     Vinson & Elkins representing Defendant Stone Pigman Walther

23     Wittmann --

24             THE COURT:  Okay.  Good.

25             MR. KRYDER:  -- LLC.

1          THE COURT:  Okay.

2          MR. FOGLER:  Murray Fogler for Defendant Tony Nunes.

3          THE COURT:  Thank you.

4          MR. REASONER:  Barrett Reasoner and Caitlyn Cowan

5    for Mr. Hryck and Mr. Van Stephoudt, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. ROSEN:  Good afternoon, Your Honor.  Kevin Rosen

8    on behalf of Defendant Reed Smith.

9          THE COURT:  Reed Smith.  All right.  Thank you.

10          Okay.  Anybody have a good idea how to work our way

11    through all these motions?  I have an outline and we can just

12    sort of jump in.  Is there anything just sort of -- anybody

13    have a preparatory statement they'd like to make, anything

14    that you all want to advise me of before we start turning to

15    the various motions?  Anything?

16      (No audible response.)

17          THE COURT:  Has discovery been proceeding or has it

18    been stagnant?

19          MR. ROSEN:  No, it's been proceeding.

20          THE COURT:  Yeah?  When is our discovery deadline in

21    this matter?

22          MR. SAMET:  Maybe I can speak to that, Your Honor.

23    We had submitted a letter on June 1st about -- regarding that,

24    and Your Honor entered a modification of --

25          THE COURT:  Okay, right.

1          MR. SAMET:  -- of the schedule.  Discovery has been

2     proceeding, mainly documents and interrogatories, and we

3     basically picked a schedule of about 120 days.

4          THE COURT:  Yeah.

5          MR. SAMET:  We don't have to address this now, but

6     one of the issues that we had raised in our letter is that we

7     would like to get some more clarity on when the depositions

8     are going to occur.  We've served them, we've -- our position

9     is with this many Defendants we'd like to lock in when they're

10     going to happen.  For a lot of reasons Defendants don't want

11     to commit yet.  We've set some sometime --

12          THE COURT:  Don't --

13          MR. SAMET:  -- within the next 90 days.

14          THE COURT:  -- don't want to commit to what, to

15     dates or to --

16          MR. SAMET:   To dates for depositions.  And --

17          THE COURT:  And is that based on, what? needing more

18     written discovery to occur or what's the issue there?

19          MR. SAMET:  Well, I think one of the issues is

20     Defendants would like to see the outcome of these hearings --

21          THE COURT:  Okay.

22          MR. SAMET:  -- in fairness.  We're fine with that,

23     we agreed to adjourn the deposition until after that.

24          THE COURT:  Okay.

25          MR. SAMET:  The Defendants I think can speak

1    themselves, maybe they want more documents, maybe not.  From

2    my perspective as Plaintiff's counsel, Your Honor, I would

3    like a date certain by which the party depositions will take

4    place and we'll work together to schedule it whenever they

5    can.  And we've asked them for dates I think over the next

6    90 days, give or take, for that to occur.  That seems to be a

7    reasonable amount of time, in my opinion.

8              THE COURT:  My plan is to -- we've got a lot of work

9    looking at the motions and forming thoughts, and I have been

10   going back and forth as to whether I was planning to rule from

11   the bench as we go along, or whether I was going to write

12   something up.  I've been more of the mind of writing something

13   up.  That'll take some time to formalize what I have by way of

14   various bench memos at this point.  But that'll take some

15   time.

16             Not an extraordinary amount of time, but after --

17   but from what I'm hearing after an Order comes out depositions

18   would occur when reasonably able to be scheduled is sort of

19   what I'm hearing the Defendants wait -- you would like to wait

20   to see who needs to be deposed and then -- but you're ready to

21   start producing people in consultation once motions --

22             MR. REASONER:  Yes.

23             THE COURT:  -- are passed.

24             MR. REASONER:  Yes, Your Honor.  I believe it was

25   Mr. Rosen's colleague, Mr. Cox, had been in some discussions,

1       but as I understand it, two things, one, when the original

2       depositions were noticed the Plaintiffs had not produced

3       documents yet.  So that was obviously an obstacle.  But as

4       alluded to, Mr. Cox and our group has expressed the view that

5       we'd like to get some clarity from the Court on what remains

6       in the case --

7                 THE COURT:  Yep.

8                 MR. REASONER:  -- so that what topics --

9                 THE COURT:  Okay.

10                MR. REASONER:  -- are appropriate and what aren't,

11      particularly as to corporate representative depositions and

12      the like.

13                THE COURT:  Okay.  All right.  Well, let's start in.

14      And on the different claims, although Defendants, you know,

15      are differently situated on each of the types of claims and

16      have different arguments, there's some overlap in the

17      arguments being made.  And so I was thinking of taking up -- I

18      know my Order -- I'm still planning to basically go at it this

19      way, that we're going to be largely dealing with the law firms

20      and the lawyers, or the lawyer -- those associated with the

21      lawyers today.

22                But also at the time that we have today and then

23      back again tomorrow, I'm not sure that we'll finish everything

24      that the law firm groups today.  And so we may continue those

25      on tomorrow.  But what I'm thinking of doing is taking up all

1       arguments as to fraudulent transfer claims first, then breach

2       of fiduciary duty, then civil conspiracy.  There's then some

3       other issues that are out there on successor liability and

4       some other aspects of the claims.  But I think that I would

5       just start into it that way, if everybody -- unless anybody

6       has a better idea.

7               (No audible response.)

8               THE COURT:  All right.  So starting with fraudulent

9       transfer claims, there -- in order here there's an argument

10      about standing to assert TUFTA claims that's brought by

11      Defendant -- is it Nuñes or Nunes?

12              MR. FOGLER:  It's Nunes.

13              THE COURT:  That's what I thought, Nunes.

14              MR. FOGLER:  No tilde over the N.

15              THE COURT:  Actually I wasn't thinking that it was

16      Nuñes, but I didn't know if it was Nunes or Nunes.  All right.

17      So for Mr. Nunes the standing to assert the TUFTA claims.  So

18      let's take that up first.

19              And, Mr. Fogler, is that your -- that's your client?

20              MR. FOGLER:  Yes, Your Honor.

21              THE COURT:  All right.  So let's go with that first.

22      Go ahead.

23              MR. FOGLER:  And if the Court please, the issue that

24      we raised in our motion to dismiss is fairly simple because

25      the statute itself is worded so that the creditors of the

1    transferring party are the ones that can raise the complaint

2    about the alleged fraudulent transfer.  And it certainly was

3    not clear, at least to me, from the Original Petition and now

4    the First Amended Complaint, that the Trustee was purporting

5    to stand in the shoes of the creditors, as opposed to standing

6    in the shoes of the bankrupt company, which is the entity that

7    I thought at least was raising the complaints in the pleading.

8         And so I raised this issue.  The Trustee came back

9    and argued in response that indeed they were attempting to do

10    both, that is to straddle the assertion of claims by the

11    Debtor company against its own officers and directors, and

12    assert claims that allegedly, or at least purportedly had been

13    transferred by the creditors in the bankruptcy itself.

14         Now the bankruptcy pleadings don't evidence any

15    assignment of creditor claims from the creditors to the

16    bankruptcy estate, or to the Litigation Trust, which is really

17    the entity that's bringing these claims.

18         It is our view of the law that there has to be some

19    express assignment made for the -- the Litigation Trustee is,

20    you know, is a fiction creation by the Bankruptcy Court for

21    the assertion of these claims, and at the least there needs to

22    be clarity in the establishment of the Trust itself for which

23    claims are being assigned to the Trust for assertion.  And at

24    least I can't see that the creditors have expressly stated:

25    We are assigning our fraudulent transfer claims to the extent

1    that we have those to the Litigation Trust for assertion.

2            THE COURT:  Okay.  Let me ask Mr. -- Mr. Samet, are

3    you going to argue -- are you taking most of the argument on

4    behalf of Plaintiff or --

5            MR. SAMET:  I think so, I can --

6            THE COURT:  Okay.  Go ahead.  So, Mr. Samet, on that

7    what's the authority by which you assert the claims?

8            MR. SAMET:  The authority by which is that -- let me

9    walk through this.  Fraudulent transfer claims are a special

10    sub-specialty off creditor claims.  Pursuant to 11 USC Section

11    544(b), at the commencement of bankruptcy all fraudulent

12    transfer claims are assigned to the -- to the bankruptcy

13    estate.  So no creditor can start claiming why they're estate

14    claims.  Under the Bankruptcy Plan of Reorganization all

15    estate claims against these Defendants were assigned to the

16    Trust.  So that is the authority for which -- pursuant to

17    which we have standing to bring them.

18            When -- and I think on Pages 10 to 12 of our brief,

19    in respect to this issue, we cite the Court authorities and

20    statutes, Fifth Circuit case law just in case the complaint --

21    when a Trustee brings fraudulent transfer claims the law is

22    that the Trustee stands in the shoes of the creditors with

23    respect to those particular fraudulent transfer claims --

24            THE COURT:  And the Plan here says, "The Litigation

25    Trust shall act for the estates."

1          MR. SAMET:  That's right.

2          THE COURT:  Okay, okay.  Anything else?

3          MR. SAMET:  No, Your Honor.

4          THE COURT:  All right.  I think I will -- I am going

5     to write up an Order on this to be more than a minute entry,

6     but I may state some views along the way as we do that.  I

7     am -- when I write it up, I may come down the other way as we

8     look more closely at it, but I'm likely to deny that argument,

9     Mr. Fogler.

10          All right.  As to the time bar argument, it's raised

11     in part by Stone Pigman and then also there's an aspect of

12     that by Defendant Hord who --

13          MR. REASONER:  Mr. -- oh, I'm sorry, Your Honor.

14          THE COURT:  Yeah.

15          MR. FOGLER:  Yes, sir.

16          THE COURT:  -- you all aren't expected to argue

17     today, so I'm not -- because you all will be back here

18     tomorrow.

19          MR. REASONER:  Yes, sir.

20          THE COURT:  I'm just wondering on any of these -- so

21     for -- let me -- I can -- thought about this --

22          MR. REASONER:  And, Your Honor, just to be clear,

23     Mr. Van Stephoudt, my client, also makes the time barred

24     argument on the alleged insider fraudulent transfer.

25          THE COURT:  That's -- and I have as to the -- is

1    that as to -- it's -- I have that down as a little separate

2    under -- I was going to take that up with constructive

3    fraudulent transfer, that there is that argument that he has.

4    I think it's a little different though than what Stone Pigman

5    is raising.

6            MR. KRYDER:  Your Honor, may it please the Court?

7    George Kryder for Stone Pigman.  So --

8            THE COURT:  Let me just say this and prep this as

9    to -- I know that Mr. Hord has this argument, you'll be able

10   to -- you're going to have the benefit of listening to

11   everything that goes on today and thinking about how you might

12   want to argue it further tomorrow.  But I'm --

13           MR. KRYDER:  Yes, sir.

14           THE COURT:  -- I'm not going to be ruling on this in

15   a dispositive way that affect your client today.  Go ahead.

16           MR. KRYDER:   Yes, sir.  We have actually two prongs

17   of the fraudulent transfer argument.  The first that I'll

18   address now is as to attorneys' fees.  There's a second very

19   belated claim that the Plaintiff has made about transferring

20   certain office equipment and the like from Cogan, but that's

21   separate.

22           As to this issue the allegation they're seeking

23   fraudulent transfer claims of $50,000 a month in attorneys'

24   fees that went to Mr. Fogler's client, Mr. Nunes, directly,

25   that's the First Amended Complaint in Paragraph 191.  They did

1      not go to the Cogan firm.

2                  THE COURT:  Right.

3                  MR. KRYDER:  They went to them.  So there's no

4      plausible --

5                  THE COURT:  Because he was seconded to it at the

6      time.

7                  MR. KRYDER:  He was succumbent to them at the time,

8      or seconded to --

9                  THE COURT:  Yeah.

10                 MR. KRYDER:  He was there, he was their employee.

11     So there's no plausible way to recover against Stone Pigman,

12     which is not an alleged transferee, even Cogan Partners was

13     not the transferee.  And so since Stone Pigman was not the

14     alleged transferee or entity for whose benefit transfers were

15     made, the $50,000 a month are unrecoverable.

16                 Secondly, as to other purported transfers of 10- to

17     $12,000 a month after January of 2017, this was basically for

18     some overhead allegedly.  Plaintiff offers as to those only

19     conclusory allegations.  Judge Brown recently issued an

20     opinion, we cited this to the Court, regardless of whether you

21     apply Rules 8(a) or 9(b), the Plaintiff has made conclusory

22     allegations as to Mr. Fogler's client, as to Mr. Reasoner's

23     client and mine about fraudulent intent, lack of reasonably

24     equivalent value and insolvency on the part of Fury.  Whatever

25     standard the Court may apply it's not entitled to -- oh, wait,

14

1          we don't have to take it as true.

2                    And the other issue we do have is that the claim is

3          time barred.

4                    THE COURT:  Right.

5                    MR. KRYDER:  And the Plaintiff waited until August

6          of 2021.  It was over a year or two late for Counts 3 and 4 as

7          to my client, and one of the issues that's very important, and

8          I think this probably comes up tomorrow, too, Your Honor, is

9          that the bankruptcy case of Fury's co-Debtors was closed.  So

10         what they're trying to say is that because a co-debtor,

11         Cornucopia Oil and Gas, that its case was left open, they're

12         trying to say from dismissal of these fraudulent transfer

13         claims.

14                   The problem is that the cases of Fury Operating

15         Alaska and Corsair Oil and Gas were closed, and the Court at a

16         minimum should dismiss as untimely under Section 546 any of

17         the fraudulent transfer claims where the transferor was Fury

18         Operating Alaska, LLC or Corsair, because it's undisputed

19         those Debtors' cases were closed on June the 30th, 2020.  If

20         any transfers by Cornucopia, the only Debtor, co-Debtor that

21         was left open, could survive dismissal under 546, they still

22         are conclusory and respectfully we believe they should be

23         dismissed on the basis of doing that.

24                   The Plaintiff says -- points to a case by Judge

25         Isgur who was construing his own Order saying that he meant to

1    keep the case open.  Obviously Judge Isgur is entitled to

2    construe his own Orders, but here, Your Honor --

3              THE COURT:  Is that *In Re: Vanguard*?

4              MR. KRYDER:  Yes, it is.

5              THE COURT:  Okay.

6              MR. KRYDER:  It's the *Vanguard* case.  And in here

7    the Final Decree was entered in Delaware, that order speaks

8    for itself and it closed Fury Operating Alaska's and Corsair

9    Oil and Gas's Chapter 11 cases on June 30, 2020.  And if those

10   two entities want to preserve their ability to bring

11   fraudulent transfer claims, they should have left the cases

12   open and they should have paid the US Trustee fees for them

13   subject to the Supreme Court's recent ruling.

14             So respectfully, Your Honor, we would urge the Court

15   to dismiss with prejudice any fraudulent transfer claims where

16   the transferor was Fury Operating Alaska, LLC or Corsair Oil,

17   including Counts 3 and 4 as time barred, and the rest, any

18   others as failing to meet the proper pleading standards.

19             THE COURT:  In the Final Decree, I don't have it

20   before me, but I believe Paragraph 5(c) says, "Entry of this

21   Final Decree is without prejudice of the Litigation Trust to

22   bring and pursue claims, causes of action or otherwise seek

23   relief in connection with the Litigation Trust assets"

24             Why doesn't that preserve the ability to bring a

25   claim, the fraudulent transfer claim?

1          MR. KRYDER:  I just -- I don't think it -- I don't

2     think it --

3          THE COURT:  Okay.

4          MR. KRYDER:  -- does because the cases themselves

5     were closed.  They needed to -- they needed to expressly --

6          THE COURT:  Okay.

7          MR. KRYDER:  -- keep those claims open.

8          THE COURT:  Okay.  All right.  Mr. Samet?

9          MR. SAMET:  Would Your Honor prefer if I speak from

10    the lectern?

11         THE COURT:  I'm happy with whichever, you can --

12         MR. SAMET:  Okay.

13         THE COURT:  -- go back and forth a lot, which I'm

14    happy for you to do if you'd like, but you can address me from

15    table if you'd like.

16         MR. SAMET:  Maybe I'll address you from table.  And

17    I thought I would take Your Honor through the bankruptcy

18    documents on our motion, it makes it easier in person, too.

19    And I'm going to address the 11 USC 546 argument first and

20    then go the substantive pleading arguments about the

21    sufficiency of the claim, if that's okay.

22         THE COURT:  Okay.  Yeah.

23         MR. SAMET:  However --

24         THE COURT:  That's -- yeah, do the time bar first

25    and then move on to the 9(b) pleading aspects of it.

17

1    Go ahead.

2    MR. SAMET:  All right.  So in our complaint, we take

3 a number of steps.  Our complaint, we bring this on behalf of

4 Cornucopia and Fury.  Fury is the 100 percent wholly owned

5 subsidiary of Cornucopia.  The complaint, the bankruptcy

6 filing as Your Honor will see later in the case, or some

7 emails, everyone first is Fury.  It's not something we made

8 up, that's just the -- that's the trade name that they use for

9 these things.

