IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CLINGMAN & HANGER MANAGEMENT | § | CASE NO. 4:21-CV-02698 |
| ASSOCIATES, LLC | § | HOUSTON, TEXAS |
| | § | WEDNESDAY, |
| VERSUS | § | JUNE 15, 2022 |
| | § | |
| KAY RIECK, ET AL | § | 1:30 P.M. TO 4:28 P.M. |

MOTION HEARING DAY TWO

BEFORE THE HONORABLE CHARLES ESKRIDGE
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | JENNELLE GONZALEZ |
| COURT RECORDER: | SHANNON HOLDEN |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX  77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


For the Plaintiff:                Robert M. Corn, Esq.
                                  3131 Eastside St.
                                  Suite 440
                                  Houston, TX 77098
                                  713-229-0055

                                  Avery Daniel Samet, Esq.
                                  AMINI LLC
                                  131 West 35th Street
                                  Floor 12
                                  New York, NY 1001
                                  917-647-8950

For Defendant Kay Rieck and       William P. Haddock, Esq.
Helena Energy:                    2777 Allen Parkway
                                  Suite 800
                                  Houston, TX 77019
                                  713-528-8555
                                  will@haddock.pro

For Defendant Michael Nunes:      Murray J. Fogler, Esq.
                                  Fogler Brar O'Neil & Gray, LLP
                                  909 Fannin St
                                  Suite 1640
                                  2 Houston Center
                                  Houston, TX 77002
                                  713-481-1010

For Defendant Reed Smith:         Kevin Rosen, Esq.
                                  Gibson, Dunn, & Crutcher LLP
                                  333 South Grand Avenue
                                  Suite 4600
                                  Los Angeles, CA 90071-3197
                                  213-229-7635

For Defendant Stone               George M. Kryder, III, Esq.
Pigman Walter Wittmann:           Jordan Leu, Esq.
                                  Vinson Elkins LLP
                                  2001 Ross Ave, Suite 3900
                                  Dallas, TX 75201
                                  214-220-7719

<u>APPEARANCES (Continued)</u>:

For Defendant David Hryck and      Barrett H. Reasoner, Esq.
Theodor Van Stephoudt:             Caitlyn Cowan, Esq.
                                   Gibbs Bruns LLP
                                   1100 Louisiana
                                   Ste 5300
                                   Houston, TX 77002
                                   713-650-8805

For Defendant Thomas Hord:         J. Marcus Hill, Esq.
                                   Hill & Hill, P.C.
                                   1770 St. James Place
                                   Suite 115
                                   Houston, TX 77056
                                   713-688-6318

                                   Jonathan Scott Stoger, Esq.
                                   Stoger Law Firm, P.C.
                                   14 Greenway Plaza
                                   Unit 10M
                                   Houston, TX 77046
                                   346-250-1446

For Defendant Sierra Pine          Crystal T. Dang, Esq.
Resources:                         Peckard Abramson
                                   3050 Post Oak Blvd.
                                   Suite 500
                                   Houston, TX 77056
                                   713-568-1500

| | |
|---|---|
| 1 | **HOUSTON, TEXAS; WEDNESDAY, JUNE 16, 2022; 1:30 P.M.** |
| 2 | COURT SECURITY OFFICER:  All rise.  The United |
| 3 | States District Court for the Southern District of Texas is |
| 4 | now in session. |
| 5 | The Honorable Charles Eskridge presiding.  God save |
| 6 | these United States and this Honorable Court. |
| 7 | THE COURT:  Thank you.  Everyone can be seated. |
| 8 | All right.  Continuing on with our hearing from |
| 9 | yesterday in Clingman and Hanger Management Associates versus |
| 10 | Kay Rieck, et al, 21-2698.  So we had the same appearances to |
| 11 | start. |
| 12 | Do we have the same Court reporter as yesterday? |
| 13 | THE CLERK:  No, Your Honor. |
| 14 | THE COURT:  No?  All right.  Can I get the |
| 15 | appearances for the Record then? |
| 16 | MR. SAMET:  Good afternoon.  Again, for the |
| 17 | Plaintiff, Avery Samet and Robert Corn. |
| 18 | THE COURT:  Thank you. |
| 19 | And for various Defendants? |
| 20 | MR. RYDER:  George Ryder and Jordan Leu for |
| 21 | Defendants Stone Pigman Walther Wittmann L.L.C. |
| 22 | THE COURT:  All right. |
| 23 | MR. REASONER:  Barrett Reasoner and Caitlyn Cowan |
| 24 | for David Hryck and Theodor Van Stephoudt. |
| 25 | THE COURT:  All right. |

1          MR. ROSEN:  Good afternoon, Your Honor.  Kevin Rosen

2     on behalf of Defendant Reed Smith.

3          THE COURT:  Thank you, Mr. Rosen.

4          MR. FOGLER:  Murray Fogler for Tony Nunes.

5          THE COURT:  All right.  Thank you, Mr. Fogler.

6          And I'll, for anybody else beyond the law -- lawyers

7     and law firms, we'll swap out for whatever's left and get

8     further appearances, I think once we move to that set of

9     issues.

10          (En masse)  Yes, Your Honor.

11          THE COURT:  Is everybody on the present set?  Okay.

12          All right, thanks everyone.

13          A couple of minor matters.  My law clerk and I were

14     looking.

15          Mr. Hryck, how is this spelled, because it seems

16     like it's spelled throughout the Record as H-R-Y-C-K.

17          MS. COWAN:  That's correct.

18          THE COURT:  That is?  But it's pronounced as if it's

19     spelled H-R-C-Y-K.

20          MS. COWAN:  It's pronounced as if it's the word her,

21     H-E-R dash sick --

22          THE COURT:  Hrcyk.  Okay, all right.  So I just want

23     to make sure.  I just was wondering whether anything on the

24     docket that would be --

25          MR. BARRETT:  In our defense, Your Honor, I think I

1    erroneously gave the Court the phonetic spelling as opposed

2    to the actual --

3              THE COURT:  Yeah, I just wanted to be clear.

4    Because actually we had started to correct some things on the

5    Record on the docket.  I was like, no, no, no, let's make

6    sure, because we were looking at -- anyways, I think we have

7    it figured out now how it's spelled and how it is said.

8              There was also, just filed a supplement to

9    Mr. Rieck's motion to dismiss about this service issue.

10             Mr. Samet, have you had a chance to see that or look

11   at it at all?

12             MR. SAMET:  I have had a chance to see it and look

13   at it briefly this morning.

14             THE COURT:  And so I don't know -- I don't know that

15   it changes my ruling or anything, but I think that it goes

16   towards, are you trying to effect some other type of service,

17   or do you think that the service that you've made is

18   sufficient?

19             Obviously I was going to give you a chance to

20   respond on what's going on.  But I've sort of thought if

21   you're like, well, we're going to be perfecting service in a

22   different way anyway, then we don't have to worry about this

23   at all.

24             MR. SAMET:  That is what -- I have a lot to say

25   about this.

1          THE COURT:  All right.

2          MR. SAMET:  But that is one of my points, which is

3     we have a section of the brief we filed back in September --

4     October that says this Court has authority to designate and

5     serve through his lawyer.

6          So in some sense it is -- I don't know that's

7     particularly relevant --

8          THE COURT:  All right.

9          MR. SAMET:  -- although I do have a lot of say if

10    Your Honor wants to hear it.  You may not.

11         THE COURT:  We'll let you know whether you need to

12    file anything further.  But with this in mind, we'll take a

13    look at what further needs to be said.  I'll issue some sort

14    of further writing on that disbursing of it.  Okay?  Or

15    directing you to let me know more.

16         All right.  So let's pick back up where we were

17    yesterday.  And let me give my outline here.  My materials are

18    growing.

19         Jacob, where was that -- here, I've got it.  My

20    tracking sheet there.

21         All right.  So we were on to the breach of fiduciary

22    duty claims yesterday.  And so, let's pick up with Mr. Hrcyk

23    as to failure to plead sufficiently fiduciary duty.

24         MR. REASONER:  Thank you, Your Honor.

25         THE COURT:  Yes.

1          MR. REASONER:  I would just like to highlight two

2     points for -- oh, I'm sorry, Barrett Reasoner for David Hryck.

3          I'd just like to highlight for the Court two points

4     there.  First, Your Honor, on the duty piece.  All of the

5     allegations against Mr. Hryck, for breach of fiduciary duties,

6     span from the time frame of February of 2016 to April of that

7     year.

8          The engagement letter in question is for December of

9     2017, but effective June of 2017.  So they have not pled an

10    attorney-client relationship between Mr. Hryck and Fury during

11    the relevant time period that they've talked about misconduct

12    allegedly taking place.  So that is -- we think that's a fatal

13    deficiency in the pleading in that regard.  But second --

14          THE COURT:  Go ahead, go ahead.

15          MR. REASONER:  Secondly, Your Honor, when you go to

16    the substance of the breaches that are alleged, and I think

17    Mr. Rosen will talk in a bit about the showing an improper

18    benefit.

19          THE COURT:  Right.

20          MR. REASONER:  Here, the allegation is that he

21    drafted a profit-sharing agreement and that he drafted a trust

22    agreement, which contemplated that he might be a trustee of an

23    entity.  Again, neither of those alleged that there was any

24    improper benefit to Mr. Hryck from that.

25          And we talked yesterday about the fact that there

1    was no allegation of any -- you know, beyond attorneys' fees,

2    that there were any involvement of Mr. Hryck as an investor in

3    any of these things or receiving any under-the-table payment,

4    any sort of untoward activity.

5           So, they're not in a position where they can fairly

6    bring a breach of fiduciary duty claim against Mr. Hryck when

7    the law says all you have, if you do not show any proper

8    benefit, is a legal malpractice claim --

9           THE COURT:  And is it -- so some of the allegations

10   are, as to Mr. Hryck having some conflicts of interests as to

11   various entities that he was representing, correct?

12          MR. REASONER:  I --

13          THE COURT:  I'm not asking you to agree that that is

14   an established state of facts, but that there are allegations

15   about that.

16          MR. REASONER:  I think they're trying to suggest

17   that through some other entities that he was representing,

18   there was a conflict with Fury.

19          THE COURT:  Okay.  And so if in that relationship,

20   it's in a conflict situation, let's then suppose that as to

21   the entities which are creating conflict of interest, there's

22   what would be perceived as an improper benefit to one of them

23   at the expense of another.

24          Assuming that state of facts is proven, is that

25   enough to meet the improper benefit or is it have to be

1    improper benefit to Mr. Hryck himself?

2              MR. REASONER:  So my understanding is, it has to be

3    to Mr. Hryck.  They have suggested that there is some state of

4    affairs where you can say trying to benefit one client versus

5    another is an improper benefit.  We've not seen authority for

6    that, Your Honor.

7              And, frankly, if you look at the cases that are

8    cited in that section of their brief, one of them -- the only

9    one that involves an attorney is *Brenner v. Centurion*

10   *Logistics*, was a situation where the Court found that

11   forfeiture of fees was not proper for, among other reasons,

12   the fact that the Plaintiff was not able to show that there

13   was any benefit, any improper benefit from the alleged

14   breaches.

15             And so, the situation that the Court hypothesizes,

16   and that they're trying to suggest, I think in their

17   arguments, is not supported by law that we have seen.  And

18   again, they've not alleged that Mr. Hryck received anything

19   other than -- well, fees were paid to Reed Smith, and he was a

20   partner there.

21             THE COURT:  And then, so further as to just to make

22   sure I hear everything from you on this point that I need to.

23             Anything further to say in terms of your

24   representation of Reed Smith on that?  I'm very clear about

25   what you say Mr. Hryck.  Is there anything else as to Reed

1      Smith?

2              MR. REASONER:  And Mr. Rosen is representing Reed

3      Smith.

4              THE COURT:  Oh, okay.

5              MR. REASONER:  So I was just --

6              THE COURT:  Right, right, right, okay.

7              MR. REASONER:  -- about that relationship.

8              THE COURT:  Got it, got it, got it.  I forgot about

9      that.  Okay.

10             Yeah.  Because you also have Van Stephoudt, but

11     there's not an argument to that.

12             MR. REASONER:  Well, yes.  The only -- Your Honor,

13     the only for Mr. Van Stephoudt, whom they alleged was for a

14     period of time, president, --

15             THE COURT:  Yeah.

16             MR. REASONER:  -- he falls squarely within that LLC

17     agreement disclaimer that was addressed --

18             THE COURT:  That we took yesterday.  Yeah.  Okay.

19     Thank you very much.

20             MR. REASONER:  Thank you, Your Honor.

21             THE COURT:  Does it make more -- from the

22     Defendants, does it make more sense for me to talk to

23     Mr. Samet, just about Mr. Hryck at this point, or should we

24     get the positions for Mr. Nunes, Reed Smith, and Stone Pigman

25     on this before we turn to him?

1          I don't know if you-all are saying kind of the same

2     thing or you've got different aspects?

3          MR. ROSEN:  Kevin Rosen for Reed Smith.

4          THE COURT:  Let me hear at least for Reed Smith.

5     Anything for that you want to say on the improper benefit

6     point?

7          And then I think, Mr. Samet, I'll take -- have you

8     respond there.  And the we will do Nunes and Stone Pigman

9     together.  Okay?

10          All right. Go ahead.

11          MR. ROSEN:  Thank you, Your Honor.

12          And that's correct.  My focus is going to be on

13     improper benefit issue --

14          THE COURT:  Yeah.

15          MR. ROSEN:  -- in connection with the direct breach

16     of fiduciary duty claim against Reed Smith.

17          I think -- there's some things that we can put aside

18     because they're not really in dispute.  I don't think it's

19     really in dispute that attorneys' fees alone are not enough

20     under Texas law to support breach of fiduciary duty claim.

21          I don't think it's in dispute that the improper

22     benefit question is a question of law, that the Court can

23     decide.  That's specifically stated, for example, in the

24     *Juan Pack* (phonetic) case that we cited.

25          And I also don't think it's disputed that simply

1   because there's an allegation of something that one might

2   consider a breach of fiduciary duty, such as a conflict, or

3   what have you, that that's enough under Texas law, the anti-

4   fracturing doctrine, to support a breach of fiduciary duty

5   cause of action.

6           I don't think any of that's in dispute.  If it turns

7   out it is, then I'll obviously address it.

8           And I also don't think -- well, I guess this is in

9   dispute.

10          If you look at the opposition brief, not having

11  disputed any of that, and acknowledging improper benefit

12  doctrine, the sum total of the opposition to the applicability

13  of the doctrine here, the improper benefit is, well, no, no,

14  no, we're talking about disloyalty.

15          THE COURT:  Right.

16          MR. ROSEN:  But the problem is every single case

17  that enforces the improper benefits doctrine describes the

18  allegations as disloyalty.

19          So just because there's an allegation of disloyalty,

20  does not in any way change the analysis.  And I'm going to

21  give you some specifics, because I think it's one thing to

22  listen to argument, it's another thing to see what the case is

23  saying.

24          I just don't spend quite a lot of time on case law.

25  I obviously presume and expect that the Court's read it.  But

1    I do think some of the points in the case law to specifically

2    call out, because there's just a few cases that I think are

3    the most relevant here are useful.

4         I think from our perspective, you start, it's useful

5    to start with the *Stanford Ponzi Scheme* (phonetic) case of

6    Northern District of Texas.  And there the Court -- you know,

7    there were allegations of how there was with breach of

8    integrity and fidelity, because fidelity is another word for

9    loyalty.

10        And there were -- there was a specific allegation

11   that the lawyers had an expectation of continuing legal fees

12   from another entity.

13        Again, very much similar to what we've seen here.

14   And the Court there addressed a number of the cases that had

15   been cited by the parties.  And at the end of the day, where I

16   think it's most relevant to focus on that decision, and I'm

17   at, I believe I'm at page 7 from the Westlaw cite, is the

18   following statement in that case, I've going to read it twice,

19   once in terms of the context of that case, and once in terms

20   of this case.

21        The Court said this in referring to the one, the

22   *Juan Pack* case that I had said it before and how that was,

23   analogous.

24        The Plaintiffs alleged Defendants subordinated the

25   interest of one client, the Stanford entities, to those of

1    another client, Mr. Stanford, in order to ensure continued

2    receipt of business and legal fees from the latter.

3              Now I'm going to put that in our case.

4              Plaintiffs alleged that Defendant, Reed Smith,

5    subordinates -- subordinated the interests of one client,

6    Fury, the Fury entities, to those of another client, Mr. Reick

7    and others, in order to ensure continued receipt of business

8    and legal fees from the latter.

9              That is their argument.  And that argument was

10   squarely rejected by the *Stanford* case.

11             THE COURT:  Who was the judge of that case?

12             MR. ROSEN:  Judge Godwin.

13             THE COURT:  Godwin, okay.

14             MR. ROSEN:  And I think the Court there did an

15   admirable job in sort of collecting a lot of the most relevant

16   authorities that are applicable.

17             But it's not limited to that case.  It's also, you

18   can see these points in appellate decisions in Texas.  The

19   *Murphy* case is another good example.  I mean there -- and

20   consider the allegations.  These are specifically called out.

21   The Court listed 11 elements or 11 allegations that supported

22   the Plaintiff's breach of fiduciary duty claim there.

23             Consider some of these allegations, which ultimately

24   the Court said do not support breach fiduciary duty claim.  It

25   was an allegation of -- conflict of interest, in the language

1     of the Court.

2              Quoting from the Plaintiff:  Violation of duties of

3     loyalty, there was an allegation of misrepresentation.  There

4     was an allegation of self dealing -- I'll come back to that

5     because certain types of self dealing are used in Court, in

6     terms of stealing.

7              But there was an allegation of self dealing.  There

8     was an allegation that the lawyers chose their own interests

9     in obtaining a multimillion dollar fee, in one case by taking

10    action in that case, it was detrimental to their clients in

11    another case.  And there's allegations about how the lawyers

12    failed to represent the Plaintiff with undivided loyalty.

