United States District Court
Southern District of Texas
**ENTERED**
March 31, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLINGMAN & | § | CIVIL ACTION NO |
| HANGER | § | 4:21-cv-02698 |
| MANAGEMENT | § | |
| ASSOCIATES LLC, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| KAY RIECK, *et al*, | § | |
| Defendants. | § | |

OPINION AND ORDER
ON MOTIONS TO DISMISS

Furie Operating Alaska LLC is a natural gas company and wholly owned subsidiary of Cornucopia Oil & Gas Co LLC. It began drilling in the Kitchen Lights Unit of Alaska in 2011 and discovered commercial quantities of gas in 2013. On the basis of this discovery, Furie represented that hundreds of billions of cubic feet of gas and millions of barrels of oil would be produced. It attracted investment of over $160 million and built out the initial infrastructure required. But Furie eventually spent $175 million more than budgeted and failed to discover additional gas reserves in line with earlier estimates.

Defendant Kay Rieck was the *de facto* head of Furie. This suit largely concerns an alleged scheme by him and other executives and advising attorneys to divert value to themselves through various insider transactions. Furie is alleged to have, among other things, chartered a drilling rig at inflated prices through insider-controlled entities; sold gas at a loss to Rieck-owned entities; compromised tax credits already pledged as collateral on its loans by

allowing another Rieck-controlled entity to use them to secure a bond offering; transferred other tax credits to Rieck-owned entities without consideration; and artificially inflated the "proved" gas reserves of Furie so that managers could continue to draw compensation while looting the company. Creditors eventually forced Rieck to cede control to outside management, with bankruptcy proceedings commencing in August 2019.

Plaintiff Clingman & Hanger Management Associates LLC is the trustee of the litigation trust established through the plan of reorganization. It brought claims against (i) Kay Reick, Lars Degenhardt, Thomas E. Hord, and David W Elder, who managed Furie and allegedly controlled non-party entities that siphoned money from Furie; (ii) Theodor van Stephoudt, David Hyrck, and Reed Smith LLP, who represented and performed legal work for Rieck-controlled entities; (iv) Michael A. Nunes, who was Furie's general counsel and represented Rieck personally, and Stone Pigman Walther Wittmann LLC and Cogan & Partners, who were the law firms that employed him; (v) Bruce Ganer, who served as Furie's internal geologist, and who owned Sierra Pine Resources International Inc, the company which issued the reserve reports used to secure funding for Furie; and (vi) Helena Energy LLC, which shared executives with Furie and is alleged to have received gas from Furie without fair purchase or price.

The pleaded claims include fraudulent transfer, breaches of various fiduciary duties (along with related claims for aiding and abetting and civil conspiracy), and unjust enrichment. Through a number of motions, Defendants seek dismissal of this action in its entirety for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Dkts 46, 57, 63, 64, 65, 75 & 169. Another motion seeks summary judgment pursuant to Rule 56. See Dkt 157 (renewing motion for summary judgment at Dkt 53).

These motions are granted in part and denied in part.

*As to fraudulent transfer,* the motions are granted to the extent that such claims relate to the Furie bankruptcy

2

estate, which are barred by limitations—but not as to the bankruptcy estate of Cornucopia.

*As to breach of fiduciary duty against Rieck, Hord, Nunes, van Stephoudt, Degenhardt, Elder, and Ganer, as named executive or de facto officers,* the motions are granted to the extent such claims rely on fiduciary duties of Furie officers, which are exculpated by the fourth amended LLC agreement—but not as to any such duties of Cornucopia officers. The related claims for aiding and abetting and civil conspiracy are resolved in similar accord.

*As to breach of fiduciary duty against Reed Smith, Hryck, and Nunes, in their capacities as attorneys,* the motions are denied.

*As to breach of fiduciary duty against Stone Pigman,* the motion is granted because the claim isn't sufficiently pleaded and is time barred.

*As to unjust enrichment against Helena Energy,* the motion is granted to the extent the claim seeks to recover against Helena Energy for gas sold through Aurora Gas—but is otherwise denied.

*As to the assertion of exemplary damages and attorney fees as stand-alone claims,* the motion is granted—but such may be pursued as remedies where permitted by law.

The extent to which repleading will be allowed as to any dismissed claims is explained elsewhere below.

# Contents

1. Background ................................................................5
   a. The parties .........................................................5
   b. The alleged scheme.................................................9
   c. Furie bankruptcy and this litigation ..................12
2. Legal standard ........................................................12
3. Analysis ..................................................................14
   a. Fraudulent transfer...............................................15
      i. *Furie Operating* proceeding............................17
      ii. *Cornucopia Oil & Gas* proceedings ...............21
      iii. Effect of final decree in *Furie Operating* ........23
      iv. Conclusion.....................................................25
   b. Breach of fiduciary duty, Furie officers..............26
      i. Exculpatory clause, considered .....................26
      ii. Exculpatory clause, applied...........................31
   c. Breach of fiduciary duty, legal services..............33
      i. Prohibition on group pleading......................33
      ii. Lack of fiduciary duty ...................................34
      iii. Anti-fracturing rule.......................................35
      iv. Conclusion......................................................37
   d. Breach of fiduciary duty, derivative theory.........37
      i. Stone Pigman via Nunes ...............................37
      ii. Stone Pigman via Cogan & Partners .............38
      iii. Fraudulent transfer between firms................38
      iv. Conclusion......................................................40
   e. Unjust enrichment ...............................................40
   f. Exemplary damages and attorney fees ..............43
4. Conclusion ..............................................................43

1.   Background

Furie Operating Alaska LLC is an oil and natural gas company that operated in Alaska from 2011 to at least 2019. It was a Texas LLC from its inception until it converted into a Delaware LLC in January 2018. Furie pursued its business as a wholly owned subsidiary of Cornucopia Oil and Gas LLC. See Dkt 155 at ¶¶ 1, 6, 32 & 42–54; see also Dkt 157-1 at 284–293 (third amended operating agreement).

This action arises out of their sequentially filed Chapter 11 bankruptcy proceeding in August 2019. See *In re Furie Operating Alaska LLC*, Civil Action No 19-cv-11781 (Bankr Del) (further referred to as *Furie Operating*); *In re Cornucopia Oil & Gas Company LLC*, Civil Action No 19-11782 (Bankr Del) (further referred to as *Cornucopia Oil & Gas*). The allegations of the live complaint largely concern and are directed towards Furie. Specifics as to Cornucopia are noted where necessary.

a.   The parties

Plaintiff Clingman & Hanger Management Associates LLC is the trustee of a litigation trust established by the joint plan of reorganization for the *Furie Operating* and *Cornucopia* bankruptcy proceedings. Dkt 155 at ¶ 4; see also *Furie Operating*, Dkts 830 at 40–42 & 835-1. The Trustee brought this action against twelve persons and entities, seeking to recoup multimillion dollar losses sustained by Furie that were allegedly caused by the malfeasance of certain executives.

Defendant Kay Rieck is a German national who allegedly controlled non-parties Deutsche Oel und Gas SA (a Luxembourgian corporation) and Deutsche Oel und Gas AG (a now-dissolved German corporation). DOGSA putatively owned the now-defunct DOGAG, which was the parent company of Brutus AG (another German corporation), which in turn was the sole owner of Cornucopia. Dkt 155 at ¶ 7. The Trustee contends that Rieck acted as the *de facto* head of Furie; served as one of

three managers on the Furie board from late 2017 until he ceded control to creditors in 2018; and allegedly controlled or owned several other entities that siphoned money from Furie. Id at ¶¶ 8, 57. The Trustee asserts claims against him for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Lars Degenhardt is a German national who served as the president of Furie from September 2014 to June 2017, while simultaneously serving as the chief financial officer of DOGSA. Id at ¶ 10. The Trustee asserts claims against him for breach of fiduciary duty, civil conspiracy, exemplary damages, and attorney fees. Degenhardt has yet to appear.