10    The bankruptcy plan -- all three entities were filed

11 into bankruptcy, all right, the Plan, the Bankruptcy Plan,

12 which established a Trust which resolved the bankruptcy, the

13 Plan went and -- it was of course approved by order of the

14 Bankruptcy Court.  The Plan went effective on June 30th, 2020,

15 which is the same day, or the day before, counsel said 30, I

16 thought it was 1st, but they closed the subsidiary cases at

17 the same time.

18    In the Plan, the plan is I think multiple -- in

19 other parts is very thick.  The Plan has of course resolved

20 all the interests of Cornucopia, Fury and of the entire -- of

21 the entire company.  And it sends different interests to

22 different places.  There is a provision for Reorganized

23 Debtors, the -- for the creditors in that Plan to release all

24 of their liens on both entities and put in new liens on the

25 resulting entities.  There is a section on what's going to

1    happen to the tax waterfall.  Everything was pulled apart and
2    put back together again under one Plan in the jointly
3    administered case.

4         I think there's three sections of the plan that are
5    important for this.  One is in Section L, it's Section 4L,
6    Section 4 is called, "Means For Implementation of the Plan."
7    Section 4L has the establishment of the Litigation Trust, the
8    powers of the Trustee, and assigns all causes of action to the
9    Trust.  That's what we just talked about, which is very broad.

10        Section P is its own stand-alone section, it's goes
11   on about a page and a half, it's called, "Preservation of
12   Causes of Action," which goes into great detail, it says:
13   Whatever else is happening in this Plan and the affiliated
14   documents and this bankruptcy, all the causes of action that
15   are being assigned to the Trust are being preserved, no one
16   should rely on any other document to think that they're not
17   going to be brought against them and that they're not going to
18   be preserved, and it -- the Court has bold in the Plan.  I'll
19   direct Your Honor to whatever else it says there.

20        And then in Section W, this is also under "Means For
21   Implementation of the Plan."  It says that once the plan goes
22   effective, the Debtor's going to make a motion and it's going
23   to close the subsidiary cases provided that the causes of
24   action are transferred to the Trust and that anything that
25   could happen in those cases, any dispute, any claims

1    objection, and attorney who must get paid, all that stuff can

2    continue to proceed.  So that's in the Plan.

3         The Debtors then made a motion pursuant to that

4    Section W, and that resulted in the -- in the Final Decree.

5    And Your Honor's correct that Section 5 does say that entry of

6    the Final Decree is without prejudice to what Your Honor read.

7         But there's a lot of other clauses in this order as

8    well which, you know, is an order of the Bankruptcy Court of

9    what it thought it was doing.  Paragraph 3, "Notwithstanding

10   anything to the contrary in this Final Decree, all the terms

11   and conditions of this decree, of this Final Decree are

12   subject to the occurrence of the effective date and the

13   transfer of all Litigation Trust assets to the Litigation

14   Trust."

15        In Paragraph 4 it says that the remaining matters --

16   I'll tell Your Honor where you can find that definition --

17             THE COURT:  Right.

18             MR. SAMET:  But --

19             THE COURT:  Defined term.

20             MR. SAMET:  -- it's a defined term which you have to

21   go back to the motion to see what it says.  Paragraph 16 of

22   the motion for the Record, I found it in preparing for this

23   hearing.  It says the remaining matters, they're going to

24   continue to be brought and they can be brought into the

25   parent's, 100 percent parent's bankruptcy case.

1           THE COURT:  And remaining matters, finding that

2    definition, it pertains to --

3           MR. SAMET:  Is in Paragraph --

4           THE COURT:  -- the fraudulent transfer claims?

5           MR. SAMET:  The remaining matters, the remaining

6    matters -- well, the fraudulent transfer claims are assigned

7    out of the estate to the Trust.  And actually in this

8    Paragraph 16 of the motion, it's a longer sentence, I hate to

9    read it in, but it -- we submitted in our papers, it actually

10   says, I'll paraphrase and the Court can look at it.

11          THE COURT:  Okay.

12          MR. SAMET:  It says, the sentence says, "Although

13   the Debtors don't anticipate further contested matters in the

14   closing cases, since such matters will, as of the effective

15   date have been transferred to the Litigation Trust for

16   prosecution and resolution by the Trust.  Miscellaneous

17   motions, applications, pleadings, objections, other matters or

18   proceedings may arise, that's then defined as remaining

19   matters."

20          So included in the definition of remaining matters

21   is that the causes of action are going to be transferred to

22   the Trust.

23          And then finally I would direct further in the Order

24   of the Court, actually in Paragraph 7, not only when it closes

25   a case it directs the Court to make a docket entry on the case

1       that says, "An order has been entered directing that all

2       further reporting concerning the administration of this case

3       will occur in the Cornucopia matter, and that docket should be

4       consulted for all matters affecting the case."

5            Similarly, Paragraph 12 also says, again a more

6       catch-all paragraph that says, "Nothing in this decree shall

7       be deemed a waiver of the rights of closing Debtor nor the

8       Trust or a waiver of any claims held by the closing Debtors or

9       waiver or limitation of the rights of the Debtors or any other

10      parties in the case."

11          So our point is, Your Honor, A, in no sense is the

12      case closed, the, A, 100 percent parent is clearly open, B,

13      it's a joint plan, C, the Order says it's not affecting the

14      Trust.  In fact, it's conditioned on the fact that the

15      Litigation Trust is going to bring the claims.  And we would

16      say that this is simply seeking a windfall result from that --

17          THE COURT:  Okay.

18          MR. SAMET:  -- that -- but if I could just say one

19      thing about Judge Isgur's decision, I appreciate the argument

20      that he's interpreting his own Order, but it's the same issue

21      and it's interesting this is apparently the only case I'm

22      going to find dealing with this exact issue, it's a recent

23      case, and Judge Isgur followed the same logic as what we're

24      saying here.

25          Thank you.

1          THE COURT:  All right.  Thank you.  You were going

2    to go on to the --

3          MR. SAMET:  Oh, yes.

4          THE COURT:  -- other substantive arguments.

5          MR. SAMET:  I'm sorry, Your Honor.

6          THE COURT:  That's okay.

7          MR. SAMET:  I'm sorry.  I'll get my -- my notes.

8    Yes.  I understand that counsel and say first -- I'm going to

9    address them in this order, first that the complaint in

10   conclusory allegations about fraudulent intent and the

11   solvency of the Debtor.  And that's just not true, that's not

12   true.  The fraudulent intent of the Debtor I would argue is

13   specified -- is pled with specificity in the complaint and I

14   would remind the Court that under both the Texas law and

15   federal law, it is the actual intent to hinder and delay and

16   defraud creditors of the Debtor.  That's the intent you need

17   to specify.

18          And I think the complaint goes into great detail

19   about how the parties here were seeking to divert resources,

20   to mislead investors, to mislead secured lenders, to do all

21   manner of statements and when pleading in order to -- in order

22   to divert monies from the company and ensure that therefore

23   the creditors couldn't be paid back.  So I think the

24   fraudulent intent is pled with specificity.

25          With respect to solvency, I have -- I also think

1    it's pled with specificity, although I would say that no one

2    has argued that solvency -- solvency can be pled, it's a fact,

3    it can be pled very simply in a complaint.  It's subject to

4    8(a) and it's a fact.

5          But we actually do plead solvency with specificity.

6    We go through -- we go through in Paragraphs 42 to 54 of the

7    complaint how Fury had to borrow hundreds of millions of

8    dollars in order to develop these reserves.  And then we --

9    throughout the rest of the complaint we -- there and in the

10   disloyal transactions and inflated gas actions, we say that

11   Fury was unable to make this money back, such that equity

12   would have a recovery.  So that's -- that I would say is more

13   than enough to plead solvency, and I can direct the Court to

14   the specific paragraphs.

15         If I could make on parenthetical statement that just

16   I remember to say and it's for the Court's convenience, the

17   way we amended the complaint, we just amended it to deal with

18   the merger issue to avoid moving the paragraphs around for the

19   initial briefing, we stuck it all at the end.  So the only

20   thing that changes from the paragraph numbering is the claim

21   section.

22         Last I want to turn to the argument about the

23   specific monthly amounts that were paid to the Cogan firm.

24   You know, it's our theory that those -- it's not our theory

25   that Stone Pigman received those monies, and we've alleged

1     they were paid to Nunes or the Cogan firm, you know, it's our

2     theory that Cogan -- I'm sorry, that Stone is the successor-

3     in-interest to Cogan and --

4            THE COURT:  And when you say the monthly, are you

5     talking about the 50,000 or the 12,000, or both?

6            MR. SAMET:  Both, Your Honor.

7            THE COURT:  Well, at 50,000 --

8            MR. SAMET:  Let's see, 50,000 went to Nunes is what

9     I thought.

10           THE COURT:  Right.

11           MR. SAMET:  And the 12,000 went to -- and that's

12     right, that's what it says.

13           THE COURT:  Okay.

14           MR. SAMET:  That's correct.  It's our position that

15     Stone Pigman is liable for those, is only liable as the

16     successor-in-interest.

17           THE COURT:  Okay.  Successor-in-interest for $50,000

18     paid monthly directly to Nunes when he's -- for work he's

19     doing when he's funded as general counsel.  Is that -- that's

20     the theory?  Because it doesn't sound to me like that money is

21     moving either through Cogan or Stone Pigman and then to Nunes.

22     It sounds like Nunes is over here and he's being paid over

23     here and it really doesn't have -- whether or not that payment

24     should be made is a different question, it's a question of

25     whether Stone Pigman had anything to do with that as a

1     successor or not.

2              And it just sort of seems like if Nunes was funded

3     over there on that, there's not a -- you got that claim as him

4     I would think, you may have arguments -- you may have argument

5     on that elsewhere in my flow chart here, but I'm just sort of

6     saying in terms of what it means as to Stone Pigman, how does

7     that connect up?

8              MR. SAMET:  To be fair, Your Honor, I think that's

9     right, I think I do agree with that.

10             THE COURT:  Okay.  All right.

11             All right.  And so then -- and let me ask this,

12    there's the $12,000 per month payments and then there's just

13    an $843,000 claim.  And can you specify for me what those were

14    for?

15             MR. SAMET:  Yes, hold on one moment.

16         (Pause in the proceedings.)

17             MR. SAMET:  All right.  The $843,000 was paid

18    directly to Stone Pigman.

19             THE COURT:  The 843,000?

20             MR. SAMET:  Yes.

21             THE COURT:  And what was that -- what was -- what

22    did that pertain to?

23             MR. SAMET:  Well, I believe that pertained to Stone

24    Pigman's invoices that they sent to Fury.

25             THE COURT:  Okay.

1          MR. SAMET:  Now there's been some disagreement even

2     in the briefing on this issue as to whether that was for the

3     general counsel's services or whether that was the fixed

4     amount or for the general counsel's services.  I believe

5     that -- by the way, I don't want to be coy about the

6     invoices -- I believe there's a portion of it that is fixed

7     and a portion of it that varies on the invoices.  And our

8     argument is that -- is that Stone Pigman is liable both in

9     constructive fraudulent transfer, I would -- well, all

10    fraudulent transfers and as disgorgement of fees.

11          I think that those invoices need to be characterized

12    as legal work, if that's what Your Honor is asking.

13          THE COURT:  All right.  So the $843,000 is for legal

14    work performed along the way?

15          MR. SAMET:  Yes, Your Honor.

16          THE COURT:  And -- okay.  And what about that makes

17    it a fraudulent transfer, what -- connect that up for me.  I

18    just don't sort of -- from the complaint I'm not sure I really

19    quite found what that $843,000 represented.  But so it's legal

20    fees which would then kind of depend on, okay, what's going

21    into those fees to then determine whether or to it fits the

22    elements to make out a fraudulent transfer claim?

23          MR. SAMET:  Well, but what we've alleged, Your

24    Honor, is that -- is that -- let me take one at a time, on

25    the --

1          THE COURT:  Yeah.

2          MR. SAMET:  -- actual fraudulent transfer I mean,

3     we've alleged --

4          THE COURT:  Yeah.

5          MR. SAMET:  -- I mean, very bluntly that all the

6     money that went out to these insiders, whether it went to them

7     directly or whether it went to their firm, is recoverable

8     because of the actions that they were engaging at the time.

9          THE COURT:  Right.

10         MR. SAMET:  We say you guys have -- these were all

11    parts of the ways to strip a company; otherwise, couldn't pay

12    back to creditors.

13              And on the constructive side of it, our argument --

14         THE COURT:  Well, so I got -- so it's $843,000

15    submitted as invoices for legal work --

16         MR. SAMET:  Yes.

17         THE COURT:  -- and you're just saying it wasn't

18    legitimate legal work.

19         MR. SAMET:  Well, no, I'm not saying that it wasn't

20    legitimate legal work.  I'm saying that the -- and I believe,

21    Your Honor, the complaint explains.  I mean, the missing part

22    of it is -- the difficulty comes is that it's both a fixed

23    amount for Mr. Nunes's succumings and for legal work.

24         THE COURT:  Okay.

25         MR. SAMET:  And our theory is that all of it needs

1   to come back.  I mean, I understand Your Honor's skepticism of
2   this point, but on this point I believe --
3               THE COURT:  No --
4               MR. SAMET:  -- I do respectfully --
5               THE COURT:  -- no, I was skeptical of the $50,000.
6   On the 843,000 I'm just sort of like I just don't understand.
7   It's not skepticism, it just like I just don't know what it
8   connects to.
9               MR. SAMET:  It --
10              THE COURT:  And it may be -- and the question here
11  is, motion to dismiss, is it pleaded well enough for you to
12  get through to some discovery where it then comes back to me
13  with what it was actually for and I can make a decision at
14  that point as to whether or not it's something you're able to
15  try to get back.
16              MR. SAMET:  Well, and if I could just respectfully
17  address that, that last point.  And we are (indiscernible),
18  but even if 9(b) applies to actual fraudulent transfers, it
19  only applies to the intent of the Debtor in doing the fraud,
20  and that we rely heavily on I think Judge Godfrey's
21  decision --
22              THE COURT:  Okay.
23              MR. SAMET:  -- and in the (indiscernible) case about
24  that.  I believe we've pled that here.  And for constructive
25  fraudulent transfer I would propose that it's only subject to

1    8(a) and that these are fact defenses, that they want to come

2    in and say, "No, we got the value regardless of what was going

3    on for our -- for that money."

4              THE COURT:  Okay.  Yeah.

5              MR. KRYDER:  Your Honor, I heard Mr. Samet --

6              THE COURT:  (Indiscernible).

7              MR. KRYDER:  -- concede, as he must, that he's pled

8    that the first $50,000 a month --

9              THE COURT:  Right.

10             MR. KRYDER:  -- went to Mr. Nunes, not to Cogan, as

11   part of a succumbent, and a succumbent means he's their

12   employee, not Cogan's, not Stone Pigman's.

13             THE COURT:  You got -- don't look any further, you

14   got that already --

15             MR. KRYDER:  I understand.

16             THE COURT:  -- when I was talking with you, so.

17             MR. SAMET:  The 843,000 is the continuation of the

18   $50,000 payments for the benefit of Mr. Nunes.  The complaint

19   at Paragraphs 38, 105 and 191 alleges that Nunes' succumbent

20   and the payments directly to him continued after he joined

21   Stone Pigman on January the 1st, 2017.  And so, Your Honor --

22             THE COURT:  And so is that $843,000 also succumbent

23   payments?

24             MR. KRYDER:  So it's the $50,000 a month, which are

25   part of his compensation as part of the succumbent, continued

1    on --

2              THE COURT:  But that is the -- that's the -- it's

3    invoices that have that legal services, it's as to

4    Mr. Nunes --

5              MR. KRYDER:  Mr. Nunes.

6              THE COURT:  -- and his succumbent.

7              MR. KRYDER:  As the purported general counsel.  So

8    that continued.

9              THE COURT:  Okay.

10             MR. KRYDER:  And --

11             THE COURT:  Let me just get clarification on that.

12             MR. KRYDER:  Okay.

13             THE COURT:  So that in your pleading is that -- is

14   that -- so I mean, there's the $50,000 that's specified one

15   way, then there's just this $843,000.  Is that an accurate

16   understanding of what he pleaded, or is it not?

17             MR. SAMET:  The $50,000 a month continues.  There is

18   the issue, and the problem is, and I'm sorry for --

19             THE COURT:  But you think there may be other stuff

20   balled into the --

21             MR. SAMET:  There --

22             THE COURT:  -- 843,000?

23             MR. SAMET:  -- certainly is.  At the previous firm

24   he gets $50,000 a month directly and his law firm bills the

25   company.

1              THE COURT:  Okay.

2              MR. KRYDER:  Stone Pigman, all right, under this is

3      partial succumbent, he gets -- the party invoices are

4      absolutely the $50,000 a month, and then there are other costs

5      in there.  I presume those are for legal services or some sort

6      of similar --

7              THE COURT:  So you're saying anything that's beyond

8      the $50,000 continuation --

9              MR. SAMET:  Well --

10             THE COURT:  -- is what you're entitled to.

11             MR. SAMET:  -- with respect to the $50,000 that

12     Stone -- Stone Pigman is the recipient and the initial

13     transferee of those funds.  And if they don't want to assert

14     the affirmative defense that there's a conflict --

15             THE COURT:  So you're saying once Stone Pigman --

16             MR. SAMET:  Yes.

17             THE COURT:  -- once he moved to Stone Pigman the

18     payments were made to Stone Pigman and Stone Pigman is the one

19     that's paying out to Nunes or whoever?