13             Over and over again, in that case, there are -- or

14    were allegations more extreme, if you will, than the simple

15    statement in the opposition brief that this is about a loyalty

16    case.  And nevertheless, and in the case was basically about

17    how one lawyer had represented two different clients in two

18    different cases.  And then when there was a counterclaim in

19    the second case, abandoned the client in order to preserve the

20    situation in the first case where the lawyer had earned the

21    fee.

22             Clearly allegations of conflict of interest.

23    Clearly allegations that the lawyer wanted to benefit in terms

24    of the fee he'd earned in another base.  And nevertheless, the

25    Court said that is not what Texas law considers to be an

1    actionable breach of fiduciary duty, as opposed to allegations

2    that would fit within a negligence cause of action.

3         So again, the important point here is, it's not

4    about whether something is arguably a breach of fiduciary

5    duty, because under Texas law, a breach of fiduciary duty

6    under the anti-fraction rule fits within a negligence cause of

7    action, unless there is a improper benefit.

8         So, you know, and I can go on.  I mentioned the *Juan*

9    *Pack* case.  That would be one more that I would suggest that

10   the Court look at it in particular.  And then even that case

11   talks about conflict of interest.  And that's one of the cases

12   that in the opposition brief, the Plaintiffs point the Court

13   to.  But in *Beck*, after looking at a number of these other

14   cases as well, *Beck* rejected the very argument that Plaintiffs

15   are asserting.

16        And the only other case that the Plaintiff provided,

17   the *First Pentecostal Union* case, that was a case where the

18   lawyer stole a million dollars from his client.  That is a

19   completely different scenario than the type of theory and

20   allegations that are being alleged here.

21        And so, in light of the distinction that Texas law

22   draws between what constitutes an improper benefit to support

23   a cause of action for breach of fiduciary duty versus what

24   breaches of fiduciary duty must be alleged in a cause of

25   action for negligence.

1          This case is easily on the side of the negligence

2     cause of action.  There really aren't any facts beyond any of

3     the cases that I cited, all of which say that is not

4     sufficient to support breach of fiduciary duty claim.

5          And that, in essence, Your Honor, is our point.  And

6     as I say, those are the cases that I think are most helpful in

7     addressing the type of allegations here in response to the

8     (indiscernible).

9          THE COURT:  Okay.

10         MR. ROSEN:  So unless you have any questions --

11         THE COURT:  No, I don't.  Thanks, it's very helpful.

12         MR. ROSEN:  Thank you.

13         THE COURT:  Mr. Samet.

14         MR. SAMET:  Thank you, Your Honor.  Mr. Corn, is

15    going to address this issue.

16         THE COURT:  Okay, great.

17         MR. CORN:  Robert Corn for the Plaintiff.

18         Judge, I want to back up just a little bit here and

19    talk about why it is there is an issue and why this

20    terminology comes up with this improper benefit.

21         It goes back to malpractice actions in Texas and the

22    general concept that malpractice action can't be fractured in

23    other claims.  It's that fundamental, that old fundamental

24    concept.  And you can't take what is generally a malpractice

25    claim and break it down into breach of fiduciary duty and

1    fraud and whatever else.

2          And so Courts have, from time-to-time, looked at

3    that issue.  And as a tool to try to evaluate the claims, one

4    of the things the Courts look for is:  Was there an improper

5    benefit to the lawyer in what is fundamentally a negligence-

6    based claim.  A claim that is about the quality of the

7    lawyer's services.

8          If you look at the cases that the Defendants are

9    citing, those are generally -- for example, the *Juan Pack*

10   case, there was another one they cited, those are cases

11   evaluating a negligence-based malpractice claim to see if the

12   breach of fiduciary duty claim could be alleged as well,

13   whether that's a viable claim, in addition to the malpractice

14   claim within a quality based controversy.

15         That's not what's going on here.  That's not what

16   this case is about.  This case is about the disloyalty.  We

17   have alleged pages and pages in detail with allegations of the

18   conduct of these lawyers doing work for everybody other than

19   Fury, and for the benefit of everybody other than Fury,

20   Mr. Rieck's other companies, Mr. Rieck.  The middleman

21   entities, they were going to syphon assets out of Fury,

22   creating all this legal work, all of that is disloyal to Fury.

23         Fury even paid for that work.  So what the cases are

24   about that we cited, we cited *Burr versus Arce* and its

25   prodigy, and those cases are about lawyers who have been

1    disloyal and what the remedies are with respect to that sort

2    of conduct.  And I think we've all become familiar with the

3    concept that there can be fee forfeiture, and there can be

4    other harm and damages that result from the disloyalty by the

5    lawyers.

6            And so, that's the line of cases that we're talking

7    about.  And it's the compensation that they received, that's

8    an improper benefit.  And there's the funds that they've

9    received as a result of the conduct, for example, for

10   representation of others that they preferred.  And we've cited

11   cases for the proposition that those sorts of conflicts of

12   that sort of behavior is disloyal and it's a breach of

13   fiduciary duty.  So I can turn as well --

14           THE COURT:  What's your leading case?

15           MR. CORN:  Well, it would be *Burroughs*, which is,

16   which is one of the original cases.

17           THE COURT:  Uh-huh.

18           MR. CORN:  It would be the *Pentecostal* case.  It

19   would be -- and we've cited those.  It's *First United*

20   *Pentecostal Church of Beaumont versus Parker*.  There is also

21   the *ERI Consulting versus Swania* (phonetic) case out of the

22   Supreme Court that we've cited, that also recognizes of these

23   concepts.

24           And another thing that's important to look at is,

25   these concepts arise out of the old *Kinsback Poodle* (phonetic)

1    case, with respect to the agent's breach of fiduciary duty.

2              THE COURT:  Uh-huh.

3              MR. CORN:  And are grounded  in that originally into

4    *Burrow versus Arce* and then into these other cases.

5              And so, that's the, that's the line of authority

6    that we're looking at as support for the proposition that is

7    disloyal behavior.

8              THE COURT:  Uh-huh.

9              MR. CORN:  That is what's at issue.  And so there is

10   the claim then of sort of an independent breach of fiduciary

11   duty claim.

12             THE COURT:  Okay.

13             MR. CORN:  Independent from the quality based sorts

14   of claims.

15             The other, another case that we cite is *Archer*

16   *versus Medical Protective Company* out of an Amarillo Court.

17   And interestingly enough it talks about this sort of conduct

18   by a lawyer falling into the category of then supporting a

19   claim for breach of fiduciary duty.  That is conflicts, self

20   dealing, use of confidential information, and so forth.  And

21   so, that's basis for the claim.

22             THE COURT:  Okay.  And then on -- hold on, to the

23   extent that Mr. Reasoner was arguing about the failure to

24   plead fiduciary duty as to Mr. Hryck.

25             MR. SAMET:  Excuse me, Your Honor.

1          THE COURT:  Did you have anything further there?

2          MR. SAMET:  Sure, Your Honor.

3          I didn't -- again, Avery Samet for the Plaintiff.

4          The complaint alleges that Mr. Hryck is the main

5     partner for Reed Smith.  Reed Smith is representing

6     (indiscernible) from at least February 2016 through 2017 --

7          THE COURT:  Whether or not there was an engagement

8     letter in place?

9          MR. SAMET:  Yeah, whether or not there was

10    engagement letter.

11         THE COURT:  Yeah.

12         MR. SAMET:  And I even talked about the problems

13    with that engagement letter a little bit last week, and that's

14    represented.

15         I also have to disagree with Mr. Reasoner's

16    characterizations of --

17         THE COURT:  I guess -- let me ask it this way:

18    You're alleging that he was doing work in that time period,

19    and that you're saying that should be sufficient.  And then if

20    in discovery it turns out, well, actually he wasn't doing any

21    work in that time period, then maybe the argument then that

22    Mr. Reasoner has traction, as you've said.  But that would be

23    a summary judgment question, not a motion to dismiss the

24    question.

25         MR. SAMET:  That's correct, Your Honor. I mean --

1     that's correct.

2               THE COURT:  Okay.

3               MR. SAMET:  That's correct.  I will also just point

4     out the allegations against Mr. Hryck go beyond him drafting

5     two particular documents.

6               THE COURT:  Okay.

7               MR. SAMET:  Thank you.

8               THE COURT:  All right.  All right, thank you.

9               So then as to also improper benefit arguments,

10    Mr. Nunes and Stone Pigman also had motions up for points in

11    consideration there.

12              Mr. Fogler, do you want to go first?

13              MR. FOGLER:  Yes, Your Honor.  Murray Fogler for

14    Tony Nunes.  I'll be very brief because I know Mr. Kryder has

15    a lot more to say about this.

16              And let me start off by saying that Mr. Corn's

17    explanation about how we got to this line of cases is correct,

18    but doesn't really get to the point of why the anti-fracturing

19    rule was put into place.

20              And the reason -- the impetus for this was,

21    negligence has a two-year statute of limitations, breach of

22    fiduciary duty has a four-year statute of limitations, like

23    fraud.

24              And so, clever Plaintiffs lawyers who had a claim

25    against a lawyer, but it was -- would had otherwise been time

1    barred because he was more than two years past, would try to

2    recast their claim as something other than negligence, that

3    would fall within, they hoped, a four-year statute of

4    limitations.

5         Well, we have that problem here because they waited

6    so long to bring the claims here.  And so, they would

7    naturally want to try to recast this as a four-year limitation

8    period.

9         Now, more to the point about Mr. Nunes, my client,

10   this really is a pleading issue, Judge, because the breach of

11   fiduciary claim, the very first cause of action in the first

12   amendment complaint against Mr. Nunes, refers only, and

13   pointedly, only to his conduct as an officer.  There is no

14   allegation in this pleading about his conduct as a lawyer

15   *per se.*  That is, he had some ethical responsibilities here.

16   He had a conflict of interest.  I mean, they plead conflict in

17   other context, but it is in the context of his alleged

18   position as an officer of the company.

19        THE COURT:  As the officer, it's as general counsel

20   though, right?

21        MR. FOGLER:  It is.

22        THE COURT:  And is that a distinction that matters?

23   I mean, that that's acting as a -- general counsel is a lawyer

24   because typically it doesn't have to be, but typically is.

25        Is there a distinction there that it needs to be an

1     outside lawyer versus the --

2          MR. FOGLER:  I don't think it does, but it's clear

3     by the way they have lumped the allegations together, that

4     they're not talking about his conduct as a lawyer giving legal

5     advice.  Because they say, for example, this is paragraph 175

6     of the first amendment complaint:  Defendants Hord, Nunes, Van

7     Stephoudt, Degenhardt, Elder and Ganer, reached their

8     fiduciary duties of loyalty, good faith, care and obedience.

9     How?  By operating Fury in a manner so as to solely benefit

10    themselves and causing material harm to Fury.

11         THE COURT:  So if I go with this argument, I would

12    necessarily also be saying Ganer and Hord fall by the way.

13         MR. FOGLER:  Well, this is going to get us back to

14    the argument that we had yesterday --

15         THE COURT:  Okay.

16         MR. FOGLER:  -- about the provision of the limited

17    liability company.

18         THE COURT:  Oh, I've got that, but no, I understand

19    that argument.

20         MR. FOGLER:  They're trying to -- I think they're

21    trying to steer away from -- they see where the Court's going,

22    I think with Section 9 of the LLC agreement.  And they have,

23    oh, we need to -- even though our complaint clearly talks

24    about Mr. Nunes as an officer, what we really meant was, he

25    was acting as a lawyer and he had duties as a result of his

1   legal relationship with the company, but that's not what they

2   pleaded.

3          THE COURT:  Okay.  All right.  I hear what you're

4   saying there.

5          As I understood it from the briefing, there was

6   argument on this point.  We were just talking about improper

7   benefit and whether that had been sufficiently shown when that

8   moved on to Mr. Hryck and Reed Smith.

9          Is Mr. Nunes also -- I hear what you're saying about

10  the capacity argument, where that would fit.  As to improper

11  benefit, is there something that you say is factually

12  deficient there?

13         MR. FOGLER:  Well, there is here.  And Mr. Kryder is

14  going to have a whole lot more to say about the allegations

15  about the payment for Mr. Nunes' services as general counsel.

16         But they made some separate allegations that there

17  was a separate company set up, Advanced Drilling, and that

18  Mr. Nunes was not only named manager of that company, but they

19  don't say because they don't have any evidence, and there's

20  nothing alleged in here, that any benefit came to Mr. Nunes

21  personally.  That is a deficiency in the complaint.

22         THE COURT:  Okay.

23         MR. FOGLER:  So they tried to get there, but they

24  don't succeed.

25         THE COURT:  Okay.  All right.  Thank you.

1              All right.  Mr. Kryder for Stone Pigman.

2              MR. KRYDER:  Thank you, Your Honor.  George Kryder

3      for Stone Pigman.

4              As to Stone Pigman, this is not a pleading issue.

5      The Plaintiff's claim for breach of fiduciary duty fails as a

6      matter of law for two reasons.  One -- at least two reasons.

7              One, no improper benefit.  And secondly, no

8      vicarious liability to begin with --

9              THE COURT:  And I have a note to myself on this.  Is

10     you main argument vicarious liability?  I mean, obviously that

11     would dispose of the improper benefit.  But does the improper

12     benefit argument sort of depend on the vicarious liability

13     theory having been found in first place?

14             MR. RYDER:  Well, for one thing, I mean, Plaintiff,

15     if you go in the timeline and however it may fit into the

16     Court's outline, the Plaintiff failed to plead that some Stone

17     Pigman, or Cogan before them, were vicariously liable for

18     Mr. Nunes.

19             And so, in the first place, they're not liable for

20     him.  They, in fact, had negated vicarious liability by saying

21     he was seconded by saying that he acted solely for his own

22     benefit; that he was purportedly self dealing; that he

23     purportedly gained interest in middle man companies.  Neither

24     Cogan nor Stone Pigman was alleged to have received any

25     interest in a company, which on some basis could be a

1    purported self dealing improper benefit.

2              So they flunk on vicarious liability.

3              THE COURT:  I got it.

4              MR. RYDER:  And if there's no vicarious liability

5    that Cogan might have for Mr. Nunes --

6              THE COURT:  Yes.

7              MR. RYDER:  -- there's obviously no liability to

8    which Stone Pigman later could become a successor under some

9    other theory.

10             And this isn't a mere omission.  They pled one or

11   more other Defendants in the case were acting the course of

12   their work.  That is not the case with respect to Stone Pigman

13   or Cogan.  And, Your Honor, you've already given them leave to

14   replread once with respect to successor or any other

15   liability.  And so, respectfully, this is not pleading issue

16   for them.

17             As to the improper benefit, attorneys' fees don't

18   support breach of fiduciary duty and claims as a matter of

19   law.  I agree with Mr. Rosen, that Judge Godbey's decision in

20   the *Greenberg Traurig* case in the Northern District is well

21   founded.

22             At page 13 of our motion we discuss *Juan Pack* and

23   *Ashton v. KoonsFuller*, a Dallas Court of Appeals case.  These

24   recite the very basic tenant that regardless of the label that

25   you put on it, if the lawyer has only received attorneys'

1    fees, or they say even the expectation that a lawyer is going

2    to earn a fee, which is what we have all done in our careers,

3    that is not enough to sustain a breach of fiduciary duty plan.

4            So to put it in the context here, even if Mr. Nunes

5    received $50,000 a month, while that he was associated with

6    Cogan from 2011 to 2016, which by my math is like $3-1/2

7    million, that's not an improper benefit to Mr. Fogler's

8    client.  It's just attorneys' fees.  And Cogan never got those

9    fees.  And of course, Stone Pigman never got those.

10           And while Mr. Corn listed a series of cases about

11   fee disgorgement, he really missed the point.  Because as a

12   matter of law, you can't disgorge fees you never received.

13           So, Stone Pigman can't be required to pay damages or

14   disgorge fees that went to Mr. Nunes, fees that never went to

15   Cogan at all.  And --

16           THE COURT:  And so, for the breach of fiduciary duty

17   claim, in terms of the timeline on when that's actionable, is

18   that -- is the allegation that Stone Pigman has some liability

19   there because of work that Nunes was doing or fees that were

20   being paid at the time he was at Cogan Partners, not after the

21   time he was at Stone Pigman.

22           MR. RYDER:  So there's successor liability claim

23   under whatever theory depends on fees that were between 2011

24   and the end of December 2016 while Mr. Nunes was at Cogan.

25           THE COURT:  And that's all at Cogan?

1          MR. RYDER:  That's all at Cogan.

2          THE COURT:  Okay.

3          MR. RYDER:  They do allege, as Mr. Samet addressed

4     yesterday, that from January of 2017, until Stone Pigman and

5     Mr. Nunes, everybody was terminated, that allegedly Stone

6     Pigman received $843,000.  Those are still attorneys' fees,

7     but those aren't any -- that is on Stone Pigman's watch.

8          The other --

9          THE COURT:  Got it.

10          MR. RYDER:  -- $600,000 a year times roughly six

11     years was while Mr. Nunes was associated there at Cogan.

12          THE COURT:  Got it.  Okay.

13          MR. RYDER:  So Mr. Corn mentioned the *Burrow* case.

14     That's *Burrow v. Arce,* 997 S.W.2d 229.  And, Your Honor, this

15     is the Supreme Court's original decision talking about fee

16     disgorgement.  And there, there was an aggregate settlement,

17     roughly $190 million.  And the lawyer took -- he entered into

18     the settlement without client consent and took a share of that

19     money.

20          Well, that's like theft, it's a clear improper

21     benefit.  And the Supreme Court opinion doesn't really focus

22     on the merits of the breach of fiduciary duty claim, other

23     than to say that fee forfeiture is a matter of law for the

24     Court.  It's not an issue for the jury.  It's a matter of law

25     for the Court under a five factor test.  But nothing in that

1      case or the 23 years of jurisprudence since, could suggest

2      that an attorney or law firm, in the position of Stone Pigman,

3      could ever be required to discourage funds it never received.