Defendant Thomas E. Hord served as the chief operating officer of Furie; owned Tom Hord Management Services LLC; and acted as chief executive officer of Advanced Drilling Solutions LLC, a company purportedly established to siphon funds from Furie. Id at ¶¶ 18, 65 & 76. He also owned a twenty percent stake in Offshore Drilling Solutions Ltd and later acquired a twenty percent stake in Offshore Management Holdings LLC, which served as the sole member and manager of Advanced Drilling. Id at ¶¶ 59 & 84. The Trustee asserts claims against Hord for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant David W. Elder is a Texas resident who acted as the chief financial officer of Furie. He also managed several other Rieck-related entities, including Furie Drilling LLC, Furie Operating LLC, Furie Petroleum Company LLC, and Advanced Capital Funding LLC. Id at ¶ 23 & 39. The Trustee asserts claims against Elder for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Theodor van Stephoudt served as president of Furie from June 2017 to March 2018. He was also employed as an economist by Defendant Reed Smith LLP, where he handled tax matters for Furie, Rieck, DOGSA, and other Rieck-controlled entities. Id at ¶¶ 12, 35–36, 75, 121 & 131. The Trustee asserts claims against van Stephoudt for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant David Hryck is an attorney and former engagement partner at Reed Smith. Id at ¶ 16. He was given power of attorney for Furie in early March 2016 to respond to IRS document requests. Dkt 118 at 12. He also served as trustee of a trust that owned a majority stake in Offshore Management Holdings beginning in early 2016. Hryck also allegedly "represented and performed work for" numerous other entities "owned and controlled by Rieck." Dkt 155 ¶ at 35; see generally id at ¶¶ 35, 76 & 81–85. The Trustee asserts claims against him for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Reed Smith is a Delaware limited liability partnership that employed van Stephoudt and Hryck. It received compensation for work they performed for Furie and numerous other Rieck-related entities. Id at ¶¶ 12, 16, 34–36 & 121. The Trustee asserts claims against Reed Smith for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Michael A. Nunes served as outside general counsel to Furie "under agreements pursuant to which he was partially seconded"—first by non-party Cogan & Partners LLP, and then by Defendant Stone Pigman Walther Wittmann LLC. Id at ¶¶ 20 & 38. Nunes also represented Rieck personally and acted as the engagement partner for Stone Pigman's representation of Furie, Rieck, DOGSA, DOGAG, Advanced Drilling, and other Rieck-

related entities. Id at ¶¶ 37–38. He was named as the member and manager for Advanced Drilling and later received a minority stake in Offshore Management. Id at ¶¶ 64 & 84. The Trustee asserts claims against Nunes for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Stone Pigman Walther Wittmann LLC is a Louisiana law firm that employed Nunes. The Trustee contends that Stone Pigman is a successor by merger to Cogan & Partners LLP. Id at ¶¶ 20, 22 & 148–166. It asserts claims against Stone Pigman for breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, successor liability by merger, and successor liability by estoppel, along with a fraudulent-transfer claim as between Cogan & Partners and Stone Pigman.

Defendant Bruce Ganer owns and manages Defendant Sierra Pine Resources International Inc. He served as internal geologist at Furie and as chief technical adviser to Rieck. Ganer and/or his wholly owned companies also acted as operator and attorney-in-fact for Helena Energy LLC, a Reick-owned entity that's also a defendant in this action. Id at ¶¶ 25 & 41. The Trustee asserts claims against Ganer for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Sierra Pine Resources International Inc is a corporation established under Texas law and owned by Ganer. The company derived the majority of its income from projects related to Rieck and Rieck-controlled entities. Particularly pertinent here, it issued multiple reserve reports used to secure funding for Furie. Id at ¶¶ 25, 27 & 41. The Trustee asserts claims against Sierra Pine for aiding and abetting breach of fiduciary duty, actual fraudulent transfer, constructive fraudulent transfer, civil conspiracy, exemplary damages, and attorney fees.

Defendant Helena Energy LLC is a limited liability company established under the laws of Delaware and owned by Rieck. It was purportedly "founded as a natural gas marketing arm to Furie," but it has been "engaged in oil production in Southwest Texas" since 2016. Id at ¶ 28. The Trustee contends that Helena Energy shared executives, office staff, and office space with Furie. And it allegedly received gas from Furie, first through the now-defunct Rieck-controlled Aurora Gas LLC in 2016, and then directly in 2017. Id at ¶¶ 94–95. The Trustee asserts a claim against Helena Energy for unjust enrichment.

b. The alleged scheme

Furie leased gas drilling rights in the Kitchen Lights Unit of Alaska, where it began drilling in Summer 2011. Two years later, it discovered commercial quantities of gas. An initial report issued in August 2013 by Netherland Sewell & Associates Inc estimated that there were 59.4 billion cubic feet in proved, undeveloped gas reserves with a net present value of $54 million. A report by Sierra Pine the next month, in September 2013, then substantially exceeded this amount, estimating that there were 276.3 bcf in proved, undeveloped gas reserves with a net present value of $315 million. There later followed a second report issued by NSAI in February 2014, again finding an estimated 59.5 bcf with a net present value of $121 million. And a draft report created by DeGolyer and MacNaughton in March 2014 estimated 59 bcf in proved, undeveloped gas reserves. Dkt 155 at ¶¶ 42–50.

Energy Capital Partners agreed to loan Furie $160 million to build necessary infrastructure. But Furie spent $175 million more than budgeted, necessitating additional loans from ECP and ING Bank. These loans were collateralized by projected tax credit receipts from Alaska. Furie subsequently experienced greater than expected operational costs. And it failed to discover additional gas reserves. Id at ¶¶ 51–55.

The Trustee contends, "Furie's insiders responded to these issues, not by operating the company in a manner designed to maximize value for the benefit of the company,

9

but rather, by diverting value to themselves through insider transactions." Id at ¶ 56. The various schemes allegedly implemented by Defendants are briefly as follows.

*The Randolph Yost rig charter*. Defendants allegedly chartered the *Randolph Yost* rig through a series of insider-controlled entities, none of which were "previously known or recognized in the industry." Id at ¶ 72. Specifically, Offshore Drilling Solutions—which was putatively owned by Reinhardt Martin Schuster, but was actually controlled by Rieck—chartered the rig from Shelf Drilling Offshore Resources Limited II for $20,000 per day. Offshore Drilling Solutions then assigned its rights and obligations to its wholly owned subsidiary, Kadmas Limited, which in turn paid Advanced Drilling $55,000 per day to manage the rig. Kadmas also sub-chartered the rig to Nordic Overseas Drilling & Services, which was putatively owned by Andreas Sasdi—but again was actually controlled by Rieck. Nordic then chartered the rig to Furie for $220,000 per day. As Elder admitted, these transactions "created a complicated and expensive series of contractual relationships, which appeared to be detrimental to Furie, and beneficial to Rieck, Hord and Nunes." Id at ¶ 72; see generally id at ¶¶ 59–72.

Rieck, Elder, Degenhardt, Hord, Nunes, and Hryck all allegedly knew the transactions related to the *Randolph Yost* were disloyal. And they "took steps to try to hide them." Id at ¶ 81. For example, one of Rieck's attorneys sent Furie a note verifying that Offshore Drilling Solutions, Kadmas, Nordic, and Furie were all "independent and unrelated companies." Id at ¶ 82. Nunes, Rieck, Hryck, Hord, and Degenhardt collaborated in another instance to create Offshore Management Holdings, which replaced Nunes as the sole member and manager of Advanced Drilling. That allowed Elder to avoid reporting Advanced Drilling as an affiliate or related party to Furie or Rieck. See generally id at ¶¶ 81–84.

*Gas sale agreements*. Furie entered into a gas sales agreement with Aurora Gas in March 2016. As noted

above, Aurora Gas was owned by Rieck and managed by him and Bruce Webb, who was Furie's senior vice president. Aurora Gas in turn sold the gas to Helena Energy. After Aurora Gas was forced into bankruptcy in May 2016, Furie continued to provide gas to Aurora Gas, resulting in a $900,000 loss to Furie because the sales were "uncollectible." Id at ¶ 91. Later that year, Furie began selling gas directly to Helena Energy. But "Furie's records do not reflect any payment received by Furie for said gas." Id at ¶ 95; see generally id at ¶¶ 89–95.

*Tax credit transfers*. Despite Furie having pledged its Alaska tax credits as collateral for its loans, DOGSA allegedly made a $170 million bond offering secured by a "global security right over all Tax Credits granted by [Furie]." Id at ¶ 96. Van Stephoudt purportedly validated the underlying tax credit collateral. Furie received no proceeds from the bond offering. Furie also allegedly transferred $18.4 million in tax credits without any consideration to a Rieck-controlled German bank named Internationale Aktien Und Rohstoff Ivest GmbH. See generally id at ¶¶ 96–101.

*Reserve valuation inflation*. The Trustee alleges that Defendants engaged in a scheme to inflate the value of Furie's reserves. Specifically, it asserts, "Defendants began manipulating and concealing the data passed to NSAI, including with respect to underlying pay maps, upon which NSAI's reserve reports were premised." Id at ¶ 113. As internal geologist at Furie and chief technical adviser to Rieck, Ganer played a significant role in this arrangement. For instance, he purportedly caused gas pay maps to inaccurately reflect Furie's expected reserves, added seismic data to pay maps, and purposefully under-estimated or omitted annual costs included in financial projections. Additionally, in March 2016, Nunes and Slaughter—with input from Elder and approval by Rieck and Degenhardt—negotiated and entered a gas supply agreement with Enstar Natural Gas Company. Defendants knew that such a contract carried significant mid- and long-term risks. But the contract allowed them to sustain

Furie's inflated future revenue projections. See generally id at ¶¶ 41, 115, 119, 125–29 & 135–42.

### c.   Furie bankruptcy and this litigation

Creditors forced Rieck to cede control of Furie to outside management firm Ankura Consulting Group LLC in 2018. Dkt 155 at ¶ 143. Both Furie and Cornucopia voluntarily filed for bankruptcy on August 9, 2019. See *Furie Operating*, Dkt 1; *Cornucopia Oil*, Dkt 1. Those bankruptcies were jointly administered, and the bankruptcy court entered a joint plan of reorganization on June 12, 2020. *Furie Operating*, Dkt 835-1. The approved plan established a litigation trust that consolidated all causes of action against Defendants. Id, Dkt 830 at 44–51.