20             MR. SAMET:  Or whoever.  But that's right.  We

21     know -- all we know is that --

22             THE COURT:  Okay.

23             MR. SAMET:  -- payments were made to Stone Pigman.

24             MR. REASONER:  The only other point I would make,

25     Your Honor --

32

1              THE COURT:  And is that accurate that it was

2       understood it's going -- $50,000 is continuing to go to

3       Mr. Nunes, but was that a change that it's like it's now that

4       is money that's moving through Stone Pigman as an accounting

5       matter?

6              MR. KRYDER:  As an accounting matter it went

7       through --

8              THE COURT:  Okay.

9              MR. KRYDER:  -- Stone to -- Stone Pigman and then to

10      Mr. Nunes for the continuation --

11             THE COURT:  Yeah.

12             MR. KRYDER:  -- of his succumbent arrangement.

13             One thing that I respectfully disagree with

14      Mr. Samet, Stone Pigman has not alleged to be an insider.  And

15      indeed, Your Honor, we're not alleged to be a conspirator, an

16      aider and abetter, an insider, there's no punitive damages or

17      attorneys' fees claim against Stone Pigman.

18             The other thing that I disagree with Plaintiff's

19      counsel is the idea that anyone was misled about what was

20      happening with this company.  Creditors weren't misled about

21      attorneys' fees being paid to Mr. Nunes, either when he was

22      associated with Cogan & Partners or when he was at Stone

23      Pigman.  No one has alleged that the fees were paid with

24      fraudulent intent or that fees and overhead payments were not

25      reasonably equivalent.  I mean, those are absolutely

1      conclusory.

2                    And again, ultimately the payments to a succumbent

3      person mean they're really to their own employee --

4                    THE COURT:  Right.

5                    MR. KRYDER:  -- not to Stone Pigman and never to

6      Cogan & Partners.

7                    THE COURT:  And what is the $12,000 a month?  That

8      was part of -- you said it was for use of furniture,

9      et cetera?

10                   MR. KRYDER:  This was for office -- apparently

11     for --

12                   THE COURT:  For supplies?

13                   MR. KRYDER:  -- office --

14                   THE COURT:  Staff?

15                   MR. KRYDER:  -- overhead, as opposed to something

16     that was booked as attorneys' fees.  The rest of it was for

17     attorneys' fees, services for Mr. Nunes who -- it's their

18     pleading that he continued to be seconded as the purported

19     general counsel of Fury.

20                   THE COURT:  Okay.

21                   MR. SAMET:  And if I can just --

22                   THE COURT:  Yeah.

23                   MR. SAMET:  -- if -- we're a little bit beyond the

24     complaint now, if Stone Pigman proves their affirmative

25     defense that they're a mere conduit --

1           THE COURT:  Right.

2           MR. SAMET:  -- for these monies and that Mr. Nunes

3     is the true initial transferee, that's -- we'll take that up

4     with Mr. Nunes.  That will be the defense that they will have

5     to --

6           THE COURT:  Are you saying that they -- so, yeah,

7     it's sort of like you're prepared to concede that if the

8     evidence proves it out that way, but you haven't seen it yet.

9           MR. SAMET:  I haven't seen it yet, and to be frank,

10    I'm slightly skeptical that --

11          THE COURT:  Yeah.

12          MR. SAMET:  -- Mr. -- that again, just Stone Pigman

13    -- in fact, they're Stone Pigman invoices, I'm pretty sure we

14    specified that in here.  But these are monies that go to Stone

15    Pigman.  All right?  I'm skeptical they got $843,000 and

16    turned over 100 percent of that to Mr. Nunes.  It's possible,

17    Your Honor, I understand what counsel's saying, but I haven't

18    seen it.

19          MR. KRYDER:  But there's no skepticism prior to

20    January 1, 2017.  So since those fees never went to Cogan,

21    there's nothing to which Stone Pigman could be a successor --

22          THE COURT:  Okay.

23          MR. KRYDER:  -- and we haven't even gotten to

24    *respondeat superior* --

25          THE COURT:  Well, we're going -- yeah, I have

1      that --

2              MR. KRYDER:  But so those funds, those funds, to the

3      extent they went to Mr. Nunes, they can never be recovered

4      prior to January 1 of 2017 against Stone Pigman.  Those fees

5      are out. However, many millions of dollars --

6              THE COURT:  Yeah.

7              MR. KRYDER:  -- those fees are out for the reasons

8      that we've indicated, and I think for the reasons that counsel

9      has conceded.

10             THE COURT:  Okay.  All right.  I'm going to have to

11     look at this -- this little set of issues that we're talking

12     about, but why don't we -- I have way down the line the

13     successor liability that we're talking about.  Why don't we go

14     ahead and address that now though, because I think it pertains

15     to -- it pertains to some other things too, but it's obviously

16     on point with these --

17             MR. KRYDER:  Thank you, Your Honor.

18             THE COURT:  -- arguments.

19             MR. KRYDER:  So, --

20             THE COURT:  Yeah, so go ahead.

21             MR. KRYDER:  So, Your Honor, I think just to put

22     this in perspective, no Texas, Louisiana or other court has

23     held a law firm retroactively liable for laterally hiring a

24     lawyer as pled here.  What the Plaintiff's seeking --

25             THE COURT:  And it's Texas law applies, not

1       Louisiana law.  I know we have that --

2               MR. KRYDER:  We have --

3               THE COURT:  -- as a threshold dispute.  Right,

4       Mr. Samet?

5               MR. KRYDER:  Yes, so what you have out on successor

6       liability -- I will answer the question on Texas law, let me

7       just -- to set the stage.  Because they have failed to plead

8       vicarious liability for Mr. Nunes at -- while he was at Cogan,

9       they all alleged that anything he did was in the course and

10      scope of working for Cogan Partners.  Instead, they say that

11      he was purportedly self-dealing and received interest in

12      purported middle man companies.

13              Cogan & Partners has no interest in the attorneys'

14      fees, the middle man companies or the purported self-dealing.

15      And obviously Mr. Fogler and Mr. Nunes dispute all that, but

16      taking their allegations what they've said is he was

17      succumbent, which means he's Fury's employee, he was self-

18      dealing which means it's for his benefit.  They've not pled

19      course, scope or vicarious liability as to Cogan, and Cogan

20      did not receive the fees.  So there's -- initially there is

21      nothing for -- that no liability that Cogan had that could be

22      passed along under any circumstance to Stone Pigman.

23              Now on the choice of law course of issues we believe

24      that Texas law applies here.  The only relationship that is at

25      issue here between Fury, Mr. Nunes and two law firms based in

1    Texas.  They allege that Fury, based in Galveston County,

2    received legal services in Texas from Mr. Nunes, a Harris

3    County resident, while working at two Houston law firms.  They

4    allege at Paragraph 22 -- 21 and 2 -- or 22 of the petition --

5    or complaint that Stone engaged in business in Texas, it was

6    registered to transact business in Texas, and importantly,

7    Your Honor, they say the causes of action against Stone Pigman

8    arose in Texas.  They're seeking to recover under Counts 3, 4

9    and 12 under Texas law.

10           So Texas rejects successor liability by statute and

11   expressly says that a domestic entity, here Stone Pigman, a

12   limited liability company, acquired some furniture, fixtures

13   and equipment of a Texas LLP, Cogan & Partners.  And Texas

14   Business Organization Statute 10.254 cited in our motion at

15   Page 20 says that the acquisition of all or part of the

16   property of a domestic Texas entity is not a merger for any

17   purpose.

18           And so what the Plaintiff is trying to do is say:

19   Even though we're asserting Texas law claims against Texas

20   residents based on legal services received here by a company

21   based here, and your order of yesterday expressly said that

22   look at the Texas-centered contacts and interests of the State

23   of Texas.  What they're saying is: Forget about all that,

24   Judge Eskridge.  Instead, look at the agreement between Cogan

25   & Partners and Stone Pigman which says,"We have a choice of

1    law provision governing our own relationship, not the

2    relationship with third parties, and we'll specify Louisiana

3    law on that."

4         But the Plaintiff wants to ignore the rest of it

5    where it says we're not assuming any liabilities, where it

6    says that they are not acquiring the intellectual property of

7    Cogan & Partners, where they say that Cogan & Partners retains

8    its accounts receivable.  It retains the files of clients who

9    did not decide to go to Stone Pigman.  Cogan remained an

10   active Texas limited liability partnership for four and a half

11   more years filing returns -- reports with the Secretary of

12   State.

13        And so this is a circumstance unlike any other in a

14   choice of law where --

15             THE COURT:  Yeah.

16             MR. KRYDER:  -- the Plaintiff wants to say:  Forget

17   about everything else and I want to take this one issue.

18             THE COURT:  Why did they -- why was Louisiana law

19   selected?

20             MR. KRYDER:  Stone Pigman --

21             THE COURT:  It's based in --

22             MR. KRYDER:  -- has been based in New Orleans --

23             THE COURT:  -- New Orleans.

24             MR. KRYDER:  -- for 80 years.

25             THE COURT:  Yeah.

1          MR. KRYDER:  So it's not a newly created entity --

2          THE COURT:  Okay.

3          MR. KRYDER:  -- and so they chose Louisiana law for

4     their membership or other agreements with the --

5          THE COURT:  Yeah.

6          MR. KRYDER:  -- two individuals that joined the firm

7     under various agreements.

8               So we don't think that when Mr. Nunes laterally

9     joined an existing limited liability company, that in any way

10    he could impose on Stone Pigman liability that Cogan &

11    Partners itself never had for attorneys' fees or alleged self-

12    dealing or anything else.

13              And the cases that the Plaintiff cites really do

14    not -- do not support any successor liability.  They're trying

15    to allege estoppel that Mr. Nunes said to somebody at Fury:

16    Hey, I -- these firms are merging and I'm going to continue to

17    serve you.  It's chronologically impossible for an email

18    statement by Mr. Nunes in 2017 to be relied upon by Fury,

19    anyone at Fury for work that Mr. Nunes did on his own behalf

20    while succumbent from 2011 to 2016.

21              And so importantly I think the Court should look at

22    the Texas law that says there is no successor liability --

23              THE COURT:  Right.

24              MR. KRYDER:  -- look at the agreement that says they

25    assume no liability and that Cogan shall continue to maintain

1    its existence and insurance, and reject the notions of

2    equitable estoppel or *de facto* merger.

3          And finally, our view of the Louisiana cases the

4    Plaintiff cites it's ultimately an act of desperation by the

5    Plaintiff to try to assert everything under Texas law and --

6          THE COURT:  So in the purchase agreement, you know,

7    the one up for its Louisiana law which is then a hook to try

8    to use the Louisiana doctrine on continuation or *de factor*

9    merger.  It selects Louisiana law, I hadn't focused it,

10   there's a clause in there that says:  We're expressly not

11   assuming liabilities --

12         MR. KRYDER:  Yes.

13         THE COURT:  -- of Cogan Partners?

14         MR. KRYDER:  That is in -- it is in our motion, Your

15   Honor.  And so it expressly -- the agreement which is attached

16   as Exhibit 3, Paragraph 6.2(b) expressly states that except

17   for leases for office space and some office equipment, Stone

18   assumed no liability to Cogan -- none.

19         THE COURT:  Yeah.  So it's -- and I'll take this up

20   with Mr. Samet, but I understand the selecting Louisiana law

21   between these firms.  You would think, well, then as to the

22   potential for liability between them we've looked at Louisiana

23   law, or liability to others you would look at how it might

24   succeed between them, but it would be hard.  And if it's a

25   choice of law issue, and so I'm wrestling with, well, if I go

1    with, well, Louisiana law applies, I'm pulling that clause

2    from a contract, I think I'd have to kind of look at

3    everything else that's in it.  Like even if I go with

4    Louisiana law, if I decide to do that, it would come with your

5    argument that, okay, well, then apply the clause that says

6    there's no acceptance of liabilities.

7                    MR. KRYDER:  But it sounds like --

8                    THE COURT:  But that's like between them and I don't

9    know how that fits with third party complaints that are being

10   brought against them.  But --

11                   MR. KRYDER:  I hear the Court saying that you have a

12   flow chart, which is awesome --

13                   THE COURT:  Yeah.

14                   MR. KRYDER:  -- but if you start at the flow chart

15   back in time, you have Mr. Nunes purporting to be over here as

16   succumbent --

17                   THE COURT:  Well, this is a time line, not a flow

18   chart --

19                   MR. KRYDER:  Okay.

20                   THE COURT:  -- that you're doing.  Okay.

21                   MR. KRYDER:  Okay.  Well, then on the time line look

22   at is this way, he is receiving fees on his own as a seconded

23   purported general counsel.  The fees --

24                   THE COURT:  Right.

25                   MR. KRYDER:  -- are not here with Cogan.  So on the

1      timeline there's nothing for which -- there's -- Cogan has no
2      liability which could -- to which Stone Pigman down the
3      continuum could be liable.  So for the reasons that they can't
4      be liable --
5                     THE COURT:  That's --
6                     MR. KRYDER:  -- for all that --
7                     THE COURT:  -- that's even -- yeah, I understand.
8      That's like another -- that's like a wholly separate reason
9      why you're saying this doesn't --
10                    MR. KRYDER:  It doesn't matter.  In other words --
11                    THE COURT:  -- put you on the hook.  I got that.
12     No, I understood that argument already.
13                    MR. KRYDER:  And then -- and so if the Court were to
14     look at the -- only three cases that the Plaintiff cites
15     actually upheld the notion of successor liability.  One was
16     called *Travis Edwards*, cited in their brief, and it upheld
17     successor liability for a mortgage where someone sold the
18     encumbered building to the Debtor's parent company subject to
19     the mortgage.  That's not what we have here.  So that's a
20     contract case, successor mortgage -- successor liability for a
21     mortgage were the related companies there.
22                    THE COURT:  Yeah.
23                    MR. KRYDER:  The *Hollowell* (phonetic) case they cite
24     was successor liability for WARN Act claims where a factory
25     was shut and they didn't pay the employees, but the successor

1    company kept the same business.  So it was a federal statutory

2    WARN Act claim very, very different than trying to find a

3    common law Louisiana successor liability.

4         And finally the *Giles* case it was purported

5    liability on a contract where they either expressed later or

6    implicitly agree to assume liabilities, not what we have here.

7         So respectfully we'd urge the Court to find there's

8    no successor liability for the variety of reasons we've argued

9    this morning and noticed in our brief.

10         THE COURT:  Okay.  Mr. Samet.

11         MR. SAMET:  Thank you, Your Honor.  All right.  I

12    have a lot to disagree with, and I have --

13         THE COURT:  Yeah.

14         MR. SAMET:  -- a presentation.  First, the choice of

15    law.  All right.  We think it's -- it's not something we came

16    up with.  Federal Courts apply choice of law for each state.

17    We cite, Your Honor, three recent Texas District Court

18    decisions from the Southern District, the Western District and

19    the Northern District.

20         All right.  If you want to talk about you're buying

21    some corporations, all right, you're going to look that the

22    agreement's choice of law provision controls the applicability

23    of successor liability documents.  That's the law.  It's not

24    something we created.

25         THE COURT:  Right.

1          MR. SAMET:  And I don't really see a lot of

2     opposition to that principle in the brief, other than maybe it

3     shouldn't be the law.  But it is the law, and so read it for

4     what Your Honor said.  The substantive acts, substantive acts

5     are governed by the state that you're in.  People need to know

6     what acts are governed when people are doing that.  We've been

7     consistent that's Texas.

8          But successor -- if you want to know whether -- how

9     we interpret this contact, whether people can have a *de facto*

10    merger and call it something else, Texas says you look at the

11    party's choice of law, because the two of them had the ability

12    to pick whatever law they wanted.  They're both law firms, so

13    presuming they could have thought about it and they chose

14    Louisiana to govern.

15         Number 2, under Louisiana law you can't just put in

16    the contract that you're not going to have any liability.

17    There's a *de facto* merger doctrine.  And I, going a little out

18    of order, I disagree we only have three cases, I didn't count

19    them, but I thought we had almost a dozen cases of denying

20    summary judgment, granting successor liability at trial,

21    denying motions to dismiss, it's a fact-intensive basis.

22         All right.  Louisiana says -- Louisiana says look at

23    the contract as a whole.  This is not a lateral -- the term

24    laterally moving over.   It's simply not what the agreement

25    is.  And we detail this in the paragraphs in our complaint.

1      They purchased the entire company, the whole stock and barrel,

2      any lawyer could continue on practicing.  All the equity

3      requirements are continued on, became requirements of the new

4      firm.  All the associates, all the support staff, all the

5      contacts were taken, even the water cooler contract was taken,

6      the clients were taken.

7               And we say -- and this is I think where Louisiana

8      law has these factors, we meet all of those factors as to

9      why -- and those factors by the way are -- if Your Honor looks

10     at the cases, they're not on motions to dismiss.  Some of them

11     are even at trial, they're not even summary judgment issues.