4              So it's pretty simple for the 3-1/2 million or more

5      dollars that purportedly went to Mr. Nunes as attorneys' fees

6      and the like before he ever got to Stone Pigman, that's off

7      the table under any theory, certainly under any breach of

8      fiduciary duty theory.

9              Mr. Corn mentioned *United Pentecostal* case.  It

10     doesn't support their claim.  There the lawyer stole the money

11     that the church had given to the lawyer to put in the trust

12     account for safekeeping.  That's clearly an improper benefit.

13     The lawyer received some of the stolen funds.

14             The *ERI versus Swania* case Mr. Corn mentioned,

15     again, it does not support their case.  In fact, it's a

16     non-attorney case.  It involved buyout funds that were ill-

17     gotten gained, and the Court ordered these buyout funds to be

18     disgorged upon a showing of fraudulent inducement.

19             There's no similar claim here.  And the principle of

20     disgorging fees -- I'm sorry, sums as in *Swania*, as in *United*

21     *Pentecostal* or the *Kins Clock* (phonetic) case that does not

22     apply in the attorney context.  We cited *Gregory versus Porter*

23     *and Hedges* for that proposition.  You simply can't be ordered

24     to disgorge those fees.

25             So for the reasons argued, Your Honor, and those in

1    our brief, we concur with our fellow Defendants that the

2    attorneys' fees are not enough.  And as to my clients, with

3    the addition of the --

4              THE COURT:  Vicarious liability.

5              MR. Ryder:  -- vicarious liability argument, we

6    believe they can't support the claim.

7              THE COURT:  Okay, thank you.

8              MR. ROSEN:  Your Honor, may I have just two

9    minutes --

10             THE COURT:  Sure.

11             MR. ROSEN:  -- to respond to Mr. Corn?

12             THE COURT:  To respond to Mr. Corn?

13             MR. ROSEN:  Mr. Corn.

14             THE COURT:  Okay.

15             MR. ROSEN:  Okay. I'm going to respond to --

16             THE COURT:  It's going to be --

17             MR. ROSEN:  I'm happy to --

18             THE COURT:  -- it's a free for all after that.  So

19   go on, it's just fine.  No, no.  We might as well.  Because I

20   think Mr. Corn is going to be getting back up to respond, so

21   we might as well address whatever you want to tell me now.

22             MR. ROSEN:  Sure.  So I think, obviously I agree

23   with what Mr. Kryder said, in terms of the cases.  Two things,

24   two fundamental things to keep in mind.  One is a breach of

25   fiduciary duty claim is not the same as a fee forfeiture

1     claim.

2             So, to the extent they site fee forfeiture cases,

3     that's very different.  And they themselves tell you that,

4     because in their brief they address the breach of fiduciary

5     duty claim and then they -- then they add, at page 15, an

6     equitable forfeiture of fees paid to Fury's available as a

7     remedy, separate and apart from whether those fees satisfy the

8     improper benefit element.

9             So all of the discussion about forfeiture cases,

10    that Mr. Corn talked about and Mr. Kryder identified, have

11    nothing to do with the question of improper benefit.  And it

12    goes back to that fundamental distinction.  They want to bring

13    a claim for disgorgement for forfeiture of fees in however

14    amounts were alleged, seven figures --

15             THE COURT:  Like he understood --

16             MR. ROSEN:  That's very different --

17             THE COURT:  What's the statute limitations on that?

18             MR. ROSEN:  I should know that, Your Honor --

19             THE COURT:  Yeah.

20             MR. ROSEN:  -- but I have to confess I don't have it

21    off the top of my head at this time.

22             THE COURT:  I just wonder if it plays into the same

23    two-year limitation that we were talking about.

24             MR. ROSEN:  I think it's remedy.  So it may tie to

25    the claims, like typically you would see that pursuant to

1    another cause of action.

2              THE COURT:  Uh-huh.

3              MR. ROSEN:  But there's a very big difference

4    between seeking forfeiture of fees of a million dollars or so

5    and seeking damages for breach of fiduciary duty of a hundred

6    times that, and that's what they're doing here.

7              So, to suggest that forfeiture cases, which they

8    acknowledge as a remedy, has anything to do with the question

9    of improper benefit, I think is apples to oranges.

10             Moreover, the question of improper benefit is not as

11   Mr. Corn said, a tool; it is a requirement.  They must

12   establish an improper benefit.  And the case law is clear that

13   the attorneys' fees that were paid, which may be subject to an

14   equitable forfeiture claim, but those attorneys' fees subject

15   to that claim do not satisfy the improper benefit.

16             I really don't think there's much of a dispute about

17   that.  They themselves call it separate.  So the question is,

18   what beyond that is an improper benefit?

19             And, you know, we cited the cases I referred to the

20   *Stanford* case and the *Murphy* case, et cetera.  I don't think

21   it's a coincidence, and you didn't see them talk about

22   *Stanford* or Murphy in their brief, and you didn't hear word

23   one for Mr. Corn about those cases.

24             For the reasons, I think I articulated, and I'm not

25   going to -- I won't repeat here.  You know, the citation, the

1    cases about stealing client money.  Mr. Kryder referred to the

2    *Pentecostal* and *Burrow* case and the *RCI Consulting* case, none

3    of that has anything to do with -- or the type of theory that

4    they're alleging here.

5          There's no allegation that Reed Smith or anyone at

6    Reed Smith took money from Fury, other than being paid for

7    fees.  And so, all that leaves you is the *Archer* case that he

8    cited, which was discussed in every one of the cases I

9    discussed with the Court earlier in my remarks.  And that case

10   was distinguished by those cases.  "Those cases" being the

11   cases that squarely held in some of the language that I quoted

12   for the Court, that the very theory that the Plaintiffs are

13   making, you were interested in helping somebody else, other

14   than Fury.  You had an interest in preserving your

15   relationship or gaining other fees from someone else.  All of

16   that was squarely rejected.

17         So when you parse through the cases that they've

18   cited and put their theory up against the cases that we've

19   cited, all of which post-date *Archer*, you're left with the

20   inexorable conclusion that what they alleged does not satisfy

21   the improper benefit, and the motion to dismiss should be

22   granted because there's no dispute that this is a question of

23   law.

24         THE COURT:  Okay.

25         MR. ROSEN:  Thank you.

1            THE COURT:  All right. Thank you.

2            For Plaintiffs, who?  Mr. Corn, Mr. Samet?

3            MR. SAMET:  Here's what we're going to do, Your

4     Honor.  I'm going to respond to some of the --

5            THE COURT:  Okay.

6            MR. SAMET:  -- arguments directed towards the

7     complaint and about what we alleged as vicarious liability and

8     what Mr. Corn --

9            THE COURT:  Okay, good.

10            MR. SAMET:  -- will speak back to the improper

11     benefit issue (indiscernible).

12            And very briefly, Your Honor, let me start with

13     Mr. Nunes.  We've sued Mr. Nunes as general counsel, and we've

14     also alleged that while he was partially succumbent, he also

15     represented Fury both at Cogan Partners and at Stone Pigman,

16     and that those firms undertook actions in connection with the

17     allegations in the complaint.

18            Mr. Nunes, as I understand his papers, does not

19     concede that he was partially succumbent general counsel.  But

20     our theory is that he was.  In the complaint Mr. -- or counsel

21     cited paragraph 175, which is of course true, that we say that

22     all of the officer Defendants in that paragraph breached their

23     fiduciary duties by operating Fury in the manner so as to

24     solely benefit themselves.

25            But in paragraph 173, we say Mr. Nunes has breached

1       his duty of loyalty by charging the Randolph the officer rate,

2       from entities he secretly owned, overcharging Fury and

3       retaining the resulting benefits for themselves.

4              So, we believe that we have pled to the extent that

5       as a lawyer where we pled that he has -- Stone has his own

6       pecuniary interest in the transactions.

7              Number two.  With respect to -- let me get into it

8       this way.  With respect to the vicarious liability arguments,

9       it is our -- it is our position that in general, law firms

10      have vicarious liable for its partners and the actions they

11      take while they're representing clients.

12             We've cited cases like, Your Honor, that this is the

13      partial succumment, that the issue of the control of the

14      control of the employer is a matter of fact, that's not

15      subject to a pleading issue.

16             And we've also argued that the argument that the

17      either Cogan Partners nor Stone Pigman had, they lacked any

18      control over Mr. Nunes is implausible.

19             I also want to point out the complaint does contain

20      allegations of the law firms being involved in the scheme,

21      both to form some of the subsidiary companies that's at Cogan

22      Partners, of course, and also at Stone Pigman while the

23      activity is still going on.

24             I believe we alleged that Mr. Nunes --

25             THE COURT:  So in terms of the succumment issue --

1          MR. SAMET:  Yes.

2          THE COURT:  -- I thought yesterday, when we were

3    discussing his work at Cogan Partners, that that was -- is

4    there going to be a factual dispute about whether he was

5    partially or fully on a succumbing assignment at that time?

6          MR. SAMET:  I don't think -- it's going to be up

7    to --

8          THE COURT:  You think it was partial and that he was

9    still doing work as a partner for Cogan and Stone Pigman?

10         MR. SAMET:  His contract allowed him --

11         THE COURT:  Okay.

12         MR. SAMET:  -- that he was only working half time at

13   Fury and he could have other clients.

14         THE COURT:  Yeah.  Actually, what I'm remembering is

15   that as the $50,000 per month at that time, was simply being

16   paid directly to him.

17         MR. SAMET:  That's correct.

18         THE COURT:  And that's different than the issue that

19   we're talking about right now, full and partial.

20         Okay, got it.  All right, go ahead.

21         MR. SAMET:  That's right.

22         The thing I was going to say about Cogan Partners is

23   that I believe that -- and let me find it in our complaint.

24   In the draft of engagement letter that Stone Pigman sent to

25   Fury, it actually included a waiver of this issue, that if any

1    conflict arose -- that there was a conflict and they wanted

2    Fury to sign off on it, that it wouldn't cause a conflict with

3    Mr. Nunes' or the firm's representation of Fury.

4          Now -- and I'm here to say that was sufficient and

5    I'm not sure that was signed.  But the idea that Stone Pigman

6    itself knew at the time contemporaneously that this was --

7    that this was an issue.

8          And I will let, I think that response to --

9          THE COURT:  Okay.  Thank you.

10          MR. SAMET:  -- to the pleading issues, I'll let

11    Mr. Corn go back to legal issues on improper benefit.

12          MR. CORN:  The sorts of things that have been

13    alleged are the sorts of things that fall into the classic

14    categories of disloyalty, the classic categories for breach of

15    fiduciary duty.  Of course, I've made comments about it in

16    several of the cases that have been cited.

17          But that case, which the Defendant's cited, has

18    commentary value.

19          THE COURT:  Let me ask this in terms of cases.

20    There's one thing that I did pick up on the last round of

21    arguments.

22          I hear you about disloyalty, I hear you about

23    conflicts of interest in doing the work.

24          On cases that you're citing to me, are they for

25    propositions where it's beyond the disgorgement of fees?  That

1    it's, in fact, okay, because you were disloyal, there's this

2    whole other category of damage and injury that can be

3    collected for that's beyond the fees that were paid to you.

4         MR. CORN:  I'm not sure if I can direct the Court to

5    a specific one.  However, the concepts of what they say, I'll

6    leave that to --

7         THE COURT:  And that's the -- because I was also

8    hearing that, too, is that sort of conceptually those overlay

9    together, that I've been just in sort of trying to, in the

10   legal world and the legal ethical world, what it means as a

11   consequence to law firms and what it might be that they're

12   exposing themselves to --

13        MR. CORN:  Well --

14        THE COURT:  -- and if other Courts have said, I

15   don't just take, you know, other contexts of companies that

16   have collapsed or dissolved or whatever, where the law firms,

17   because of what they were doing, exposed themselves to what

18   are much larger scope of loss than just simply fees, that may

19   have been substantial, but simply the fees that have been paid

20   along the way.

21        MR. CORN:  I think the idea is that that is one

22   remedy.

23        THE COURT:  Yeah.

24        MR. CORN:  It's not the only remedy.

25        THE COURT:  Uh-huh.

1          MR. CORN:  And I don't think it's articulated as the

2     only remedy.  It's a useful remedy that's out there and

3     there's cases that talk about it, but they don't exclude the

4     prospect of other damages.

5          THE COURT:  Okay.

6          MR. CORN:  For example, there could be other amounts

7     that the disloyal attorney earns as a result of the disloyal

8     conduct, and those could be a factor as well.

9          So I was going to mention the *Beck* case where the

10    gist of the complaint is not disclosing and having a conflict

11    and so forth.  Again, disloyalty, breach of fiduciary duty,

12    independent of the type of or quantity based type of claim.

13         The *Archer versus Medical Protective* case also

14    articulates some of these concepts as well, self dealing, use

15    of confidential information, conflicts, and so forth as the

16    foundation for breach of fiduciary duty claims as independent

17    from.

18         THE COURT:  And those cases get to a conclusion of

19    breach of fiduciary duty.  And then the concept -- and maybe

20    nothing more was pleaded or sought.  But then the consequence

21    of that is disgorgement of fees in that particular case.

22         But you're saying conceptually, it would overlay

23    onto --

24         MR. CORN:  They talked about the concept of it.

25         THE COURT:  Yeah, okay.

1           MR. CORN:  Okay.  So I just wanted to point that

2     out.

3           THE COURT:  And I think Mr. Samet has something for

4     you.

5           MR. SAMET:  I apologize, Your Honor.

6           THE COURT:  That's okay.

7           MR. SAMET:  Just because Your Honor asked, and I was

8     thinking that in the -- and I know the line in cases of

9     *Burrow's* and *Pentecostal* and I think the other one was *ESI,*

10    *ERI*?

11          THE COURT:  *ERI*?

12          MR. SAMET:  And I think this goes direct to -- when

13    the Court is talking about disgorgement, the Supreme Court is

14    referring saying, even if you cannot prove actual damages, you

15    can still get disgorgement.  I think the take from that is

16    that the actual damages --

17          THE COURT:  I can hear you saying of proving actual

18    damages --

19          MR. SAMET:  That's causation and everything else.

20          THE COURT:  Therefore they don't.  Okay.

21          MR. SAMET:  And I would also point out, Your Honor,

22    in the *Pentecostal* case, while it's true there was

23    embezzlement, I think it's overstated, because the lawyer who

24    embezzled the money went to jail.  The law firm and the other

25    lawyer in the case was working on it.  They continued in that

1    appeal and they were liable.

2                THE COURT:  Okay.  Go ahead, Mr. Kryder.

3                MR. KRYDER:  Just, I had to clarify something on

4    *Burrow versus Arce*.

5                What the Court said there is, it's a matter of law

6    if you find a clear and serious violation breach of fiduciary

7    duty, so then there's this five factor test that the Court

8    looks to about whether fee forfeiture is appropriate.  So it

9    does deal with breach of fiduciary duty, and the predicate has

10   to be a clear and serious violation before the Court would use

11   that remedy.

12               Turning to the issue of vicarious liability, there

13   is no allegation as to my client about vicarious liability or

14   course and scope.  If the Court thinks of cases in our careers

15   and one of them come before the Court where someone is suing

16   an employer, how many times are you going to find where they

17   say nothing about vicarious liability, nothing about scope?

18   And the answer is you won't see it except in this complaint.

19               They did make one allegation that Mr. Van Stephoudt

20   acted in the course and scope of his employment at Reed Smith,

21   that's paragraph 176.  You won't find anything else in the

22   entire complaint about Mr. Nunes being within the course and

23   scope of his employment at Stone Pigman or Cogan.  In fact,

24   the allegations of succumbent purported self dealing for his

25   own benefit, negate any sort of course and scope.

1          Finally, Your Honor, we pointed to the Supreme

2     Court's *St. Joseph hospital versus Wolff* case.  And there, the

3     Court pointed out that the Plaintiff had five vicarious

4     liability theories that the Court looked at.  They don't even

5     have one here.  You can't find it.

6          So, respectfully, this is not a pleading issue.

7     They should --  you've already given them leave to replead

8     once their theories as to Stone Pigman and urge that our

9     motion be granted in whole or in part.

10          THE COURT:  All right, thank you.  All right.

11          MR. ROSEN:  If I may have 30 seconds?

12          THE COURT:  30 seconds.  I promised a free-for-all,

13     so.

14          MR. ROSEN:  You notice I'm falling down in time.  I

15     went from several minutes to two minutes, and now I'm on

16     30 seconds.

17          UNIDENTIFIED SPEAKER:  Six seconds.

18          MR. ROSEN:  No, that doesn't count.

19          THE COURT:  You've got 20 seconds left.

20          MR. ROSEN:  In substance 30 seconds.  All right.

21          In *Beck*, which addressed *Archer, Beck* concluded in

22     the context of the case where the lawyers were participants in

23     a -- served on the Board of Directors in the scheme and

24     profited from that.

25          The *Beck* Court nevertheless said, we conclude

1       without difficulty here the appellant's conflict of interest

2       complaint sounds in negligence only, and not breach of

3       fiduciary duty.

4               So whatever it is counsel said about that case, I

5       would  submit supports our position, because the conclusion

6       was that everything about *Beck* that counsel was talking about

7       was determined by the Court, not to support.

8               And I don't want there to be the impression, and I'm

9       confident the Court doesn't have it, but to state the obvious,

10      it's not like lawyers who engage in conflicted transactions,

11      but improper benefit doctrine is not satisfied or immune.

12      They are subject to a negligence cause of action for breach of

13      duty.

14              So the suggestion that this is somehow insulating

15      lawyers, I think is important to make clear that that isn't

16      the case --

17              THE COURT:  No, that's the, I think that that's the

18      point of the anti-fracturing rule and that it's one or the

19      other, and statute of limitations issues can sometimes dictate

20      what you're going to try to plead.