The Trustee brought this action in Texas state court on August 6, 2021. Dkt 1-4. It was promptly removed to this Court. Dkt 1. Defendants subsequently brought a variety of dispositive motions. Motions to dismiss for failure to state a claim are pending from Helena Energy LLC (Dkt 46), Bruce Ganer and Sierra Pine (Dkt 57), Reed Smith LLP (Dkt 63), David Hyrck (Dkt 64), Theodor van Stephoudt (Dkt 65), Michael Nunes (Dkt 75), and Stone Pigman Walther Wittmann LLC (Dkt 169). Also pending is a motion by Thomas Hord styled as one for summary judgment (Dkt 157, and re-urging the motion at Dkt 53).

Argument was heard on all of these motions over the course of two days. See Dkts 186 & 187.

### 2.   Legal standard

Seven of the eight pending motions seek to dismiss certain causes of action for failure to state a claim. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted."

Read together, the Supreme Court holds that Rule 8 "does not require 'detailed factual allegations,' but it

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v Taylor*, 503 F3d 397, 401 (5th Cir 2007), quoting *Twombly*, 550 US at 555.

A complaint must therefore contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 US at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id at 678, quoting *Twombly*, 550 US at 557.

Review on motion to dismiss under Rule 12(b)(6) is constrained. The reviewing court "must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Walker v Beaumont Independent School District*, 938 F3d 724, 735 (5th Cir 2019). But "courts 'do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Vouchides v Houston Community College System*, 2011 WL 4592057, *5 (SD Tex), quoting *Gentiello v Rege*, 627 F3d 540, 544 (5th Cir 2010). The court must also generally limit itself to the contents of the pleadings and attachments thereto. *Brand Coupon Network LLC v Catalina Marketing Corp*, 748 F3d 631, 635 (5th Cir 2014).

The eighth motion—by Hord—seeks summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. Dkt 157 at 2. This requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the

13

movant is entitled to judgment as a matter of law." Disputed factual issues must be resolved in favor of the nonmoving party, with all reasonable inferences drawn in the light most favorable to the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994); *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008). But of note here, all of these motions proceed in the early stages of this litigation with discovery ongoing. Hord's motion will thus be considered only the Rule 12(b)(6) standards—where allegations in the complaint are assumed as true. Resolution in such fashion is without prejudice to reassertion of similar arguments under Rule 56, if possible, in good faith after discovery closes.

For any claims subject to dismissal under Rule 12, Rule 15(a)(2) states that a district court "should freely give leave [to amend] when justice so requires." The Fifth Circuit holds that this "evinces a bias in favor of granting leave to amend." *Carroll v Fort James Corp*, 470 F3d 1171, 1175 (5th Cir 2006) (cleaned up). But the decision whether to grant leave to amend is within the sound discretion of the district court. *Pervasive Software Inc v Lexware GmbH & Co KG*, 688 F3d 214, 232 (5th Cir 2012). It "may be denied when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v Chapman*, 969 F3d 238, 248 (5th Cir 2020).

### 3.   Analysis

Many arguments asserted by Defendants overlap. What's more, the disposition of certain arguments by some Defendants affects claims brought against others, even where those other Defendants didn't directly raise such issues. For that reason, the following sections first broadly address dispositive arguments, followed by specific application to individual defendants where necessary.

In sum:

- o   All claims for fraudulent transfer under §§ 544 and 548 of Title 11 are barred by limitations to

the extent that they relate to the bankruptcy estate Furie—but not as to that of Cornucopia;

o   Claims for breach of fiduciary duty are barred by the fourth amended LLC agreement to the extent such claims rely on exculpated fiduciary duties of Furie officers—but not as to any such duties of Cornucopia officers;

o   Likewise precluded are claims in that regard for aiding and abetting and for civil conspiracy to the extent such claims rely on the aforementioned exculpated fiduciary duties of Furie officers—but not as to any such duties of Cornucopia officers;

o   The claims for breach of fiduciary duty will proceed against Nunes, Hryck, and Reed Smith in their capacities as attorneys;

o   The claim for breach of fiduciary duty against Stone Pigman will be dismissed for failure to plead sufficient facts and as time barred;

o   The unjust enrichment claim against Helena Energy will proceed—except to the extent that the Trustee seeks to recover against Helena Energy for gas sold through Aurora Gas; and

o   The assertion of exemplary damages and attorney fees will be dismissed as stand-alone claims, but such will be allowed as remedies where permitted by law.

Specific orders as to claim dismissals and the Trustee's ability to replead are stated in the conclusion.

a.   Fraudulent transfer

The Trustee brings claims for actual fraudulent transfer and constructive fraudulent transfer pursuant to 11 USC § 548. It also brings parallel state claims and insider fraudulent-transfer claims pursuant to Texas Business and Commerce Code §§ 24.005 & 24.006 through 11 USC § 544. Dkt 155 at ¶¶ 190–94, 195–98, 199–201. These claims appear to be stated as to transfers from Furie

in the four-year period preceding the commencement of Furie's bankruptcy case. Id at ¶ 191.

As a threshold matter, Nunes contends that the Trustee lacks standing to sue under the Texas Uniform Fraudulent Transfer Act because the Act only allows creditors to seek relief. Dkt 75 at 11. Although the state fraudulent-transfer claims cannot be brought by debtors, such claims "become estate property once bankruptcy is under way by virtue of the trustee's successor rights under § 544(b)." See *In re Moore*, 608 F3d 253, 262 (5th Cir 2010); 11 USC § 544. The joint restructuring plan states, "The Litigation Trust shall act for the Estates." Dkt 835-1 at 45. And so, the Trustee brings the state claims standing "in the shoes of" the Furie and Cornucopia bankruptcy estates. *US Bank National Ass'n v Verizon Communications Inc*, 479 BR 405, 413 (ND Tex 2012). The Trustee therefore has standing to bring the fraudulent-transfer claims under TUFTA. See *US Bank*, 479 BR at 413.

As a substantive matter, Stone Pigman and Hord contend that these claims are time-barred insofar as they relate to the Furie bankruptcy estate. Dkt 157 at 12–15 & 169 at 22–24. In support, they cite 11 USC § 546, which states:

> An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
>
> (1) The later of—
>
> > (A) 2 years after the entry of the order for relief; or
> >
> > (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
>
> (2) the time the case is closed or dismissed.

Subsection (2) is the pertinent reference point here. The final decree in *Furie Operating* states in pertinent part, "The chapter 11 Case[ ] of Furie Operating Alaska, LLC (Case No. 19-11781) . . . [is] hereby CLOSED, effective and enforceable upon the later of, (a) the entry of this Final Decree and (b) the occurrence of the Effective Date" of the third amended joint plan of reorganization. *Furie Operating*, Dkt 868 at 2. The effective date of that plan of reorganization was June 30, 2020. Id at Dkt 866. The bankruptcy court entered the final decree on July 1, 2020. Id at Dkt 868 at 5.

By the decree's plain terms, then, *Furie Operating* closed on July 1, 2020. All claims under §§ 544 and 548 relating to the Furie bankruptcy estate had to be brought before that date. The Trustee brought those claims over one year later, on August 6, 2021. Dkt 1-5. The claims thus appear to be barred by § 546 unless some reason establishes that the limitations period didn't commence or was somehow otherwise tolled.

The Trustee proffers three such reasons. None are convincing.

i.   *Furie Operating* proceeding

The Trustee asserts that provisions within the final decree of the *Furie Operating* bankruptcy matter establish that that such proceeding isn't actually "closed" for purposes of § 546(2). See Dkt 171 at 10, 13.

For example, the final decree notes at several points that certain matters that litigants could have brought in *Furie Operating* can still be brought in *Cornucopia Oil & Gas*. It states:

> The Remaining Matters, whether or not they pertain to the Closed Cases, including any Claims Objections with respect to claims against the Closing Debtors, shall be filed, administered, and adjudicated in the Chapter 11 Case of Cornucopia Oil & Gas Company, LLC (Case No 19-11782)

17

> (the "Remaining Case") or by the Litigation
> Trust, pursuant to the Litigation Trust
> Agreement, without the need to reopen the
> Closing Debtors' Chapter 11 cases.

*Furie Operating*, Dkt 868 at 2 (point 4) (emphasis omitted);
see also id at 9–10.

The Trustee also points to the fact that the final decree
required that a docket entry be made in *Furie Operating*
that stated:

> An order has been entered in this case
> directing that all further reporting
> concerning the administration of the assets
> and liabilities in this case will occur only in
> the case of Cornucopia Oil & Gas Company,
> LLC, Case No. 19-11782. The docket in
> Case No. 19-11782 should be consulted for
> all matters affecting this case.

Id at 10. Such an order was in fact entered. See *Furie
Operating*, Dkt 879.

But argument as to the former depends upon the
definition of *Remaining Matters*. That term is elsewhere
defined much more narrowly, to include only "miscella-
neous motions, applications, pleadings, objections, or other
matters or proceedings [that] may arise from time to time
in respect of the Closing Debtors' Chapter 11 Cases or the
Closing Debtors (together with the Claims Objections and
the Fee Applications)." *Furie* Operating, Dkt 868 at 1 n 2,
citing *Furie Operating*, Dkt 843 at 4 (defining "Remaining
Matters"). And that definition was immediately proceeded
by observation that "the Debtors do not anticipate any
further contested matters in the Closing Debtors' Chapter
11 Cases *since such matters will, as of the Effective Date,
have been transferred to the Litigation Trust for prosecution
and resolution by the Litigation Trust*." Ibid (emphasis
added). Taken together and read in context, this doesn't

18

appear to provide any support for what is an otherwise late-filed fraudulent transfer claim.