12     So that's why we say they have successor liability under

13     Louisiana law even though the underlying causes of action are

14     under Texas law.

15               Now with respect to some of the specific -- see,

16     this was have to go back to some of the specific claims

17     because I disagree with how they're being interpreted.  First,

18     Nunes got $50,000 a month.  Cogan Partners also was just paid,

19     was received fees.  That's what the complaint says.  All

20     right?  I'm sorry, Cogan Partners, I think I said Nunes

21     Partners.  Cogan Partners received fees as well.

22               The scope of control, we briefed this as well.  It's

23     a partial succumbent, it's not a full succumbent.  Texas law

24     made clear you look to what level of control the corporation

25     has.  Nunes is an equity partner at Cogan & Partners, he's an

equity partner at Stone Pigman, and fundamentally rejected the
idea that Stone Pigman, an apparently 8-year-old law firm, is
like a hospital overseeing the actions of an orderly.

They are responsible, and we've argued that they're
responsible for Nunes's actions directly in these agreements,
of their partner.  And that's especially -- and we have
instances in here where both Cogan Partners and Nunes are both
operating and dealing with different matters.  Yes, Nunes is
supporting, he has the dual hat of both being an interested
party in these actions of only some of the shell -- not shell
entities, but middle man entities, all right, and providing
legal services where he has an independent fiduciary
obligation to Fury.

With respect to the -- I think that counsel -- the
little -- a little bit of the public statements out then and
statements to Fury.  Again, the second news articles to Your
Honor, both the general partner, Cogan Partners and the
general partner of Stone Pigman both publicly said we're
merging.  And that's the long -- I think we quote it in the
complaint.  Nunes wrote to Fury, says:  We're about to issue a
public announcement of our merger.  Don't worry, nothing's
going to change except for -- except your retainer is going to
be transferred over.

And again, I say an attorney, before he transfers it
over, that file, has an obligation to say, oh and by the way,

1   even though we're calling it a merger and I'm telling you

2   explicitly that nothing's going to change, oh, by the way, I'm

3   leaving all the liabilities that I might have, sure, I'm

4   leaving in this other company even though it's not going to

5   have any lawyers, any lease, no water cooler contract, no

6   phone number, that went to Stone Pigman, too -- nothing.

7           And so we saw the contract, we saw what was raised

8   by counsel, we've amended the complaint and that's why -- that

9   is why we this issue, Your Honor.

10          THE COURT:  Okay.  All right.  All right.

11          All right.  Let's go back to -- further on

12  fraudulent transfer.

13          Mr. Van Stephoudt and Mr. -- is it Hryck or Hryck,

14  who's --

15          MR. REASONER:  Oh, oh, I'm sorry.  Hersick

16  (phonetic).  Yeah, this is --

17          THE COURT:  Hersick (phonetic).

18          MR. REASONER:  -- an odd spelling, Your Honor.

19          THE COURT:  That --

20          MR. REASONER:  Hersick (phonetic), yes.

21          THE COURT:  Well, it's -- okay.  H-R-Y-C-K, it's --

22  but it's Hersick (phonetic).

23          MR. REASONER:  H-R-C-Y-K.

24          THE COURT:  C-Y-K.  Then, all right -- that's why,

25  I've got it wrong here.  Okay.  Hryck.

1           All right.  Mr. Hryck and Mr. Van Stephoudt, I did

2     receive a qualified transfer, I have that and subsequent

3     transferee defense on the actual fraudulent transfer claim.

4           MR. REASONER:  Yes, Your Honor.

5           THE COURT:  All right.

6           MR. REASONER:  Your Honor, the actual fraudulent

7     transfer claims against both gentlemen fail in a couple of

8     ways.  First, they are -- it's admitted by the other side that

9     they are not initial transferees, they did not receive these

10    payments, neither of these gentlemen.  That's admitted in

11    their response.  Under Texas, looking at the Texas piece of it

12    the actual fraudulent transfer law does not apply to a

13    subsequent transferee, period.  There is no good faith

14    requirement.

15          When you look at that language and a plain reading

16    of the Texas Business and Commerce Code, Your Honor, 24.009(a)

17    which applies here, it just says plainly it is not -- a

18    transfer is not avoidable against a subsequent transferee,

19    period, full stop.

20          Now what the other side is trying to do here, Your

21    Honor, is to attempt to rely on (b)(2), 24.009(b)(2) to impose

22    a good faith requirement there.

23          But that has different language and it only applies

24    under -- I'm sorry to keep bouncing around in these statutes

25    but 24.008(a)(1) which applies to actions by creditors.  Here

1    the Plaintiff has explicitly said:  We are bringing the claim

2    on behalf of the Debtor, and they cite explicitly in the

3    heading of their claim, 24.005(a) for those claims.  And

4    that's what takes you to 24.009(a) which says there's no good

5    faith requirement.  Simply a subsequent transferee cannot be

6    held liable, period.  That's that issue, Your Honor.

7             THE COURT:  Okay.

8             MR. REASONER:  The other issue as to the actual

9    fraudulent transfer of claim, Your Honor, is the way that

10   they've pled it.  In Paragraph 172 of the petition, they

11   simply allege that Van Stephoudt, Hryck, or the firm, Reed

12   Smith, received X amount of payments, and they didn't say, "To

13   the extent payments were made to Reed Smith, either Van

14   Stephoudt or Hryck received some origination credit or

15   compensation based thereon."

16            And this is the type of hypothetical pleading, Your

17   Honor, that's just not sufficient.  When you look at the *Iqbal*

18   case for example, Your Honor, it says when the pleading does

19   nothing more than permit the Court to infer the mere

20   possibility of misconduct, then the complaint has alleged but

21   it has not shown that the pleader is entitled to relief.  And

22   that's the issue there, Your Honor.  They have not pled

23   anything with adequate specificity on that point as to these

24   transfers.  So that is the issue --

25            THE COURT:  But is your -- it does plead that they

1    received origination credit for that?

2         MR. REASONER:  Well, it says one or the other of

3    them did, alternative.  It says either Hryck or Van Stephoudt

4    received some sort of credit.  But again, this is -- it's not

5    affirmatively making a statement, it is just pleading

6    hypothetically and in the alternative as to who might have

7    received it.  We don't believe that's adequate under the law.

8         THE COURT:  But I mean, I can understand what

9    they're specifying there.  They're not saying which of them

10   got origination credit, they're saying one or the other.  If

11   one or the other -- if the facts proved out that one or the

12   other got origination credit for that, is that something that

13   would bring them potentially within the sphere of liability

14   here?

15        MR. REASONER:  You would still have the original

16   problem I identified, Your Honor --

17        THE COURT:  Well, I understand that.

18        MR. REASONER:  -- that they're not --

19        THE COURT:  I'm not --

20        MR. REASONER:  -- an original transferee.

21        THE COURT:  -- I'm sort of focusing on --

22        MR. REASONER:  But if that were explicitly pled on a

23   good faith basis, then that would be adequate I think to get

24   over the hurdle.

25        THE COURT:  Because that's the thing, it is being

1   pleaded and so what do you have -- and I don't -- why is there

2   not a good faith basis for him to be saying one or the other

3   got origination credit for that?

4           MR. REASONER:  Well, I think it's simply the way it

5   is pled, Your Honor, in an alternative hypothetical way as

6   opposed to an affirmative declaration or pleading that that

7   took place.

8           THE COURT:  Okay.  What is Mr. Van Stephoudt's

9   relationship to Reed Smith?

10          MR. REASONER:  He was an economist consultant who

11  worked for Reed Smith.

12          THE COURT:  So he's employed by Reed Smith, but he's

13  not a lawyer.

14          MR. REASONER:  Correct.

15          THE COURT:  So and not equity in any way.

16          MR. REASONER:  No.  Salary basis --

17          THE COURT:  Salary basis --

18          MR. REASONER:  -- economist.

19          THE COURT:  -- as an economist.

20          MR. REASONER:  So did not receive any percentages

21  of --

22          THE COURT:  Right.  So like --

23          MR. REASONER:  -- the things they were --

24          THE COURT:  -- origination credit.  That's why I'm

25  just sort of thinking it's like there wouldn't be a reason for

1        him to have origination credit, presumably.  But then again

2        we -- I don't -- I never heard of economists being on retainer

3        like that.

4                    MR. REASONER:  I think they have to be, I mean, I'm

5        not -- I'm getting into an area of expertise here, Your Honor,

6        but I think they have to be on it.  That sort of situation, it

7        has to be a salary-type --

8                    THE COURT:  Right.

9                    MR. REASONER:  -- situation.

10                   THE COURT:  Because otherwise it would be a non-

11       lawyer sharing in legal fees, and you can't do that.

12                   MR. REASONER:  That would be my perception, Your

13       Honor.

14                   THE COURT:  Yeah, okay.

15                   MR. REASONER:  I also have a couple of points to

16       make on the constructive piece, Your Honor, but I can wait --

17                   THE COURT:  Yeah, why don't we hold off on that?  I

18       have that separate.

19                   Mr. Samet, can I hear from you on these points?

20                   MR. SAMET:  Thank you, Your Honor.

21                   THE COURT:  Let me just ask just factually, although

22       it's in pleading form right now, you know, as to origination

23       credit, and you've got it testified as an "or" for

24       Mr. Stephoudt.  But knowing that he's not a lawyer and is not

25       employed that way by a law firm or someone that could share in

1    legal fees, why -- what do you -- what would -- what do you

2    mean by origination credit being pleaded in the alternative

3    for him?

4         MR. SAMET:  Yeah, what -- here's what I'd like to

5    say.  I generally agree with what has been said about that, I

6    mean, I think that it's certainly plausible that the engaging

7    partner at an international law firm is getting origination

8    credit for a case this size.  The confusion is that is this --

9    and this is in Paragraph 36 -- at the end of the -- of when --

10   at the end of the relationship in December 2017, Reed Smith

11   decides that they need an engagement letter with Fury.  And

12   they send them a strange letter.  And Hryck sends the

13   engagement letter and says that Van Stephoudt would be Fury's

14   principal contact on the case.

15        THE COURT:  And it's Van Stephoudt?  I'm sorry, I

16   had the pronunciation of that very wrong.

17        MR. SAMET:  No, I apologize --

18        MR. REASONER:  It's Stephoudt, Van Stephoudt.

19        THE COURT:  Van Stephoudt.  Well, I was still wrong.

20   But okay, we were all wrong about that.

21        All right.  Mr. Van Stephoudt.

22        MR. SAMET:  And Van Stephoudt is listed on the

23   engagement letter as the principal contact.  And again, this

24   is maybe beyond the complaint, but it is a question on our

25   minds.  I've never -- to be honest I've never seen this before

1    that a law firm employs an economist at like -- at that level,

2    as the party contact.  And it does bear out, he sent me a lot

3    of bills in that month.  My understanding is that Mr. Hryck is

4    supervising him and we've alleged that in the complaint.

5            THE COURT:  Right, right.

6            MR. SAMET:  Mr. Stephoudt is the, we alleged, is the

7    tax credit specialist on these major bonds that are being

8    issued and Reed Smith has then -- or he is opining on them.

9    And so the relationship here, what his role is seems to be

10   someone beyond a paralegal, even though his counsel points

11   out, it would seem impossible to me that lawyers can share --

12           THE COURT:  Right.

13           MR. SAMET:  -- can share client funds with a non-

14   lawyer.  But I actually have never seen this arrangement

15   before and I think it's led to a lot of -- I also wouldn't

16   have thought possible that this sort of partner level

17   economist would also be the -- become the president of the

18   company that they're representing.

19           Our position is, to be clear, is that what we're

20   saying is, to the extent that these gentlemen received

21   payments from Reed Smith, and we can trace them so that

22   they're tied to Fury, then they should be liable as subsequent

23   transferees.

24           And if I can just speak very briefly --

25           THE COURT:  Yeah.

1          MR. SAMET:  -- to that?  Our complaint, both in the

2     actual -- and flip back, I apologize -- we have actual

3     fraud -- well, let me go a little slower.

4          The way we've grouped them, we grouped actual fraud

5     under the Bankruptcy Code and under the Texas -- the Texas

6     Code as Count 3, and then constructive fraud --

7          THE COURT:  Right.

8          MR. SAMET:  -- on each of them in Count 4.

9          Counsel is correct, in the heading we focus on the

10    liability portion of the -- of the claim, but in the claim

11    itself, so in actual fraud in Paragraph 194, we want relief

12    under 11 USC 550, that's the provision of the Bankruptcy Code

13    that says who you can receive the monies from, all right, and

14    Texas Business Code 24.008(a) and 24.009(b).  We say the same

15    thing in the constructive section.

16         And in our brief on this point, Your Honor, we

17    cited, you know, many Texas authorities that the Uniform

18    Fraudulent Transfer Act permits recovery from subsequent

19    transferees in a very similar manner to the way that the

20    Bankruptcy Code permits subsequent transfers from persons --

21    I'm sorry, I'm speaking about -- allows for recovery from

22    subsequent transferees.

23         (Parties confer.)

24         MR. REASONER:  And, Your Honor, I would just say

25    that the type of vague -- and I say this not disrespectfully,

1     but counsel is musing about, well, I wonder if it was this, I

2     wonder if it was that?  That's not pleading and that's -- and

3     again, the pleading is in that sort of alternative, wonder if

4     it was this, wonder if it was that.  I mean, that's not

5     specific enough to meet the requirements.

6          But on the issue, Your Honor, of 24.009 again, which

7     is what they are -- which is what ties to 24.005(a), their

8     claim, it says, "A transfer or obligation is not voidable

9     under 24.005(a)(1) of this Code against any subsequent

10    transferee or obligee," period, full stop.  The other

11    provision he's talking about where a creditor brings a claim

12    says there's a good faith requirement.  That's not required

13    here under the --

14          THE COURT:  Okay.

15          MR. REASONER:  -- plain face of the statute.

16          MR. SAMET:  No, no, that's not -- that's not true at

17    all.  Again, under the Bankruptcy Code all creditors -- all

18    for the state law fraudulent transfer claims, on commencement

19    upon the filing of that case under Section 544(b) of the

20    Bankruptcy Code, all creditor fraudulent transfer claims under

21    state law, under any state, are given to the Debtor's estate.

22          Those are the claims we -- that we're bringing,

23    24.009(b)(2), transfer is avoidable against any subsequent

24    transferee other than a good faith transferee for value or

25    from any subsequent transferee.  So they took it from the

1    second one.

2             And as we cite Fifth Circuit and all sorts of Tenth

3    Circuit cases about it, this -- that's not in dispute.  Again,

4    with respect to the -- we think it's plausible that people at

5    this level of Reed Smith are receiving credit for this

6    account, and that's the basis for our allegation.

7             THE COURT:  And it's in part -- that's in part based

8    on it's an unusual relationship that Van Stephoudt has with

9    Reed Smith.  It's not -- I mean, I think I can take sort of

10   just like --

11            MR. SAMET:  Let me -- I'm sorry --

12            THE COURT:  -- legal experience in this is like -- I

13   mean, I'm not aware of ever seeing an arrangement like this.

14            MR. SAMET:  I've never seen an arrangement like

15   that.  And my understanding, again, it's beyond the complaint,

16   my understanding is that Mr. Van Stephoudt has some Greek work

17   in the university and engages in very highly specialized

18   practice and engages in a lot of cross-border tax arbitrage

19   matters, but for purposes of the complaint with respect to

20   Mr. Hryck, it's a plausible inference we're drawing from the

21   fact that he sent an engagement letter, that he's getting

22   origination credit for this count.

23            With respect to Mr. Van Stephoudt, it's our

24   inference from the fact that he's a principal contact, and

25   from his stature running this account.  And he's receiving

1      some sort of credit for that as well.

2              THE COURT:  Okay.  All right.

3              All right.  Let's see, hold on one sec.

4          (Pause in the proceedings.)

5              THE COURT:  All right.  So let's go on to

6      constructive fraudulent transfer.

7              Mr. Reasoner, you have more on that?

8              MR. REASONER:  Yes.  Thank you, Your Honor.

9              Your Honor, as to Mr. Van Stephoudt they made an

10     allegation that he received insider fraudulent transfers.

11             THE COURT:  All right.

12             MR. REASONER:  And the basis of that is that they

13     claim that he was president or acting president in some

14     fashion from June '17 to March '18, March of 2018.  Under

15     well-established law, Your Honor, on the insider fraudulent

16     transfer claims, you have a one-year period of time to bring

17     them.  So that would be March of 2019.  It's undisputed that

18     that was not done here, that it was not brought within that

19     time.

20             Their only response is that we cite no authority for

21     the proposition that courts should look at the actual time of

22     transfer, as opposed to some other possible earlier time when

23     a company agreed to make a transfer.  Okay?  So that's their

24     assertion.

25             THE COURT:  That that under a statute of limitations

1       law would make it always a really disputed point and hard to

2       discern when the statute even began running.

3               MR. REASONER:  Yes, Your Honor.  And that's why both

4       the statute and the case law that we cite to the Court refer

5       to the time, the actual time of the transfer.  We cite the

6       Court to the *In Re Holloway* case and the *Dobie Carol*

7       (phonetic) case, both of which refer to the -- their status at

8       the actual time of the transfer, and the statute reads that

9       way as well.  And the Plaintiffs cite no authority for the

10      proposition that you should look at some other more vague time

11      period.