21              Also, well, maybe both causes of action would open

22      up the same scope of damages.  But that's obviously the other

23      consideration that you have --

24              MR. ROSEN:  Correct.

25              THE COURT:  -- of what you're trying to recompense.

1            MR. ROSEN:  And the *Pentecostal* case, I think,

2     illustrates that in the sense that the damages was the money

3     that was stolen.

4            THE COURT:  Uh-huh.

5            MR. ROSEN:  And I think the underlying case was the

6     church suffered hurricane damage, and they got some insurance

7     money and the lawyers stole it.  The lawsuit was to the theft

8     of the funds.

9            THE COURT:  No.  And the damage here rippled out

10    more than that.

11           MR. ROSEN:  Than this case.

12           THE COURT:  Than this case is what I'm talking

13    about.

14           MR. ROSEN:  That's the allegation, but --

15           THE COURT:  Right.

16           MR. ROSEN:  And that's the point.  If they wanted to

17    allege to rippled out the damages, they were free to do in the

18    negligence card.

19           THE COURT:  And negligence would give them that?

20           MR. ROSEN:  Exactly.

21           THE COURT:  Okay.  All right.  Thank you.

22           MR. ROSEN:  Thank you.

23           THE COURT:  All right.  Let's move on to civil

24    conspiracy claims.  And I have that it's only Mr. Van

25    Stephoudt and Mr. Hryck, who have more arguments on the civil

1    conspiracy *per se.*

2              MR. REASONER:  Your Honor. I think we --

3              THE COURT:  And then, honestly, at this point, you

4    know, we may be repeating ourselves under the arguments.  But

5    it's a separately broad aspect of -- I have that failure to

6    plead some specific facts as to that, and intra-corporate

7    conspiracy doctrine.

8              MR. REASONER:  Yes.

9              THE COURT:  If you have anything further, you'd like

10   to address, I'll give you time to do so.

11             MR. REASONER:  The only thing I would highlight

12   there, Your Honor, is what you find are merely:  Here is an

13   email and here is a conclusory statement about some meeting of

14   the minds.  They do not come in with a requisite specificity

15   to show a meeting of the mind or an improper end as to either

16   Mr. Hryck or Mr. Van Stephoudt.  So that's the pleading

17   deficiency.

18             And then as we discussed it at length yesterday, the

19   disclaimer in the agreement would eliminate the conspiracy

20   claim --

21             THE COURT:  And then --

22             MR. REASONER:  -- because the --

23             THE COURT:  -- itself.

24             MR. REASONER:  -- co-conspirators would not have a

25   breach, would not have a duty that they breached.

48

1          THE COURT:  Okay.  All right.  Thank you.

2          Mr. Samet, anything that you need to respond to on

3     that?

4          MR. SAMET:  I disagree with those, sir.  I don't

5     know that -- other than repeating my argument --

6          THE COURT:  I was going to say for reasons

7     previously stated, you would rest on your briefing and your

8     argument yesterday?

9          MR. SAMET:  Yes, Your Honor.

10          THE COURT:  Okay.  All right.  Thanks.

11          The only other -- so as to the law firms and

12     lawyers, the only other two things that I see that could be

13     addressed are Reed Smith brought up arguments as to exemplary

14     damages and attorney fees.  If you'd like to say something on

15     that?

16          And, Mr. Fogler, there was impermissible group

17     pleading I think at the lead of your motion.

18          Neither are particularly long arguments in the

19     briefing, but anything further that you would want to say on

20     either of those?

21          MR. ROSEN:  Your Honor, Kevin Rosen.

22          The only thing I would say on it is, neither is a

23     cause of action.

24          THE COURT:  Uh-huh.

25          MR. ROSEN:  I understand that it can be pled in

1    remedies.  So, two things.  One is, they shouldn't be

2    causative action.  And number two, on the attorneys' fees

3    point, we called out that they're not entitled to attorneys'

4    fees.  The Plaintiff said, well, we're entitled to attorneys'

5    fees for certain of our fraudulent transfer claims under Texas

6    Business and Commerce Code Section 24.013.

7              So in light of that, I would respectfully request

8    that the Order simply make that clear that the Plaintiff was

9    only entitled to their fee claim as a remedy, only the

10   attorneys' fee claim only applies to a claim that fits under

11   that statute.

12             I think that clarification and limitation will

13   benefit the parties over the course of the case.

14             THE COURT:  So the remedy is limited to what?

15             MR. ROSEN:  If you look at their opposition brief,

16   we said, you're not entitled to fees, you know, it's based on

17   the standard rule that every state acknowledges.  And

18   opposition said, no, no, no.  Texas Business and Commerce Code

19   Section 24.013 allows for fees.  That's section talks about

20   state, certain types of state fraudulent transference.

21             I believe it's limited to constructive.  So I

22   believe the actual fraudulent transfer.  But regardless, all

23   they're saying is the opposition, I'm adding a little bit,

24   but, we recognize we're not entitled to fees other than what's

25   allowed under that statute.

1          THE COURT:  Okay.

2          MR. ROSEN:  And I think if the Order says that

3    specifically --

4          THE COURT:  And so, from following the statute,

5    you're saying that would then link it as a potential remedy to

6    the extent that actual fraudulent transfer is established, but

7    not in any other respect?

8          MR. ROSEN:  Correct.

9          THE COURT:  Okay.  Mr. Samet.

10         MR. SAMET:  Yeah, just briefly.  I think we listed

11   them as independent cause of action, which originally filed in

12   State Court.

13         THE COURT:  Right.

14         MR. SAMET:  That's correct.  I believe that

15   counsel's right.  The actual fraudulent transfer claim is the

16   only, I think --

17         THE COURT:  Okay.

18         MR. SAMET:  -- the only explicit claim provides for

19   attorneys' fees.

20         You know, that last conversation, I just -- if such

21   an Order is entered, I want to make sure that it doesn't touch

22   on the potential for damages in the attorneys' fee context,

23   but other than that --

24         THE COURT:  What do you mean by that?

25         MR. SAMET:  Well, as I want to go back to the

1    argument Mr. Corn was explaining.  That even if in the

2    disgorgement context, if the purpose of any tort damages is to

3    put the Plaintiff in the same position had the tort not

4    occurred, that could be a relevant consideration.

5           THE COURT:  Okay.  So if under -- so I guess what

6    you're saying there is, if under breach of fiduciary duty

7    claims, the law shows that disgorgement of fees is properly

8    characterized as damages for that, you wouldn't say, well, we

9    could still get it for breach of fiduciary duty?

10          MR. SAMET:  In that narrow context.  And --

11          THE COURT:  As opposed to it just being a follow on

12    remedy from a claim that's been established?

13          MR. SAMET:  That's right.

14          THE COURT:  Okay.

15          MR. SAMET:  That's right, Your Honor.

16          THE COURT:  Okay.  I think I understand that.

17    Do you?

18          MR. ROSEN:  Yes, I do.  I think another way to frame

19    it, if I think about it.  There's a difference between what

20    they've alleged fees to prosecute this lawsuit and fees as

21    damages.  I mean, if they're alleging -- or fees that may be

22    subject to some other form or some other remedy --

23          THE COURT:  Uh-huh.

24          MR. ROSEN:  -- disgorgement or forfeiture,

25    what-have-you, but -- or I would acknowledge if someone's

1    budgeting fees as damages, I, as a result of somebody's

2    typically seeing as negligence, as result of somebody's

3    negligence I had to employ a lawyer to fix your problem.  But

4    that is very different than the lawyer I'm hiring to sue you.

5              THE COURT:  Uh-huh.

6              MR. ROSEN:  And the way this is pled is they want

7    fees for counsel's action in suing all of the Defendants.

8    That's what is not allowed, with the narrow exception of that

9    statutory provision.

10             THE COURT:  Oh, okay.

11             MR. ROSEN:  That's the point.

12             THE COURT:  Okay.

13             MR. ROSEN:  Hopefully that's clear.

14             THE COURT:  I got it.  Okay.

15             Mr. Fogler, anything that you want to address on

16   group pleading?

17             MR. FOGLER:  In the interest of time, Your Honor,

18   let's just stand on the brief.

19             THE COURT:  All right.  Thank you very much.

20             All right.  Anything else on behalf of the law firms

21   and lawyer Defendants that you'd like to raise?  I think we've

22   covered it.

23             All right.  I see agreement on that.  So why don't

24   we take a 10-minute break and we'll let the tables reshuffle

25   and we'll be back on the Record in ten.  Okay?

1          Thank you.

2          (Recess taken from 2:37 p.m. to 2:51 p.m.)

3                         AFTER RECESS

4          THE COURT:  Okay, thank you.  Everyone can be

5     seated.

6          All right.  Let's now take further appearances for

7     the aspects that we have left.

8               Plaintiffs stay the same.

9               Who do we have for Defendants now?

10              MR. HILL:  Judge, Marcus Hill, and I have my

11    colleague, Mr. Jonathan Stoger here, along with my associate

12    attorney, Ms. Kalen Burwell (phonetic) on behalf of Tom Hord,

13    H-O-R-D.

14              THE COURT:  Thank you.

15              MS. DANG:  Good evening, Your Honor.  This is

16    Crystal Dang on behalf of Sierra Pine Resources International.

17    And with me I have Graze Meshina (phonetic) who is my law

18    clerk this summer.

19              THE COURT:  Excellent, welcome.

20              MR. MESHINA:  Thank you.

21              MR. HADDOCK:  Good afternoon, Your Honor.  William

22    Haddock, on behalf of Kay Rieck and Helena Energy, LLC.  With

23    me also is Mr. Leonard Simon.

24              MR. SIMON:  Good afternoon, Your Honor.

25              THE COURT:  Good afternoon.

54

1          All right.  Does For Mr. Rieck, do we have any

2     motions, anything pending for him that we're arguing today? I

3     know that we do for Helena, but --

4               MR. HADDOCK:  Right.

5               THE COURT:  -- you're here representing him.  I'm

6     sort of like, I don't have a motion from him, though, on what

7     we're addressing right now.  Do I?

8               MR. HADDOCK:  He has no motion to dismiss under

9     12(b)6.

10              THE COURT:  Okay.

11              MR. HADDOCK:  We have that issue with the summons

12    under 12(b)(5).

13              THE COURT:  Yep.  And you-all will -- I'm going to

14    take a look at that, but we'll figure out that issue, but

15    separately from today.

16              MR. HADDOCK:  Okay.  All right.  Thank you.

17              THE COURT:  Okay.  So there are some aspects of what

18    we addressed yesterday, where Mr. Hord, Mr. Ganer, Sierra

19    Pines, were also making argument.  And so, I wanted to go over

20    those first.

21              As to the fraudulent transfer claims, there was the

22    time bar issue that had been raised.  And I'll take that up

23    first.

24              Is there anything further that Mr. Hord would like

25    to be heard on as to that issue?

1          MR. STOGER:  Yes, Judge.  I put together a

2    PowerPoint presentation --

3          THE COURT:  That's what I thought that it related

4    to.

5          MR. STOGER:  I'm happy to present if the Court would

6    entertain that?

7          THE COURT:  I will.  Is this PowerPoint directed

8    only to that issue?

9          MR. STOGER:  There were two issues, Judge.  One was

10   the statute of limitations issue under Section 546.

11         THE COURT:  Uh-huh.

12         MR. STOGER:  And if we could briefly touch on the

13   fiduciary duty issue as well, there are a few comments I'd

14   like to make --

15         THE COURT:  Okay, great.

16         MR. STOGER:  -- in addition to what we said.

17         THE COURT:  All right.  Let's take those up.

18         And on the breach of fiduciary duty, is that as to

19   the fourth amended LLC?

20         MR. STOGER:  Yes.  And also, Your Honor, as to the

21   third amended, as well.

22         THE COURT:  Well, the third.  Okay.  The language is

23   the same.

24         Okay.  We'll take up both of those, and those are

25   standalone for what I have.

1          So Mr. Samet, you'll be responding.  We'll take both

2     of these up and then you can respond.

3          All right, go ahead.

4          MR. HILL:  Judge, If we may?  on the limitations,

5     Mr. Stoger's going to carry the water on that.

6          THE COURT:  Okay.

7          MR. HILL:  On the second one, that we just

8     mentioned, he's got the lion's share, but I'd just like to

9     reserve three minutes --

10          THE COURT:  Okay.

11          MR. HILL:  -- for some observations on some

12     research.

13          THE COURT:  All right.  Thank you.

14          MR. STOGER:  May it please the Court?

15          Your Honor, I will just to start off with

16     Section 546.  And I went back last night to take a look at the

17     history of it.  And this statute dates back to 1978.  This is

18     not new.  I think most bankruptcy attorneys concentrate on

19     subsection (1) that A case would be filed only two years after

20     the order for relief when the case is first filed.

21          But there's also subsection (2).  And one of the

22     other points I would trace, and I think it plays into the

23     later interpretation of the Bankruptcy Court's Decree, is that

24     the bankruptcy power, just to highlight, is enumerated in our

25     -- in the Constitution.  It falls under Article One,

1    Section Eight, and I've seen some case law saying that

2    Congress has plenary power in -- over bankruptcy law.

3           And, I mean, this is not an implied power.  And I

4    think it has to do with Congress's role and with the Court's

5    role, and I'll touch on that is I get a little bit deeper.

6           But moving on, I just wanted to highlight, again,

7    one of the cases we cited in the briefing, which was the *Nine*

8    *West Securities* litigation case.  And so --

9           THE COURT:  Get we back up?

10          Just prepping for your argument.  So based on citing

11   me to (a)(2), is it -- are you moving towards an argument that

12   it is, if the case is closed or dismissed, there's not really

13   a savings power that the Bankruptcy Court has.

14          MR. STOGER:  Yes, yes, exactly.

15          THE COURT:  Statutorily that's where it says.

16          MR. STOGER:  Exactly, Judge.

17          THE COURT:  All right.

18          MR. STOGER:  That's the exact argument.  That the

19   text for the statute controls that it's Congress' role to

20   proscribe the law, and bankruptcy it's Court's role to follow

21   the law.  That's exactly it.

22          THE COURT:  Okay.

23          MR. STOGER:  No question.

24          Moving on that Section 546 applies to litigation

25   trusts.  It was applied in the *Nine West Securities* case.  It

58

1    was just issued in 2020.

2              As far as the timeline, I would just highlight that

3    the bankruptcy case was filed in August of 2019.  The

4    Confirmation Plan Order was in June 12th.  The Motion for

5    Final Decree was filed June 15th.  The Final Decree was

6    July 1st.

7              There was plenty of time for Fury to file this case

8    before the bankruptcy was closed.  This was not a matter of

9    the hidden claim.  Tom Hord and the other Defendants were

10   actually mentioned in the Chapter 11 Plan.

11             This isn't a case where the litigation tries, to

12   where Fury had to go out and search for claims.  I mean, they

13   knew these existed and could have filed them, you know, before

14   entering the Final Decree.

15             And then moving on that, the controlling rule under

16   the Bankruptcy Rules, is Section -- Rule 3022.  And the key

17   language here, the key factor is that a case shall be closed

18   when it's fully administered, and that's the key focus.  It's

19   the "full administration" language.

20             And I see that over and over again in the bankruptcy

21   pleadings.  And the motion for Final Decree, Fury cited this

22   several times.  They used the language that this case has been

23   fully administered.  I mean, they cited it in paragraph 2 of

24   their motion.

25             I'm sorry, Judge.  I'm on Slide 6.

1          They cited it in paragraph 5.  Again, they said the

2    statutory basis for relief requested herein are Bankruptcy

3    Code 350, which is the actual Bankruptcy Code statute that

4    talks about closure.  They cite Rule 3022.

5          I move on, Judge, to slide 7.

6          Again, in paragraph 24, they highlight again that

7    the case has been fully administered.  Then in the preceding

8    portions of the motion they go through in great detail and

9    list all the factors that the Courts consider as their factors

10   in the advisory rules to Rule 3022.  And they go through in

11   great detail and they follow each one of the factors.  And

12   again, they state that the factors weigh strongly in favor of

13   closing the case, because it's been fully administrated and

14   the Plan would've been substantially consummated.

15          And then this just plays back into where I was

16   before the power.  The Bankruptcy Courts derive their power

17   principally from Section 105.  It does give the Bankruptcy

18   Court broad equitable power, but there are limits on that.

19   And I cited this provision out of the Collier on Bankruptcy

20   Treatise.

21          Again, what they say citing the Supreme Court

22   precedent is that the Courts obviously do have broad equitable

23   power, but that equitable power cannot be used to contravene

24   another section of the Bankruptcy Code or any other State or

25   Federal statute.  And that plays back into Section 546.  So

1    although Congress has given Bankruptcy Courts power, a general

2    power.  But they've specified, you know, as interpreted under

3    the case law that that power can't be used to contravene

4    another specific section of the Bankruptcy Code.

5         And coming back to that again, we have a Final

6    Decree from the Bankruptcy Court in Delaware.  And in the

7    Plan, nowhere does that Decree mention Section 546.  I didn't

8    see that statute listed in the Decree.  I don't see any

9    explicit language in the Decree to overrule Section 546 or any

10   other Bankruptcy Code statute.

11        And again, I think it would really raise a real

12   separation of powers issue for a Court to even overrule a

13   statute of limitations provision here or anywhere else.  I

14   mean, there's no argument that Section 546 is

15   unconstitutional.  It is a provision that was adopted under

16   Congress' enumerated power.  I think it's Article One, Section

17   Eight.

18        So I think that, I think that for a Court to

19   overrule that statute, or override it, is something that would

20   exceed the Court's role.  And just coming back to it,

21   judgments as I've cited, just one, I think of many cases out

22   there, that judgments are to be construed like other written

23   instruments, like in my mind, other contracts.