And as to both, Section 350(a) of Title 11 and implementing procedural rules warrant a different construction. Section 350(a) provides, "After an estate is fully administered and the court has discharged the trustee, the court shall close the case." Rule 3022 of the Federal Rules of Bankruptcy Procedure in mandatory terms thus states, "After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case."

The advisory committee notes set forth a list of six factors that a court should consider in determining whether the estate has been fully administered. These are:

> (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

FRBP 3022, advisory committee note (1991); see also 11 USC § 1101(2). Delaware bankruptcy courts have adopted the view that all factors needn't be present in order to determine that a case has been fully administered. See *In re SLI Inc*, 2005 WL 1668396, *2 (Bankr D Del).

Furie moved to close its bankruptcy action on June 15, 2020. *Furie Operating,* Dkt 843. It there generally affirmed that the "foregoing factors" pertinent to Rule 3022 "weigh

strongly in favor of closing". *Furie Operating*, Id at 7. It also argued that any remaining matter "can be administered by [Cornucopia] without any substantive impact on any party in interest." Id at 4; see also id at 7–8. And it asserted that closing the action would have "no impact on the resolution of any remaining claims or distributions, other legal entitlements under the Plan, or the substantive rights of any party in interest." *Furie Operating*, Dkt 843 at 9. The bankruptcy court granted that motion and entered an order closing the action, titled "Final Decree and Order (I) Closing Certain Cases and (II) Amending Caption of Remaining Case." *Furie Operating*, Dkt 868.

The Trustee notes that the bankruptcy court stated there that "all further reporting concerning the administration of the assets and liabilities in [*Furie Operating*] shall occur only in" *Cornucopia Oil & Gas*. Dkt 171 at 10, citing *Furie Operating*, Dkt 868 at 3. But a respected treatise on bankruptcy procedure makes clear that the existence of remaining ministerial tasks doesn't "render an order closing a case invalid or justify recharacterizing it as an interim order." 3 *Collier on Bankruptcy* ¶ 350.02, citing *Matter of Wade*, 991 F2d 402, 408 (7th Cir 1993); see also *In re Swiss Chalet Inc*, 485 BR 47, 52 (Bankr DPR 2012). That remains true even though Furie hadn't filed its final report as required by Rule 3022-1(c) of the Local Rules of the US Bankruptcy Court for the District of Delaware. See *Matter of Wade*, 991 F2d at 408.

Also apparent is the fact that Furie sought to close its bankruptcy action largely to avoid "significant costs on [Furie's] estate," namely US Trustee fees. *Furie Operating*, Dkt 843 at 2. But nothing in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure would appear to allow a bankruptcy court to *close* an action yet *continue* to administer the estate for the sake of *circumventing* such fees. See *In re Atna Resources Inc*, 576 BR 214, 221–23 (Bankr D Colo 2017); *In re Swiss Chalet Inc*, 485 BR at 52;

but see *In re Garcia*, 2018 WL 3524581, \*1, \*3 (Bankr D Mass). Instead, Congress prescribed a single way to close an action pursuant to 11 USC § 350(a), as implemented by Bankruptcy Rule 3022. And the equitable power of the bankruptcy court is insufficient to vitiate this statutory mandate. The United States Supreme Court instead holds, "It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." *Law v Siegel*, 571 US 415, 421 (2014) (cleaned up).

In sum, the final decree means what it says—in line with what Furie specifically requested. And that is, that *Furie Operating* closed as of July 1, 2020.

### ii. *Cornucopia Oil & Gas* proceedings

The Trustee argues that the case isn't closed because *Cornucopia Oil & Gas* remains open. Dkt 171 at 13. This proceeds from observation that *Furie Operating* and *Cornucopia Oil & Gas* were jointly administered pursuant to 11 USC § 302 and Rule 1015(b) of the Federal Rules of Bankruptcy Procedure, with *Furie Operating* being designated the lead case. *Furie Operating*, Dkt 50. And *Cornucopia Oil & Gas* does in fact remain open.

But importantly, the Rules of Bankruptcy Procedure distinguish between *joint administration* and *substantive consolidation*. That's because the latter "affects the substantive rights of the creditors of the different estates." FRBP 1015, advisory committee note (1983). As one bankruptcy court summarized:

> There is a dramatic difference between the joint administration contemplated by Rule 1015(b) and substantive consolidation. Joint administration is a creature of procedural convenience. It is justified by the laudable desire to avoid wasting of resources, which would result through the duplication of effort if cases involving related debtors were to proceed entirely

> separately. Thus, rather than having two of everything, there need only be one trustee, one docket, and duplicate pleadings or claims can be avoided. The estates of each debtor, however, remain separate. In this way, the desire for administrative efficiency can be fulfilled without altering the substantive rights of the parties.
>
> Unlike joint administration, substantive consolidation has a dramatic impact on the rights of the parties to a bankruptcy proceeding. When cases are substantively consolidated, the debtors lose their separateness and are treated as one entity. Their individual estates are combined to create a single pool, out of which the claims of all creditors can be paid. The ultimate result is the same as if there were only one debtor.

*Matter of Steury*, 94 BR 553, 553–54 (Bankr ND Ind 1988) (internal citations omitted).

As noted above, distinct bankruptcy proceedings were sequentially opened in the District of Delaware—case numbers 19-11781 (*Furie Operating*) and 19-11782 (*Cornucopia Oil & Gas*). The companies then moved for joint administration pursuant to Rule 1015(b). *Furie Operating*, Dkt 3. That motion was granted. Id at Dkt 50. But the actions were never consolidated. Instead, the order directing joint administration specifically states that the two actions were "consolidated for procedural purposes only" under the *Furie Operating* bankruptcy proceedings. Id, Dkt 50 at 2.

The bankruptcy court then reiterated this distinction in the plan of reorganization, stating that the two cases had been "consolidated for procedural purposes only" and were being "jointly administered" in such way. Id, Dkt 806 at 5. Consolidation was only mentioned three other times in the plan, but never in a context suggesting in any way that the bankruptcy court did or had intended to substantively consolidate the two actions. See id, Dkt 806 at 38, 39, 50.

In short, nothing supports contention that *Furie Operating* and *Cornucopia Oil & Gas* were ever substantively consolidated. They instead remained separate and distinct actions despite joint administration. Whether one proceeding or the other was designated as *open* or *closed* doesn't affect the status of the other. As such, the active status of *Cornucopia Oil & Gas* doesn't circumvent the reality that *Furie Operating* closed on July 1, 2020.

iii.   Effect of final decree in *Furie Operating*

The Trustee also points to certain language in the final decree, arguing that the closure of the *Furie Operating* matter doesn't preclude the Trustee's ability to bring causes of action transferred to the litigation trust. Dkt 171 at 13. Specifically, the final decree stated:

> 5. Entry of this Final Decree is without prejudice to: . . . (c) the Litigation Trust to bring and pursue claims, causes of action, or otherwise seek relief in connection with the Litigation Trust Assets.
>
> . . .
>
> 12. Notwithstanding the relief granted in this Final Decree and any action taken pursuant to such relief, nothing in this Final Decree shall be deemed: . . . (f) a waiver of any claims or causes of action held by the Closing Debtors which may exist against any entity.

Dkt 157-1 at 244–255.

Nothing in this language of itself tolls the limitations period or otherwise disturbs statutory provisions pertinent to that period. Stated differently, the final decree means what it says on the day it entered—no less, but also no more. And so, entry of the final decree neither prejudiced the rights of the Trustee *to bring and pursue claims, causes of action, or otherwise seek relief in connection with Litigation Trust Assets*, nor waived any rights, claims, or causes of action held by *the Closing Debtors*—who are

defined in the final joint plan of reorganization for the Furie bankruptcy to include Furie. *Furie Operating*, at Dkts 868 n 2 & 843 at 1 (defining "Closing Debtors"). Yet its entry then commenced the running of the § 546 limitations period. And when that time period ran, § 546 independently barred the claims under §§ 544 and 548 that derive from the Furie bankruptcy estate.

The Trustee suggests that *In re Vanguard Natural Resources,* 2021 WL 220697 (Bankr SD Tex 2021), is to the contrary. Dkt 171 at 14. There, a parent company and its subsidiaries entered a jointly administered bankruptcy. The bankruptcy court later closed the cases of the subsidiaries to avoid accrual of US Trustee fees, with the parent company's case remaining open. 2021 WL 220697 at *21. When the trustee sought to recover against third parties pursuant to claims under §§ 547 and 549 that arose out of a subsidiary estate, the third parties argued that the claims were barred by § 546. Id at *19. The bankruptcy court—construing its own order—found that the debtor knew that the subsidiary action wasn't fully administered and that the final decree wasn't intended to close the subsidiary action within the meaning of § 350(a). Id at **21–22. Rather, the closure was "purely an administrative and non-judicial act." Id at *22 (cleaned up). The bankruptcy court thus held that the final decree "overrode" the limitation period of § 546. Ibid.