12              THE COURT:  And what about when he -- he was an

13      insider when, June 2017 to March 2018.  Is that right?

14              MR. REASONER:  That's what they allege.

15              THE COURT:  That's what they allege.  And so you're

16      saying latest is March 2019.

17              MR. REASONER:  Correct.

18              THE COURT:  But their allegation is, well, the

19      decision was made within that June 2017 to March 2018 period?

20              MR. REASONER:  I believe that's what they're trying

21      to suggest, yes, Your Honor.

22              THE COURT:  But then before -- and then the transfer

23      occurred August of 2019 -- no, it occurred --

24              MR. REASONER:  The --

25              THE COURT:  What's the transfer dates that we're

1       talking about here?

2               MR. REASONER:  Let us find that for you, Your Honor.

3       I think there's no dispute as to when they brought the claim

4       that it was fraudulent.

5               THE COURT:  Yeah.

6               MR. REASONER:  But I'll run to ground when the

7       actual -- what transfer --

8               THE COURT:  Transfers --

9               MR. REASONER:  -- they're focused on.  There's no

10      allegation that Mr. Stephoudt was receiving any compensation

11      directly.  Their assertion in the pleading, Your Honor, is

12      that he was -- that Reed Smith was receiving just normal fees

13      for time spent when Mr. Van Stephoudt was allegedly in his

14      role as president from June of 2017 --

15              THE COURT:  Okay.

16              MR. REASONER:  -- to March of '18.  So I presume

17      they're trying to recoup those fees.

18              THE COURT:  All right.  And have we covered -- have

19      you covered their -- I have down a separate argument on

20      constructive fraudulent transfer, about receipt of reasonably

21      equivalent value.

22              MR. REASONER:  Oh, that's what I was about to say --

23      go into --

24              THE COURT:  Okay.

25              MR. REASONER:  -- if I could, Your Honor.

1          THE COURT:  Yeah, please do.

2          MR. REASONER:  Yes, on that Plaintiff has simply

3    failed to make any showing here.  As the Court says under

4    24.005(a)(2), there is a requirement to show that Fury

5    received less than reasonably equivalent value, either the

6    fees received were less than the value of -- I mean, were

7    greater than the value of the services that were rendered

8    here, Your Honor.  And there are just simply no allegations

9    about this at all, that they don't intend to meet that burden

10   in any way, shape or form, and I don't think it's disputed

11   here that legal services were being rendered at the time.

12         THE COURT:  But some of the allegations are that he

13   charged Fury for work that he was performing for other

14   clients.  Isn't that right?

15         MR. REASONER:  I think it's a little more -- it's a

16   little more nuanced than that, Your Honor.  I think they're

17   trying to say that he was -- that Mr. Hryck was doing legal

18   work but he really meant to benefit other clients because they

19   were more important to him than the legal work.  That's

20   something that's come into their response.  They do not plead

21   anything in the petition that is before this Court --

22         THE COURT:  Okay.

23         MR. REASONER:  -- about Mr. Hryck being motivated to

24   keep favor of future business with one client versus another,

25   nor do they allege that Mr. Hryck received more money than he

1        otherwise would have, or had some economic interest in pursing

2        things that way.  So that's sort of speculation in the

3        response, but not something that they've pled nor --

4                  THE COURT:  Okay.

5                  MR. REASONER:  -- would they have a reasonable basis

6        to plead, Your Honor.

7                  THE COURT:  All right.

8                  MR. REASONER:  Thank you.

9                  THE COURT:  All right.  Thank you.

10                 Mr. Samet?

11                 MR. SAMET:  Let me -- I think there's two separate

12       arguments here.  Let me actually see if I can respond maybe

13       and strengthen counsel's argument with respect to the --

14                 MR. REASONER:  I would appreciate it.

15                 MR. SAMET:  Yeah.  No, because -- but just to

16       clarify.  We've got the fifth cause of action that they seek

17       to dismiss against Mr. Van Stephoudt.  As I understand -- oh,

18       I lost it, I'll have to find my --

19                 THE COURT:  That's okay.

20                 MR. SAMET:  -- case.  Well, oh, as -- their argument

21       is that the one-year statute of limitations on insider

22       constructive fraudulent transfer in the specific section

23       that's where we measure from the time that the Defendant

24       ceased being an insider.

25                 THE COURT:  Yeah.

1           MR. SAMET:  And so they say if you cease being an

2     insider in March of 2018, then it expired in March of 2019.

3           THE COURT:  And in March 2018 Mr. Van Stephoudt

4     ceased being what?

5           MR. SAMET:  The president.

6           THE COURT:  The president.  All right.

7           MR. SAMET:  President, that brought a new --

8           THE COURT:  All right.

9           MR. SAMET:  -- president --

10          THE COURT:  All right.  All right.

11          MR. SAMET:  -- working for the company.

12          And our response is that it should be measured --

13    the one year should be measured not from the time that he

14    ceases being an insider, but from the transfer date, the date

15    of the transfer.  Now here's where I'm going to strengthen

16    counsel's argument, because in looking through the complaint I

17    had a feeling Your Honor might ask that question --

18          THE COURT:  Yeah.

19          MR. SAMET:  -- and in candor, the complaint does not

20    specify the date that he received -- well, that Reed Smith

21    received the transfers.  So that's something that is not in

22    the complaint.  My understanding is that the transfers were

23    made after --

24          THE COURT:  Yep.

25          MR. SAMET:  -- after March of 2018.

1          THE COURT:  But prior to --

2          MR. SAMET:  Prior to one year before the petition

3     date --

4          THE COURT:  Yeah.

5          MR. SAMET:  -- that's when the statute, which is --

6          THE COURT:  But just if we were talking about a

7     window, it would be, so somewhere between -- the transfers are

8     between March 2018 and August of 2018.  Right?  Because then

9     you --

10         MR. SAMET:  I think I understand.  I think from

11    August of 2018 --

12         THE COURT:  What am I --

13         MR. SAMET:  -- there needs to be transfers -- there

14    needs to be transfers from August 2018 to August of 2019.

15         THE COURT:  That's it, yeah.

16         MR. SAMET:  I think that's right.  And I do not

17    have --

18         THE COURT:  That's it.  And what transfers are we

19    talking about for this?

20         MR. SAMET:  We're talking about the payments that

21    were made to Reed Smith that was --

22         THE COURT:  To Reed Smith.

23         MR. SAMET:  -- in the complaint.

24         THE COURT:  All right.

25         MR. SAMET:  So this is, again, the subsequent

1    transfer.  You know, again, I have to -- because this is going

2    to relate to --

3            THE COURT:  And so this transfers -- transfers --

4            MR. SAMET:  Yeah.

5            THE COURT:  -- those are for -- that Reed Smith is

6    billing as just fees?

7            MR. SAMET:  Well, they are, they're Reed Smith's

8    invoices.

9            THE COURT:  All right.

10           MR. SAMET:  Included on the invoices, as we alleged

11   in the complaint, are these eight -- when Mr. Van Stephoudt is

12   president you see these eight-hour block days for his -- just

13   to Fury as sort of block billing.  So is that salary that's

14   being paid through Reed Smith to Van Stephoudt or not?

15           THE COURT:  Well, so on these invoices, and maybe

16   it's -- if it's not specified in the complaint, maybe that's

17   the problem.

18           MR. SAMET:  Right.

19           THE COURT:  So are we talking about -- as I'm

20   hearing it now are we talking about invoices that are being

21   generated and then paid after August of 2018, but it's dating

22   back to services allegedly performed by Van Stephoudt between

23   June of 2017 and March of 2018?

24           MR. SAMET:  That is -- that is my theory, Your

25   Honor.  And as you say it, I recognize the --

1          THE COURT:  All right.

2          MR. SAMET:  -- problems with it, but that's not --

3          THE COURT:  So that's a theory.  Okay.  But we

4   don't -- all right.  So then it just sort of makes it a pure,

5   should you be repleading that to like make that express?

6   Because is that -- because I don't have -- that's what I was

7   wondering.  I don't have an understanding of what these

8   transfers were, so what are the measuring dates?  But what

9   you're saying is, you're saying in discovery you've gotten or

10  maybe it was before --

11         MR. SAMET:  I have --

12         THE COURT:  -- you already had invoices that show --

13  because I can conceive of this, here's an invoice that's at

14  this period of time, but it's billing for servicing that were

15  performed six months prior, and it's specified that way, I

16  could maybe think about that as something that -- I don't

17  know, but even then the transfer's not being made until after

18  the facts --

19         MR. SAMET:  Your Honor --

20         THE COURT:  -- and Van Stephoudt would be --

21         MR. SAMET:  -- in all candor on this claim I do not

22  have those -- the facts in the complaint, nor at my

23  fingertips, and I would --

24         THE COURT:  Yeah.

25         MR. SAMET:  -- either I can go back and replead that

1    or I cannot.

2              THE COURT:  Mr. Barrett -- Mr. Reasoner, are you --

3    so your argument, if it was, now that we're hearing this that

4    it's like it's invoices that are, you know, later in the year

5    of 2018, but it's billing for services of this time at a time

6    when he was an insider, it just didn't get billed and paid

7    until then.  Do you have a -- we didn't realize we were going

8    to be talking about that.

9              Do you have a reaction to that  argument?

10             MR. REASONER:  Your Honor, I don't have the -- I

11   don't have the factual information before me on that

12   precise --

13             THE COURT:  Right.

14             MR. REASONER:  -- question to answer the Court.  I

15   don't think it saves the claim, but I guess I would reserve

16   the right to look at what he wants to -- well, as currently

17   pled, the pleading is deficient.

18             THE COURT:  Right.

19             MR. REASONER:  Whether or not there is something

20   that can be done to salvage that, we just have to evaluate

21   what he re-pleads.  But the current pleading on that score --

22             THE COURT:  All right.

23             MR. REASONER:  -- is inadequate.

24             THE COURT:  All right.  I think I agree with that.

25   But you would -- are you on your first complaint, first

1    amended complaint?

2             MR. SAMET:  We are, Your Honor.  We amended to deal

3    with this -- the merger issue.

4             THE COURT:  Right.  All right.

5             MR. KRYDER:  We have one constructive --

6             THE COURT:  Yep.

7             MR. KRYDER:  -- issue, but this should really be

8    briefed, Your Honor.  So --

9             THE COURT:  Oh, okay, so moving on from -- it's not

10   on this issue that --

11            MR. KRYDER:  It's not on --

12            THE COURT:  Let me finish up my -- you can stay

13   there for a second --

14            MR. KRYDER:  Oh, I'm sorry.

15            THE COURT:  -- just let finish up my thinking on

16   this point.

17            In your responses, Mr. Rosen, I mean, have you asked

18   for leave to replead on anything that I might be saying is

19   deficiently pleaded and have you all engaged on oh, no, no, it

20   would be too late, it would be prejudicial to do that, or

21   where are we in the litigation on that?

22            MR. SAMET:  We certainly have not had that

23   discussion.

24            THE COURT:  Okay.

25            MR. SAMET:  I will check our specific motion now,

1      because on many of them --  whether we specifically asked to

2      review them on that.

3              THE COURT:  Well, but where we are in the

4      litigation, Mr. Reasoner, with where we are in the litigation,

5      and there's a lot of discovery left, et cetera, if he's able

6      to look at what he's got and specify something that might

7      bring it plausibly within this, I mean, you'd still be able to

8      say, no, that still doesn't, you know, legally match for the

9      constructive fraudulent transfer claim.

10             But just in terms of leave to replead, is there some

11     procedural reason why you would argue I shouldn't allow it at

12     this juncture?

13             MR. REASONER:  Your Honor, I don't see -- just in

14     looking quickly at the response I don't see that that is

15     requested.

16             THE COURT:  Right.

17             MR. REASONER:  However the Court wants to handle it,

18     we will --

19             THE COURT:  Yeah.  Okay.

20             MR. REASONER:  -- at minimum I wanted the

21     opportunity to challenge any repleading --

22             THE COURT:  Oh, absolutely, yeah.

23             MR. REASONER:  -- but --

24             THE COURT:  Okay.

25             MR. REASONER:  -- I don't see that it was sought

1      here.

2                  THE COURT:  Okay.  All right.  Thank you.

3                  MR. REASONER:  Thank you.

4                  THE COURT:  All right.  Moving on from there.

5                  MR. ROSEN:  So the Court did grant them what

6      presumably is their one shot at repleading as to my client.

7      Count 12 was an amended claim and this is for fraud --

8      purported constructive fraudulent transfer of Cogan's assets.

9      And, Your Honor, it -- for the reasons that we've stated in

10     our brief, and I'll briefly -- quickly summarize, it's time

11     barred, as well as being conclusory under any pleading

12     standard.

13                 But the Plaintiff elected not to sue Cogan, the

14     purported predecessor when it sued -- when it filed that suit

15     on August the 6th, 2021.  It also failed to join Cogan &

16     Partners as a Defendant by the Court's October 29, 2021

17     joinder deadline, even though we had already moved to dismiss

18     and had raised a variety of issues including the agreement

19     between Stone Pigman and Cogan & Partners.

20                 So Plaintiff, through Count 12, belatedly alleges

21     that Cogan Partners fraudulently transferred some of its

22     assets to Stone.  That's the complaint, Paragraphs 232 through

23     36.  But the claim is time barred because the purported

24     transfer was on January 1, 2017, it's the date of the

25     agreement that's been before the Court as part of our motion,

1      and so the statute of limitations expired on January 1st,

2      2021.  They didn't seek leave to add the claim until long,

3      long after that.

4              And importantly the new fraudulent transfer claim

5      cannot relate back to the original petition because it arises

6      from completely different conduct, transactions or occurrences

7      than those in the petition, and so it doesn't meet

8      Rule 15(c)(1)(B) standards.

9              If you look at it, this involves a different

10     transfer, a transferor, Cogan Partners, not Fury.  It involves

11     different transfers of furniture, fixtures and equipment, not

12     cash or attorneys' fees.  It involves a different transfer

13     time, January the 1st, 2017, not these purported monthly

14     payments from 2011 to 2016 to Mr. Nunes.

15             It's different than the fraudulent claim -- transfer

16     claims in the petition.  All of those were based on attorneys'

17     fees or expenses.  Nothing in the original petition alleged

18     that Cogan was insolvent, nor could it plausibly be insolvent

19     and remain in existence for four and a half more years.  It

20     had insurance, it kept its own receivables.  Nothing in the

21     petition suggested that Cogan Partners did not receive

22     reasonably equivalent value.  The agreement that is part of

23     the Record between Cogan & Partners and Stone Pigman shows

24     they paid fair market value, over $50,000 for furniture,

25     fixtures and equipment.

1    We cited to the Court the *Uplift RX* case and there,

2    that's another Judge Isgur case, but the Court there not only

3    refused to allow the addition of certain transferees, but also

4    refused to allow the Trustee to plead additional claims like

5    these against existing Defendants because they simply did not

6    relate back.

7    So for these reasons, Your Honor, we'd urge that

8    Count 12 be dismissed as -- both as time barred and then under

9    the Rule 8 and 9(b) pleading standards, as well.

10    THE COURT:  Okay.  All right.  Thank you.

11    Mr. Samet?

12    MR. SAMET:  Okay.  Let me refocus on this claim.  I

13    don't -- I don't agree with that.

14    First, let me back up.  The only as I understood --

15    as I understood the motion the only argument against this

16    claim is that it's time barred, not that it failed on a

17    Rule 12(b)(6) basis, and we did not brief that.  To be honest,

18    Your Honor, this claim is pled in the alternative.  We believe

19    that Louisiana law governs that agreement and they're the

20    successor-in-interest to Cogan Partners.  We pled this I think

21    explicitly in the alternative.

22    And it's the same theory.  It's a theory we reached

23    in a Judge Rosenthal case.  I've yet to -- again, this wasn't

24    in the motion that (indiscernible), that if Texas law applies,

25    then we believe it's a fraudulent transfer under Texas law.

1    And it's the same theory, the theory is that Cogan took over

2    this law firm, you know, completely and including -- I

3    disagree with the calculation of the -- that they were just

4    buying furniture, fixtures and equipment.  It's just not true.

5         First of all, Cogan Partners sold its client files

6    to Stone Pigman, and that's the issue.  The cases are all

7    going over there and that's why we're saying the liability is

8    going as well.  It's the reason we can sue them, frankly.  I

9    know we have to give a reason, but is that -- as far as we can

10   tell, they're a complete defunct entity and we haven't sued

11   any of the defunct entities in this case.

12        But again, this complaint to be detailed, all the

13   messes of it, every last portion of this law firm was moved

14   over to Cogan Partners.  And as such, we say they have just

15   another form of successor liability, that they have liability

16   for that as a fraudulent transfer with respect to the

17   bankruptcy case.  Counsel says it's on course.  It's just not.

18   In that case the Plaintiff tried to amend the complaint by

19   bringing in new parties that had never been served on the

20   previous complaints.  So, well, maybe these people also got

21   fraudulent transfers.