24        And I mean, I'm not saying that the Decree here is

25   ambiguous.  I don't think it is, it doesn't mention 546.  And

1    I don't think it was the Bankruptcy Judge's role to focus on

2    the statute of limitations.  But in the event that it was

3    ambiguous, the general rule is that contracts, even if

4    ambiguous, should be construed in a manner that makes them

5    legal and enforceable, where that would be a logical

6    conclusion.

7         And so in my view, the Bankruptcy Court wouldn't

8    have had the authority to overrule or override Section 546,

9    and the Decree should be construed and party, you know, with

10   the principle that the Decree should be interpreted in the

11   manner consistent with the law and to make it consummate with

12   the Bankruptcy Code.  But that was the point that I was trying

13   to make.

14        And then coming to the *Vanguard* case.  I read it and

15   I think there's sharp distinction between that case and our

16   case.  As the Court there pointed out in *Vanguard*, that the

17   Reorganized Debtors knew that the case was not fully

18   administered and within the meaning of Section 350, the

19   closure section.

20        And in the Motion for Final Decree by Fury.  Fury

21   pointed out -- Fury cited to Section 350(a), they cited

22   Section 3022.  So there's no question, I think in my mind,

23   that Fury was not invoking Section 350 or the closure rule

24   3022.  So that's one distinction.

25        And again, in the Final Decree, the Bankruptcy Court

1    cited the motion.  And I think what they were saying is I'm

2    act -- the Court was saying, "I'm acting pursuant to

3    Section 350, I'm acting pursuant to Section 3022."

4         And so -- and again, in the *Vanguard* case, the Court

5    said that the Court intended to continue the administration of

6    the estates of the Debtors.  In contrast with the Fury Final

7    Decree, the Court explicitly said that the Chapter 11 case of

8    Fury is hereby closed.

9         I mean, so there's no question, I think, that the

10   Court had in mind to close the case.  And that once closed,

11   just a simple syllogism that once that the case is closed,

12   then the Bankruptcy Code claims of 544 and the 548 claims are

13   time barred.  This case was closed.  And, therefore, the

14   claims in this case are time barred.

15        And I know the Court yesterday had focused on

16   Section 5 of the Decree and had discussed that.  And again, I

17   would say nothing in Section 5 mentions Section 546.  Nothing

18   about it purports to overrule or override Section 546, and

19   nothing about Section 5, moving away, prevented Fury from

20   bringing other causes of action in this case.

21        I mean, here, Fury has brought causes of action

22   against many, many Defendants.  I think it seems like almost

23   everybody.  I think perhaps not everyone for fiduciary duty.

24   They've brought claims against other Defendants, I think it

25   was one other Defendant for unjust enrichment.  So nothing

1    about the Decree prejudiced Fury's right to bring claims, they

2    brought other claims.

3              And so, I would just say in closing on this subject,

4    that nothing about the Decree purports to overrule or override

5    Rule 546.  I don't, with all due respect to the Bankruptcy

6    Court, I don't think the Bankruptcy Court had that power.

7    I've never seen a Court override of statute of limitations

8    before, you know, without due respect to the Court.

9              And I think that the Decree should be interpreted in

10   a manner --

11             THE COURT:  So what about the final clause here,

12   "Without prejudice to the rights of closing Debtors to seek to

13   reopen such cases for good cause shown?"

14             MR. STOGER:  There's been no motion.

15             THE COURT:  There's no motion, but you're saying you

16   can't do it given the statute and the way it was done.

17             MR. STOGER:  Right.

18             THE COURT:  You have to go reopen and seek

19   permission to do it.

20             MR. STOGER:  Well, and also, I would say I don't --

21   to be honest, I don't agree with the *Vanguard's* decisions

22   outcome, but I would say that it does list several cases where

23   Courts have held that even if the case is reopened at this

24   point, it would not reactuate the statute of limitations.  But

25   we're not there.

1            THE COURT:  Okay.  Thank you.

2            MR. STOGER:  Just a few other points, Judge.  We

3    talked about in the  --

4            THE COURT:  And I've looked at this already.

5            MR. STOGER:  Okay.

6            THE COURT:  I know has a duty to, under 1 means

7    less.

8            MR. STOGER:  Right, yes.

9            THE COURT:  But 2, 3, and 4, or should, may or will.

10   But it concludes, only since 1 is what you would use if you

11   were strictly --

12           MR. STOGER:  Yes.

13           THE COURT:  -- drafting it.

14           MR. STOGER:  Yes.

15           THE COURT:  So --

16           MR. STOGER:  I think that that covers it, Judge.

17           THE COURT:  One of Mr. Garner's less helpful

18   definitions.

19       (Laughter.)

20           THE COURT:  He gathers in all usages of it, and

21   that's always the point with what does "shall" means, that

22   people use it in different ways.

23           MR. STOGER:  And Judge, I looked at some other

24   dictionaries as well.  I didn't cite them all here.

25           THE COURT:  Yeah.

1          MR. STOGER:  But obviously it's an auxiliary verb,

2     and most of them I've seen quote all these different messages.

3          THE COURT:  Okay.  All right.  So let's -- thank you

4     on that.

5          And is that an argument that pertains to the

6     fraudulent transfer claims only or does it pertain to all

7     claims that have been brought --

8          MR. STOGER:  Well, Judge --

9          THE COURT:  -- for breach of fiduciary duty.  Would

10     it pertain to that?

11          MR. STOGER:  Well --

12          THE COURT:  I have this -- I ask, only because in my

13     chart on putting all things together here, I had it as part of

14     the fraudulent transfer claim argument.  And so I'm just

15     wondering, does it sweep more broadly than that?

16          MR. STOGER:  Well, 546 applies by its terms to the

17     Bankruptcy Code claims to the 544, which is the strong arm

18     statute, and then 548, which is the Bankruptcy Code fraudulent

19     transfer.  The TUFTA State law claims come in through 544 to

20     the -- sorry, through the strong arm statute.  So it would

21     apply to the -- it would apply to Bankruptcy Code 548,

22     fraudulent transfer claim, and then also to the State claims

23     that are only viable through 544.

24          THE COURT:  All right.  All right.  Thank you.

25          All right.  And now, as to breach of fiduciary duty,

1    you had some more on the operating agreements.

2           MR. STOGER:  Yes, Judge.  I would just say, I know

3    I've cited in the briefing, the *L3 Communications* case and the

4    *B&B Parigus* (phonetic) case.  The key factor that they pointed

5    to, and those were two breach a contract cases and they

6    weren't LLC cases.  But one point I agree with the Plaintiffs

7    on is these LLC agreements are treated as contracts and

8    construed as contracts.  And so, the operative language would

9    be the amend and restate portion.

10          And again, in *L3* we had a letter of intent, and an

11   original and amended letter of intent.  The amended went

12   through and talked about, we desire to amend and restate the

13   original agreement.  The Plaintiff brings -- tries to bring

14   some claims under the original letter of intent.

15          The Court dismissed those claims.  I'm citing this

16   language because the parties' intent to supersede was

17   basically evident from the amended and restated language.  The

18   same thing *B&B Paradis* citing *L3* reached the same conclusion.

19   And there were breach of contract claims there.  There was a

20   breach of fiduciary duty claim in that case.

21          In reading the opinion, it wasn't clear exactly, you

22   know, whether they're focusing on the fiduciary duty in this

23   section of the opinion.  I think they were, though.  It was a

24   long opinion, a little bit unclear.

25          And just to wrap it up, I was thinking about this.

1     This actually reminds me of a case that I had handled about

2     five years ago.  I hope you don't mind I focus on this.  But

3     it was *Supply Pro versus Ecosorb*.  And basically what happened

4     there, there was a suit of a -- there was a supply contract.

5     There was a workout agreement after there was a problem with

6     the supply contract.  And then our client, who was the seller

7     of the goods, filed suit over the workout agreement when it

8     wasn't honored.  The buyer, Defendant buyer alleged fraudulent

9     inducement as to the original contract.

10            And what we argued, and which the Court of Appeals

11    agreed with us on, there was that the Court held that the

12    workout agreement was an novation of the earlier agreement,

13    basically superseding the earlier agreement and dispensing

14    with any fraudulent inducement.  It was a defense there.

15            And so I was thinking about this, and I think that

16    the analogy would be, I believe this more closely fits towards

17    an novation. And when you have an novation, you have a

18    subsequent agreement.  Here I think it would be the third or

19    fourth amended LLC agreements that supersede and take the

20    place of the early agreements.  And in that event, only the

21    later agreements apply, any claims would have to be brought

22    under the waiver agreement, which here includes the fiduciary

23    duty exculpatory clause.

24            You know, in that case one of the arguments the

25    other side tried to make, that there was no release language.

1     The Court, you know, rejected that and said that an novation

2     discharged the obligation.  I would just also point out that

3     the Court in the *B&B Parabis* case agreed with the same theory,

4     that the Defendant attempted to argue, there was no release

5     language and the Court rejected that.

6           So with that, if the Court has any questions, I'll

7     be happy to address those.

8                 MR. HILL:  Judge, I have --

9                 THE COURT:  Thank you.  Yeah, go ahead.

10                MR. HILL:  Yes, sir.

11          Judge, I want to talk about a doctrine at law that

12    goes directly on the point of what we were just discussing

13    that we just went off the screen.  And that's called the

14    relation back doctrine or the doctrine relation back.

15          There was much discussion yesterday between the

16    counsel.  Well, if the third and fourth are here, can they

17    relate back here, can they then go forward?  And there was

18    even discussion on the word "shall" going forward being

19    prospective.

20          Texas law recognizes three different ways the

21    doctrine relation back or the relation back doctrine.  First,

22    as you know, we adopted the common law in 1836, and then again

23    our current Constitution of 1876.  And the common law treats

24    it as a novation, that we were just talking about.  And from

25    my authority on the novation, I'd use the following quote:

1    "As a rule as said to an acceptance, acceptance of the terms

2    of novation need not be shown by expressed words to that

3    effect, but the same may be implied from the facts and

4    circumstances attending the transaction and conduct of the

5    parties."

6         So you say, did I sign off on those amended and

7    restated, Mr. Hord?  No, I did not.  But our actions.  We have

8    the third, which were the taxes, clean slate, and the fourth,

9    which are the Delaware, clean slate.  We relayed back.  That's

10   the first leg of the three-legged stool.

11        We also recognize it in the statutes.  Now it's

12   being used for a particular purpose in the Civil Practice and

13   Remedies Code when we relayed back.  But how much more

14   important is that than our pleadings, as we relate back.

15   Again, the doctrine relation back.

16        And the third way is -- and this is what the

17   revolution's about in addition to taxation without

18   representation.  And that would be deeds entitled to land, the

19   free ownership, the fee off land.

20        And it's very important when you have, and I've got

21   one at the Fifth Circuit right now on a correction deed.  It

22   all relates back.  Here the amended and restated relate back

23   to that original time and then go forward.  Texas law

24   recognizes it, and of course the federal rules will give you

25   relate back on pleadings.

1          But I think it's important to point those out to the

2     Court.  For my authority, Judge, and for the Record, I rely on

3     the *Flanagan versus Martin*, 880 S.W.2d 863.  It's a Waco '94

4     on the novation.

5          And in relation back, I've got a humdinger.  Dinger

6     of course being a home run home, humdinger when you got

7     somebody on base.

8          I've got the Supreme Court of Texas in June the 6th

9     of 1898, matters that arose beginning in 1860, and it's the

10    doctrine of relation back, talking about how important it is

11    to your property rights that you have.  And this one,

12    actually, they talk about how the Federal Courthouse in Tyler

13    burned.  So they bring in Federal law, State law.  And that

14    site is so old, it's 47 Southwestern Reporter, June 6th, 1898

15    at page 712.

16         Judge, that's what I have to bring up about that

17    relation back.

18              THE COURT:  Thank you, sir.

19              MR. HILL:  Thank you, Judge.

20              THE COURT:  All right.  Mr. Samet.

21              MR. SAMET:  Thank you, Your Honor.

22              THE COURT:  I've got a copy of the PowerPoint, if

23    you want to refer to any page, yeah.

24              MR. SAMET:  I have a copy.  He handed me one.

25              THE COURT:  No, I understand that if you want to

1    refer me to whatever page you're looking at.

2        MR. SAMET:  Yeah, I might do that.  And I have to

3    say, I got a lot of motions -- I know Your Honor has just as

4    many as I have to deal with, I recognize that.

5        But it seemed to me that there was a lot, both in

6    the presentation and the last presentation, that was not in

7    briefs on the cases, so I'm going to do my best to respond.

8    But I don't think there was a lot of new material.

9        THE COURT:  Well, so was there new material or was

10   there not?

11       MR. SAMET:  Yes, there --

12       THE COURT:  There was new material.  All right.  So

13   you asking for a chance to brief a little bit further what

14   you've just heard?

15       MR. SAMET:  Let me see if I can address it.

16       THE COURT:  Okay.

17       MR. SAMET:  And then --

18       THE COURT:  Well, you're not going to get a ruling

19   from me.  When you finish arguing I'm not going to say, okay,

20   I agree with you.  I'm going to have to think about it.  And I

21   heard some very interesting things in this PowerPoint.

22       So, do you want a chance further brief some of what

23   you've just heard?

24       MR. SAMET:  May I discuss at this point?

25       THE COURT:  Sure.

1            (Counsel confer.)

2                  MR. SAMET:  Your Honor, I'm going to do my best to

3      proceed.

4                  THE COURT:  Okay, all right.  Thank you, go ahead.

5                  MR. SAMET:  All right.  And I'm also going to do my

6      best to avoid maybe repeating all the arguments from

7      yesterday.  And --

8                  THE COURT:  I guess I want to say --

9                  MR. SAMET:  Yeah.

10                 THE COURT:  -- just to be clear on the Record, if

11     I'm persuaded by what I just heard, I'm saying this clearly on

12     the Record, I don't want to see an argument to the Appellate

13     Court saying that I made a decision based on something that

14     wasn't properly briefed.

15                 MR. SAMET:  Your Honor --

16                 THE COURT:  Okay.

17                 MR. SAMET:  -- absolutely.

18                 THE COURT:  All right.  I just want to be sure about

19     that, so.  Because I'm giving you the chance if you want to.

20                 There are some of this that is covered in Mr. Hord's

21     brief.  I mean, some of the citations to the things that are

22     being referred to are all there, this connects it up in a

23     different way than I had thought about it before.

24                 MR. SAMET:  It does.  And that's why -- and I

25     apologize.

1          THE COURT:  Okay.

2          MR. SAMET:  I'm not trying coy.  I haven't gone back

3     and matched exactly to the replies.

4          THE COURT:  Okay.

5          MR. SAMET:  I'd like to proceed here, Your Honor --

6          THE COURT:  Go ahead.

7          MR. SAMET:  -- I'm not trying to play games.

8          THE COURT:  Thank you.  I have no doubt about that.

9          MR. SAMET:  Okay.

10         THE COURT:  You've been terrific both days.  So go

11    ahead.

12         MR. SAMET:  All right.  But I didn't think -- I was

13    going to say that I thought particularly on the issue of 546,

14    you know, I thought that the presentation didn't entirely --

15    wasn't entirely fair to the points that I was going through,

16    especially in the Order and what's going on here.

17         And I thought to organize myself, though, just to

18    avoid repeating, repeating all of that, maybe I would organize

19    by the presentation itself.

20         THE COURT:  Okay.

21         MR. SAMET:  The first issue is with respect to the

22    timeline.  And my client, the Trustee of the Fury Litigation

23    Trust, came into existence on June 30th, 2020.

24         THE COURT:  Okay.

25         MR. SAMET:  All right?  The Final Decree is entered

1    on July 1st, and I could be wrong, but it might even be signed

2    on June 30th.  It is -- as we talked about yesterday, it is

3    referenced in the Plan that the Debtor is going to make this

4    motion, Section 4(w), I believe.

5              THE COURT:  Okay.

6              MR. SAMET:  And it's all being coordinated together.

7    And of course -- and I'm going to talk about this in more

8    detail later on.  The reason that the Debtors are saying you

9    can close this case, they're saying is because the trust has

10   the claims, those actions are going to be prosecuted through

11   the trust.  And so this -- that's how this that's how this

12   works.

13             Second, with respect to Bankruptcy Rule 3022 -- I'm

14   sorry, I didn't get that out.  I understood that counsel is

15   making reference to the Debtor's motion to close in the case.

16   But I do want to point out that in both the motion, and in the

17   Order itself in great detail, it is not over, the case is not

18   over.  The claims of the remaining matters, which as we talked

19   about, I think I read it into the Record.  I have the

20   paragraph number here, paragraph 16 of the Debtor's motion

21   with the definition --

22             THE COURT:  I've got it.  Your argument would be

23   representations about it being fully administered or accurate

24   at that time.  But part of that administration was giving

25   these claims specifically to the trust with the understanding

1    that they're going to be brought, and that isn't something

2    that keys to the concerns being raised by 546.

3              MR. SAMET:  That's correct.

4              THE COURT:  Okay.

5              MR. SAMET:  And in addition, Your Honor, the other

6    reason why is that the issues that are not going to be brought

7    by the Trust are going to be brought in the parent case in the

8    *Cornucopia* case, which everyone agrees is open.  All right?

9    And then that's why -- and those remaining matters are claims

10   objections, those are fee objections, those are all the

11   miscellaneous things that have to be done, is there any party

12   that wants to be heard?  Those matters are still open.

13             And, in fact, pursuant to -- it's not just, it's not

14   just, it's not just section -- paragraph 5 of the Order that

15   says it is without prejudice to the cause of action.  It's

16   paragraph 4, the remaining matters are going to proceed in the

17   case.  It's paragraph 7, that all further reporting is going

18   to occur in the Cornucopia case.  That there's going to be

19   actually a docket entry made that anything is going to

20   continue in the *Cornucopia* case?

21             And paragraph 11, any objections to claims or

22   interest in the closing Debtor is filed, administered, and

23   adjudicated in the remaining case.  And of course the

24   catch-all provision in paragraph 12.