But such statements were made by the bankruptcy court when construing its own order on matters still before it—and as to what the parties before it did or didn't understand about that order. Such ruling doesn't meaningfully inform the decision here. It also isn't tenable if generalized to encompass the present procedural posture. As previously noted, a bankruptcy court may not use its equitable powers in contravention of an explicit provision of the bankruptcy code. See *Law*, 571 US at 421. As such, it can't use its equitable powers to circumvent the requirements of 11 USC § 350(a). Nor can such powers override the limitations period set forth in 11 USC § 546.

The bankruptcy court in *In re Vanguard* went on to suggest that even if entry of a final decree that "overrode" the limitations period of § 546 violated the bankruptcy code, such a determination wouldn't invalidate the order's effect. In so holding, the bankruptcy court relied on *United States Aid Funds Inc v Espinosa*, 559 US 260, 260 (2010). The Supreme Court there found that an order by a bankruptcy court contained a legal error, but it held that the order remained enforceable against the creditor because the creditor had actual notice of the error and failed to object or timely appeal. Id at 272.

But just as Defendants aren't (as in *In re Vanguard*) parties here before the bankruptcy court as it construes its own order, neither are they (as in *Espinosa*) creditors with claims before the bankruptcy court. Certainly, nothing on the bankruptcy court docket suggests that Defendants received actual notice of the motion or final decree in such context as party or creditor. See *Furie Operating*, Dkt 851.

Simply put, *Espinosa* and *In re Vanguard* are inapposite.

### iv.   Conclusion

As determined above, the bankruptcy proceedings in *Furie Operating* closed on July 1, 2020. *Furie Operating*, Dkt 868 at 5. The limitations period of § 546 thus applies and began to run, further meaning that the claims under §§ 544 and 548 claims arising out of the Furie bankruptcy estate are barred by that limitations period. All such claims against Defendants will be dismissed with prejudice.

As noted at the outset, it appears that the Trustee may intend fraudulent-transfer claims as well with respect to the Cornucopia bankruptcy estates. And the bankruptcy proceedings in *Cornucopia Oil & Gas* aren't closed and so the § 546 limitations period hasn't begun to run. This means in turn that any claims under §§ 544 and 548 arising out of the Cornucopia bankruptcy estate aren't barred. But as currently pleaded, such claims—to the extent pleaded— are impossible to separate from those arising out of the Furie bankruptcy estate. Any such claims with respect

solely to the Cornucopia bankruptcy estate will thus be dismissed without prejudice. The Trustee may seek leave to replead in this regard within 45 days, if desired.

> b.   Breach of fiduciary duty, Furie officers

The Trustee alleges that a number of Defendants owed fiduciary duties to Furie due to their relation to it, being (i) Rieck, due to his ownership interest and control; (ii) Hord, Nunes, van Stephoudt, Degenhardt, Elder, and Ganer, due to their positions as named or *de facto* officers. The Trustee further alleges that each of them breached those fiduciary duties. Dkt 155 at ¶¶ 167–82.

Defendants respond that exculpatory clauses in certain of Furie's amended LLC agreements eliminated the fiduciary duties of all officers of Furie, which in turn eliminates here all theories of liability related to breach of fiduciary duty in that respect. See Dkts 63 at 11–15, 75 at 9–10, 157 at 15–18 & 169 at 14–16; see also Dkts 64 at 23–24 & 65 at 19.

> i.   Exculpatory clause, considered

Furie was originally formed under the laws of Texas in 1999. Dkt 157-1 at 306. Neither its first nor second amended LLC agreement contained any waiver of fiduciary duties. Its second agreement remained in effect from 2012 until December 10, 2017. Dkt 157-1 at 266–81. Furie then filed a third amended and restated operating agreement. Id at 283–293. That agreement stated that Furie remained a Texas LLC organized under Texas law. Id at 284. And it included an exculpatory clause stating in pertinent part:

> 9.   <u>No Fiduciary Duties; Business Opportunities.</u> To the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, in each case, solely in their respective capacities as such, shall have any duty, fiduciary or otherwise, to the Company in connection with the business and affairs of the Company or any consent or approval

given or withheld pursuant to this Agreement.

Id at 288.

Furie then reincorporated as a Delaware limited liability company. It filed a fourth amended and restated operating agreement effective January 25, 2018. Dkt 157-1 at 306–319. The fourth amended agreement contains the same exculpatory clause as above, while stating that Delaware law governs. Id at 311, 314.

The Trustee brings various claims relating to alleged breaches of fiduciary duties by Furie officers that occurred before December 10, 2017. Iterations of such claims include (i) breach of fiduciary duty against Rieck, Hord, van Stephoudt, Stone Pigman, Degenhardt, Elder, Nunes, and Ganer; (ii) aiding and abetting breach of fiduciary duty against Ganer and Sierra Pine; and (iii) civil conspiracy against Rieck, Hord, Degenhardt, Nunes, Elder, van Stephoudt, Hryck, Reed Smith, Ganer, and Sierra Pine. Dkt 155 at ¶¶ 167–82, 183–89, 208–13.

Reed Smith, Nunes, Stone Pigman, Hyrck, and van Stephoudt contend that the exculpatory clause in the fourth amended LLC agreement not only eliminated fiduciary duties of Furie officers going forward, but also broadly exculpated any breach of fiduciary duty that occurred under the prior LLC agreements. See Dkts 63 at 11–15, 75 at 9–10, & 169 at 14–16; see also Dkts 64 at 23–24 & 65 at 19. Hord makes the same argument under both the third and fourth amended LLC agreements. Dkt 157 at 15–18. The Trustee responds that the third and fourth amended LLC agreements had "no effect on causes of action that had already arisen in Furie's favor for breaches" under the earlier agreements. Dkt 118 at 15–16.

"When reviewing issues of state law, federal courts look to the law of that state's highest court." *City of Alexandria v Brown*, 740 F3d 339, 351 (5th Cir 2014). "In the absence of a final decision" by that court, federal courts "must make an *Erie* guess" and determine how the state's highest court would decide the issue "if presented with the same case."

Ibid, quoting *In re Katrina Canal Breaches Litigation*, 495 F3d 191, 206 (5th Cir 2007). Federal courts in making an *Erie* guess defer to "intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." Id at 351 (cleaned up).

As a preliminary matter, it's important to note that the parties agree that the fourth amended LLC agreement selects Delaware law, and that Delaware law thus governs the question of the retroactive effect of that exculpatory clause. For example, see Dkts 63 at 13, 75 at 10, 157 at 18, 169 at 14 & 118 at 15. Obviously, if that clause has retroactive effect, it subsumes all prior versions—meaning in turn that there would be no need to determine whether the same language in the third amended LLC agreement would also have retroactive effect under Texas law.

Interpreting Delaware law, the Delaware Court of Chancery holds, "Drafters of an LLC agreement must make their intent to eliminate fiduciary duties plain and unambiguous." *Feeley v NHAOCG, LLC*, 62 A3d 649, 664 (Del Ch 2012) (cleaned up). Section 18-1101(c) of Title 6 of the Delaware Code provides that "the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement." The only apparent limit provided by the statute is that the LLC agreement "may not eliminate the implied contractual covenant of good faith and fair dealing." Ibid.

Neither party cites controlling authority from the Delaware Supreme Court that resolves the retroactive effect of the exculpatory clause here at issue. But they appear to agree that the question of whether the fourth amended LLC agreement exculpates fiduciary duties arising before that date is simply one of contractual interpretation. This proceeds from straightforward holdings of the Delaware Court of Chancery. For instance, the court in *Gooden v Franco* summarized:

> It is frequently observed that LLCs 'are creatures of contract,' which they primarily

28

are. The first step when analyzing a case involving the internal affairs of an LLC is therefore to examine the LLC agreement to determine whether it addresses the issue. If it does, then the contract controls, unless the provision violates one of the exceedingly few mandatory provisions in the LLC Act. If the LLC agreement is silent, then the next step is to look to the LLC Act to see if one of its default provisions applies. If neither source addresses the matter, then the LLC Act instructs that "the rules of law and equity . . . shall govern."

2018 WL 3998431, *7 (Del Ch) (citations omitted). Analysis will thus proceed in such way.

The fourth amended LLC agreement begins with certain recitals. One states, "This Agreement *amends and restates* the Previous Agreement in its entirety." Dkt 157-1 at 306 (emphasis added). The Delaware Chancery Court has held that the *amends-and-restates* phrasing indicates "that the subsequent operating agreement *replaced and superseded* the predecessor agreement." *Focus Financial Partners LLC v Holsopple*, 241 A3d 784, 822 (Del Ch 2020) (emphasis added). Once an LLC agreement is superseded by a subsequent agreement, a limited liability company can no longer bring claims that arose under the superseded agreement. Id at 823.