22        And that's not what we've done here.  That's not

23   what we've done here.  We're suing the same party under --

24   this is just a more -- we thought that there had been a

25   merger, they advised us of the non-public agreement that they

1    had -- they were claiming they had not so merged, and that's

2    what we're doing here.

3          With respect to the statute of limitations on the

4    fraudulent transfer claims, which again, I do not understand

5    have been briefed, and my apologies if it was -- the issue is,

6    is that you have to measure it from the date of the merger.

7    And then of course all statutes of limitations are tolled

8    against the bankruptcy estate for two years, pursuant to

9    Section 108 of the Bankruptcy Code.

10         Again, I do not understand this motion to raise any

11   substantive questions with the claim other than that, you

12   know, it wasn't the same claim that had been previously

13   asserted.

14         MR. FOGLER:  And if -- the Court need only look at

15   Page 22 of our motion, which is docket entry 169, we expressly

16   say that the fraudulent transfer claims are time barred and

17   fail to satisfy 8(a) and 9(b).  The actual agreement, which is

18   the -- is Exhibit 3 to our motion to dismiss, it expressly

19   indicates that, in Paragraph 9.3, which is at Page 15 of this

20   exhibit, that Stone Pigman was acquiring -- acquired property,

21   a defined term, but it's basically furniture, fixtures and

22   equipment for the sum of $50,000 which equals the agreed fair

23   market value.

24         So what they're doing is, this is not a successor

25   liability theory, this is a constructive fraudulent transfer

1       claim, and you can see right from here that it is -- we don't

2       believe that it relates back because it arises out of a

3       completely set of circumstances than what they pled as to --

4       in the original petition.

5             THE COURT:  So your argument is under the -- is it a

6       transfer agreement, what is --

7             MR. FOGLER:  Yes.  So this was Exhibit -- this was

8       the agreement that has the -- they like for the choice of law,

9       but they don't like for --

10            THE COURT:  Right.

11            MR. FOGLER:  -- everything else.

12            THE COURT:  And that specified -- the only

13       consideration that it's specifying is $50,000?

14            MR. FOGLER:  So it says, well, it says a number of

15       other things but at Paragraph 9.3 it indicates that Stone

16       Pigman acquired personal property, it says, "Stone Pigman

17       shall pay Cogan Partners the sum of $50,000 which equals the

18       agreed fair market value of the acquired personal property."

19       So that's what they were buying.

20            So now what they're asserting is a fraud --

21       constructive fraudulent transfer claim for assets that Stone

22       Pigman got from Cogan.  What are the assets?  We didn't get

23       the attorneys' fees from -- that Cogan had because they never

24       got them to begin with from 2011 to '16.  The only assets that

25       were acquired were personal property in terms of furniture,

1    fixtures and equipment, and Stone Pigman did assume certain

2    liabilities like the photocopy machines and the lease.  But

3    beyond that, Your Honor, there's no purported asset that has

4    been received.

5              And in any event --

6              THE COURT:  Well, does the purchase agreement in any

7    way deal with -- but I mean, obviously a bunch of lawyers and

8    partners at Cogan then moved over and started working with

9    Stone Pigman.  But that's not something I take it that's like

10   specified or part of the purchase agreement that you're

11   referring to.  Right?  That's --

12             MR. FOGLER:  That's -- well, it does deal with

13   that -- who the counsel are that are going to be joining the

14   firm, it deals with some issues like that that certain

15   attorneys will be special counsel, certain attorney staff,

16   Mr. Nunes had not yet become a member of Stone Pigman, so

17   that's --

18             THE COURT:  But it -- and so is it -- it's

19   specifying those attorneys, so it's part of this agreement.

20   Those attorneys and their clients, they're going to be

21   bringing their clients with them over to Stone Pigman and

22   that --

23             MR. FOGLER:  Only those clients who consent and --

24             THE COURT:  Of course, I mean, obviously it's only

25   ever going to be by consent.

1          MR. FOGLER:  Right.

2          THE COURT:  But they're not -- those attorneys are

3    going to be working for those clients somehow separate from

4    moving over to Stone Pigman.  It's they're moving to Stone

5    Pigman and those clients can or --  may or may not but it's up

6    to them as to whether they go over with them to Stone Pigman.

7          MR. FOGLER:  Well, certain attorneys did not come

8    over from Cogan & Partners, LLP to --

9          THE COURT:  Yeah.

10          MR. FOGLER:  -- Stone Pigman, and I the ink it's

11    clear even from the documents that the Plaintiff will have is

12    that Cogan remained in existence and some of the attorneys, I

13    believe, continued to serve clients.  So Cogan & Partners

14    remained an active Texas limited liability partnership for

15    four and a half years.

16          THE COURT:  Four and a half years.

17          MR. FOGLER:  It retained after January 1, its

18    accounts receivable.  It retained the files of clients who did

19    not come over, who did not go to Stone Pigman.  It had its own

20    email address.  So Cogan & Partners --

21          THE COURT:  So for prior -- so as the Cogan lawyers

22    were moving over to Stone Pigman, work that's been done in the

23    past where there's accounts receivables that's not something

24    that's now going to be paid to Stone Pigman?

25          MR. FOGLER:  Correct.

1          THE COURT:  It's still going by and whatever the

2     arrangement is there on who gets those fees, but that remains

3     back with Cogan Partners?

4          MR. FOGLER:  Yes, they received --

5          THE COURT:  Okay.

6          MR. FOGLER:  -- they retained their accounts

7     receivable, and importantly, and this is in our motion, but

8     it's in the agreement, they were required to maintain

9     professional liability insurance at the same or greater levels

10    than what they had had.  They were required to remain in

11    existence for at least three years.

12         So it was not a one-to-one transfer of all assets,

13    and the only assets that are before the Court that were

14    transferred were some furniture, fixture and equipment in

15    Paragraph 9.3 for which it recites a fair market payment of

16    $50,000.

17         THE COURT:  Okay.  All right.  Thank you.

18         Mr. Samet, anything further?  Yeah, go ahead.

19         MR. SAMET:  Your Honor, I do, and I think we're

20    really back to the fact of the merger argument again.

21         THE COURT:  Right.

22         MR. SAMET:  And let's go back to this agreement.  I

23    disagree with this.  First of all, and this is -- I'll give

24    the -- this is a motion to dismiss and so --

25         THE COURT:  Yeah.

1          MR. SAMET:  -- and it could relate back to the

2     complaint was alleged.  Paragraph 150, all right, "All Cogan

3     Partner attorneys, either came to or turned to Stone Pigman

4     and they stopped practicing law at Cogan Partners."  All

5     right?  If Cogan Partners retained no attorneys to serve as --

6     to serve as clients, Cogan Partners had three equity partners,

7     one retired, the other two became equity partners of Stone

8     Pigman pursuant to the agreement.

9          Pursuant to the agreement Cogan Partners has four

10    attorneys.  Okay?  They moved over, too, to Stone Pigman.  All

11    right?  I'm sorry, three attorneys moved to Stone Pigman as

12    special counsel and a remaining attorney became in-house

13    counsel for a former clients.  That's Paragraph 150(d).  All

14    right?

15         Paragraph 151, pursuant to the agreement, all of their

16    support staff, service contracts, methods of communication,

17    research and the office are transferred to Stone Pigman.

18         The firm retained no administrative support to serve

19    its clients.  All right?  I'm detailed because the agreement

20    details it.  IT, office administrators, staff administrators,

21    billing and time keeping program, electronic data storage

22    systems, contract legal research providers. the postage

23    machine, the telephone.  All right?  The telephone number, the

24    fax number, the website says if you go to Stone Pigman that --

25    I don't know exactly the address, it says, "We've now joined

1    Cogan," you go to Cogan Partners it says, "We've now joined

2    Stone Pigman."  All right?  They say they sold their client

3    files.  All right?  They say on the fact of voluntary consent

4    from the client.  There's nothing in this Record that any

5    client stayed at Cogan Partners.  All right?

6           Cogan Partners had reached these best efforts to

7    cause all the current clients to consent to become clients of

8    Stone Pigman as soon as possible.  And that of course is the

9    communication with Fury we discussed earlier.  All right?

10          So now it's true, the -- oh, and I said they had

11   Fury on deposit, the retainer, $30,000, was transferred to

12   Stone Pigman.  All right?

13          So the agreement provides for a specified payment of

14   $50,000 on account of FF&E in it.  But our underlying consent

15   is that this agreement, this was a *de facto* merger is actually

16   they're getting all of that for nothing.  And we know what's

17   really happening, they're getting it for equity in Stone

18   Pigman.  That's what the agreement is saying, they're becoming

19   an equity partners in it.

20          So that is our theory why we say this is a *de facto*

21   merger.  Again, in the alternative we've said that would plead

22   a theory under Texas fraudulent transfer law because all the

23   assets were taken -- all the revenue-producing assets were

24   taken from this law firm and transferred to Stone Pigman.  So

25   that's our theory, Your Honor.

1          THE COURT:  Okay.  All right.

2          All right.  Mr. Reasoner, were there any other

3     arguments under constructive fraudulent transfer that you had,

4     or are we done there?  I just want to make sure that the --

5          MR. REASONER:  I believe we've covered those, Your

6     Honor.

7          THE COURT:  Okay.  All right.

8          MR. REASONER:  Thank you.

9          THE COURT:  All right.  All right.  So let's move on

10    now to -- well, I guess let me ask this:  Anything else that

11    anybody -- is there anything that anybody else wants to raise

12    on fraudulent transfer claims, because I'm going to move on to

13    breach of fiduciary duty?

14         (No audible response.)

15         THE COURT:  All right.  Are we good?  Okay.

16         Does anybody need a break?  I'm prepared to go a bit

17    longer.  I'm happy to take short break, if we'd like to.

18         UNIDENTIFIED SPEAKER:  I would like a drink of

19    water.

20         THE COURT:  Okay.  Let's -- we'll take a 10-minute

21    break.

22         UNIDENTIFIED SPEAKER:  Thank you.

23         THE COURT:  We'll pick up at 4:30.  We'll go beyond

24    5:00 o'clock just a little bit, if that's all right?

25         Okay.  10-minute break, I'll be back.

1          (Recess taken from 4:18 p.m. to 4:30 p.m.)

2                        AFTER RECESS

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  All right.  Thank you.  Everyone can be

5    seated.

6          All right.  So let's pick up with breach of

7    fiduciary duty.  Let's start with argument on the waiver per

8    the fourth amended LLC agreement, and that's kind of raised by

9    everybody I've been talking to.

10         So who would like to start talking about that first?

11         MR. ROSEN:  I will, Your Honor.

12         THE COURT:  All right.  Good.

13         MR. ROSEN:  I guess I would start by saying that

14   that issue actually relates to both breach of fiduciary duty

15   and conspiracy.

16         THE COURT:  Right.  Okay.

17         MR. ROSEN:  Because from --

18         THE COURT:  Noted.

19         MR. ROSEN:  -- a non-officer, I understand there's

20   allegations that two of the lawyers were functioning as

21   officers, so it will be directly relevant to them in terms of

22   a direct breach of fiduciary duty claim.  But for the law

23   firms the issue links to conspiracy because if there's no

24   underlying duty there can be no underlying breach, you can't

25   conspire to breach something that's not breached.

1          THE COURT:  Yeah.

2          MR. ROSEN:  So that's basically the idea on the

3     issue.

4          So, you know, we start with the LLC agreement

5     itself, Paragraph 9, and the agreement's very clear, that

6     there is no duty, fiduciary or otherwise.  As I said, if

7     there's no duty, then there's no direct breach of fiduciary

8     duty claim against officers or the managers.  And there would

9     be no conspiracy to breach fiduciary duty if there's no

10    predicate for duty.  So the question is:  Is there a duty, is

11    there a fiduciary duty or was there not that supports either

12    claim, both claims really?

13         And here Paragraph 9 says, "No," the fourth

14    amended -- and I would say amended and stated, I'm going to

15    come back to that, amended and restated LLC.  We've cited a

16    lot of cases, the LLC agreement says it's Delaware law, we've

17    cited a lot of Delaware cases that say this is a provision

18    that's well recognized in Delaware under the Delaware Code,

19    Corporate Code, or (indiscernible) Code.  And there are myriad

20    cases that acknowledge the provision and its import, which is

21    it eliminates a breach of fiduciary duty claim, among others.

22         So really the only argument that's being raised in

23    response to that is, well, it doesn't apply to anything that

24    happened before 2018.

25         THE COURT:  Right.

1          MR. ROSEN:  That's really it.  And it's, I think,

2     significant that there's no case law as part of that argument.

3     But beyond that I start with what I mentioned before, the --

4     it's a restated, it's amended and restated.  What does that

5     mean?

6          THE COURT:  Yeah.

7          MR. ROSEN:  Restated means that it supplements or

8     replaces -- not supplements, it replaces everything else.  And

9     Delaware case law also says that when a fiduciary duty is

10    eliminated, which is what this is, then the corporation is

11    powerless to bring a breach of fiduciary duty claim.  So that

12    relates to the direct breach of fiduciary duty claim.

13          Moreover, if you are powerless to bring -- the

14    notion that there is a temporal aspect to the elimination of a

15    duty and therefore elimination under Delaware law to bring a

16    breach of fiduciary duty claim, the temporal aspect becomes

17    irrelevant if you think about it, because regardless -- let's

18    start with the officers and managers, regardless of when

19    anything, any alleged breach of fiduciary duty occurred, if

20    you are disempowered from bringing a breach of fiduciary duty

21    claim, which is what Delaware says happens, then it doesn't

22    matter when the breach of fiduciary duty was, you are not

23    allowed to bring a claim.

24          So the notion of a temporal distinction that they're

25    trying to make makes no sense in the context of what Delaware

1    law says about how that Delaware provision, which Fury chose

2    to enact, applies here with respect to direct claims.  And

3    then the obvious import with respect to -- with the obvious

4    import with respect to the conspiracy claims as well.

5         I'll note, as well, there's no savings clause,

6    there's no carve outs, there's none of that with respect to

7    pre-existing claims either in the LLC agreement.  So it's an

8    argument, it's a temporal argument that is inconsistent with

9    Delaware law, inconsistent with the way the agreement was

10   framed and inconsistent with ways in which they could have

11   crafted the agreement to do exactly with what they're saying.

12        And I'll add that nothing that I'm saying -- I'm not

13   breaking new ground here.  Everything I am saying is exactly

14   what they told the Bankruptcy Court.  This Plaintiff told the

15   Bankruptcy Court in connection with Exhibit B that we

16   submitted.  Now they say, well, we only told the Bankruptcy

17   Court about close vector issues.  Well, we only have to look

18   at their motion to see that that's not accurate.  Again,

19   that's Exhibit B in Paragraph 16 of the very motion that they

20   filed, this Plaintiff filed.

21        THE COURT:  And I want to hear this.  Am I going to

22   be getting an argument, well, I can't consider that right now

23   on motion to dismiss, but maybe it would have meaning on the

24   motion for summary judgment?

25        MR. ROSEN:  Not at all, Your Honor, because we put

1      this in our brief that the Court is permitted to take --

2      consider this in connection with the motion to dismiss.

3              THE COURT:  Because it's -- oh, okay.  All right.

4              MR. ROSEN:  The Court could take judicial notice of

5      it and consider this in connection with the motion to dismiss.

6              THE COURT:  Okay, all right.

7              MR. ROSEN:  The point here is, in citing this, it's

8      really just to illustrate the fact that everything I have just

9      said, I wish I could take credit for, really, but everything

10     I've said is what they told the Bankruptcy Court.  They

11     represented, not Mr. Samet and his firm, but his counsel for

12     his client --

13             THE COURT:  Yeah.

14             MR. ROSEN:  -- represented to the Bankruptcy Court

15     was the way that their LLC provision in the LLC agreement

16     worked.  And they said in Paragraph 16, and it's also in

17     Paragraph 18, which is Pages 7 and 8 of Exhibit B, they

18     specifically called out how it relates to "mismanagement and

19     misconduct" -- and I'm quoting here, "occurring before 2018."

20     And they give specific examples and bullets of misconduct in

21     2011, in 2013 through '15, and in 2016.

22             And then in Paragraph 18 they go on to talk about

23     reserve reports, which is one of the aspects of their

24     allegations here being inaccurate and serving as the

25     foundation for the type of malfeasance that's alleged here,

1      inaccurate reports from 2016 and 2017.

2              So the bottom line here is, Your Honor, that we have

3      a provision that is very clear on its face that there's no

4      duty.  If there's no duty, there can be no breach of duty --

5              THE COURT:  Right.

6              MR. ROSEN:  -- and so forth.  And it's not just me

7      saying it, it's them saying it.

8              And again, the sole argument without a single case

9      to support it is that somehow notwithstanding everything I've

10     just said, that somehow magically the provision, even though

11     it doesn't say it, only applies to conduct in 2018 or after.

12     And that in essence is --

13             THE COURT:  Okay.

14             MR. ROSEN:  -- our point.

15             THE COURT:  Good.  Thank you.

16             And by our point is there anybody else from

17     Defendants that wanted to speak to that a little bit further?

18             MR. KRYDER:  I do just briefly, Your Honor.

19             I think, well, what is helpful is for the Court to

20     focus on the fact that Delaware law allows a limited liability

21     company to give the maximum effect for such provisions.  If I

22     could just -- I've got a copy of this --

23             THE COURT:  Sure.

24             MR. KRYDER:  -- if I can hand it to the clerk?  One

25     is --

1           (Pause in the proceedings.)