25             And so it's fully administered, but with those two

1  big *provisos;* the one that Your Honor just mentioned, and of

2  course these, that is simply not -- it's continuing to be

3  administered and it's continuing to be open.

4       And again, this isn't that it's continued to be open

5  in some random other proceeding or in some other outfit.  It's

6  100 percent parent case, it's that they're -- all three cases

7  are being jointly administered in that proceeding.  And I

8  believe in our papers, we cited Your Honor, we put in a

9  declaration with the joint administration order.

10       And again, the Plan itself is a single Plan of

11  Reorganization, it's 108 pages that takes -- we went through

12  this yesterday, too.  It takes all the assets of the --

13  because it's all 100 percent owned with the different

14  entities, all the liens and claims, and recombines them and

15  sends them to different places.

16       So where that's taking me through, Your Honor, is

17  that this idea that somehow the Bankruptcy Code -- the

18  Bankruptcy Court was contravening an order of Congress, I

19  really think is not -- I actually don't quite understand it,

20  that that's not what is -- they are administratively closing

21  this case for the convenience.  And probably, as Judge Isgur

22  pointed out, to save on paying U.S. attorney fees, because if

23  you keep a case open, then even though the debt is closed and

24  new company is going on and the claims are being prosecuted by

25  the case, they don't want to keep paying hefty fees based on

1    the original assets of the case in bankruptcy.

2          And so this -- what I really think counsel -- to the

3    extent that counsel is making an argument, is an argument

4    against the case closure order.  That to say, well, the case

5    shouldn't -- it shouldn't have said case closed.  You should

6    have kept -- if you were having the remain matters going to

7    the parent and if you were having the State claims going to

8    the trust, Judge Silverman shouldn't have closed the case.

9    And that was wrong under Rule 3022, and maybe it's wrong

10   pursuant to counsel's constitutional argument or statutory

11   interpretation argument.

12         But again, and this takes me to have slide 9 of the

13   debt, which is --

14         THE COURT:  I will say, I mean, I agree that the

15   argument that I heard was technical argument.  And in terms of

16   I'm still thinking about humdingers -- is that, you know, but

17   if you go foul, you go foul on these statutory things.  And I

18   mean, that's -- it's like, look, if you want to do things a

19   certain way and there's a statute that tells you how you have

20   to do it, then you need to meet each of those things.  And

21   it's not really a criticism to say, hey, a lawyer stood up and

22   made sure that you actually did all of the exact things that

23   you needed to do.  That's the job.

24         And so, I mean, I'm going to take a look at that.  I

25   hear you talking about sort of intent and big picture, which I

1    also understand, but there's a statute that I'm going to have

2    to be dealing with.

3         MR. SAMET:  Well, hold on a second, Judge, because

4    this is exactly --

5         THE COURT:  So now we are on page 9 where do you

6    want us to go.  Okay, go ahead.

7         MR. SAMET:  Again -- and this is a general

8    proposition when you've got contracts.  But contracts

9    documents should not be interpreted to render them illegal and

10   unenforceable, or the wording leads them to a logically

11   acceptable construction that renders them legal and

12   enforceable.  All right?  I agree with that.  And I think

13   going back, there's nothing in here about 105, about

14   overruling the Bankruptcy Code.  In fact, they don't have a

15   claim that says that was an illegal Order.  They say that --

16        THE COURT:  Let me ask this, let me ask this,

17   though.

18        So let's assume that the theory aspect of these --

19   there's three bankruptcy proceedings that were going forward

20   or being separately administered, and now there's just the

21   parent *Cornucopia*.  The other two were --

22        MR. SAMET:  They were always being jointly

23   administered, but the parent and the two 100 percent

24   subsidiaries each had their own bankruptcy docket.

25        THE COURT:  All right.  And so, and they were

1  closed.  Let's assume that it was to avoid payment further

2  fees to the U.S. Trustee.  Is that the only reason that they

3  were being closed?

4         MR. SAMET:  Well as -- and to be honest, I'm not

5  pulling that from an intent, a lawyer's intent.  But the

6  motion goes through they're closing it -- why they're closing

7  it, for administrative convenience.  I mean, that's what

8  the -- that's what the motion is saying.

9         THE COURT:  Sure.

10         MR. SAMET:  And, in fact, that's why it comes back

11  to this conditional, on this condition.  It says, if the

12  assets aren't transferred, don't close this case.  And again,

13  I think the logical import of counsel's argument, though, from

14  a technical perspective that I heard, is that the case should

15  be reopened and that it should never have been closed in the

16  first place, which of course means if it never was closed in

17  the first place, then I'm not sure what we're talking about.

18         Again, 546 says -- 546 doesn't have anything to do

19  with any similar requirement about what needs to be in the

20  case closure order.  All it says is, is you can't bring

21  fraudulent transfer claims after the case has been closed or

22  dismissed.  And our argument, Your Honor, is that the case has

23  simply not been closed in the meaning of that statute, it is

24  open.

25         THE COURT:  Because *Cornucopia* is open.

1          MR. SAMET:  That's right.  Anything you wanted to do

2     in that case you can do in the *Cornucopia* action.  All right?

3     With the exception, of course, of the fraud and transfer

4     claims, which the order is preserving for us to bring in

5     appropriate forum.

6          So that is our argument.  And that's why I don't

7     agree with what I heard here, that somehow the Bankruptcy Code

8     was exceeding something by allowing the Trustee to bring the

9     claims.

10          THE COURT:  Okay.

11          MR. SAMET:  There was also an argument about -- and

12     that's what I thought it was interesting that counsel's next

13     slide talked about intent and how that was a distinction and

14     the *Vanguard* case is closed to hear.

15          And on page 13 counsel quoted from the *Vanguard*

16     decision saying the Court intended to continue administration

17     of the estates.  And again, that's what we're pointing to Your

18     Honor.  I don't think there's a question now about Judge

19     Silverman's intent.  It says in paragraph 4 the main matters

20     are going to be, are going to be continued in the *Cornucopia*

21     case, and all the other arguments cited in there.  And so --

22          THE COURT:  Okay.

23          MR. SAMET:  So that is my -- and let me add to what

24     I said yesterday, Your Honor.  It is my rebuttal to that, to

25     the presentation on that point.

1                    THE COURT:  Okay.

2                    MR. SAMET:  Let me move to the presentation on the

3         operating agreement.  And I don't think -- I think this is a

4         similar argument.  I don't presuppose to keep --

5                    THE COURT:  It is, I would just say, can you --

6                    MR. SAMET:  -- very briefly.

7                    THE COURT:  *L3 Communications*, I think we talked

8         about that some yesterday.  But can you give me your take on

9         that case?  And I think the other two follow from that.

10                   MR. SAMET:  I was on going as well on it.  I just --

11        take me out of my order.  Hold on one second.  I'm sorry.

12                   THE COURT:  Yeah.

13                   MR. SAMET:  This is allowed, it's allowed, I'm

14        just --

15                   THE COURT:  In terms of what I heard additional to

16        yesterday, we were focusing on the *L3* case.

17                   MR. SAMET:  Well, I was going to talk about it,

18        that's fine, and then I'll go back.

19                   THE COURT:  Okay.

20                   MR. SAMET:  Well, if Your Honor will just let me get

21        a half a second --

22                   THE COURT:  Yeah, go ahead.

23                   MR. SAMET:  Because I think leading into the *L3* case

24        on slide 15, counsel is pointing out that both the third and

25        the fourth state -- that amends and restates the previous

1    agreements in their entire.  That's obviously -- it says that

2    in there.

3            And again, I just want to point out, our main point

4    is that it amends and restates in their entirety effective as

5    the dates on the document.  That's our argument.  I'm not

6    going to repeat that.

7            THE COURT:  Okay.

8            MR. SAMET:  I think -- and on the *L3* case, and I

9    also on the next cases as well.  These are cases that come

10   from the realm of contracts.  I think we talked about

11   novation.  That was a new argument probably.

12           But I think I can talk about it here, too.  Novation

13   and when parties have -- and I don't remember the specific

14   case in as great detail.  But when parties are putting in

15   language that they're superseding a previous agreement, two

16   parties, all right?  There are all sorts of doctrines in the

17   law as to how you handle those situations.

18           Mr. Hill talked about, if you look -- sometimes you

19   look at the facts and circumstances, right?  What's going on

20   here?  In the *DG* case we talked about the other day, they had

21   changed an investment over into an operating agreement and

22   they put in an integration clause, and then they said, okay,

23   you've given up your previous rights, we're going under this

24   document now.

25           And, you know, what we're saying here is that this

1    is not a contract that the parties then continued operating

2    under.  They're trying to say there's a retroactive

3    exculpation to a time when the company was operated in a

4    different manner.  And there is just simply no doctrine in

5    law, in Delaware law, about what retroactive exculpation

6    might mean.

7              We have doctrines as to, you know, when we talk

8    about novation and what happens when a contract is novated.

9    And we have documents when people have letter of intents, and

10   then they have an original letter of intent, and then they go

11   onto a second letter of intent.  All right?  There's cases

12   available about that.

13             THE COURT:  Well, we're looking at that -- I think

14   it's paragraph 9 of the LLC.

15             MR. SAMET:  I see it --

16             THE COURT:  I think it's paragraph 9.  I don't have

17   it before me anymore.

18             It's not -- it doesn't have to do with exculpation

19   or release.  In fact, it doesn't really talk about suit or the

20   ability to sue at all.  But what I'm understanding it, when

21   you're talking about as to who that paragraph pertains to,

22   that they no longer have duties.  That's insulating them from

23   the ability of who to bring suit against them.  Is it the

24   company would be bringing suit against its officers,

25   directors, et cetera, or is it somebody else?

84

1          MR. SAMET:  Well, it's --

2          THE COURT:  Because it's breach of fiduciary duty

3     and it's the fiduciary duty that's owed to the company.

4     Right?

5          MR. SAMET:  It's the -- the paragraph 9 says that

6     they shall not have a fiduciary duty to the company.

7          THE COURT:  Okay.

8          MR. SAMET:  It's typically the case, just to answer

9     Your Honor's question.

10          THE COURT:  Yeah.  And so I look at that, it's not

11     that it's entitling or disentitling the company to do anything

12     as of a specific time period.  It seems to me like it's

13     saying, you know, once that provision is in place, it's saying

14     what the company can do *vis-à-vis* these people.

15          And I mean the argument that I'm getting is that the

16     company just can no longer bring those types of suit against

17     its people, ergo litigation trust who's standing in the shoes,

18     the company can't do that.

19          And so I don't see, I honestly, I don't see with the

20     amended and restated that it's a question about, well, what

21     was exculpated in the past?  It's more talking about as of,

22     effective as of that date that it's happening, what can the

23     company do against its officers and directors?

24          And I'm not sure it has the ability anymore to say

25     that there's a duty that was breached.

1          MR. SAMET:  Well, I'd like to respond.  I'd like to

2     respond in two ways.  And I think it's an important argument,

3     so I apologize.

4          THE COURT:  No.  Yeah, it's a big argument.

5          MR. SAMET:  Again, it's our read of the contract

6     that is saying --

7          THE COURT:  Again, it's technical, and I sit here.

8     I don't like reading a document that says you can breach all

9     the fiduciary duties, you can violate your fiduciary duties at

10    will and nobody can sue you for it.  I don't like that.  But

11    the Delaware statute says we're going to give parties the

12    ability to do it to the maximum extent by contract.

13         And so, it really doesn't really matter what I

14    personally think about it.  It's like, what does that law

15    require?

16         MR. SAMET:  Let me make my arguments.

17         THE COURT:  Yeah.

18         MR. SAMET:  My argument is, first, that the plain

19    reading is that going forward these officers, if they want to

20    know how they should conduct themselves going forward, they

21    shall have no duty, fiduciary or otherwise, to the common.

22         All right.  Now, I will also point going forward,

23    the officers are going to be subject to a board that's under

24    this agreement as well.  All right?  Going forward they're

25    going to be subject to a board, which has independent

1     directors and the lenders can sit on it.

2              And so, that would answer Your Honor's question as

3     to, well, who in their right mind would not have a fiduciary

4     duty, but now they're going to be subject to supervision.

5              So, our read of the contract, is that from this date

6     going forward, if you want to know how to conduct yourself,

7     you have no fiduciary duty to the company and there's going to

8     be a board in place.

9              And that takes me to my next point, which is, if you

10    look at the agreement it's not just section 9 that we're

11    saying it's like that going forward.  It's every section.

12    It's every section is like that.

13             I'll used the fourth provision because we were using

14    the fourth yesterday.  But it's section -- and we can look at

15    them all, Section 5, it's going to be a company and

16    registration state Delaware.  Obviously had a registration in

17    Texas before that, it's a Texas company.  Got a mailing

18    address, that's going to be perspective.  Got a management

19    company 7(a), it's going to be directed by a board of

20    directors.  All right?  7(b).

21             All of these -- all of this -- everything this

22    document is looking for is how is this company going to be

23    operated going forward?  And my interpretation, apparently all

24    these learned gentlemen think otherwise, is that if you want

25    to know how the company's going to be operated going forward,

1      this restates the entire operating agreement.  You're not

2      going to look to anything else.  You're going to look to this

3      document.

4                    THE COURT:  As of the date.

5                    MR. SAMET:  As -- well, not as is.  It says is

6      effective as of this date.

7                    THE COURT:  Right.  That's what I meant.

8                    MR. SAMET:  Effective as of this date.  All right?

9                    There's no integration clause that says supersedes

10     any prior conflict.  And I would also just say, as a matter of

11     course, parties need to know when they take actions, what

12     governs them.  And I would say, think about the opposite

13     situation, Your Honor, if this had said -- if the previous

14     document, when they took the actions, and they did these

15     transactions with the Randolph tax credits with the gas, if it

16     had said you have no fiduciary duty and then afterwards they

17     said, we're restating it back and now you have the most

18     onerous fiduciary duty.

19                    Could it really stand in my shoes and say, well, now

20     they're liable.  I've just restated it.  They would say, well,

21     of course not.  When I took those actions, I was relying on

22     it.

23                    And again, with respect to Mr. Hord, in particular,

24     and we pointed this out in the brief, it's just -- it's

25     peculiar to us.  He has an employment agreement.  He submitted

1    that agreement to the Court.  He denominated his motion for

2    summary judgment.  You know, he doesn't say I understood it.

3              In fact, I think counsel just got up and said, he

4    didn't -- wasn't participating in this.  He submitted his

5    employment contract.  It's an employment contract under Texas

6    law, he's going to fulfill his duties faithfully and

7    diligently under Texas law.

8              And this argument, this argument that this has --

9    that this document now goes back in time and says, well, no,

10   all that was different.  I find it difficult to say, how is

11   that going to be applied?  And I will come back, and there was

12   a lot of this yesterday, and I don't need to re-argue this,

13   but.

14             THE COURT:  I mean, you're going to get everybody

15   out in the benches --

16        (Laughter.)

17             THE COURT:  -- to rush the stage at this point.

18             MR. SAMET:  There is a lot of cases that have been

19   thrown around about what restated operating agreement means,

20   about what an exculpation means.  Although I will point out

21   all the cases, they have different clauses, and that's what I

22   was going to say about the *L3* case, which is where we started.

23             THE COURT:  Yeah.  It where we --

24             MR. SAMET:  You have to look at the -- when you're

25   looking at a contract, you have to look at the specific

1    contract and the specific language.  Does it say entered into,

2    does it say, as of, does it see effective, does it say a

3    limit, does it say, shall or have none, or what's going on.

4              And, no one has a case where someone went back and

5    said the operating agreement, know everything that happened

6    beforehand.  All right?  Was completely now you can't bring it

7    anymore.

8              And I suppose that goes for us as well.  I suppose

9    that -- you know, I'm not being, we've had a lot of argument

10   about that.  We don't have this exact situation.

11             So without repeating the arguments I made about the

12   statute and why that affected it, I think has meaning under

13   Delaware law.  That's our argument on this, Your Honor.

14             THE COURT:  Okay.  Either way the Delaware Supreme

15   Court's ultimately going to have something to say about

16   whenever I rule on this issue.  They'll tell me either I was

17   right or wrong.

18             Anything else?

19             MR. SAMET:  You know, I did.  If I could just put

20   one thing on the Record also, which I forgot to say, which is,

21   I do think that in looking at it, and with respect Your

22   Honor's question, I would put out there that before -- we

23   talked yesterday about releases, is it releases in our

24   release.

25             But I would say the same thing, before you eliminate

1    fiduciary duties for past actions, I think this Court or any
2    Court though, should really --
3                THE COURT:  It should be clear.
4                MR. SAMET:  -- should be clear.  Thank you.
5                THE COURT:  Thank you.
6                MR. STOGER:  May I respond briefly, Judge?
7                THE COURT:  Of course.
8                MR. STOGER:  Thank you.
9                Judge, as I said in the reply brief, it's just
10   inconceivable to me that Fury would file motion to close their
11   bankruptcy case; that the Bankruptcy Court would hold a
12   hearing on it and the Bankruptcy Court would enter a Final
13   Decree, closing the case all to no effect.  I mean, I think
14   that the Order means what it says, that the case was closed.
15   I mean, it's just beyond my understanding that they would've
16   gone through all these steps and not actually intending for
17   the case to be closed.  I think it means what it says.
18               A couple of other points:  I think one of the
19   purposes of a litigation trust is to move the litigation out
20   of the bankruptcy estate into litigation trust to bring, and
21   that tunes into the whole idea of closing the bankruptcy case.
22               And you know, the other point, I think this is a
23   binary question, it's --
24               THE COURT:  Well, so where do you go with that
25   thought, though?  What is that?  By saying that, what do you

1    mean by that?  It moves into litigation trust to bring the
2    claim, which is what they did.
3              MR. STOGER:  Yes.  They moved it to -- I'm sorry,
4    Judge.
5              THE COURT:  And so, but they needed to bring the
6    case before the main case was closed.
7              MR. STOGER:  Yes, absolutely.  Nothing prevented the
8    litigation trust from bringing this case before the bankruptcy
9    estate.  Because really nothing prevented Fury from filing
10   this case years ago.  I mean, the bankruptcy -- the litigation
11   trust just stands in the shoes of Fury.  But the Fury itself
12   could have brought this case.  They didn't have to wait for
13   litigation trust.  I mean, it was -- I think it was a Debtor-
14   in-possession.  There was no Trustee in the labor.  Energy
15   Capital Partners was essentially in control of the case.