Such a conclusion conforms to the broad language of the exculpatory provision. As phrased, it vitiates all fiduciary duties owed by Furie officers to "the fullest extent permitted by applicable law." Dkt 157-1 at 310. Elimination of fiduciary duties *to the fullest extent* permitted by Delaware law necessarily includes—in accord with authority noted immediately above—exculpation of those fiduciary duties owed (and potentially breached) in the past. And indeed, the Trustee conceded at hearing that Delaware law not only permits the exculpation of all fiduciary duties going forward, but also allows an LLC to

release its officers from past breaches of fiduciary duty. Dkt 190 at 94; see *CelestialRX Investments, LLC v Krivulka*, 201 WL 416990, *16 (Del Ch 2017) (finding exculpatory clause to eliminate fiduciary duties to extent permitted by Delaware law).

All of this simply means that the plain language of the fourth amended LLC agreement not only exculpates all fiduciary duties after January 25, 2018, but also all fiduciary duties that arose under all prior agreements. The Trustee argues to the contrary, noting that the agreement (i) states that it is "effective as of January 25, 2018," (ii) is written prospectively, and (iii) can't be construed as a silent release. Dkt 118 at 16–17. None of these arguments withstands scrutiny.

*First,* there's a distinction between the effective date of the fourth amended LLC agreement and what it portends as to its exculpatory effect. Section 18-201(d) of the Delaware Limited Liability Company Act provides parties broad discretion regarding the effective date of their agreement. See also *Rodgers v Erickson Air-Crane Co*, 2000 WL 1211157, *5 (Del Superior Ct) (holding that parties can agree that written contract took effect earlier than execution date). But the parties here didn't need to backdate the fourth amended LLC agreement—or even indicate any particular effective date—to exculpate all past breaches of fiduciary duty. That purpose was instead achieved by the *amends-and-restates* language quoted and addressed above. See Dkt 157-1 at 306.

*Second,* as the Trustee contends, it's true that "the relevant portion of both operating agreements is written *prospectively*" in that they state no manager or officer "shall have" fiduciary duties in connection with Furie. Dkts 171 at 17 (emphasis in original) & 157-1 at 310. But this language doesn't stand alone. It must instead be read in conjunction with the clause's introductory phrase pertaining to modification "[t]o the fullest extent permitted by applicable law." Dkt 157-1 at 310. As determined above, such phrasing signals the exculpation of past breaches of fiduciary duties. Again, this follows from what Delaware

law allows in its maximal extent, as conceded above by the Trustee.

*And third,* contrary to contention by the Trustee, construing the language of the fourth amended LLC agreement to exculpate past breaches isn't a "silent release." Dkt 118 at 17. Quite the contrary. Such a construction simply affords each clause its due legal and textual significance under Delaware law. This is particularly evident where the Delaware Corporate Statute specifically provides, "No such provision shall eliminate or limit the liability of a director or officer for any act or omission occurring prior to the date when such provision becomes effective." 8 Del C § 102(b)(7). Given that this or similar language does *not* feature in the Delaware Limited Liability Company Act, the *omitted-case canon* of construction undercuts the Trustee's argument. This is "the principle that what a text does not provide is unprovided." Antonin Scalia & Brian A. Garner, *Reading Law* 96 (West 2012). In such view, it simply isn't the province of "the judicial power . . . to supply words or even whole provisions that have been omitted." Id at 93. This is particularly true here, for the Delaware legislature certainly knew how to provide limitations on the effect of exculpatory clauses when it so intended. That it didn't do so under Delaware Limited Liability Company Act is the end of the matter. Such a limitation can't later be read into the statute.

In conclusion, the fourth amended LLC agreement exculpates past (and later) breaches of fiduciary duty.

### ii.   Exculpatory clause, applied

The application of the exculpatory provision on claims brought by the Trustee differs based on the claim and the status of the individual defendant. The parties without elaboration rely upon Texas (and not Delaware) law for the purpose of certain claims ancillary to that for breach of fiduciary duty. Analysis on those claims appropriately proceeds upon such concession.

*As to claims for breach of fiduciary duty against Furie officers generally,* they will be dismissed with prejudice insofar as they are brought based on their duties arising from various roles as Furie officers. Such claims against Rieck, Hord, van Stephoudt, Degenhardt, Ganer, and Elder are thus barred by the exculpation clause in the fourth amended LLC agreement.

*As to the claim for breach of fiduciary duty against Nunes,* the claim will be dismissed with prejudice insofar as it relates to his role as a Furie officer. But as discussed below, the Trustee adequately pleaded that Nunes owed separate and distinct fiduciary duties to Furie as an attorney. See Dkt 107 at 14–15 (consolidating multiple instances alleged in complaint where Nunes received improper benefits and acted for benefit of Rieck); see also Dkt 155 at ¶¶ 61–64, 67, 81, 83–84, 87–88. The motion to dismiss by Nunes will thus be denied as it relates to such a claim.

*As to the claims for aiding and abetting breach of fiduciary duty,* they will be dismissed with prejudice to the extent that they rely on duties that the various officers owed to Furie. The parties rely without elaboration upon Texas law. While the Supreme Court of Texas hasn't yet expressly so stated, the Fifth Circuit holds that Texas law recognizes a claim for "knowing participation in a breach of fiduciary duty." *D'Onofrio v Vacation Publications Inc*, 888 F3d 197, 215–16 (5th Cir 2018). But such a claim requires an underlying breach of fiduciary duty. And none exists here as to officers of Furie.

*As to the claims for civil conspiracy,* they will be dismissed with prejudice insofar as they relate to the exculpated duties of Furie officers. The parties again rely without elaboration upon Texas law. Generally speaking, such a claim "requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means," and it "inherently requires a meeting of the minds on the object or course of action." *First United Pentecostal Church of Beaumont v Parker*, 514 SW3d 214, 222 (Tex 2017). One of the essential elements of such a

claim is that one or more unlawful, overt acts are taken in pursuance of the object or course of action. Ibid. But again, any underlying breach of fiduciary duty was exculpated—meaning that it is (or was) no longer unlawful.

*As to claims for breach of fiduciary duty and related claims in other contexts,* they will be dismissed without prejudice. The extent to which these claims—as against Rieck, Hord, van Stephoudt, Degenhardt, Ganer, Elder, and Nunes—purport to arise from fiduciary duties that may exist beyond role their roles as Furie officers isn't clear. For example, and at a minimum, the Cornucopia LLC agreement hasn't been put at issue here. As such, neither the claims for breach of fiduciary duty arising out of duties (if any) owed by Defendants as Cornucopia officers, nor any related claims, are subject to dismissal. But as currently pleaded, such claims are impossible to separate from those arising out of the exculpated duties of Furie officers. The Trustee may seek leave to replead such claims with respect solely to any other fiduciary duties owed within 45 days, if desired.

### c.   Breach of fiduciary duty, legal services

The Trustee asserts claims for breach of fiduciary duty against various counsel to the company, including Reed Smith, Hryck as the engagement partner at Reed Smith, and Nunes as outside general counsel (from Cogan Partners and Stone Pigman as its successor). Dkt 155 at ¶¶ 34, 170, 179. Nunes contends that this is an improper attempt at group pleading. See Dkt 75 at 7. Hryck argues that the Trustee failed to plead facts demonstrating that he owed any fiduciary duty. And all three contend that the claims are barred by the anti-fracturing rule. Dkt 64 at 22. These aren't persuasive.

### i.   Prohibition on group pleading

Nunes contends that the Trustee has engaged in impermissible group pleading by failing to allege which individual defendants took which action. Dkt 75 at 7–9, citing *Alaska Electrical Pension Fund v Asar*, 768 Fed Appx 175, 184 (5th Cir 2019); *Financial Acquisition Partners LP*

*v Blackwell*, 440 F3d 278, 287 (5th Cir 2006). In particular, Nunes argues that the complaint "tells nothing about what Nunes himself is alleged to have done," while only singling him out in the paragraph that introduces him. Dkt 75 at 7.

Not so. The complaint provides sufficient detail regarding his role in the overall enterprise. For instance, Nunes structured Advanced Drilling and served as its sole member until February 2016, at which time Offshore Management (in which Nunes received a twenty percent ownership interest) became the sole member. Dkt 155 at ¶¶ 64 & 83–84. Furie nominally paid Advanced Drilling $55,000 a day to manage the *Randolph Yost* rig. Id at ¶ 62. But in actuality, Advanced Drilling was used to screen fraudulent transfers. Nunes knew that these transactions were disloyal and took affirmative steps to hide them. Id at ¶ 81; see also id at ¶ 83–85. And what's more, Nunes negotiated the Enstar agreement despite knowing that Furie couldn't meet its obligations under that contract. Id at ¶¶ 137–38.

Or so it's alleged. But in short, the Trustee hasn't engaged in impermissible group pleading.

### ii.  Lack of fiduciary duty

Hryck contends that the Trustee failed to plead facts supporting that he "was in fact providing professional legal services to Furie in the 2016 timeframe." Dkt 64 at 18. He notes that the Trustee alleges only that Reed Smith began billing Furie for work beginning in February 2016 and that Hryck happened to be an attorney for Reed Smith during that period. And the complaint suggests it wasn't until December 2017 that Hryck signed an engagement letter (backdated to June 2017) on behalf of Reed Smith. Ibid.