2           MR. KRYDER:  So, Your Honor, Delaware, 18-1101(c)

3    says that "To the extent at law or in equity any person has

4    duties for -- including fiduciary duties, a person's duties

5    may be expanded, restricted or eliminated," and the only thing

6    you can't eliminate is the implied contractual covenant of

7    good faith and fair dealing not at issue here.

8           THE COURT:  Yep.

9           MR. KRYDER:  Then if the Court looks at what

10   actually happened, just as Mr. Rosen had indicated, this is

11   the Provision Number 9, it's headed, "No Fiduciary Duties,

12   Business Opportunities," and here it is, "To the fullest

13   extent permitted by applicable law."  They're talking about to

14   the fullest extent under Delaware 18-1101(c), "No manager,

15   officer, other person shall have any duty, fiduciary or

16   otherwise, to the company."

17          It also indicates importantly that the very conduct

18   that the Plaintiff complains about says that they're allowed

19   to engage directly or indirectly with other businesses,

20   ventures or opportunities.  Nothing prevents them from

21   engaging in commercial transactions with a customer or

22   supplier, it's not being wrongful or improper.  The legal

23   doctrines of corporate opportunity, business opportunity and

24   similar doctrines will not be applied.

25          And Paragraph 10 specifically allows a transaction

89

1        with interested parties.

2              So to the fullest extent of the law, there's no

3        fiduciary duty, there is no liability.  What they have done is

4        eliminate a fiduciary duty, eliminate a liability, eliminate

5        the ability to assert any claims.

6              And, Your Honor, you can't breach a duty that

7        doesn't exist.  And yet that's what they are trying to do.

8              THE COURT:  Right.

9              MR. KRYDER:  In our motion at Page 14 we cited the

10       Delaware Supreme Court in the *Cornerstone* case and also

11       *EZ Corp*, and basically the holdings in those cases is that the

12       Plaintiff's claim cannot survive a motion to dismiss here, and

13       you must dismiss the claim against a person who's protected by

14       a provision like this that eliminates any fiduciary duty.

15             And the Court asked, yes, it is proper to address

16       this on a 12(b) motion.  We cited the Court at Page 14 of our

17       motion a series of cases and one of the courts in Delaware

18       said it would be judicially uneconomic for the Court to

19       consider the Trustee's breach of fiduciary duty claims without

20       considering the operating agreement.

21             And, Your Honor, this is a matter of law, it's a

22       matter for you to construe, you could look at the statute, you

23       could look at Paragraph 9 and you could determine on the basis

24       of the maximum extent of Delaware law, which has been applied

25       here, that this not retroactive, it is restated, as Mr. Rosen

1    pointed out, and the only thing you need to find is that this

2    lawsuit was filed after this provision was implemented.

3           Finally, Your Honor, we cited in our motion at

4    Page 14 in our reply, the *DG v Ray* case.  And it -- the

5    Delaware Chancery Court there made a very clear holding that a

6    Delaware elimination clause, just like this one, covers all

7    liability for breach of fiduciary duty, it eliminates both the

8    liability and the remedy.  That's at Star 9 and 10 of the *DG*

9    opinion.

10          And importantly in *DG*, Your Honor, the elimination

11   provision was adopted at the time the Plaintiff invested and

12   the Plaintiff asserted fiduciary duty claims based on conduct

13   before the elimination provision was adopted.  But the Court

14   found that the provision barred both pre- and post-adoption

15   conduct in the same way that the other cases we have cited

16   have.

17          So respectfully this eliminates any duty, any

18   liability, and any ability to assert claims.  As *Cornerstone*

19   said, it is an immunity from suit.  So all the Court needs to

20   do is consider whether this suit was filed after the adoption

21   of this provision.

22               THE COURT:  All right.  Thank you.

23               MR. ROSEN:  Your Honor, just to --

24               UNIDENTIFIED SPEAKER:  Your Honor --

25               MR. ROSEN:  -- follow up on --

1          THE COURT:  Hold on one second.  Be seated please.

2     No, be seated please.  You're not before the Court.

3          Go ahead.

4          MR. ROSEN:  I apologize.  Just to follow up --

5          THE COURT:  You don't need to apologize.  Go ahead.

6          MR. ROSEN:  -- you asked a question about judicial

7     notice.  Mr. Kryder mentioned judicial notice with respect to

8     the LLC agreement.  On Page 7 of our brief we also cite a

9     Fifth Circuit, as well as a case from the Southern District of

10    Texas that are affirmed by the Fifth Circuit with respect to a

11    bankruptcy docket pleading, such as the one --

12         THE COURT:  Okay.  And this -- yeah, so --

13         MR. ROSEN:  Which I think that was your question,

14    Your Honor.

15         THE COURT:  It is.  I just want to make sure we

16    didn't really have a dispute about --  I mean, I know that

17    some things extraneous to the complaint sometimes are proper

18    to consider, so I want to make sure we didn't really have a

19    dispute about that here.  It doesn't seem like we do.

20         MR. ROSEN:  And that's on Page 7 of our motion.

21         THE COURT:  Okay.  Mr. Samet -- anything else from

22    counsel at table?

23         MR. ROSEN:  No, Your Honor.

24         THE COURT:  All right.  Mr. Samet, under the

25    Delaware law that's cited to me, I guess my first question is,

1    it's possible under Delaware law, I take it, to give

2    effectively a waiver for bringing a breach of fiduciary duty

3    claim, even if it's already happened in the past.

4              MR. SAMET:  Absolutely.

5              THE COURT:  Okay.  And so then your argument is then

6    simply but this amended restated LLC in its Paragraph 9 didn't

7    do that.

8              MR. SAMET:  That's right.

9              THE COURT:  Okay.  Okay.  Go ahead.

10             MR. SAMET:  All right.  Thank you, Your Honor.

11             And just to pick up on that line of questioning,

12   it's obviously a common issue under Delaware law, it goes

13   under LLCs and under corporations and under limited

14   partnerships for there to be all manner of exculpation,

15   elimination of duties, limitation of duties, partial

16   limitation of duties.  All right?  That's very common.  And

17   that's all the cases that have been cited to you by counsel.

18             And I will point out just out the outset here,

19   because I heard of them, so I'm going to get back to some

20   specific cases cited.  None of the learned counsel, I think

21   there was five or six motions on this point, have any case

22   that says a restated agreement that adopts a fiduciary clause

23   somehow retroactively insulates everybody from all fiduciary

24   breaches prior to that.  None of these lawyers have a case

25   like that.

1           THE COURT:  I still feel like I have a case either

2     way though that necessarily compels the results here.

3           MR. SAMET:  No, and I think the reason is, is -- I

4     would like to give my presentation now -- is that --

5           THE COURT:  So your point is so obvious that no

6     one's ever tried to do this before.

7           MR. SAMET:  Well, I think it is frankly.

8        (Laughter.)

9           THE COURT:  Okay.

10          UNIDENTIFIED SPEAKER:  It's true.

11          MR. SAMET:  I think, you know, I think it is obvious

12    and I think it's a bit of a tortured reason as -- a tortured

13    reading of this document is actually --

14          THE COURT:  Well, that's why I started with:  Is it

15    even possible to do this under Delaware law?  You say, well,

16    yeah, it is.  To say --

17          MR. SAMET:  Well --

18          THE COURT:  -- everybody -- everybody may have been

19    breaching fiduciary duties in the past, but as part of working

20    all of this out, we're saying that's -- as we restate and go

21    forward here, there's -- I'm not saying that that's what it

22    says here, but you could restate and go forward, it's too late

23    to bring any breach of fiduciary duty claims.

24          MR. SAMET:  Well, an LLC agreement is a contract.

25    Right?

1          THE COURT:  Right.

2          MR. SAMET:  And, yeah, corporations enter into

3    settlements with their executives all the time pursuant to

4    which they might lay claims, and those claims will say so in a

5    release agreement or release or whatever it's going to be,

6    that is something that corporations of all types can do.  And

7    that's not what the parties did here.

8          And, you know, I'll take the agreement, we need to

9    look at the fourth amended restated agreement, the agreement

10   that's the date that it's going to be effective on.  It says

11   it is effective as of January 25th, 2018.  It doesn't say

12   restated, it's stated as of today's date.  It doesn't say

13   restated from the beginning.  It says is effective as of

14   January 25th, 2018.  The Delaware law, the statute, we cite

15   this in our brief, provides that parties can take anything for

16   an LLC operating agreement and get that -- it can be before

17   the day of the agreement, it could be the beginning of time,

18   it could be January 1st, 1900.  They picked January 25th, 2018

19   for the agreement to be effective.

20         And that's not just a clause that's effective with

21   respect to Section 9.  That's a clause with respect to the

22   entire agreement.  And I would say it would be a little bit

23   absurd if the whole rest of the agreement was now enforced

24   prior.  If you could say, well, you know, this isn't fair,

25   it's going to be controlled under the retro board of managers.

1    Well, does that invalidate all the proceedings that were heard

2    prior to that date where there was a board of managers and

3    (indiscernible) was operating the company?  Of course not.

4         The clause doesn't state, if you look at Clause 9,

5    it's a contract.  It says, "No manager or officer shall have

6    any duty."  That's respective language.  It doesn't say, as

7    the *DG* case says by the way, which Mr. Kryder mentioned, all

8    right?  It does not say eliminate fiduciary duties as the

9    clause did in that case.  It doesn't say, no office -- the

10   company shall be prohibited from suing for any fiduciary duty

11   ever again.  This is dicta from other cases where the

12   operating agreement had an exculpation clause, which is a very

13   common clause.  All right?  You'll have to read it --

14        THE COURT:  But like the -- but the "shall have"

15   language that you're just pointing me to, "None of them shall

16   have any duties, fiduciary or otherwise, to the company."  At

17   that point in time, there's not a claim for breach of

18   fiduciary duty that's pending.  Right?

19        MR. SAMET:  Well, --

20        THE COURT:  When this amended restated -- as of the

21   effective date of January 25th, 2018.  That's a rhetorical

22   question, there was to your claim pending at that point.

23        MR. SAMET:  It was not my claim pending.  I actually

24   believe there was, I don't know if that is dispositive

25   (indiscernible) way a claim.

1                    THE COURT:  But, well --

2                    MR. SAMET:  But --

3                    THE COURT:  -- the claim that we're talking about

4          right now --

5                    MR. SAMET:  That's right.

6                    THE COURT:  -- was not then pending, and so what we

7          have here is a breach of fiduciary duty claim that is brought

8          after the date of this document, and I'm looking at language

9          that says, "No" -- it said, "No manager of the board, officer,

10         et cetera, shall have any duty, fiduciary or otherwise, to the

11         company."  And so --

12                   MR. SAMET:  And that's part of the --

13                   THE COURT:  -- I'm sort of like --

14                   MR. SAMET:  -- you know?

15                   THE COURT:  -- I would see -- I kind of see your

16         argument definitely having traction in wrestling with this

17         language.  That is if there's already a breach of fiduciary

18         duty claim that's ongoing, maybe you would say, "Well, it

19         wouldn't pertain to that."

20                   But what I'm looking at "shall have" language, which

21         is -- I mean, let's assume that that means it's something

22         that's prospective.  I don't know that it's prospective to

23         when the conduct occurred, I think it's prospective to when

24         the claim is brought.  And it's saying, "Get rid of that

25         claim."

1        MR. SAMET:  With respect to my -- Your Honor, my

2    argument is that it's when the action accrues, it's when the

3    action accrues, I mean, and not when the -- the action accrued

4    prior to that and it does not say no one's going to bring a

5    claim.  It's not, "By the way, their clause is like that."

6    Their clauses say "Covenant not to sue for past acts."  All

7    right?

8        THE COURT:  Well, but then I -- again, I started

9    with what's the ability under Delaware law to make it

10   effective to past conduct?  Because this whole clause starts

11   out with, "To the fullest extent permitted by applicable law,"

12   and our starting point is, well, Delaware law allows you to do

13   it.  They still have language in the contract that does that,

14   but it's something --

15       MR. SAMET:  Well, I would say two things for that.

16   Again, going back to the first thing, which is Delaware law

17   says you -- the parties to an LLC operator agreement can pick

18   the effective date.  That's what Delaware law allows.

19       THE COURT:  Yeah, and then you've got the effective

20   date set.

21       MR. SAMET:  They set, it is effective as of that

22   date.  So my first argument to that is that they took

23   advantage of that and picked that date.  My second argument,

24   Your Honor, and we cite this in our papers as well, Delaware

25   law says before you read a clause in a contract to effectuate

1    a release, make sure that it's specified that these are claims

2    that are being released.

3            I have to -- I have to say, as well, I find that to

4    read this -- to read this op agreement as a *sub silentio*

5    saying everything that happened beforehand is all water under

6    the bridge, only with respect by the way to the fiduciary

7    claim, but not with respect to any of the other terms of the

8    contract.  That we're going to -- that's going to still be

9    binding on the company.

10           It's a very difficult reading of this agreement.

11   And I think it's more difficult here because of something --

12           THE COURT:  How does that -- how does that square

13   though with the argument as to representations that were made

14   to Bankruptcy Court about what the effect of this was?

15           MR. SAMET:  Oh, let me address that.

16           THE COURT:  I know you're going to get to that,

17   but --

18           MR. SAMET:  Yeah, let me -- I want to get -- I'm

19   sorry, pull it up only so much, if you'll forgive me.

20           So in bankruptcy, Your Honor, and we addressed this

21   in our papers, but in the bankruptcy there were claims that

22   were brought, actually sort of the mirror image of the claims

23   that my client is bringing.

24           THE COURT:  What does that -- what does that mean?

25   Yeah.

1            MR. SAMET:  There were claims that were brought

2       actually by many of the Defendants on this side --

3            THE COURT:  Okay.

4            MR. SAMET:  -- that the reason that the gas was all

5       gone, that the operating reserves were gone, and the company

6       had failed, and it only has garnered $5 million was because

7       the actions of actually the managers that were put in place

8       after this agreement, that -- the post-2018 managers,

9       particularly Mr. Pinisole (phonetic).  There were claims -- I

10      have to say the one -- that overlapped their claims against

11      Mr. Elder.  There were claims against the lender, BCP.  And we

12      quoted this in our briefs, Your Honor.  Mr. Pinisole didn't

13      even get there until April of 2018.

14            With respect to Paragraph 16 that counsel was

15      referencing that somehow Paragraph 16 of the Debtor's brief

16      somehow -- it's just wrong, Your Honor, and I would ask the

17      Court to look at that paragraph.  The paragraph says that the

18      Movant -- so there -- they say the Movants -- the problems,

19      costs and losses that arose in the 2018 and '19 drilling

20      season that the Movants -- those are the people trying to

21      bring the claim in the bankruptcy, so they didn't get

22      permission, there was a motion for that -- that the Movants

23      can accurately claim resulted from the mismanagement and

24      negligent of (indiscernible) and Kurrah (phonetic) and PRA

25      are, in fact, the results of Movants for weeks mismanagement

1    and misconduct occurring before 2018.

2            They're rebutting the complaint saying, "These

3    things that you're blaming on Pinisole and people who over the

4    company, that's not true at all.  It happened prior to that

5    and these are the bullets that go from there."

6            The legal argument, which is not in that paragraph

7    at all, the legal argument says, "But in the 2018 time period

8    their officers owed no fiduciary duties to the company."  So

9    the time those claims arose, they didn't have any fiduciary

10   obligation.

11           And that brings me to something that I think counsel

12   in the presentation sort of lied a little bit in the clause.

13   It doesn't say -- this is sort of a strange posture, this

14   argument, it says, "No manager or officer of the company shall

15   have no fiduciary duties."  But ironically I'm not sure that

16   will -- that will help some of the parties who are bringing

17   this argument.  It does not have anything to do with the

18   breach of fiduciary duties by the lawyers.  And the lawyers,

19   of course, have fiduciary duties under state law to their

20   clients, so it's not going to help them with respect to that.

21           Now with respect to the parties who are both either

22   lawyers and officers who are maybe not a lawyer, but at the

23   law firm and offices.  Again, this is part of our briefing as

24   well.  I think it's a very peculiar reading of a contract that

25   a lawyer has the duty to say, Before you release a claim

1    against me, you know, a lawyer has the duty to make

2    representations to a client before a lawyer gets their claims

3    released.

4          So that Nunes or Stephoudt was going to say, "Well,

5    maybe as a lawyer I'm not released, but as an officer, because

6    you said I'm also an officer, I am released." So what that

7    does -- to us it was a very strange reading of this -- of this

8    agreement. And --

9          THE COURT: So let's -- so but then as to -- so

10   you're construing -- is there any argument in reference to no

11   manager of the board? Is there any assertion -- are you

12   making any assertion that anybody here was a manager of the

13   board?

14         MR. SAMET: Under -- the board as defined in this

15   document, because this document is putting up a new board

16   for --

17         THE COURT: Okay.

18         MR. SAMET: -- for -- so there is an independent

19   board member who's not in this case, there was the lender

20   who's not in this case. Kay Rieck was the third manager, he

21   is -- he is insulated from it. I don't think we have a claim

22   in the complaint for his actions as a board member from this

23   period afterwards. So he would be insulated from his actions

24   as a board member from this date forward.