16             And my understanding, really, from reading the
17   Chapter 11 Plan is, I think that any recovery by the
18   litigation trust would flow to Energy Capital Partners and
19   maybe some other lenders as well.  I wasn't exactly clear.  My
20   understanding is the main beneficiary of all this litigation
21   is the chief lender.

22             And also I think that kind of feeds into Your
23   Honor's concern about the fiduciary duty clause.

24             Also my understanding was that the lender put this
25   board of managers in place, the one where these, the third and

1    the fourth operating agreement was adopted, they put this

2    board of managers in place so they could exercise control.

3         So again, it wasn't as if the operating officers

4    just ran out and adopted this and, you know, were trying to

5    eliminate everything.  And I think the truth of the matter

6    was, it was the chief lender that they came in, forced

7    installation this board of managers.  I think, it was

8    Mr. Rieck, I think it was Mr. Broadsky (phonetic) for Energy

9    Capital Partners, and then there was an independent manager as

10   well.

11        So my understanding is that the third and fourth

12   agreements were adopted, probably drafted, I don't know that

13   for a fact, by Energy Capital's partners.  But I'm assuming

14   that it was either drafted by them, or at least they had

15   significant input into adoption of the third and fourth

16   agreement.

17        And also they talked -- when they talked about

18   private consolidation.  There was procedural consolidation

19   here, not substantive consolidation of bankruptcy cases.  We

20   talked about it in briefing.  But legally these are two

21   separate companies.  I mean, you have *Cornucopia* as the -- I

22   think the parent company that Fury is a subsidiary of.  And

23   there's never been any argument for alter ego in this regard.

24   The corporate form here they were filed under separate

25   bankruptcy case numbers, I believe.  So, I mean, these were

1    two separate, fully separate legal entities for all purposes,

2    no alter ego, no piercing the corporate veil.

3        And also, when you talk about Delaware law here, but

4    the way I see it, there was two hoops to cross through.  The

5    third agreement was actually adopted when this was a Texas

6    corporation.  So the first hoop to cross through is Texas law

7    and how the fiduciary duty clause would be treated under Texas

8    law.  And then I think if Fury crosses through that hoop, then

9    we get to Delaware law.

10       I can't say I've seen a significant difference

11   between two states on these issues, but I thought I would just

12   point that out.

13       THE COURT:  Okay.

14       MR. STOGER:  So there's two different hoops to cross

15   through here.

16       And then the final point on this:  With the closure,

17   I mean I'm going say this is judicial *estoppel*.  I mean,

18   although perhaps not fully, but you know, Fury represented to

19   the Bankruptcy Court that the case had been fully administered

20   and asked for closure.

21       And I saw in their motion, they said the only

22   remaining matters anticipated for resolution were final fee

23   applications and claims objections.  You know, for all intents

24   and purposes the case was closed by Order.

25       So just to close on that point, I would just say the

1    Order means what it says.  They vote 350, it says it's closed.

2    They asked for closure many times in the motion, the Order of

3    the case was closed under Section 546.

4                    THE COURT:  Okay.  I got it.

5                    MR. STOGER:  And then --

6                    THE COURT:  I get your argument.  Okay.  Thank you.

7                    MR. STOGER:  I think that covers.  And, again, I

8    think I've covered -- and you know, we've already touched on

9    the fiduciary duty.

10                   THE COURT:  Okay.  Yeah, and I think I've got

11   everything there.

12                   Mr. Samet, anything else?  I think I've got it.

13                   MR. SAMET:  No, Your Honor.

14                   THE COURT:  All right.  Thank you.

15                   All right.  So what I have left, let me hear all

16   arguments that Mr. Ganer and Sierra Pines wish to bring.  And

17   I have that there's some aspects as to Rule 9, as to Rule 8,

18   I guess pleading as to pleading of a fiduciary duty, and then

19   aiding and abetting breach of fiduciary duty.

20                   So, let's take them all up.  They're spaced out on

21   my outline, but let's just do them all.

22                   And Mr. Samet can then scramble further.

23       (Laughter.)

24                   THE COURT:  Go ahead.

25                   MR. SAMET:  I've got an outl, too.

1           MS. DANG:  Thank you, Your Honor.

2           Just a little bit of background of who Sierra Pines

3    is and who Mr. Ganer is.  And since this is a Rule 12(b)(6)

4    we'll kind stick of kind of the pleadings as well.

5           What we know from the Plaintiff's pleadings is

6    Sierra Pines is a third party consulting firm that Fury

7    retained to provide these reservoir reports.  Mr. Ganer was

8    the owner of Sierra Pines.  And, in fact, Plaintiff's

9    response, Docket Number 87, page 4, admits that Mr. Ganer did

10   not have a formal role at Fury.

11          And so when we talk about their breach of fiduciary

12   claim, that there's two avenues in which a breach of fiduciary

13   duty claim we establish either formal or informal.

14          For their formal role.  They've stated that because

15   Mr. Ganer operated, or at least held himself out to be an

16   internal geologist and had access to confidential information,

17   that that somehow rises to a formal fiduciary relationship,

18   and that's not the case.

19          In fact, the Fifth Circuit in *Jacked Up, LLC versus*

20   *Sara Lee*, stated that just because a confidential agreement

21   even exists, something such as an NDA, a licensing agreement,

22   any agreement that requires confidentiality does not

23   automatically create or give rise to the fiduciary duty.

24          Now, the two cases that were cited was *Hunter versus*

25   *Shell and Lloyd versus Pendleton* (phonetic) to somehow support

1       that because a geologist has confidential information and

2       automatically creates a fiduciary duty, but that's not what

3       those cases say.  In fact, in *Hunter versus Shell*, the issue

4       there was that Hunter was a geologist employed by Shell in

5       which Shell had a company rule that you could not then go buy

6       mineral or royalty interest that you had discovered while your

7       time working there.  And Shell, in fact, then later learned

8       that Hunter was divulging that information of third parties.

9       And, in fact, using shell corporations to buy interest in this

10      name, that's not what we have here.

11              In Lloyd versus Pendleton, that was an issue where

12      the geologist there admitted that he had a quasi-joint venture

13      with the Pendletons, and the Pendletons also testified at

14      trial that they view him as a close family friend, which the

15      Court then said the trial Court should have submitted that

16      question at least to the jury.  So those two cases sided to

17      support somehow just because of geologist --

18              THE COURT:  Let me as for Mr. Ganer.

19              MS. DANG:  Yes.

20              THE COURT:  In my notes here, I have a paragraph

21      down incorrectly from the first amendment complaint, because

22      it's not paragraph 150.

23              But isn't there an allegation that Ganer was either

24      a named officer or a *de facto* officer of Fury?

25              MS. DANG:  There is an allegation that simply

1    classified him as a *de facto* officer of Fury.  But --

2            THE COURT:  Okay.  So -- well, what's the but?  But

3    if you want to proved to me by evidence later that that's not

4    so, your motion's denied.  So why does that not sufficiently

5    plead to go forward as to that claim?

6            MS. DANG:  Because in that specific paragraph, that

7    is where the Plaintiff wants not just Mr. Ganer, but all the

8    other, Mr. Hord, Mr. Ganer, other folks saying that they are

9    now officer Defendants is what it's classified.  In

10   Plaintiff's response --

11           THE COURT:  What paragraph is it?  Do you have the

12   paragraph.

13           MS. DANG:  Yes.  It is --

14           THE COURT:  And, Mr. Samet, if you know, you can let

15   us know.  No?  Okay.

16           MR. SAMET:  I do, but I would cite the Court to

17   paragraph 25 in the first instance.

18           THE COURT:  Okay.  Is that what you were having in

19   mind or was it something else?

20           MS. DANG:  I don't believe it was paragraph 25.

21           THE COURT:  That's just the definition for

22   Mr. Ganer.

23           MS. DANG:  Yes.  Yeah, 25 is just the definition of

24   Mr. Ganer.  But when we look at what is going to be -- and I

25   apologize, Your Honor -- I believe it is paragraph 165.

1            THE COURT:  165.  Thank you.

2            MS. DANG:  Yeah, 165 is aiding and abetting and 150

3       is the definition.  So just to be clear.

4            COURT CLERK:  169.

5            THE COURT:  169.  Well, wait.  Yeah.  Okay.  So 169.

6       I'm looking at Plaintiff's first amendment

7       complaint, Docket 155, paragraph 169, which is right when the

8       first cause of action for breach of fiduciary duty begins.

9       Hord, Nunes, Stephoudt, others, including Ganer, were either

10      named officers or de facto officers of Fury.

11           Okay.  So why is that not clear enough?  I mean, it

12      articulates it.  It is then discovery that can be taken on

13      that and I can later determine whether that is or is not true.

14           But what is it about that, with everything else said

15      about him in advance, that that's not enough to invoke the

16      concept of a fiduciary duty?

17           MS. DANG:  Well, one, Your Honor, even in

18      Plaintiff's own response to that, states that he did not have

19      a formal role at Fury.  There is no allegation that he was

20      receiving some sort of salary, as what they have alleged to

21      the other Defendants.

22           And another reason why that's not sufficient is

23      simply because he may be an officer doesn't automatically

24      impute some sort of fiduciary duty.  And here, taking kind of

25      what they've said, what he's done, aside, that's still simply

1     not enough for a formal fiduciary relationship.

2            THE COURT:  Okay.  I'm given some -- were you here

3     yesterday?

4            MS. DANG:  I was not, Your Honor.

5            THE COURT:  Okay.  Only on a couple of them have I

6     indicated sort of what I think in a definitive way.

7            I do think it's pretty thinly pleaded, but I do

8     think that the argument you're raising is something that's

9     probably going to be better heard on summary judgment.  I

10    think you may have something there.  But I think there's

11    enough to go forward on that.

12           That's my -- I'm going to look further at your

13    arguments on it.  But that's kind of what I'm thinking about

14    it right now.

15           MS. DANG:  Okay.  Now, I'll be really brief on the

16    informal fiduciary.

17           THE COURT:  Okay.

18           MS. DANG:  Because the other avenue of having that

19    relationship is if there is an informal one.

20           As we know, Texas Courts have held that in order to

21    have an informal fiduciary relationship, it has to arise

22    separate and apart from the business relationship itself.  And

23    here, in the pleading itself, there is no allegation of an

24    informal fiduciary relationship.  There is no allegation that

25    Mr. Ganer or Sierra Pines had some social, close personal

1    relationship with Fury.  So we don't get there under that.

2              THE COURT:  Okay.

3              MS. DANG:  And then the other point would be under

4    aiding and abetting.

5              So we do agree with Plaintiff that while aiding and

6    abetting is not a real cause of action, there is a cause of

7    action called the knowing participation in breach of fiduciary

8    claim --

9              THE COURT:  Right.

10             MS. DANG:  -- which is a mouthful.  So we agree with

11   them on that.  I think our issue with that is the way that

12   it's pled is just Defendants, Officer Defendants.  Who are we

13   assisting, knowingly participating in their breach?  That's

14   where we get the Officer Defendants that are defined; that's

15   Hord, Nunes, Van Stephoudt, Elder, and another party I cannot

16   pronounce.  But because of that we have no clarity as to who

17   we have allegedly assisted in breaching what their fiduciaries

18   are, if they have one, and what did he do?

19             THE COURT:  Okay.  And that's as to -- I'm looking,

20   trying to find -- which cause of action?

21             MS. DANG:  Aiding and abetting, it is the second

22   cause of action --

23             THE COURT:  Second cause of action --

24             MS. DANG:  -- on the Plaintiff's first, or I guess

25   original complaint.

1          THE COURT:  Hold on one second.

2          Okay, all right, thanks.  I got that.  I'll take a

3     look at that.

4          MS. DANG:  And I guess our second bucket of argument

5     is related to the fraudulent transfer claims.

6          THE COURT:  Yes.

7          MS. DANG:  And so the first one is the actual

8     fraudulent transfer under both the Texas statute, as well as

9     the federal statute.  And under that is Rule 9(b) requires

10    that for that claim to be plead with specificity.  And, in

11    fact, in *Campbell versus Texas Tea*, which was a case decided

12    by Judge Edison in 2021, he applied rule 9(b) to a fraudulent

13    transfer claim.

14          He stated that it required pleading of the transfer,

15    the initial transferee, the date of the transfer, the amount

16    or value in consideration paid, if any.  Here we don't have

17    that.  All we have in Plaintiff's complaint, in paragraph 172,

18    is just a blanket answer or blanket statement that 3.8 million

19    was transferred at some point in time.  We don't know who.

20    Was it to Sierra Pines?  Was it to Mr. Ganer?  What was the

21    date?

22          And, in fact, in *Campbell,* Judge Edison stated that

23    in that complaint, the allegation that the fraudulent

24    transfer, quote, "took place within a four-year range was not

25    specific enough to meet the Rule 9(b) standard."

1          As to constructive fraudulent transfer, Courts have

2     then held that that is only required under Rule 8.  And our

3     issue there is because there's no kind of clarity as to what

4     and when the transfers were made, we don't know whether or not

5     to negate, if it was for reasonably equivalent value.

6          THE COURT:  Okay.

7          MS. DANG:  And, in fact, Judge Edison in that case

8     also says:  Simply stating that without further facts is

9     damaging.

10         THE COURT:  Which case is that?

11         MS. DANG:  *Campbell versus Texas Tea*, I have a copy

12    of the case if Your Honor would like that?

13         THE COURT:  Okay.  And that's Judge Andy Edison not

14    Keith Ellison.

15         MS. DANG:  Yes.

16         THE COURT:  I just want to be sure, Andy Edison.

17    Okay.

18         MS. DANG:  Edison.

19         THE COURT:  All right.  Thank you.

20         All right.  Anything else?

21         MS. DANG:  That is all, Your Honor.

22         THE COURT:  All right.  Mr. Samet?

23         MR. SAMET:  Okay.  Briefly in the Order.

24         THE COURT:  You have starting with the fiduciary

25    duties.

1              MR. SAMET:  You know, we've -- let me back up.

2              We've sued Mr. Ganer and his company SPRI on a

3      number of alternative theories, and that that certainly

4      arising from his somewhat unusual position in the company.

5              And I would direct Your Honor to paragraph 25 of the

6      complaint.  We do introduce him, but we also state that he is

7      Fury's internal geologist, which is an important role.  And

8      that's why we cited those Fifth Circuit cases, which I've

9      recognized here in jury trials, of whether internal geologists

10     at oil and gas extraction companies is a very important role.

11             But we also said that he was chief technical advisor

12     to Mr. Rieck, he report directly to Rieck.  He gave

13     instructions to Fury's employees and consultants, he oversaw

14     strategic decisions, and he was held out as the Fury's

15     internal lead geologist to third parties.  And that's why we

16     think that that plead's enough to argue that he's, in fact, an

17     officer, and also pleads not to argue that he's the type of

18     control person that has fiduciary duties.

19             And I think in that *Jacked Up* case from the -- the

20     name is *Jacked Up* --

21             THE COURT:  I understand.

22          (Laughter.)

23             MR. SAMET:  --  from the Fifth Circuit.  Those --

24     that's the question, which is level of control.  Control gives

25     you -- control is what creates the fiduciary relationship.

1    And I refer the Court for the other authorities I'm going to

2    add to our brief, and where we also argue it's really not an

3    issue for pleading.  It's an issue for summary judgment, or

4    maybe even summary judgment, but for trial, it's a fact

5    intensive issue.

6             THE COURT:  Okay.

7             MR. SAMET:  Second, with respect to aiding and

8    abetting.  Actually, hold on.

9             You know, the motion, I just want to point out, the

10   motion only stated, and let me check it too, maybe we'll sum

11   up.  But my understanding the motion only stated that, well,

12   Texas doesn't have an aiding and abetting argument.  I didn't

13   really go into the whether we had pled knowing participation

14   in the brief.

15            But I think -- and this is on page 7 of the brief.

16   We certainly address this in our opposition.

17            We think that the complaint does -- that it does

18   meet the elements --

19            THE COURT:  Of knowing participation.

20            MR. SAMET:  -- of knowing participation, and in

21   particular, how Mr. Ganer and Sierra Pine worked with Fury's

22   officers to issue inflated reserve reports.  And, in

23   particular, they both understand --

24            THE COURT:  Let me ask this.  So when I look at this

25   and write it up, should I be construing it as pleading and

1       knowing participation claim?

2               MR. SAMET:  Yes, Your Honor.

3               THE COURT:  All right.  All right.

4               MR. SAMET:  In particular, I just want to point out

5       for here, and we argue this in our brief as well.  You know,

6       Ganer and Sierra Pine, they both knew they were working for

7       Rieck's other entities while they were stating in for Fury

8       reserve reports that they were independent, which is another

9       fact that we pointed out.  And these facts were summarized on

10      page 7 o four opposition.

11              THE COURT:  Okay.

12              MR. SAMET:  All right.  And lastly, with respect to

13      the fraudulent transfer claims.  I think we covered this a lot

14      yesterday.  We disagree that 9(b) applies to actual fraud,

15      even if it does apply to actual fraud, it applies -- you know,

16      what needs to be plead was specificity is the actual fraud or

17      fraud or a fraud-like scheme.  The standard here on our actual

18      fraudulent claim is intent, is the Debtor's intent to hinder

19      or delay the false creditors.  And we think that's pled with a

20      lot of specificity in the complaint.