To the contrary, the Trustee pleads sufficient facts to state a claim for relief that's "probable on its face." *Twombly*, 550 US at 547. In particular, it's alleged that Furie actually engaged Reed Smith—via Hryck—in February 2016, even though an engagement letter between Reed Smith and Furie wasn't signed until that December. Dkt 155 at ¶ 16, 36. It also alleges knowing participation

by Hryck in multiple schemes to defraud Furie. For example, see Dkt 155 ¶ 81, 83–85.

### iii.   Anti-fracturing rule

The anti-fracturing rule prevents a plaintiff from pursuing "what are actually professional negligence claims against an attorney" under the guise of some other cause of action, thus precluding a claim for breach of fiduciary duty where the "gravamen" of the complaint focuses "on the quality or adequacy of the attorney's representation." *Won Pak v Harris*, 313 SW3d 454, 458 (Tex App—Dallas 2010). But such a claim may go forward if the allegations involve "the integrity and fidelity of an attorney" and "focus on whether an attorney obtained an improper benefit from representing the client." Id at 457; see also *Murphy v Gruber*, 241 SW3d 689, 693 (Tex App—Dallas 2007).

An attorney "benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." *Murphy*, 241 SW3d at 693. As to conflicts of interest specifically, a complaint must surpass allegations that the undisclosed conflict resulted in substandard representation. The client must instead assert that the attorney deceived him, pursued the attorney's pecuniary interests over the client's interest, or obtained an improper benefit from failing to disclose the conflict. See Id at 698; *Beck*, 284 SW3d at 438–39.

As but one example, Judge Sidney Fitzwater of the Northern District of Texas found in *Taylor v Scheef & Stone LLP* that a temporary receiver who brought claims on behalf of the estates of certain defunct entities avoided the anti-fracturing rule where he pleaded that a law firm "participated in breaches of fiduciary duties by knowingly providing services to perpetuate" such breaches. 2020 WL 4432848, *8 (ND Tex). This was so, in part, because it was alleged that the law firm serving as the entities' primary outside counsel knew that an officer had established a

35

scheme to "misappropriate millions of dollars" by selling "unregistered securities using unregistered sales reps"—yet it created a compensation program that allowed the scheme to continue. Ibid.

Nunes, Hryck, and Reed Smith all argue variations on the theme that they didn't receive any improper benefit. Read with the proper standard of review in mind, the complaint discloses otherwise.

*As to Nunes,* he argues that the complaint doesn't state that he received *any* benefit from his role in Advanced Drilling—and "mere receipt of legal fees will not suffice." Dkt 75 at 6, 10. But as noted just above, the Trustee details how Nunes knowingly participated in multiple disloyal schemes. For example, allegation of acquisition of a stake in a company allegedly used to screen siphoned funds from a client obviously pleads a benefit—and one quite improper at that. Dkt 155 at ¶¶ 64 & 83–84. In other words, the "gravamen" of the claim certainly isn't that Nunes' actions were professionally negligent. Instead, the claim involves his "integrity and fidelity." *Murphy*, 241 SW3d at 693.

*As to Hryck,* he also argues that nothing suggests that he received anything of value in exchange for his alleged breaches. In particular, he asserts that the mere fact that he became the trustee of Offshore Management doesn't necessarily show that he received any benefit. Dkt 64 at 18–19. But the Trustee alleges that Hryck provided legal services that he *knew* would help Furie executives hide fraudulent transactions. Dkt 155 at ¶ 81. In other words, the claim "involves the integrity and fidelity" of Hryck—that he knowingly and actively helped officers raid his client. *Murphy*, 241 SW3d at 693. Indeed, such factual allegations largely track those in *Taylor*. See 2020 WL 4432848 at *8.

*As to Reed Smith,* it asserts that the Trustee failed to allege receipt of an improper benefit. Dkt 63 at 16–17. But the Trustee argues that Reed Smith billed Furie for services rendered by van Stephoudt as president of Furie. See Dkt 118 at 8. This alone constitutes an improper benefit because the fees didn't represent compensation for

legal services. What's more, the complaint contends that both van Stephoudt and Hryck—as representatives of Reed Smith—directly participated in a scheme to loot Furie. For example, see Dkt 155 at ¶¶ 85, 131. As van Stephoudt and Hryck took actions disloyal to Furie (and instead being to the benefit of other Rieck-controlled entities), Reed Smith directly benefited to the extent Furie paid it directly for the services of Hryck and van Stephoudt. Id at ¶ 121; see also Dkt 118 at 20–21. At least it is so alleged, and that is sufficient.

### iv. Conclusion

The motions to dismiss the claims for breach of fiduciary duty as they relate to Reed Smith, Nunes, and Hryck in their capacities as counsel and attorneys to Furie will be denied. The pleaded allegations at this stage properly present claims against them for breach of fiduciary duty. See *Taylor*, 2020 WL 4432848 at *8.

### d. Breach of fiduciary duty, derivative theory

The Trustee also brings a claim for breach of fiduciary duty against Stone Pigman. Dkt 155 at ¶¶ 167–82. But importantly, the Trustee doesn't contend that Stone Pigman itself breached any fiduciary duty. It instead alleges that Stone Pigman is liable for breach of fiduciary duty via Nunes, who was partially seconded by Cogan & Partner and (in turn) Stone Pigman. Id at ¶ 20; see also id at ¶ 38 (noting Nunes as seconded for half of his time). It additionally contends that Stone Pigman is liable for breaches of fiduciary duty by Cogan & Partners because Stone Pigman is a successor by merger or by equitable estoppel, or because Cogan & Partners fraudulently transferred its assets to Stone Pigman. Id at ¶ 20; Dkt 175 at 8. None of these theories bear out.

### i. Stone Pigman via Nunes

The Trustee conceded at hearing that Furie paid Nunes directly while he worked as a partner at Stone Pigman. Consequently, there's no allegation that Stone Pigman received any improper benefit. See Dkt 190 at 23–24. This

precludes a claim for breach of fiduciary duty under the anti-fracturing standards addressed above.

Independently fatal to this claim is the fact that the Trustee didn't plead any facts showing that Stone Pigman is vicariously liable for Nunes' conduct. The Trustee in fact didn't plead vicarious liability at all. And it would be hard pressed to do so now. Seconded employees are considered employees of the borrowing employer. *Brenham Oil & Gas Inc v TGS-NOPEC Geophysical Co*, 472 SW3d 744, 760 (Tex App—Houston 2015). Notwithstanding allegations of secondment of Nunes to Furie, the Trustee suggests that Nunes wasn't a borrowed employee because Furie didn't have "the right to direct the details of the work" that he performed. Dkt 175 at 18, quoting *St Joseph Hospital v Wolff*, 94 SW3d 513, 537–38 (Tex 2002). Such contention surpasses credulity, as the Trustee elsewhere specifically pleaded that Furie directly paid Nunes $50,000 per month to act as its general counsel. Dkt 155 at ¶ 191.

The claims for breach of fiduciary duty against Stone Pigman via Nunes will be dismissed.

ii.     Stone Pigman via Cogan & Partners

The Trustee asserts claims against Stone Pigman as a successor to Cogan & Partners, either by merger or by equitable estoppel. Dkt 155 at ¶¶ 20, 219–26, 227–31. Establishing liability on the part of the prior firm is thus a necessary prerequisite before any transposition of that liability onto the succeeding firm. But the Trustee again fails to do so for the same reason that it failed to establish facts sufficient to hold Stone Pigman liable—nothing suggests that Cogan & Partners is vicariously liable for Nunes' alleged breach of fiduciary duty.

The claims against Stone Pigman for successor liability—whether by merger or by equitable estoppel—will be dismissed.

iii.     Fraudulent transfer between firms

Section 108(a) of Title 11 requires non-bankruptcy-law claims to be brought "before the later of" the expiration of the claim's limitations period or two years after the "order

for relief." The Fifth Circuit holds that the referenced *order for relief* operates "from the original filing date of the case under Chapter 11." *Matter of Phillip*, 948 F2d 985, 988 (5th Cir 1991).

The pertinent order for relief for purposes here was entered on August 9, 2019. *Furie Operating*, Dkt 1; *Cornucopia Oil & Gas*, Dkt 1. The Trustee didn't seek to amend its complaint to add this claim until October 19, 2021. Dkt 94. The claim is thus barred unless it relates back to the original complaint, which the Trustee filed on August 6, 2021. See Dkt 1-5.

A claim relates back if it arises "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FRCP 15(c)(1)(B). As for a fraudulent-transfer claim specifically, it will relate back if (i) the amended complaint alleges that the additional transfers were part of a course of conduct alleged in the original complaint, and (ii) the original complaint notified the parties, against whom the additional transfer claims are asserted, that the Trustee could pursue avoidance of the additional transfers associated with the course of conduct alleged in the original complaint. *In re Uplift RX LLC*, 625 BR 364, 376 (Bankr SD Tex).

The Trustee argues that this claim relates back because it's "based on the same agreement and facts as the successor-in-interest claim." Dkt 175 at 16. The Trustee also contends that it relied on public and private representations by Stone Pigman that it merged with Cogan & Partners. Stone Pigman therefore "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Id at 17.