25         And by the way, perhaps, Your Honor, prior to this

1      date -- well, actually prior to the -- the third amended

2      agreement was a month prior, this just changed it to Delaware.

3      Prior to that, the company didn't have a board.

4                    THE COURT:  Okay.  So then -- and then as to

5      officer, Mr. Nunes acted as GC?

6                    MR. SAMET:  That's right, Your Honor.

7                    THE COURT:  Is he or is not an officer?

8                    MR. SAMET:  Well, that was my point I was just

9      making, Your Honor.  He's an officer, but he's still a lawyer,

10     he's got a --

11                    THE COURT:  Okay.  But -- well, okay.  And then

12     Mr. Van Stephoudt who was president.

13                    MR. SAMET:  He's not a lawyer, but he's at their law

14     firm.

15                    THE COURT:  And he's --

16                    MR. SAMET:  I think that --

17                    THE COURT:  -- well, but he's an officer.

18                    MR. SAMET:  He's an officer of that firm.

19                    THE COURT:  Okay.  All right.  And then as to Stone

20     Pigman, Reed Smith and Hryck, none of them are construed as an

21     officer or a manager.  And I'll hear -- I'm obviously going

22     to -- Mr. Fogler, I'm just getting sort of background on this,

23     I'm going to want to hear what your all's thoughts are.

24                    MR. SAMET:  That's correct.

25                    THE COURT:  There's not -- so it makes me wonder --

1    I can see why this could apply to Mr. Nunes and Mr. Van

2    Stephoudt.  I'll want to hear more from you all about why the

3    firms and everybody else falls within this protection on

4    fiduciary duty.  Okay?

5             So let me finish with Mr. Samet.

6             Go ahead, Mr. Samet.

7             MR. SAMET:  Thank you, Your Honor.

8             Let me just make sure I've covered the points I want

9    to make on this because this is an important point.  I think

10   it really just comes down to the -- it's amended as of -- it's

11   a matter of just as of.  Sometimes you see operating

12   agreements as -- mis-stated as of this date.  Right?  But is

13   says right there, it's effective as of January 25th.

14            It's a contract, Delaware law says it needs to be --

15   in fact, this then Mr. Kryder handed me, the maximum effect of

16   the principle of freedom of contract.  All right?  And

17   Delaware law has a separate provision which we cited in our

18   brief that says the parties can pick even and earlier date,

19   and that is the rub of our argument, Your Honor.

20            THE COURT:  Right.  Okay.  Thank you.

21            MR. SAMET:  Thank you.

22            THE COURT:  All right.  Who would like to -- go

23   ahead, Mr. Fogler.

24            MR. FOGLER:  If I could just make one comment,

25   Judge?

1       THE COURT:  Sure.

2       MR. FOGLER:  Mr. Kryder and I can certainly expound

3  at length on the restrictions that a lawyer ethically has

4  about making a release agreement with a client.  That is not

5  what this is.

6       THE COURT:  Right.

7       MR. FOGLER:  In fact, there is no release in this

8  LLC agreement and it's not a contract between the company and

9  Tony Nunes where the company and Mr. Hryck --

10      THE COURT:  No, I understand that.

11      MR. FOGLER:  -- they weren't even involved in the

12  negotiation of this LLC agreement.  It is not a release at

13  all.  It is a contractual provision that disclaims any duty on

14  behalf of the officer.  That's the key point that they're

15  missing.

16      THE COURT:  So why -- so why does this apply to Mr.

17  Hryck, Reed Smith and Stone Pigman?

18      MR. ROSEN:  It applies --

19      THE COURT:  So, let's let Mr. --

20      MR. REASONER:  Well, no, I'll let Mr. Rosen --

21      THE COURT:  He was going to speak first, I'm just

22  going to let him get [indiscernible 5:01:58].  I'll hear from

23  you both.

24      But go ahead, Mr. Reasoner.

25      MR. REASONER:  I was just going to say on that

1       point, Your Honor, for the conspiracy claim specifically.

2                    THE COURT:  Oh.

3                    MR. REASONER:  Because the allegation is you have a

4       couple of things that are -- you have an allegation that

5       Mr. Hryck, for example, conspired in part with Reed Smith,

6       which he can't do because of the intercompany, you know,

7       conspiracy prohibition, but then there are others --

8                    THE COURT:  As to this if there's no duty, you can't

9       conspire as to breach of a duty.

10                   MR. REASONER:  Right.

11                   THE COURT:  But that's just -- so as to -- well, I

12      guess that we've -- as to Hryck, Reed Smith and Stone Pigman

13      is it -- is the argument simply about the civil conspiracy

14      claim?  That this would remove the ability to have the breach

15      of fiduciary duty, well, claim against -- or assert that

16      there's a fiduciary duty on behalf of Mr. Van Stephoudt and

17      Mr. Nunes, and so therefore you can't state that it's a

18      conspiracy to breach that duty involving Hryck, Reed Smith and

19      Stone Pigman?  Is that what your argument is?

20                   MR. ROSEN:  There's no conspiracy count against

21      Stone Pigman.

22                   THE COURT:  Say again?

23                   MR. ROSEN:  There is no conspiracy count against

24      Stone Pigman.  So as to Stone Pigman, Mr. Nunes could not be

25      liable because -- as a officer of the company which it sounds

1          as if Mr. Samet agrees -- an agreement could provide that.  He

2          could not be liable as an officer, we cannot be liable for any

3          of his acts as the -- as a purported officer.  We'll put aside

4          separately if there could be a breach of fiduciary duty.

5                    THE COURT:  I guess then my question is -- I think

6          we're talking past each other -- there's an assertion for a

7          breach of fiduciary duty, an actual breach of fiduciary duty

8          by Stone Pigman.

9                    MR. ROSEN:  Correct.

10                    THE COURT:  Why would this provision pertain to

11          Stone Pigman when it refers only to manager of the board or

12          officer of the company?

13                    MR. ROSEN:  Only to the extent, Your Honor, that

14          they're trying to roll through the successor liability, like

15          taking Mr. Nunes to make Cogan responsible for him and then to

16          roll it down to us.

17                    THE COURT:  So then as to Stone Pigman, it's a

18          successor liability issue?

19                    MR. ROSEN:  Only on that issue.

20                    THE COURT:  Okay.

21                    MR. ROSEN:  But otherwise, there's no conspiracy

22          count as to Stone Pigman.  But our point is in our motion

23          Mr. Nunes is -- cannot be liable for breach of fiduciary duty,

24          it's been eliminated, there's no liability --

25                    THE COURT:  Right.

1    MR. ROSEN:  -- you can't bring the claim.  It's not
2    a release.  And therefore we can't be liable for his director
3    or officer liability in that context.
4    THE COURT:  Okay.
5    MR. KRYDER:  And, Your Honor, I'll let Mr. Rosen
6    elaborate, but just to say for my client, as to Mr. Hryck, he
7    cannot have conspired with someone who did not have an
8    underlying --
9    THE COURT:  Right.
10    MR. KRYDER:  -- fiduciary duty.
11    Mr. Van Stephoudt, as discussed, the allegation is
12    he served as -- he was not a lawyer, the allegation is he
13    served as president and this disclaimer would apply squarely
14    to him, and to him the conspiracy piece as well.  But on the
15    breach of fiduciary duty issued directly for him.
16    THE COURT:  Okay.
17    MR. KRYDER:  Thank you.
18    MR. ROSEN:  And I think the point about focusing on
19    the word "release," I think ties to this point.  I understand
20    why the Plaintiff keeps using that word, because a release
21    implies that there was a claim, a viable claim, a claim you
22    asserted or could have asserted if you are releasing.  That's
23    not how the statute works.  And I think the Court should not
24    be led down the wrong path by use of that word because that's
25    not the way the Delaware statute works.

1          It's not about a claim that is being released.  It's

2     about a claim, a duty that doesn't exist.  That's what the

3     statute does allow us, that's what the provision --

4               THE COURT:  Right.

5               MR. ROSEN:  -- does.  And if there's no duty, there

6     can be no breach.

7               THE COURT:  Right.

8               MR. ROSEN:  And if there can be no breach of duty,

9     there cannot be a conspiracy to breach fiduciary duty.

10              THE COURT:  Okay.

11              MR. ROSEN:  So it is tied to the conspiracy claim.

12    The improper benefit issue, which we'll come to, I'm sure --

13              THE COURT:  Yes.

14              MR. ROSEN:  -- possibly tomorrow, but we'll come

15    to --

16              THE COURT:  Is that a request?

17              MR. ROSEN:  No, not at all.  I'm happy to go on as

18    long as you want, Your Honor.

19         (Laughter.)

20              MR. ROSEN:  You're right that --

21              THE COURT:  Okay.

22              MR. ROSEN:  -- from the standpoint -- I don't want

23    to speak for individuals, but certainly from the standpoint of

24    Reed Smith, the principal --

25              THE COURT:  Okay.

1          MR. ROSEN:  -- focus is the conspiracy claim.

2          THE COURT:  Okay.  All right.  Thank you --

3          MR. ROSEN:  Now --

4          THE COURT:  -- oh, go ahead.

5          MR. ROSEN:  I'm sorry, Your Honor.

6          THE COURT:  Didn't mean to cut you off.  Go ahead.

7          MR. ROSEN:  You know, in terms of the timing

8    issue --

9          THE COURT:  Yeah, the effective as of --

10         MR. ROSEN:  Yeah, and the agreement has a date.

11   It's just a date that it's implemented.  But what is

12   effective?  What is effective is --

13         THE COURT:  It doesn't answer the question of what

14   actually did it do.

15         MR. ROSEN:  It restated is what it did.

16         THE COURT:  Yeah.

17         MR. ROSEN:  And that's the piece that Plaintiff

18   keeps ignoring.  It restated.  What does restated mean under

19   Delaware law?  It means replaced, and so we --

20         THE COURT:  Is that -- are you looking at a case for

21   that?

22         MR. ROSEN:  I am looking at a case for that, Your

23   Honor.

24         THE COURT:  Okay.  What's the cite for that because

25   that was a question I had, where does it -- you had said

1        before and I meant to ask you, restate means replace.

2                    MR. ROSEN:  Exactly.

3                    THE COURT:  And what is your cite for that?

4                    MR. ROSEN:  It's a case called *Focus Financial*

5        *Partners* --

6                    THE COURT:  Okay.

7                    MR. ROSEN:  -- 241 A.3d 784, 2020.

8                    THE COURT:  All right.  Okay.

9                    MR. ROSEN:  And just so -- you'll obviously read it

10       I'm sure, but when you see it, it cites specific Delaware

11       Corporations Code provisions about restating a certificate of

12       formation, restating a certificate of incorporation as doing

13       the same thing.  Under Delaware law when you restate something

14       you replace and supercede it.

15                   So when you replace and supercede operating

16       agreements then the only one that as a matter of law we're

17       talking about is this one agreement.

18                   THE COURT:  Yep.

19                   MR. ROSEN:  And if you have only this one agreement,

20       again, the temporal distinction he's trying to make

21       doesn't exist.

22                   THE COURT:  No, I can understand that.  I mean, if

23       you simply amend something, you know, the amendment to the

24       document, we still need to refer to the prior document.

25                   MR. ROSEN:  Precisely.

1           THE COURT:  But it's a restatement, it gathers it

2     all in, that's why the amendments to the Constitution, you

3     still look to the Constitution because they didn't redo the

4     whole thing --

5           MR. ROSEN:  Exactly.

6           THE COURT:  -- each time.

7           MR. ROSEN:  Precisely.

8           THE COURT:  All right.

9           MR. ROSEN:  That's precisely the point, Your Honor.

10    And I think what's been helpful collectively in this process

11    is it doesn't sound like there's a dispute about what Delaware

12    law permits in the Corporations Code.  And what this restated

13    LLC agreement did.  The only dispute it sounds like that we

14    have right now is whether this restated LLC agreement covers

15    pre-2018 which then doesn't even answer the question that the

16    Court posed about is it the conduct or is it the claim?

17          THE COURT:  Okay.

18          MR. ROSEN:  Which becomes a non-issue when you see

19    it I think this way, which I have to say I think that's right

20    way, but then that question becomes a non-issue.

21          THE COURT:  Okay.  Mr. Samet.

22          MR. SAMET:  I'd like to make -- just briefly in

23    rebuttal.  I very much disagree as to what Delaware law is.

24    Delaware law does not have a statute that says if you restate

25    an agreement and you have exculpation that applies

1    retroactively.  That's what we're talking about.  There is no

2    such statute.

3            THE COURT:  Okay.

4            MR. SAMET:  All right?  Delaware law, all right?

5    You -- it says the effective date is -- has -- there's a

6    statute, 18-201(d), there's an effective date.  It has a

7    meaning in Delaware law.  All right?  And there's cases we

8    cited, Your Honor, the case, the *Rogers* case.  All right.

9    That was -- actually that was a regular contract with a

10   liability set that you could pick whatever, I'm sorry,

11   whatever you want.

12           The effective date is an important term in the

13   contract.  The claim had accrued and there is -- forgive me,

14   there's a lot of cases in this -- I would also encourage Your

15   Honor to look at these cases.  There is not a case that is

16   going to say that when you restate an agreement that you

17   release previously accrued claims, and it would make no sense

18   to do that.

19           And again, parties are free in the LLC agreement to

20   do whatever they wanted to say.  The date on this agreement,

21   it's just not true that's the date of the agreement.  I mean,

22   it's just not -- that's only the date of the agreement, I

23   don't know when the agreement was executed.  I imagine it was

24   around that date.  All right?

25           But the agreement on its own terms is putting -- is

1        changing the governance of the company.  And I understand that

2        they're citing cases where there was an exculpation provision

3        and the Court says, "Well, of course if there's an exculpation

4        provision you can't do it."  But there are separate cases that

5        restate the agreement, all right, but here that's not what

6        this agreement is doing.  And I would very much encourage the

7        Court to look at these cases, particularly --

8                    THE COURT:  Yeah.

9                    MR. SAMET:  -- the *DG* case that was cited by

10       counsel.  You will not find that in these decisions.

11                   THE COURT:  Okay.

12                   MR. ROSEN:  Just ever so briefly.

13                   THE COURT:  Yep.

14                   MR. ROSEN:  I did catch counsel sliding back into

15       the word "release" again and again.  But I think what counsel

16       also hasn't answered, which is another reason why the argument

17       doesn't work, is under Delaware law when you have a provision

18       like this, the corporation is no longer empowered to bring a

19       breach of fiduciary duty claim.  That's why in some instances

20       the cases talk about, well, in the alternative can they bring

21       a breach of implied good faith and fair dealing, and

22       Delaware's very restrictive about that.

23                   But the point of it is, it doesn't matter when a

24       claim accrued, it doesn't matter when the actions took place,

25       it doesn't matter when you brought the claim --

1           THE COURT:  If you have the power to bring the

2     claim.

3           MR. ROSEN:  -- if you don't have the power to bring

4     it.

5           THE COURT:  Yeah.

6           MR. ROSEN:  And that's the reason his temporal

7     argument -- another reason why his temporal argument doesn't

8     work.

9           MR. SAMET:  But if I could just say, that's actually

10    my contention is the opposite of the case.  The Delaware cases

11    say you don't have the power to bring it because there's an

12    exculpation clause.  They do not discuss what happens to

13    the -- what the -- if there is an effective date --

14          THE COURT:  All right.

15          MR. SAMET:  -- what happened prior to that point.

16    That's the whole point.  And to make -- this agreement could

17    have said there's no longer power to bring this for a previous

18    claims that have accrued, it does not say that.  The question

19    here is the retroactive element of it, and we can character

20    that release as retroactive as a waiver.  But we're talking

21    about the same thing.

22          THE COURT:  All right.  All right.  Let's leave it

23    there, we'll pick up tomorrow with -- there was some arguments

24    on failure to sufficiently plead fiduciary duty and the

25    improper benefit.  We'll start with that and then pick up what

1    we need to on civil conspiracy, there are a few other small

2    issues, and then I'm also going to hear arguments from

3    Mr. Hord, Sierra Pine, Ganer and the bond issues that they've

4    got.  All right?

5            MR. KRYDER:  Are we still at 1:30 tomorrow, Your

6    Honor?

7            THE COURT:  1:30 tomorrow.  That's --

8            MR. SAMET:  Thank you, Your Honor.

9            THE COURT:  Okay.  Great.

10           MR. KRYDER:  Thank you.

11           THE COURT:  All right.  Thank you all very much.

12           MR. SAMET:  Thank you.  Thank you for your time.

13           THE COURT:  Yeah, we're adjourned.

14       (Hearing adjourned 5:14 p.m.)

15                                   *  *  *  *  *

16           *I certify that the foregoing is a correct transcript*

17    *to the best of my ability produced from the electronic sound*

18    *recording of the proceedings in the above-entitled matter.*

19       */S./  MARY D. HENRY*

20    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

21    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

22    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

23    *JTT TRANSCRIPT #65945*

24    *DATE FILED:  JULY 16, 2022*

25