21              Mr. Ganer and his company's activities were very

22      crucial, instrumental, in that, in those activities.  And

23      that's also detailed in the complaint, and in particular in

24      paragraphs 106 to 134 of the complaint.  And we believe that

25      -- and again, we're relaying heavily on how the Fifth Circuit

1    in *Jen re: the Outlier* decision, maybe they switched the names

2    when it went on appeal, you know, and they adopted how that

3    had been looked at by the District Court, which is if you pled

4    the fraudulent scheme, you don't have to go through and

5    itemize each of the transfers.

6         And we also believe on the constructive fraud that

7    we pled, in quite detail, why Fury was in an insolvent

8    situation at the time that it was paying them, that it could

9    not pay back it's secured debt.  And it was engaging in the

10   activities.  It was, because they knew they couldn't pay back

11   their debt.

12        Thank you, Your Honor.

13        THE COURT:  All right, thank you.

14        All right.  So then last from Helena, the validity

15   of the -- viability of an unjust enrichment claim here.  At

16   least that's the last thing I have on my list.

17        MR. HADDOCK:

18        THE COURT:  And I'm sure everybody wants it to be

19   the last thing on their list.

20        (Laughter.)

21        MR. HADDOCK:  It may be.  I think that as they call

22   things in Louisiana, this unjust enrichment claim, maybe a

23   little bit of *Lanham Act* at the end of pleadings.

24        (Laughter.)

25        MR. HADDOCK:  Anyway, I'm just going to stay focused

1    on the amended complaint in connection between the original

2    petition and the amended complaint, the eight paragraphs that

3    really describe this cause of action for unjust enrichment are

4    identical.  The numbering is a little bit different, but

5    that's the only difference.

6           We believe that, first of all, the Court has the

7    preliminary question of deciding which law applies, whether

8    it's Alaska or Texas, and probably the hardest question would

9    be if Alaska law applies -- and also to choose which law

10   applies, kind of skipping back here, The Court has to, you

11   know, look at the application of the conflicts of laws as

12   applied in Texas, which is adopted the second restatement.

13   And all of the factors, you know, therein really do lead to

14   the conclusion that Alaska law probably is the law that

15   applies in this case.  The only factor that leans against it

16   would be the domicile of Fury.

17          THE COURT:  Does the result vary if I pick one state

18   or the other?

19          MR. HADDOCK:  I think the -- well, it's, of course,

20   an easier decision, I believe, if Texas law applies.  But even

21   in Alaska, it's not a viable cause of action.  The key case

22   out of Alaska is the *Millet* decision from the Alaska Supreme

23   Court, which really addresses unjust enrichment as a broad,

24   equitable concept, that really is a prerequisite for

25   restitution.  And then they keep -- you know, they describe

1       the restitution itself as not a cause of action.  It's merely

2       a remedy for various equitable causes of action.

3               And here, nothing has been really, you know, pled

4       other than unjust enrichment.  No claim for --

5               THE COURT:  Yeah.

6               MR. HADDOCK:  -- any kind of quasi-contract, or

7       *quantum meruit* has been pled, or anything of the such.  And --

8               THE COURT:  So you're saying -- the point of your

9       argument is, there would have to be some other cause of action

10      pleaded and proved against Helena to stand alone to which a

11      remedy of unjust enrichment would attach.

12              MR. HADDOCK:  Correct.  And under the --

13              THE COURT:  And am I right, that's the sixth cause

14      of action, and as to causes of action one through five and

15      seven through twelve, or whatever it is, Helena's not a named

16      Defendant in any of those, right?

17              MR. HADDOCK:  Right.  It's only these eight

18      paragraphs on this unjust enrichment claim.  There's no -- you

19      know, Helena's not been accused of participating in any

20      conspiracy or breach of fiduciary duty or anything.

21              THE COURT:  Okay.

22              MR. HADDOCK:  And then like in paragraph 204, it

23      talks about how Helena purchased natural gas from Aurora and

24      paid -- you know, and Aurora purchased, you know, natural gas

25      from Fury.  And the complaint is Fury didn't get paid for the

1    natural gas, you know, but that's a problem -- that if that's

2    a real complaint, that should have been addressed in the

3    Aurora bankruptcy.  There was no -- nothing resembling a

4    contract between Fury and Helena in that paragraph.

5         In paragraph 205, where there is a, you know,

6    general allegation that Helena received gas directly from Fury

7    for which, you know, no compensation was received.  But in all

8    of these instances, whether no cause of action was really

9    stated or in paragraph 205 where there's no detail as to how

10   much gas, how much Fury believes it's entitled to receive, the

11   pleading allegations, simply don't you know, meet standards of

12   Rule 8.

13        So under Alaska law, you know, without some

14   underlying cause of action, you know, whether even if it's

15   *quantum meruit*, this case has to be dismissed against Helena.

16   Under Texas law it's clearer because here's a slip authority

17   amongst the Texas appellate Courts.  The two Houston Courts of

18   Appeals and Texarkana and El Paso say that unjust enrichment

19   is a standalone cause of action.

20        A bunch of the other Courts say that it is not.  The

21   Texas Supreme Court hasn't weighed in on the issue.  In the

22   Fifth Circuit, you know, the Fifth Circuit acknowledges this

23   problem and the Fifth Circuit's most recent pronouncement from

24   2021, in the *Midwestern Cattle Marketing versus Legend Bank*

25   case, you know, the Court concludes that:  Our opinion

1    expressly distinguished the conceptual theory of unjust

2    enrichment from an independent claim under Texas law for money

3    had and received.

4         That view aligns with Texas Court's understanding

5    that unjust enrichment describes the nature of certain claims

6    and remedies, not a distinct cause of action itself.  And so

7    similarly as Alaska has that problem, the Fifth Circuit would

8    analyze it in, you know, very much the same way, that what's

9    asked for is a remedy, but not a cause of action.  And we

10   don't have this basic set of facts and, you know, plead that

11   would entitle the Plaintiffs to a judgment establishing

12   liability in order for the Plaintiff to have an ultimate

13   remedy.

14        THE COURT:  Is it ultimately just a formalistic

15   distinction, though?  Because under both laws, quasi-

16   contracts, *quantum meruit*, however you look at it, I mean

17   those are viable claims, and then this would be a remedy

18   attached to that.

19        So is it just a matter of pleading it differently?

20   As a necessity, are you saying that there's even if we pleaded

21   to specifically state and elucidate those factors, it's not

22   enough?

23        MR. HADDOCK:  I'm not sure it can be plead

24   differently.  The Plaintiff has had an opportunity to brief --

25        THE COURT:  I have no doubt that if I said, look at

1    these elements and plead a cause of action, plead allegations

2    that attempt to meet those elements, Mr. Samet would know what

3    it is he's trying to state.  And I'm not sure how much it

4    would vary from what's pleaded already.

5         But I hear you that there's -- you know, it is

6    styled as unjust enrichment right now, but what it's getting

7    to is sort of, it's unfair to allow the benefits that were

8    received to be retained without payment, because of the way

9    Mr. Rieck was handling that business.

10        MR. HADDOCK:  Right.  But like in paragraph 204

11   where it talks about, you know, Aurora being, you know, a

12   wholesaler, in essence.  Any kind of cause of action for like

13   *quantum meruit* or some sort of quasi contract still requires

14   something that sort of looks like a contract.  But the key

15   thing it requires is some sort of ascent between the parties

16   that are dealing with each other.

17        And in paragraph 204 the pleading is clear, Helena

18   was dealing with Aurora, and that's where the contract

19   existed.  Whereas in, you know, paragraph 205, where it talks

20   about Helena receiving gas directly from Fury --

21        THE COURT:  And remind me about Aurora.  Is that a

22   independent company unrelated to Mr. Rieck in any way or is it

23   another thing that Mr. Rieck is controlling and has his hands

24   in?

25        MR. HADDOCK:  I think that's been an allegation that

1    Mr. Rieck does have some sort of ownership or control in that

2    entity.  Aurora was a company that went into bankruptcy, I

3    believe in Alaska, and that's, you know, really kind of where

4    I think all these unjust enrichment, you know, allegations,

5    you know, come from here in the present case.

6              But I was kind of talking about, you know, element

7    of the ascent and all that.  All of these equitable remedies

8    also require as a threshold to show that there's no adequate

9    remedy of law.  So under paragraph 205, where there is

10   allegedly a direct relationship between Helena and Fury, if

11   there was, that's a matter that, you know, that primarily

12   there should be a claim for breach of contract.  Natural gas

13   sales contracts that are required to be in writing under UCC

14   Article 2, if there is no contract and, you know, it's hard to

15   imagine that an equitable cause of action under that paragraph

16   could stand.

17             THE COURT:  Okay.  I hear your contract-based

18   argument on that.  But then tell me why it's on equity, why

19   it's just for Helena to receive gas directly from Fury without

20   paying for it, if I'm looking at it equitably.

21             MR. HADDOCK:  Right.  And that may be a matter that

22   then goes you know --

23             THE COURT:  There is no argument as to that.

24             MR. HADDOCK:  That's probably a matter that, you

25   know, goes beyond, you know, the mere pleadings here in the

1     scope of what we're doing under rule 12(b)(6).

2             But again, the fact that a cause of action can't be

3     established under existing, you know, law where no claim for

4     breach of the contract has been pled or no other, you know,

5     equitable cause of action has been, you know, pled, you know,

6     we just have unjust enrichment here --

7             THE COURT:  Okay.

8             MR. HADDOCK:  -- standing on its own.  That's

9     insufficient and, you know --

10            THE COURT:  Okay.

11            MR. HADDOCK:  And the Court really should dismiss

12    the case against Helena for that reason.

13            THE COURT:  Okay.  You represent Mr. Rieck as well,

14    correct?

15            MR. HADDOCK:  Yes.

16            THE COURT:  Okay.  You've received the first amended

17    complaint?

18            MR. HADDOCK:  Yes.

19            THE COURT:  And have you given it to Mr. Rieck?  Has

20    he seen it?

21            MR. HADDOCK:  I believe he has.

22            THE COURT:  Okay.  Why shouldn't I consider that

23    sufficient service of Mr. Rieck?

24            MR. HADDOCK:  Well, you know, Mr. Rieck hadn't

25    waived service of process.

1            THE COURT:  Okay.

2            MR. HADDOCK:  You know, we represent Helena, and

3      obviously we have -- you know, Mr. Rieck did file a motion

4      under Rule 12(b)(2) previously.  But --

5            THE COURT:  Okay.  State for the Record specifically

6      how service can be perfected on him promptly.

7            MR. HADDOCK:  I believe that --

8            THE COURT:  Is he evading service?

9            MR. HADDOCK:  No.

10           THE COURT:  Where will he be, so the service can be

11     handed to him, if you believe that that's something that's

12     necessary?

13           MR. HADDOCK:  I believe that Mr. Rieck is, you know,

14     is currently in Dubai at his residence, which is, you know,

15     properly listed the in pleading.  And I believe it could be

16     done under existing or under Dubai law.  You know, if a

17     process server were to fully comply with Dubai law, which is

18     set forth in -- we have the citation, we have it, too, in our

19     briefing.

20           THE COURT:  Okay.

21           MR. HADDOCK:  So if it, and it is a relatively

22     simple procedure to do that, so.

23           THE COURT:  What's the procedure that you think is

24     so simple to get him served in Dubai?

25           MR. HADDOCK:  Well, the process server has to

1    certify that they are over 18.  They have to, you know --

2           THE COURT:  It's not like serving him in Harris

3    County.

4           MR. HADDOCK:  It's actually probably very similar.

5    You know, you either have to serve him personally.  Or the law

6    does state that if you can't serve a person personally, you

7    can serve, you know, a spouse, family member, a housekeeper,

8    or somebody like that who resides at their residence.  And if

9    you serve one of these alternate persons, you do have to

10   certify that, you know, that they verify that they're over 18

11   and have no apparent conflict of interest.  So --

12          THE COURT:  So I do have that from Plaintiffs, but

13   then I just now have a counter-declaration from Mr. Rieck

14   saying, well, everything that they just swore to isn't true.

15          So, does Mr. Rieck want to come here and testify

16   about that?  I'm happy to have him come here if he'd like to

17   stand behind his declaration.

18          MR. HADDOCK:  Well --

19          THE COURT:  Or does he not want to do that?

20          MR. HADDOCK:  Well, I don't know.  I mean, I haven't

21   talked to him about coming to, you know, to testify about

22   that.  I mean, Dubai is a 10,000 mile flight or something.

23          THE COURT:  So I have your supplement, wherein we

24   just have his declaration where Mr. Rieck essentially says

25   somebody else is lying.  So how do I resolve that factual

1     dispute that you purport to tee up?

2              MR. HADDOCK:  I'm not sure what the Plaintiff's

3     response to that would be.  In all fairness, they'd --

4              THE COURT:  I'm going to suspect that the Plaintiffs

5     say, we think our guy's telling the truth about what he said,

6     and that there was a housekeeper there who accepted it.

7              MR. HADDOCK:  Yeah.

8              THE COURT:  And you just said to me, if you give it

9     to a housekeeper, that's enough.  And now I have a declaration

10    though, saying, yeah, I don't have a housekeeper named Tamour

11    (phonetic), I have a different housekeeper, but she doesn't

12    live there on premises.

13             How am I supposed to resolve that?  When all of it's

14    towards this fiction that, what he's oblivious to what's going

15    on here, or can't come here and protect his interests?

16             MR. HADDOCK:  Well, again, you know, Mr. Rieck's

17    entitled to service and process under, you know, the

18    applicable section of Rule 4.  He's not waived service of

19    process.  And --

20             THE COURT:  There are lots of entities that are

21    entitled to, what's due them under the law.  All right.  I'll

22    sort that out as to Mr. Rieck.

23             Thank you.

24             Mr. Samet, is there anything that you need to say at

25    all on these points?

1          MR. SAMET:  I would like to make a Record, actually.

2          THE COURT:  Okay, go ahead.

3          MR. SAMET:  I apologize.

4          THE COURT:  No, please go ahead.

5          MR. SAMET:  I heard counsel say, and actually I know

6    why he said it cause Mr. Rieck put it in the declaration this

7    morning, that the address listed in the complaint in Dubai is

8    his address.  I heard him just say it now.

9          I just want to put onto the Record from the

10   declaration filed in this case, Docket 32-1, was filed on

11   September 7th, 2021, paragraph 16, Mr. Rieck stated:  However,

12   I was no longer a resident at the Jumeriah Palm residences.

13         I can -- and then going on, I continued to not

14   reside at the Jumeriah Palm residences and do not a post

15   office back in Dubai.  And that was the address list on the

16   complaint.

17         THE COURT:  Connect that up for me again.  I'm not

18   following you.  When I look at Docket at 184-1, you're looking

19   at 32-1, did you say?

20         MR. SAMET:  I'm looking at 32-1.

21         THE COURT:  All right.  So --

22         MR. SAMET:  The complaint, and this is where we

23   served at the Jumeriah Palm residences, and I heard from the

24   declaration filed this morning and from the recitation of the

25   facts by counsel just now, that Mr. Rieck does live there.

1          But in his declaration filed in September, he said

2     he was not a resident there.  I'd just like to make that for

3     the Record.

4               THE COURT:  What do I do with that?

5               MR. SAMET:  Well, the two facts are not --

6               THE COURT:  No, I got that.  But so what am I'm --

7               MR. SAMET:  One of the two declared statements are

8     false, Your Honor.

9               THE COURT:  Okay.

10              MR. SAMET:  That is just my --

11              THE COURT:  Okay.  All right.  As to the unjust

12    enrichment claim, let me just ask:  Am I to construing it as a

13    *quantum meruit* claim?  Perhaps I need to have you technically

14    re-plead it as such.  I'm not sure about that.

15              But is that essentially what you're pleading?

16              MR. SAMET:  Your Honor, first of all, under both

17    Alaska *Millet* case --

18              THE COURT:  Right.

19              MR. SAMET:  -- and we said Texas law has an unjust

20    enrichment claim.  And Alaska, the case actually says, *quantum*

21    *meruit*, unjust enrichment, they're all the same thing.

22              THE COURT:  Okay.

23              MR. SAMET:  They're used interchangeably. In Texas,

24    what they call it, *quantum meruit*, we cited the case in our

25    papers as well.  We're pleading that it meets that standard,

1    or whatever you want to call it.  And I did want to read it.

2    In a sense it's useful.  It's not just the eight paragraphs

3    referenced by counsel, but this is described in some detail in

4    paragraphs 89 to 95 of the compliant, where the parties are

5    discussing, gee, we won't be able to get paid, so let's just

6    give to them for free anyway.  That's why there the business

7    about Aurora, and Your Honor can look at that in this case.

8                THE COURT:  Okay.  All right.  That's all I have.

9                Anything else that I haven't touched on?  I think

10   that's pretty comprehensive.

11       (No audible response.)

12               THE COURT:  All right.  I think an exceedingly well

13   argument argued by everyone across, Mr. Samet, you get special

14   commendation for being on your feet, half the time, responding

15   to everybody.  I guess Mr. Corn, you pitched in some there.

16   But Mr. Samet, you did a fine job.

17               Thanks to everybody.  It was really interesting

18   arguments.  And, it's going to take me at least 30 days to get

19   an order out, but this will be something that I'll be working

20   on.  I know this case has been sitting for a little bit

21   getting to this part -- point with so many different parties.

22   But I intend to get you-all an opinion and Order as quickly as

23   I can.

24               All right.  Thank you all very much.  We're

25   adjourned.

1        (Proceedings adjourned at 4:28 p.m.)

2                          * * * * *

3            *I certify that the foregoing is a correct transcript*

4    *to the best of my ability produced from the electronic sound*

5    *recording of the proceedings in the above-entitled matter.*

6        /S./  MARY D. HENRY

7    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

8    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

9    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

10   *JTT TRANSCRIPT #65946*

11   *DATE FILED:  JULY 17, 2022*