To the contrary, the amended complaint doesn't allege or identify the "course of conduct" in the original complaint from which the fraudulent-transfer claim in the amended complaint arose. Dkt 155 at ¶¶ 232–36. The original complaint instead implicated Stone Pigman through its successor and/or vicarious liability. A fraudulent-transfer claim involving Cogan & Partners and Stone Pigman is a

very different thing, which can't be said to arise out of the same "overarching scheme" as the conduct from which the original claims arose. The alleged transfer from Cogan & Partners to Stone Pigman instead is a "distinct transaction or occurrence." See *In re Uplift RX*, 625 BR at 377 (also noting that original complaint must allege that additional transfers were part of course of conduct alleged in original complaint).

As such, the claim doesn't relate back, is thus barred by limitations, and will be dismissed.

### iv.   Conclusion

Each of the various theories by which the Trustee would assert liability against Stone Pigman will be dismissed. The Trustee has already had an opportunity to amend regarding its claims in this regard. See Dkts 94, 152 & 155. Further amendment would be futile in light of prior pleadings and the applicable law. Such dismissal will thus be with prejudice.

### e.   Unjust enrichment

The Trustee asserts a claim against Helena Energy for unjust enrichment. Dkt 155 at ¶¶ 202–07. It contends that Helena Energy shared executives, office staff, and office space with Furie, while allegedly receiving gas from Furie, first through the now-defunct Rieck-controlled Aurora Gas LLC in 2016, and then directly in 2017. Id at ¶¶ 94–95. Helena Energy seeks dismissal, contending that the law of Alaska governs this dispute, such law only recognizes a claim for quasi-contract, and the Trustee failed to plead such claim. It argues further that Texas law—even if it applies—doesn't recognize unjust enrichment as an independent cause of action. Id at 11–18.

Extended choice-of-law analysis isn't necessary at this juncture because the pertinent law from both jurisdictions isn't at meaningful variance.

The Supreme Court of Alaska holds under Alaska law that "unjust enrichment is not in and of itself a theory of recovery. Rather, it is a prerequisite for the enforcement of the doctrine of restitution." *Alaska Sales and Service Inc v*

*Millet*, 735 P2d 743, 746 (Alaska 1987). "Restitution, in turn, is not a cause of action' but rather a remedy for various causes of action," such as quasi-contract. Ibid.

The Supreme Court of Texas hasn't addressed this issue directly under Texas law. But some Texas appellate courts have taken the view that unjust enrichment isn't an independent cause of action. See *Foley v* Daniel, 346 SW3d 687, 690 (Tex App 2009); *RM Dudley Construction Co v Dawson*, 258 SW3d 694, 703 (Tex App 2008). The Fifth Circuit has proceeded upon the same understanding. For example, in *Sullivan v Leor Energy LLC*, it noted, "Unjust enrichment characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to pay." 600 F3d 542, 550 (5th Cir 2010); see also *Midwestern Cattle Marketing LLC v Legend Bank NA*, 999 F3d 970, 972 (5th Cir 2021) (rejecting unjust enrichment as distinct cause of action in Texas). Regardless, and without question, Texas courts recognize *quantum meruit* as a cause of action, with such claims arising "when non-payment for services rendered would result in an unjust enrichment to the party benefited by the work." *Sullivan*, 600 F3d at 550; see also *Vortt Exploration Co, Inc v Chevron USA, Inc*, 787 SW2d 942, 944 (Tex 1990).

This harmony in theoretical approach leads to similar accord as to the necessary elements of pleading. The elements of a quasi-contract claim under Alaska law are (i) a benefit conferred upon the defendant by the plaintiff, (ii) appreciation by the defendant of such benefit, and (iii) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof. *Ware v Ware,* 161 P3d 1188, 1197 (Alaska 2007). The elements of a claim in *quantum meruit* under Texas law are (i) valuable services and/or materials furnished by plaintiff, (ii) to the party sought to be charged, (iii) which were accepted by the party sought to be charged, (iv) under such circumstances as reasonably notified the receipt that

41

the plaintiff expected to be paid by the recipient. *Heldenfels Brothers Inc v Corpus Christi*, 832 SW2d 39, 41 (Tex 1992).

Properly understood, the Trustee sufficiently pleads a claim against Helena Energy under the law of either Alaska or Texas. Specifically, it contends that Helena Energy received a benefit (or valuable services and materials) when it utilized Furie personnel and office space. Dkt 155 at ¶ 94. Helena Energy appreciated and accepted this benefit. And it would be inequitable for Helena Energy to keep that benefit without paying Furie. Likewise, the Trustee contends that Helena Energy received a benefit (or valuable materials) when it took natural gas from Furie. Id at ¶ 95. Helena Energy appreciated and accepted this benefit. And it would be inequitable for Helena Energy to keep that benefit without paying Furie.

Helena Energy protests that the Trustee failed to state how much gas Helena Energy allegedly received and to what extent it paid Furie for that gas. Dkt 46 at 14. It also suggests that "there are insufficient facts pleaded to set forth what the ultimate amount of restitution should be" because the Trustee only seeks "a dollar for dollar benefit." Id at 14–15. This misapprehends the pleading standard. A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 US at 570. The complaint states that Helena Energy didn't compensate Furie for use of Furie's office space and staff, and that Helena Energy didn't pay for gas it received from Furie. Dkt 155 at ¶ 94–95. This is sufficient to proceed, leaving questions as to exact amounts for discovery.

Helena Energy also argues that there should have been a contract because the sale of natural gas removed from realty is a sale of goods under the UCC—meaning that the Trustee should have brought a claim for breach of that contract. Dkt 46 at 14. To the contrary, the complaint states that Furie and Helena Energy executives drafted a gas sales agreement; Furie creditors refused to approve it; and Furie nonetheless delivered gas to Helena Energy

without payment. Dkt 155 at ¶ 95. With no contract being at issue, argument on such basis simply isn't pertinent.

Helena Energy last argues that the Trustee can't recover for gas sales from Furie to Helena Energy via Aurora Gas because "the entity that was supposed to pay" Furie was Aurora Gas and not Helena Energy. Dkt 46 at 14. The Trustee doesn't address this issue in its response. Dkt 86. Such failure to defend a claim in response to a motion to dismiss constitutes abandonment of the claim. See *Black v North Panola School District*, 461 F3d 584, n 1 (5th Cir 2006) (failure by plaintiff to defend); see also *Lefkowitz v Administrators of Tulane Educational Fund*, 2022 WL 376148 *3 (ED La 2022) (collecting cases). Opposition to dismissal in this respect is thus waived.

The motion to dismiss by Helena Energy will be granted to the extent that the Trustee seeks to recover against Helena Energy for gas sold through Aurora Gas. It will otherwise be denied. Dkt 46.

### f.    Exemplary damages and attorney fees

The Trustee purports to plead claims for exemplary damages and attorney fees. Dkt 155 at ¶¶ 214–16, 217–18. Reed Smith correctly notes that neither is a stand-alone cause of action. Dkt 63 at 18–19; see also Dkt 191 at 48–49. Instead, exemplary damages and attorney fees are remedies that may spring from an otherwise established cause of action. The Trustee essentially concedes their dismissal as claims, while preserving their potential as remedies. For example, see Dkt 118 at 27.

The stand-alone claims for exemplary damages and attorney fees will be dismissed. But the Trustee may seek either or both as a remedy where permitted by law.

### 4.    Conclusion

The motions to dismiss by Helena Energy, Bruce Ganer and Sierra Pine Resources International Inc, Reed Smith LLP, David Hyrck, Theodor van Stephoudt, Michael A. Nunes, and Stone Pigman Walther Wittmann LLC are GRANTED IN PART and DENIED IN PART. Dkts 46, 57, 63, 64, 65, 75 & 169.

43

The motion for summary judgment by Thomas Hord is GRANTED IN PART and DENIED IN PART. Dkt 157.

Claims under §§ 544 and 548 of Title 11 of the United States Code for fraudulent transfer are DISMISSED WITH PREJUDICE to the extent that they arise out of the *Furie Operating* bankruptcy proceeding. All such claims are DISMISSED WITHOUT PREJUDICE to the extent that they arise out of the *Cornucopia Oil & Gas* bankruptcy proceedings.

Claims for breach of fiduciary duty against Rieck, Hord, Nunes, van Stephoudt, Degenhardt, Elder, and Ganer in their capacity as Furie officers are DISMISSED WITH PREJUDICE. To the extent such claims may arise out of any fiduciary duties owed as Cornucopia officers, they are DISMISSED WITHOUT PREJUDICE. Related claims for aiding and abetting breach of fiduciary duty (as well as for civil conspiracy in that regard) are resolved in like fashion.

The claim for breach of fiduciary duty against Stone Pigman is DISMISSED WITH PREJUDICE.

Claims for breach of fiduciary duty against Reed Smith, Hryck, and Nunes in their capacities as attorneys will proceed.

The claim for unjust enrichment against Helena Energy is DISMISSED WITH PREJUDICE to the extent that it seeks recovery for gas sold through Aurora Gas but will otherwise proceed.

The claims for exemplary damages and attorney fees are DISMISSED to the extent they are pleaded as stand-alone claims, but such will be allowed as remedies where permitted by law.

As to claims dismissed without prejudice above, the Trustee may seek leave to replead within 45 days, if desired. Observe the conference requirement imposed by Section 17 of this Court's procedures before bringing any such motion.

So ordered.

Signed on March 30, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge