## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CLINGMAN & HANGER MANAGEMENT ASSOCIATES, LLC, as Trustee of the Furie Litigation Trust, | § § § § | CIVIL ACTION NO. 4:21-cv-02698 |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| KAY RIECK | § | |
| LARS DEGENHARDT | § | |
| THEODOR VAN STEPHOUDT | § | |
| DAVID HRYCK | § | |
| REED SMITH LLP | § | |
| THOMAS E. HORD | § | |
| MICHAEL ANTHONY NUNES | § | |
| STONE PIGMAN WALTHER WITTMANN LLC | § § | |
| DAVID ELDER | § | |
| BRUCE GANER | § | |
| SIERRA PINE RESOURCES INTERNATIONAL, INC. and HELENA ENERGY, LLC | § § § | |
| Defendants. | § | |
| | § | |

## SECOND AMENDED COMPLAINT

Plaintiff Clingman & Hanger Management Associates, LLC, as Trustee of the Furie Litigation Trust ("Trustee"), alleges:

## INTRODUCTION

1.     Defendants, all officers and control parties of Cornucopia Oil and Gas, LLC ("Cornucopia") and its wholly owned subsidiary Furie Operating Alaska, LLC

1

("FOA") and their respective companies, touted grand plans for the companies: major infrastructure and drilling plans, and the anticipated production of hundreds of billions of cubic feet of gas and millions of barrels of oil. But after building out the initial infrastructure for the first production well, the companies had incurred so much debt that neither its equity owner, owned in large part and controlled by Defendant Kay Rieck ("Rieck"), nor the Defendant managers hereto would be likely to ever recover significant personal profits from the companies' operations.

2.      Rather than continuing to operate the companies in a manner intended to maximize their value, Rieck and certain Defendants implemented a brazen scheme to divert cash (provided by its outside lenders) to entities secretly owned by them. Together, they caused the companies to drill for fictitious gas using a company they secretly owned, sell gas at a loss to Rieck-owned entities and pledge/transfer valuable tax credits to Rieck-owned entities without consideration. At the same time, the Defendants artificially inflated the companies' "proved" gas reserves estimates so they could continue drawing compensation. Once their malfeasance came to light, the companies predictably collapsed into bankruptcy, and their assets—previously valued at hundreds of millions of dollars— were sold for a mere $5 million.

3.      By this action, the Trustee seeks to recover over $100 million on account of Defendants' breaches of fiduciary duty receipt of fraudulent transfers and other wrongdoing.

## THE PARTIES AND SERVICE OF CITATION

4.      Plaintiff is the Trustee of a litigation trust established by FOA's chapter 11 plan confirmed by Order dated June 12, 2020 entered by the United States Bankruptcy Court for the District of Delaware (Case No. 19-11781), to which Cornucopia and FOA's causes of action against Defendants were transferred.

5.      Cornucopia was the sole member of Furie Operating Alaska, LLC. Officers for Cornucopia were also officers for FOA. The companies operated out of the same offices. Cornucopia and FOA were co-borrowers on loans from ECP and ING (defined below. Cornucopia and FOA also routinely shared funds through joint bank accounts and transfers between the companies. For example, on August 28, 2017, as described below, FOA paid $1,500,000 to Shelf II related to the Randolph Yost rig. However, these funds originated in a joint Wells Fargo account for FOA and Cornucopia and were transferred from the joint account to FOA's account to Shelf II all in the same day. The officers of the two companies did not distinguish between them and instead referred to both companies simply as "Furie." This Second Amended Complaint distinguishes between Cornucopia and FOA when possible but refers to them jointly as "FOA and Cornucopia" when otherwise necessary.

6.      FOA and Cornucopia maintained their corporate headquarters in League City, Galveston County until November 2016. Following that date, numerous FOA and Cornucopia executives and critical service providers continued to work from the Houston area, including but not limited to the counterparties discussed herein.

7.     From their inception until January 25, 2018, FOA and Cornucopia were Texas limited liability companies. On that date, they converted to Delaware limited liability companies.

8.     Non-party Deutsche Oel und Gas, S.A. ("DOGSA") is a Luxembourgian company and the putative owner of Deutsche Oel und Gas, A.G. ("DOGAG"), a now-dissolved German company, which was the putative member of Furie. At all times relevant hereto, DOGSA and DOGAG were controlled by Defendant Rieck.

9.     Rieck was the ultimate control person for most other entities described herein and functioned as the *de facto* head of FOA and Cornucopia. Rieck is a German national residing in Dubai, United Arab Emirates.

10.     Rieck is a foreign individual. At all times material hereto, Rieck was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction. Rieck, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause. The causes of action asserted herein against Rieck arose from purposeful transactions entered by Rieck and consummated in Texas and the agreements were to be performed in whole or in part in Texas or, alternatively, Rieck committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below. Rieck travelled to Houston to meet with FOA and Cornucopia's executives and counterparts and with attorneys, including with FOA and Cornucopia's general counsel Tony Nunes. In addition, Rieck used and

4

maintained agents in Texas. All of the foregoing give rise to Plaintiff's causes of action asserted herein. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Rieck may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Rieck at his home of Maurya Penthouse, Grandeur Residence, West Crescent, Palm Jumeirah, P.O. Box 29193 A 502, Dubai, 2772, United Arab Emirates.

11.     Defendant Lars Degenhardt ("Degenhardt") was FOA's President from September 2014-June 2017, while he simultaneously served as CFO of DOGSA. He became Cornucopia's president on August 11, 2016. Degenhardt resides in Frankfurt, Germany.

12.     Degenhardt is a foreign individual. At all times material hereto, Degenhardt was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction. At the time of the actions discussed herein, Degenhardt maintained an office at FOA and Cornucopia's headquarters in League City, Texas and travelled to Texas in connection with his work for FOA and Cornucopia. Degenhardt, however, no longer maintains a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause. The causes of action asserted herein against Degenhardt arose from purposeful transactions entered by Degenhardt and consummated in Texas. Degenhardt committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas

corporation, all as more fully described below. In addition, Degenhardt used and maintained agents in Texas. All of the foregoing give rise to Plaintiff's causes of action asserted herein. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Degenhardt may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Degenhardt at his home office of LDG Venture, Westendstr. 49 60325 Frankfurt, Germany, Biocybernaut Institute Europe Ehrhafts 4, 88167 Maierhöfen, Germany, or wherever he may be found.

13.     Defendant Theodor van Stephoudt ("van Stephoudt") was FOA's President from June 2017-March 2018. Stephoudt was also an economist at Defendant Reed Smith LLP, who handled tax matters for FOA and Cornucopia, Rieck, DOGSA, and other entities controlled by Rieck. Upon information and belief, van Stephoudt resides in New York City, New York.

14.     At all times material hereto, van Stephoudt was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction. Van Stephoudt, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this cause. The causes of action asserted herein against van Stephoudt arose from purposeful transactions entered by van Stephoudt and consummated in Texas. In this regard, van Stephoudt entered the agreements that made the basis of this suit with Texas residents and the agreements were to be performed in whole or in part in Texas or,

6

alternatively, van Stephoudt committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below. In addition, van Stephoudt used and maintained agents in Texas. All of the foregoing give rise to Plaintiff's causes of action asserted herein. As part of Reed Smith's engagement with FOA and Cornucopia, van Stephoudt also oversaw tax matters for a wide variety of Rieck's entities, including Texas entities FOA and Cornucopia, Furie Petroleum Company, and Furie Oil & Gas V (and at least VII, VIII, X, and XII), LLC. To do so, van Stephoudt was in regular contact with FOA and Cornucopia's controller, a Texas resident (and controller for the other Texas entities as well), FOA and Cornucopia's accountants, based in Houston, Texas, FOA and Cornucopia's lawyers, as discussed herein and FOA and Cornucopia's Texas reserve auditors, in addition to FOA and Cornucopia's Texas personnel. Van Stephoudt also travelled to Texas in connection with his work for FOA and Cornucopia. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), van Stephoudt may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to van Stephoudt at his home office of Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086.

15.    Defendant Reed Smith LLP ("Reed Smith") is a limited liability partnership organized and existing under the laws of the State of Delaware, which represented FOA and Cornucopia and other entities controlled by Rieck. Reed Smith routinely advises Texas companies like FOA and Cornucopia on all manner of legal issues, including litigation, transactional work, tax and oil and gas matters.

16.     Reed Smith is a law firm that engages in business in Texas, including the operation of law offices in Dallas, Austin, and Houston. At all times material to this action, Reed Smith was registered to transact business in Texas and maintained a registered office and a registered agent in Texas. Reed Smith may be served with citation in this cause by serving its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Dallas County, Texas. Alternatively, Reed Smith has allowed its registration to transact business in Texas to expire and, as a result, though required to do so, Reed Smith has not maintained a registered agent for service of process. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Reed Smith may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Reed Smith at its home office of 20 Stanwix Street, Suite 1200, Pittsburgh, Pennsylvania 15222.

17.     Defendant David Hryck ("Hryck") was the engagement partner at Reed Smith, who executed the engagement letter providing for van Stephoudt and himself to provide tax assistance and legal services to FOA and Cornucopia on an hourly basis. Upon information and belief, Hryck resides in New York City, New York.

18.     At all times material hereto, Hryck was engaged in business in Texas as defined in TEX. CIV. PRAC. & REM. CODE § 17.042, initiated contact in Texas and is subject to the jurisdiction of Texas courts under theories of general and specific jurisdiction. Hryck, however, does not maintain a regular place of business in Texas and has no designated or registered agent on whom service of citation may be made in this

cause. The causes of action asserted herein against Hryck arose from purposeful transactions entered by Hryck and consummated in Texas. In this regard, Hryck entered the agreements made the basis of this suit with Texas residents and the agreements were to be performed in whole or in part in Texas or, alternatively, Hryck committed torts in whole or in part in Texas, including misfeasance in the operation of a Texas corporation, all as more fully described below. In addition, Hryck used and maintained agents in Texas. As part of Reed Smith's engagement with FOA and Cornucopia, Hryck oversaw tax and other legal matters for a wide variety of Rieck's Texas entities. To do so, Hryck was in regular contact with Texas residents. All of the foregoing give rise to Plaintiff's causes of action asserted herein. Accordingly, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1), Hryck may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Hryck at his office of Duane Morris LLP, 1540 Broadway, New York, NY 10036-4086.

19.     Defendant Thomas E. Hord ("Hord") was FOA and Cornucopia's COO, and at all relevant times was responsible for its drilling activities. Hord resides in Galveston County. Hord's July 1, 2013 Employment Agreement with both FOA and Cornucopia referred to FOA and Cornucopia collectively as the "Company," and made Hord Chief Operating Officer for both FOA and Cornucopia. Pursuant to that employment agreement, Hord agreed to submit all employment-related disputes to Courts in Houston, governed by Texas law.

20.     Hord may be served with citation in this cause at his residence address of 912 Forest Rd., Clear Lake Shores, Galveston County, Texas 77565, or wherever he may be found.

21.     Defendant Michael Anthony (Tony) Nunes ("Nunes") was Cornucopia and FOA's General Counsel under agreements pursuant to which he was partially seconded by the law firms that employed him; first Cogan & Partners LLP, a Houston law firm, and then Stone Pigman Walther Wittmann LLC.

22.     Nunes resides in Harris County. Nunes may be served with citation in this cause at 712 Main Street, Suite 110, Houston, Harris County, Texas 77002 or at 2601 S. Broadway Street, No. 51, La Porte, Harris County, Texas 77571-6574, or wherever he may be found.

23.     Defendant Stone Pigman Walther Wittmann LLC is a Louisiana law firm ("Stone Pigman").[1] Stone Pigman is a professional limited liability company organized and existing under the laws of the state of Louisiana. Stone Pigman engaged in business in Texas, including the operation of law offices in Houston, Harris County, Texas. At all times material to this action, Stone Pigman was registered to transact business in Texas and maintained a registered office and a registered agent in Texas. Effective June 8, 2021, Stone Pigman filed with the Texas Secretary of State a certificate of withdrawal of registration thereby surrendering its authority to transact business in Texas. In its certificate of withdrawal, Stone Pigman consented that service of process in any action,

---

[1]     On October 18, 2022 Stone Pigman moved to designate Cogan & Partners, LLP as a Responsible Third Party (ECF 89); the Court granted Stone Pigman's motion on November 17, 2022 (ECF 121).

suit, or proceeding stating a cause of action arising in Texas during the time Stone Pigman was authorized to transact business in Texas may be made upon Stone Pigman by serving the Texas Secretary of State. Stone Pigman further agreed in its certificate of withdrawal that the Texas Secretary of State may mail a copy of any process against Stone Pigman to 1001 McKinney, Suite 1600, Houston, Texas 77002. As the causes of action asserted herein against Stone Pigman arose in Texas during the time Stone Pigman was authorized to transact business in Texas, Stone Pigman may be cited to appear in this cause by serving the Secretary of State of the State of Texas with duplicate copies of process. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), the Secretary of State shall forward process to Stone Pigman by mailing to 1001 McKinney, Suite 1600, Houston, Texas 77002.

24.     Defendant David W. Elder ("Elder") was Cornucopia and FOA's CFO and resides in Harris County. Elder's 2015 and 2018 employment agreements were with both Cornucopia and FOA. His 2015 employment agreement referred to Cornucopia and FOA jointly as the "Company." His 2018 employment referred to Cornucopia, FOA, and Corsair Oil and Gas, LLC collectively as the "Company." Elder served as CFO and manager for a wide variety of Rieck related entities, including at least Furie Drilling, LLC, Furie Operating, LLC, Furie Petroleum Company, LLC, and Advanced Capital Funding LLC, and assisted Rieck's enterprise in financial matters. Elder resides in Harris County. Pursuant to an employment agreement between Elder and FOA and Cornucopia dated February 15, 2015, Elder agreed to submit all employment-related disputes to Courts in Houston, governed by Texas law.

25.     Elder may be served with citation in this cause at 18153 Bal Harbour Drive, Houston, Harris County, Texas 77058.

26.     Defendant Bruce Ganer ("Ganer") is the owner and manager of Sierra Pine Resources International, Inc. ("SPRI"). Ganer served as FOA and Cornucopia's internal geologist and testified that he was Chief Technical Adviser to Rieck. In that role, he reported directly to Rieck, gave instructions to lower-level FOA and Cornucopia employees/consultants and oversaw FOA and Cornucopia's strategic decisions. He was also held out as FOA and Cornucopia's internal lead geologist to third parties. Ganer resides in Harris County.

27.     Ganer may be served with citation in this cause at 3118 Ivy Falls Dr., Houston, Harris County, Texas 77068-1413 or at 110 Cypress Station Dr., Suite 105, Houston, Harris County, Texas 77090, or wherever he may be found.

28.     Defendant SPRI is a corporation organized and existing under the laws of the state of Texas owned by Ganer, with its principal office in this state in Harris County. SPRI may be served with citation in this cause by serving its registered agent, Ira D. Weizel, at 700 Louisiana St., Suite 1200, Houston, Harris County, Texas 77002.

29.     Defendant Helena Energy LLC ("Helena") is a Delaware limited liability company that, according to its website, was founded as a natural gas marketing arm to FOA and Cornucopia, but which has been engaged in oil production in Southwest Texas (specifically, Dimmit County) since 2016. Helena is owned by Rieck and employs Ganer as its geologist-operator. Helena is registered to transact business in Texas and maintains a registered office and registered agent in Texas. Helena may be served with citation in

this cause by serving its registered agent, Gary W. Miller, at 2925 Richmond Avenue,

14th Floor, Houston, Harris County, Texas 77098.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action because the amount in
controversy exceeds this Court's minimum jurisdictional requirements.

31.     A substantial part of the events or omissions giving rise to the claims
asserted herein occurred in Harris County, Texas. Accordingly, venue is proper in Harris
County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(1)(Vernon 1995).
Furthermore, at the time the cause of action accrued, Defendants Nunes, Ganer, Hord,
and Elder resided in Harris County, Texas. Accordingly, venue is proper in Harris
County, Texas under TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(2)(Vernon 1995).
In addition, SPRI maintains its principal office in this state in Harris County, Texas.
Accordingly, venue is proper in Harris County, Texas under TEX. CIV. PRAC. & REM.
CODE ANN. § 15.002(a)(3)(Vernon 1995). All claims asserted herein arise from the same
transaction or occurrence, or series of transactions or occurrences, and venue of all claims
and causes of action as to all defendants is therefore proper in Harris County, Texas
under TEX. CIV. PRAC. & REM. CODE ANN. § 15.005 (Vernon 1995).[2]

## RULE 47 STATEMENT

---

[2]     This lawsuit was originally filed on August 6, 2021 in the District Court of Harris County, Texas.
On August 18, 2021, Defendant Stone Pigman removed this action (ECF 1) to this Court. Defendant Hord
subsequently moved to remand this action (ECF 51), which the Court denied at hearing (ECF 134).

32.    Pursuant to TEX. R. CIV. P. 47, Plaintiff states that it seeks monetary relief over $1,000,000 and demand judgment for all other relief to which they show themselves entitled.

## FACTS

### I.    GENERAL BACKGROUND

### A.  Rieck's Enterprise and Defendants' Role Therein

33.    Rieck oversaw a panoply of related corporate entities in multiple states and countries. Each had the loosest of organization and corporate form and Rieck, together with the Defendants hereto, constantly formed new entities and changed the entities' names, so as to keep ahead of creditors and regulators. Still, the basic structure of Rieck's enterprise was as follows:

- Oil and gas mineral rights in Alaska were owned by FOA and Cornucopia, and financed by hundreds of millions of dollars from secured lenders;

- Oil and gas mineral were rights in Texas owned by other Rieck companies, overseen by FOA and Cornucopia's executives using FOA and Cornucopia's personnel and infrastructure;

- Marketing entities in Germany and Luxembourg, which raised monies from primarily German investors to invest in the Alaska and Texas projects;

- Corporate entities formed in numerous jurisdictions (e.g., Texas, Wyoming, Louisiana, Delaware, Malta, Germany, United Arab

14

Emirates) for the purpose of extracting funds from the above-referenced activities and distributing those funds to Rieck and his insiders.

34.     The Defendants hereto assisted him in that enterprise.

35.     The attorney and attorney-related defendants, Nunes, Stone Pigman, van Stephoudt, Hryck and Reed Smith, assisted Rieck in structuring and representing the dozens of corporations involved in the enterprise. In addition, they handled inquiries from federal, state, and international regulators as to the problems that developed with the enterprise.

36.     Reed Smith, led by Hryck and Van Stephoudt, represented and performed work for numerous entities owned and controlled by Rieck for many years, including: FOA and Cornucopia, DOGSA, DOGAG, Furie Petroleum Company (another Texas Rieck entity which Rieck used as a fund to pay himself and his associates), Rieck Oil Inc. (the parent of Aurora, discussed below), Helena, Nordic (discussed below), many Texas and German fund entities also named Furie, German banking entities named IARI and SAAG (discussed below) and served as the designated Tax Expert for a bond issued by a DOGSA affiliate (also discussed below). In addition, Reed Smith advised Rieck, Hord and Nunes on how to structure their interests in the entities involved in chartering the Randolph Yost, discussed below.

37.     Between June 2017 and March 2018, van Stephoudt also served as the President of FOA and Cornucopia. Reed Smith began billing FOA for work beginning in February 2016. On December 14, 2017, Hryck submitted an engagement letter to Furie signed by him, purporting to "memorialize[] the intent of the parties starting on June 1,

2017." The letter stated that Reed Smith would provide general tax advice and legal assistance on an hourly basis. It also provided that van Stephoudt, a non-lawyer, would be FOA's principal contact. The letter contained a boilerplate disclaimer of representations with counterparties of FOA with no other specific or general conflicts waiver.

38.    In addition to serving as FOA and Cornucopia's General Counsel, Nunes also represented Rieck personally. In addition, Nunes was the engagement partner for Stone Pigman to represent FOA and Cornucopia, Rieck, DOGSA, DOGAG, Advanced Drilling and numerous of Rieck's other entities. In this capacity, Stone Pigman created, structured, and negotiated contracts for a wide variety of Rieck-controlled entities, including the Randolph Yost entities, discussed below.

39.    Per his secondment agreement, Nunes served as "special legal consultant for Kay Rieck FOA and Cornucopia half days (up to a maximum of 80 hours per month) and the remainder of his time he will continue to work for other clients of, and will remain a partner of, Cogan & Partners, LLP." This relationship continued when Nunes worked for Stone Pigman Walther Wittmann LLC.

40.    In addition to his role as CFO of FOA and Cornucopia, Elder served as manager and CFO of numerous Rieck entities, including at least Furie Drilling, LLC, Furie Operating, LLC, Furie Petroleum Company, LLC, and Advanced Capital Funding LLC, and assisted Rieck's enterprise in financial matters. His role included moving funds, reporting transactions, and working with van Stephoudt, Hryck and Reed Smith to respond to tax regulators. Pursuant to a 2015 employment agreement with FOA and

Cornucopia, Elder received a salary of $250,000 per year, and would also receive more than $750,000 if Rieck sold FOA and Cornucopia.

41.      In addition to his role as COO of FOA and Cornucopia, Hord served as manager and CEO of numerous Rieck drilling entities and handled other oil and gas projects for Rieck. Pursuant to a 2013 employment agreement with FOA and Cornucopia, Hord received a salary of $500,000 per year, and would also receive more than $1,000,000 if Rieck sold FOA and Cornucopia. Between August 2015 and October 2016, Hord received more than $3.9 million from FOA and Cornucopia with approximately $577,670 coming from Cornucopia's bank accounts and $3,383,232 coming from FOA's bank accounts.

42.      Ganer served as Technical Adviser to Rieck for his enterprise activities and received millions of dollars from Rieck through various entities wholly-owned and controlled by him each named Sierra Pine. Ganer worked on over 30 projects for Rieck and Rieck-related entities accounted for the majority of Sierra Pine's income. Beginning in 2016, Ganer and/or his wholly-owned companies served as operator, and executed documents as attorney-in-fact, for Helena. Rieck employed Ganer's inflated reserve reports and other mineral reporting documents in the enterprises' bond offerings, prospectuses and other money raising documents. Ganer issued numerous reserve reports describing FOA and Cornucopia's mineral reserves, falsely stating that he was independent. Ganer and Sierra Pine received approximately $777,600 from Cornucopia between September 2015 and December 2016 and $678,618 from FOA between September 2015 and July 2018.

**B. Background Facts Concerning FOA and Cornucopia**

43.     The State of Alaska designated an 84,000-acre area located in the Cook Inlet as the Kitchen Lights Unit ("KLU") and leased gas drilling rights therein to FOA. FOA and Cornucopia then agreed in an operating agreement that FOA would be the operator of the KLU and have a 15.75% working interest in the KLU. Cornucopia had a 79% working interest.

44.     In the summer of 2011 and 2012, FOA and Cornucopia drilled two exploratory wells in the KLU but failed to discover commercial quantities of gas.

45.     In the summer of 2013, FOA and Cornucopia drilled a third exploratory well ("KLU #3") and discovered commercial quantities of gas.

46.     Following the discovery, FOA and Cornucopia commissioned several reserve and future revenue reports from SPRI and other reserve auditors.

47.     In its report, dated August 23, 2013, independent reserve auditor Netherland Sewell & Associates, Inc. ("NSAI") estimated there were 59.4 billion cubic feet ("BCF") in proved, undeveloped gas reserves at KLU #3 as of June 30, 2013, having a net present value of approximately $54 million.

48.     By contrast, SPRI issued a report, dated September 3, 2013, estimating 276.3 BCF in proved, undeveloped gas reserves as of June 30, 2013, having a net present value of approximately $315 million.

49.     In contemplation of negotiating terms for loans to develop infrastructure needed to produce gas, FOA and Cornucopia procured additional reports estimating proved reserves at KLU #3 as of December 31, 2013.

50.     NSAI issued such a report, dated February 26, 2014, estimating the roughly the same amount of proved, undeveloped reserves (59.5 BCF) as it had in its prior report, as of December 31, 2013, having a net present value of $121 million.

51.     DeGolyer and MacNaughton, another independent reserve reporter, issued a draft report, dated March 24, 2014, projecting a similar amount of proved, undeveloped gas reserves (59 BCF).

52.     In July 2014, Cornucopia and FOA jointly entered into a secured term loan agreement with Energy Capital Partners ("ECP"), pursuant to which ECP agreed to loan FOA and Cornucopia $160 million to build infrastructure needed to produce gas; specifically, a drilling platform at the location of KLU #3, an onshore gas processing facility, an undersea pipeline connecting the two.

53.     FOA and Cornucopia failed to build the infrastructure on budget, or on schedule. They spent about $175 million more than budgeted and could not complete the planned infrastructure until November 2015.

54.     FOA and Cornucopia financed the shortfall with additional loans from ECP, and a separate loan from ING Bank ("ING") collateralized by projected tax credit receipts from the State of Alaska. The ING loan, executed on July 14, 2015, was for $135 million and both Cornucopia and FOA were borrowers obligated to repay the loan.

55.     FOA and Cornucopia also used borrowed funds to drill two more exploratory wells; however, like the first and second, these new wells both failed to yield commercial quantities of gas.

56.     Cornucopia and FOA were highly integrated. As just discussed, they shared officers and were co-borrowers on the loans from ECP and ING, which generally were funded into a joint account of both Cornucopia and FOA. Cornucopia and FOA had nine joint bank accounts, including an account where proceeds of gas sales were initially deposited. Those deposits were then transferred to other accounts held jointly by Cornucopia and FOA or directly to an FOA account with Wells Fargo Bank ending in 6064 ("Account 6064"). Cornucopia would also regularly deposit funds into Account 6064 from a separate Wells Fargo account held by Cornucopia that ended in 9240 ("Account 9240").

57.     Cornucopia directly paid Tom Hord's personal service company, Tom Hord Management, between August 2015 and October 2016 for Hord's benefit from Account 9240. Cornucopia paid Hord $620,301.80 during this period. FOA then began paying Tom Hord's company from Account 6064 in November 2016 and continued to do so until June 2018. The payments in this later period totaled $913,812.82. These payments are detailed in attachment B to this Complaint.

58.     Ganer and SPRI were similarly paid by both Cornucopia and FOA through Account 6064. Cornucopia paid SPRI, Ganer's company, directly between September 2015 and December 2016 from Account 9240. Cornucopia's payments to Sierra Pine totaled $777,606.60 and were made for the benefit for Ganer. Then FOA began paying SPRI from Account 6064 in January 2017 and continued to do so until July 2019. Payments to SPRI for Ganer are identified in Exhibit E to this Complaint.

59.     Stone Pigman was also paid out of Account 6064 in February 2017 after Cornucopia transferred $1.325 million into the account. FOA transferred $37,000 to Stone Pigman on February 6, 2017 and another $25,000 to Stone Pigman on February 24, 2017. Stone Pigman received $843,128.74 from Account 6064 between January 2017 and June 2018. Transfers to Stone Pigman are identified in Exhibit D to this complaint.

60.     Nunes also appears to have been paid with money transferred from Cornucopia. Between August 2015 and January 2017, Nunes was paid $828,279.89 from Account 6064. Transfers to Nunes are included in Exhibit C to this Complaint.

## II.     DISLOYAL TRANSACTIONS

61.     Once the infrastructure was built out, FOA and Cornucopia experienced greater-than-projected operational costs, principally resulting from production of greater-than-projected volumes of water produced at wells located in zones known to be composed of loose sand (i.e. "wet"), and further, failed to discover additional gas.

62.     Cornucopia and FOA's insiders responded to these issues, not by operating the companies in a manner designed to maximize value for the benefit of the companies, but rather, by diverting value to themselves through insider transactions.

### C. Randolph Yost Rig Charter

63.     As set forth below, Cornucopia's owners and managers siphoned funds from Cornucopia, through various entities owned by them, in connection with the chartering of the Randolph Yost drilling rig from Shelf Drilling Offshore Resources Limited II ("Shelf II"), a company organized under the laws of the Cayman Islands.

64.     After initially negotiating directly with Shelf II's parent to charter the rig on FOA and Cornucopia's behalf, Rieck, Hord, Degenhardt, Nunes and Elder worked in concert to charter the rig through a series of insider-controlled entities and then to sub-charter it to FOA at a substantially marked-up rate.

65.     Even before any of the charter agreements had been executed, Hord and Rieck had privately agreed that Hord would receive 20% of any revenue generated by the related entities. On May 17, 2015, Hord forwarded to his attorney emails discussing the preliminary structure of the related entities and asked him to "take a look at this, this is a new start-up company in Dubai [Offshore Dilling Solutions, Ltd., discussed below] to operate [the Randolph Yost] in [Alaska]. Which I will own 20 percent of that it has a possibility of earning 150 ml. Over a three-year period." On July 4, 2015, Offshore Drilling Solutions Ltd. ("ODS"), an entity organized under the laws of Dubai, chartered the rig from Shelf II for $20,000/day, pursuant to a Bareboat Charter Agreement.

66.     ODS was purportedly owned by Reinhardt Martin Schuster ("Schuster"), a known front man for and longtime associate of Rieck. In any event, Rieck was the ultimate owner of ODS and Rieck made all business decisions for ODS.

67.     On November 2, 2015, with Shelf II's consent, ODS assigned all of its rights and obligations under the Bareboat Charter Agreement to Kadmas Ltd. ("Kadmas"), an entity organized under the laws of Malta and 99% owned by Schuster. The assignment instrument stated Kadmas is a "wholly owned subsidiary" of ODS.

68.     On the same date, Kadmas in turn (a) agreed to pay Advanced Drilling Solutions, LLC ("Advanced Drilling") $55,000/day to manage the rig under a Drilling

Vessel Management Agreement and (b) entered into a Sub-Time Charter of the rig with Nordic Overseas Drilling & Services, GmbH ("Nordic"), a German company.

69.     On December 1, 2015, FOA agreed to pay Nordic $220,000/day to charter the rig, pursuant to an Offshore Daywork Drilling Contract.

70.     Under Nunes' direction, Cogan & Partners organized Advanced Drilling under the laws of the State of Louisiana, and its charter named Nunes as its member and manager. Cogan & Partners billed FOA and Cornucopia for its work for Advanced Drilling.

71.     Hord became CEO of Advanced Drilling and Doy Dugan, a financial analyst at FOA and Cornucopia, became its CFO.

72.     Nevertheless, Advanced Drilling's executives took direction from Rieck and Degenhardt.

73.     As Elder, Hord, Degenhardt, Nunes and Rieck knew, Advanced Drilling shared employees and contractors with FOA and Cornucopia (who FOA and Cornucopia continued to pay). Its personnel continued to use their Furie email addresses to conduct business for Advanced Drilling. FOA invoiced Advanced Drilling $2,500 a month for "shared expenses" but Advanced Drilling did not pay.

74.     Advanced Drilling was lucrative for Hord in other ways as well. Whereas FOA and Cornucopia's finances were audited and subject to numerous restrictions by lenders and regulators, Advanced Drilling's finances were not. For example, in December 2015, Hord sold rig equipment to Advanced Drilling for $1.8 million that he had recently purchased for just $135,000.

75.     In addition, Nunes and Hord caused Advanced Drilling to pay Hord a monthly consulting fee plus a car allowance. In January 2017 alone, Hord's monthly invoice came to $40,000. This was while he was still being paid $500,000 a year by FOA and Cornucopia.

76.     Nordic was purportedly owned by Andreas Sasdi, another known front man for and longtime attorney for Rieck. As Elder, Degenhardt, Hord and Nunes knew, Rieck was the ultimate owner of Nordic and Rieck made all business decisions for Nordic.

77.     Payments to Nordic were in fact from Account 9240, Cornucopia's bank account held separately from FOA. Between September 2015 and August 2016, Cornucopia paid Nordic $31,207,339.83, including $9,600,000 paid to Nordic on December 21, 2015. These transactions are detailed in Exhibit A attached to this complaint.

78.     Given the convoluted ownership structure of Nordic, its contract with Advanced Drilling, and the contracts for the lease of the Randolph Yost, each of the payments from Cornucopia to Nordic were made for the benefit of Rieck, Hord, and Nunes.

79.     Elder subsequently admitted that "none of these entities [referring to Advanced Drilling, Kadmas, Nordic and ODS] was previously known or recognized in the industry as a drilling contractor"; and that the "Randolph Yost-related transactions created a complicated and expensive series of contractual relationships, which appeared to be detrimental to [FOA and Cornucopia,] and beneficial to Rieck, Hord and Nunes."

80.     Nevertheless, Elder was intimately involved in the creation of these entities and authorized the payments from Cornucopia to Nordic.

81.     In addition, as manager of FPC, Elder knew or should have known that Nordic was cycling funds back to Rieck through FPC, with approximately $2 million paid in November and December 2015.

82.     Similarly, Elder knew Reed Smith was charging FOA and Cornucopia for van Stephoudt's time doing tax work for Nordic.

83.     Between February and April 2016, while Reed Smith had been engaged by FOA and Cornucopia, Hryck, acting as Rieck's lawyer, prepared a draft profit-sharing agreement between Kadmas and Hord's solely-owned company, Tom Hord Management Services, LLC, a Texas limited liability company. That agreement specifically included an "example" calculation that illustrated the scheme: Hord would be paid 20% of the profits that Kadmas made on the rig sub-charter to FOA, calculated as the day rate FOA paid, minus Kadmas' actual expenses. The included example provided for a $220,000 day rate to FOA (the price FOA had already then agreed to pay Nordic); $75,000 in actual costs and expenses (the actual day rate ODS (and then Kadmas) was paying Shelf II for the rig of $20,000/day, plus the $55,000/day Kadmas agreed to pay ADS to manage the rig); which resulted in $145,000/day profit to Kadmas ($220,000 minus $75,000); with $29,000/day profits going to Hord (20% of $145,000). In short, the plan hinged on charging Cornucopia $220,000 per day for just $75,000 worth of daily services and costs.

84.     ECP balked at the steep rate that Nordic had then proposed to charge FOA and Cornucopia. However, Degenhardt falsely assured ECP that "we did prove that we

do not have a [sic] affiliate/related transaction," and the transaction was ultimately approved, albeit under false pretenses.

85.     Between late 2015 and 2016, FOA recorded expenses paid to Nordic of $82 million. As stated above, more than $31 million was paid by Cornucopia.

86.     Despite the significant cash paid, ODS and Kadmas defaulted on their payment obligations to Shelf II related to chartering the rig.

87.     Nevertheless, in August 2017, Elder, working together with van Stephoudt (then President of FOA and Cornucopia) and another Rieck associate, caused FOA to pay Shelf II $1.5 million even though FOA had no direct obligation to Shelf II, and the funds were used to offset existing balances owed by Kadmas and ODS. The $1.5 million payment to Shelf II was transferred from a joint bank account for Cornucopia and FOA to FOA's bank account on August 28, 2017. FOA paid it to Shelf II on the same day. Neither FOA nor Cornucopia had an obligation to pay Shelf II. This payment benefitted Rieck, Hord, and Nunes as the owners of Nordic, Kadmas, ODS, and Advanced Drilling.

88.     Rieck, Elder, Degenhardt, Hord, Nunes, van Stephoudt, and Hryck all knew the above-described transfers were fraudulent and took steps to try to hide them.

89.     For example, on December 7, 2015, Rieck's attorney Harald Plewka (of the Dubai firm HPL Plewka & Coll. LLP) sent Cornucopia and FOA a "Verification Note" which claimed that ODS, Kadmas, Nordic and FOA were all "independent and unrelated companies" despite the fact that Rieck ultimately controlled all of them, and that ODS and Kadmas had signed agreements acknowledging that the latter was wholly owned by the former.

26

90.     By way of another example, on February 10, 2016, Nunes, Rieck, Hryck, Hord, and Degenhardt collaborated to draft a message for Elder so that Elder could avoid reporting Advanced Drilling as an affiliate or related party to FOA and Cornucopia or Rieck. Working together, they created an idea that Hryck would form a trust with himself as trustee which would own enough of Advanced Drilling to make Hord a minority owner, which could then give Elder plausible deniability that Advanced Drilling was not related.

91.     Also, in February 2016, James Cogan, Nunes' law partner, organized a new entity named Offshore Management Holdings LLC ("OMH") to serve as Advanced Drilling's new sole member and manager in place of Nunes. OMH's principal place of business was listed as FOA and Cornucopia's Texas headquarters in League City. OMH was initially set up to be owned 51%/49% by Hord and Nunes; but was then changed to 20% owned by Hord, 20% owned by Nunes and 60% owned by a trust, of which Reed Smith attorney Hryck was Trustee. Regardless, as was known by all of Nunes, Hord, Cogan, van Stephoudt, and Hryck, OMH was ultimately owned and controlled by Rieck.

92.     On May 23, 2016, van Stephoudt emailed a draft letter on Hryck's letterhead to Elder and Degenhardt, as a first draft of a statement confirming the independence of Advanced Drilling. The letter addressed to Degenhardt at his Texas address stated "We, Reed Smith LLP, hereby state that we have reviewed the ownership structure of [Furie]."

93.     In early 2016, Hord, Nunes, Rieck, ODS, Kadmas, Nordic, FOA and Cornucopia circulated (and partially executed) a "Memorandum of Agreement"

27

purporting to release Hord and Nunes from any conflict of interest that may arise as a result of their employment by FOA and Cornucopia and their ownership/management of Advanced Drilling.

94.     Even though Rieck and Nunes signed the Memorandum of Agreement document, they were unable to convince Plewka, the attorney-in-fact for ODS, Kadmas and Nordic, to agree to release Hord and Nunes. Nunes continued to acknowledge the conflict, writing to Hord and Hord's attorney on May 5, 2016: "I feel I definitely need to get [Plewka] to sign something regarding my role as attorney and manager for the companies." Nunes further wrote on May 19: "[t]o protect myself I believe I need to get Harald [Plewka] to sign something in my favor along the lines of [the Memorandum of Agreement]." According to Nunes, Plewka said he did not have authority to sign for Nordic.

**D. Gas "Sales"**

1. <u>Aurora</u>

95.     Rieck, Degenhardt, Nunes, Webb, and Elder caused FOA to enter into gas "sales" transactions with Aurora Gas, LLC ("<u>Aurora</u>"), another company which they all knew was owned by Rieck and managed by him and Bruce Webb ("<u>Webb</u>"), Senior Vice President for both FOA and Cornucopia. Although FOA was the "seller" under the contract, all payments were to be made to Cornucopia.

96.     In March 2016, Rieck, with the knowledge of Elder, Degenhardt and Nunes, agreed to sell FOA and Cornucopia gas to Aurora, which in turn sold FOA and Cornucopia's gas to Rieck-owned Helena (which was managed by Rieck, Webb and

FOA and Cornucopia executive Mark Slaughter), which then sold the gas to Helena's customers for Rieck's and Webb's benefit.

97.     After Aurora was forced into involuntary bankruptcy in early May 2016, Elder asked internally if FOA and Cornucopia could continue selling gas to Aurora. Webb replied: "One consideration is that the commercial customers (Kay's investors / Helena Energy) get their gas from Aurora - which they purchase from us." Unsurprisingly, FOA and Cornucopia continued providing gas to Aurora, ultimately writing off more than $900,000 in Aurora sales as uncollectible.

98.     As FOA and Cornucopia's lenders became hesitant to continue gas deliveries to Aurora, in January 2017, Mark Slaughter (an executive of FOA, Cornucopia, and Helena) impressed upon Nunes, Elder and Webb the need to execute a gas supply contract directly between FOA and Cornucopia and Helena to keep Rieck (and his customers) satisfied: "We want to get this to Jen at ECP so we can cut off sales to Aurora. Currently if we cut sales off to Aurora we cut the sales to Kay's Helena customers and we can't do that. With this contract we'll remove Aurora from being the middle man."

99.     Even after the bankruptcy, FOA and Cornucopia continued to provide gas to Aurora at Rieck's direction, for which FOA and Cornucopia was never fully compensated.

2.  <u>Helena</u>

100.    As discussed above, Helena was receiving FOA and Cornucopia gas (through Aurora) beginning in April 2016, which it then sold to its customers. Helena and

FOA and Cornucopia also shared multiple executives, including Bruce Webb, Mark Slaughter, and Bruce Ganer (who served as Helena's project manager and operator for Helena's wells in Dimmit County), and FOA and Cornucopia's office staff performed administrative functions for Helena (which also shared FOA and Cornucopia's office space). Helena did not compensate FOA and Cornucopia for these services.

101.   At Rieck's direction, Elder, Webb, Degenhardt, Nunes and Slaughter put together a draft gas sales agreement with Helena, which Elder presented to FOA and Cornucopia's lenders for approval on June 30, 2017. As with Aurora, the gas sales agreement listed FOA as the Seller, but all payments were to be made to Cornucopia. After the Aurora bankruptcy, ECP balked at a contract with another Rieck affiliate and requested additional assurances before it would further consider the proposed transaction. Nonetheless, Webb instructed Slaughter later that day to "[t]ake the gas anyway. We have no choice[,]" and the gas was delivered to Helena. FOA and Cornucopia's records do not reflect any payment received by FOA and Cornucopia for said gas.

### E. Tax Credit Transfers

102.   Despite Cornucopia and FOA having pledged their Alaska tax credits to its lenders ECP and ING in 2014 and 2015, Rieck also purported to pledge their Alaska tax credits to various related entities. For example, in March 2016, DOGSA, through a special purpose vehicle DOG TC-2016 SA, made a bond offering of up to $170 million. According to the offering memorandum, DOG TC-2016 SA's primary business was to purchase tax credits from Cornucopia and FOA at a discount and then to collect the

credits. The offering memorandum provided that the obligations were secured by inter alia a "global security right over all Tax Credits granted by Cornucopia and [FOA]."

103.  Reed Smith's van Stephoudt (FOA and Cornucopia's future President) is named the "Tax Credit Expert" in the memorandum, purportedly validating the underlying tax credit collateral.

104.  Cornucopia received no proceeds from the bond offering, despite DOGSA having placed more than $16 million of the bonds.

105.  Reed Smith applied to BaFin, the German Federal Financial Supervisory Authority, on behalf of a Rieck-controlled German bank, IARI Internationale Aktien Und Rohstoff Ivest GmbH ("IARI"), and its subsidiary Süddeutsche Aktienbank A.G. ("SAAG"), for permission to include the March 2016 DOGSA bond in SAAG's equity by including it in its capital reserve. After BaFin questioned the liquidity and reasonable value of the DOGSA bonds, Reed Smith withdrew the request and announced that SAAG would increase its equity through the direct purchase of tax credits.

106.  Immediately thereafter, in December 2016, Rieck caused Cornucopia to transfer $18.4 million in Alaska state tax credits to IARI, which then purportedly transferred $4 million of the tax credits to SAAG. Cornucopia received no consideration for these transfers.

107.  Rieck used those transfers as equity at his banks. However, to be validly perfected, these tax credit transfers would need to have been recorded with the appropriate Alaskan authorities. But they were not so recorded.

### F. Other Compensation

108.   As long as they were members in good standing of Rieck's enterprise, the Defendants could and did receive a host of additional benefits.

109.   Hord put friends and family members on FOA and Cornucopia's payroll (like his cousin Ricky Bell, for whom FOA and Cornucopia also rented an apartment). Webb complained to Rieck and FOA and Cornucopia's then-President van Stephoudt about Hord wasting FOA and Cornucopia's money, noting that Hord's "relatives and friends … get paid all year for doing almost nothing. That could have changed, but went nowhere."

110.   Elder received wire transfers between August and September 2015 from Rieck-owned Furie Petroleum Company totaling $150,000.

111.   Nunes received $600,000 per year from FOA and Cornucopia for his general counsel services and directed FOA and Cornucopia and Rieck's legal work to his law firms, generating additional legal fees for Cogan & Partners and Stone Pigman.

### III.   INFLATION OF ESTIMATED PROVED RESERVES

112.   To keep drawing benefits from FOA and Cornucopia, the Defendants needed to demonstrate mineral reserves sufficient to keep the lenders and counterparties at bay, or to obtain new sources of funding to take their place.

113.   ECP's loans were secured by substantially all of FOA and Cornucopia's assets, principally its leases, well platforms, and pipelines in the KLU, and each of funding availability and defaults (or rather the absence thereof) was premised upon the existence of significant, "proved" reserves as estimated by its independent auditor, NSAI.

114.   Per NSAI's reports, "proved reserves are those quantities of oil and gas which, by analysis of engineering and geoscience data, can be estimated with reasonable certainty to be commercially recoverable; probable and possible reserves are those additional reserves which are sequentially less certain to be recovered."

115.   As noted above, NSAI's reserve report, dated February 26, 2014, like its prior reserve report, estimated that FOA and Cornucopia had proved, undeveloped reserves of 59.5 BCF, as of December 31, 2013, having a net present value of $121 million; and the draft reserve report from DeGolyer and MacNaughton, dated June 3, 2014, estimated a similar amount of proved reserves. While the NSAI report states it was prepared for FOA, the report estimated the amount of gas available in the KLU for FOA and the other "interest owners" in the KLU. As discussed above, Cornucopia was a 79% working interest owner of the KLU lease.

116.   In contemplation of providing regular reporting services to FOA for the benefit of ECP (its loan agreement called for FOA and Cornucopia to furnish annual, independent reports by NSAI), FOA and Cornucopia engaged NSAI to provide such services pursuant to an engagement letter, dated November 24, 2014.

117.   NSAI's first post-engagement reserve report dated March 25, 2015 and estimating gas reserves as of December 31, 2014 ("2015 Report"), estimated FOA and Cornucopia to have 56.3 BCF in "total proved" reserves, having a total net present value of $243 million, broken up into "proved developed producing" (7.5 BCF), "proved developed non-producing" (21.6 BCF) and "proved undeveloped" (27.2 BCF).

118.     NSAI's next reserve report, dated February 29, 2016 and estimating gas reserves as of December 31, 2015 ("February 2016 Report"), estimated FOA and Cornucopia to have the same gas reserves, having an identical net present value.

119.     However, when efforts to find commercial quantities of gas other than in the immediate vicinity of KLU #3 failed, Defendants began manipulating and concealing the data passed to NSAI, including with respect to the underlying pay maps, upon which NSAI's reserve reports were premised.

120.     In early July 2016, FOA and Cornucopia failed to discover gas at yet another well, now drilled by Advanced Drilling using the Randolph Yost rig. On July 6, 2016, one of FOA and Cornucopia's working interest holders wrote to all the officers of FOA and Cornucopia, including Rieck, Degenhardt, Elder, Hord and Nunes:

> I think it's time for Kay to reassess and make a lot of changes. This present operation is the most unprofessional I have ever witnessed. The cost overruns are more than huge, the geology pitiful, this is as far as a company can get from being a well-run prudent operation. This is amat[eur] hour at its worst. The cost overruns of this well are enormous and each month we are upside down in regard to income from production and outrageous LOE'S. When this debacle of a well is done, we are required to drill another, how can Kay keep letting this happen. There must be a way these insane operations can be corrected. Something is very wrong here, it must be fixed. If there has ever been a pre Chapter 11, this sure looks like one to me. Kay is this what you[r] final intention is for Furie?

121.     Instead of rectifying the problem, Ganer undertook to vastly inflate FOA and Cornucopia's reported reserves, and soon after convinced NSAI to issue a preliminary report, dated September 9, 2016, estimating gas reserves as of July 31, 2016

("September 2016 Report"), tripling FOA and Cornucopia's proved reserves. Rieck and Ganer instructed NSAI to hide this report from Elder.

122.    NSAI did not issue a year-end 2016 report as it had done in previous years and that was contractually mandated by FOA and Cornucopia's various counterparties. To comply with FOA and Cornucopia's reporting obligations, Elder instead relied on a February 1, 2017 report issued by Ganer, which predictably showed more than 204 BCF in proven reserves.

123.    Each of the executive Defendants had additional reasons not to trust Ganer.

124.    Among other things, Nunes, Elder, Rieck and Degenhardt all knew that Ganer did not consider himself bound by the ordinary rules of oil and gas reserve estimation. For example, as Ganer told them why he enjoyed not having a petroleum engineering (PE) certification:

> The rules, regulations and process I think are confining and counterproductive in the execution of work in the sense that there is no room for interpretation in the technical work that allows for innovations or going beyond pure facts to project what is really expected or possible. Technically that statement is probably not entirely correct but in practice it seems to overshadow or overly discount representations of project evaluations and I think is a disservice to those relying on the results to make decisions. That is, the sideboards that come with the PE significantly limit what the engineer really thinks and can represent of the possibilities of his project evaluations.

125.    Among other things, they knew that Ganer had issued a series of inflated and implausible reports under his own name since 2013, showing vast quantities of gas and oil that never came to fruition.

126.    Among other things, they knew that Ganer was not disinterested, serving as Rieck's technical adviser on numerous projects and getting paid by Rieck.

127.    In or about June 2017, Degenhardt resigned from DOGSA and ceased being FOA and Cornucopia's President. In his place, van Stephoudt became President of FOA and Cornucopia. Nevertheless, Reed Smith continued to bill FOA and Cornucopia for van Stephoudt's time and van Stephoudt continued using his Reed Smith email address to conduct business for FOA and Cornucopia. FOA and Cornucopia did not pay van Stephoudt directly.

128.    By the summer of 2017, Rieck and FOA and Cornucopia's management, including van Stephoudt and Elder, were soliciting new outside investors to replace FOA and Cornucopia's lenders and provide additional capital to keep FOA and Cornucopia operating as a billion-dollar company. However, at least one such potential investor (PJT Partners) required a current reserve report prior to committing funds, to ensure that the value of its collateral exceeded the value of loans anticipated to be extended.

129.    This presented a predicament. As Ganer explained to Elder and van Stephoudt in August 2017, if the truth as to the above-described water problems and water remediation costs were disclosed, they would likely be unable to convince NSAI to keep proved reserves and their estimated net present value at the levels reported in the September 2016 Report. As Ganer put it, "[w]e (!) are stuck between a ROCK and a Hard Place." To accomplish this plan Ganer suggested continuing with NSAI for reserve reporting services but "staying under the radar and keeping this quiet". Van Stephoudt, copying Elder, agreed: "Unfortunately, that is the only way forward."

130.   At the same time, Ganer explained to both Elder and van Stephoudt: "our mission is to keep reserves at the 200 Bcf mark."

131.   For his part, Ganer inflated FOA and Cornucopia's reserves by providing misleading, inaccurate, partial and/or reckless information to NSAI in order to reflect significant, additional proved reserves.

132.   By way of example only, Ganer caused FOA and Cornucopia's gas pay maps to inaccurately reflect FOA and Cornucopia's expected reserves. For example, Ganer reported significant, proved reserves in a large zone that begins far from KLU #3. However, FOA and Cornucopia had never drilled any exploratory wells in that zone. The nearest two wells closed decades prior and without ever having yielded commercial quantities of gas.

133.   For example, Ganer also purportedly added seismic data to the pay maps resulting in significant additional reserves therein and in other locations, despite later acknowledging that seismic data is an insufficient basis on which to project such reserves.

134.   In addition, van Stephoudt, Elder and Ganer also took steps to inflate the net present value of FOA and Cornucopia's reserves, by reducing the annual costs included in the financial projections, all of which resulted in relatively higher net present value estimates for FOA and Cornucopia in the 2017 Report (defined below).

135.   On September 23, 2017, for example, van Stephoudt noted to Elder that "I think that [PJT Partners] start to understand that with the costs of the rig added to the deal the deal will be difficult at best." On September 27, Elder provided NSAI's Burton with

FOA's financial plans and projections that did not include about $5 million annually in traditional general and administrative (G&A) costs. Although Burton responded that those expenses are typically included in a reserve report, Elder convinced NSAI to omit the G&A from the 2017 Report in early October.

136.    By way of another example, on October 4, 2017, Elder confided in van Stephoudt his doubts as to whether FOA and Cornucopia could really produce the gas called for by the plan being evaluated by NSAI, and whether FOA and Cornucopia had enough money to complete the four wells called for by the plan. Van Stephoudt agreed with Elder that FOA and Cornucopia were unlikely to produce the gas or complete a fourth well. Nevertheless, van Stephoudt advised Elder to proceed: "Let's get the money to finish well three and get it producing. Then we will take it from there as we will have more leverage."

137.    At the time that van Stephoudt was overseeing the procurement of the 2017 NSAI reserve report, he was not only acting as FOA and Cornucopia's President but was also wearing many other hats. He maintained his position at Reed Smith representing FOA and Cornucopia. He continued to represent DOGSA and Rieck's other entities, which he had represented separately for years. And, as discussed above, he served as the designated Tax Expert for DOGSA affiliate's $170 million bond offering, where he was charged with validating FOA and Cornucopia's tax credits.

138.    NSAI's next report, dated October 30, 2017 and estimating gas reserves as of December 31, 2016 ("2017 Report"), perpetuated the major increase in the September 2016 Report by relying on the fabricated reserves, as follows:

| Category | Gross Gas Reserves (Bcf) | | | |
| --- | --- | --- | --- | --- |
| | 2015 Report | Feb. 2016 Report | Sept. 2016 Report | 2017 Report |
| Proved Developed Producing | 7.5 | 7.5 | 22.8 | 14.1 |
| Proved Developed Non-Producing | 21.6 | 21.6 | 20.6 | 117.7 |
| Proved Undeveloped | 27.2 | 27.2 | 107.8 | 23.5 |
| Total Proved | 56.3 | 56.3 | 151.2 | 155.2 |

139.   Thomas Walsh, a partner of Petrotechnical Resources of Alaska, LLC ("PRA"), which ECP engaged in 2018 to provide a technical and commercial review of the KLU, testified after the fact that, "the truth was revealed that the zone [added to the 2017 Maps] had not been tested [by FOA and Cornucopia] because it was not expected to flow gas."

140.   He further testified that his own analysis "revealed that the prior reserves estimate [referring to that in the September 2016 and 2017 Reports] had been grossly inflated, and that gas column thickness associated with individual sands were thin or non-existent in sands that had been promoted as holding the vast majority of reserves in the KLU."

## IV.   GAS SUPPLY CONTRACTS FIXING UNREALISTIC PRODUCTION REQUIREMENTS

141.   The "base case projections" in the ECP loan agreement projected realization of substantial revenues from gas sales under supply agreements with third parties.

142.    Although FOA and Cornucopia had barely enough production capacity to meet their supply requirements under its 2014 gas supply agreement with Homer Electric Association ("Homer"), FOA nevertheless entered into a second such contract with Enstar Natural Gas Company ("Enstar") in March 2016 calling for FOA to sell and Enstar to purchase 18.6 billion cubic feet of gas over three years (6.2 billion cubic feet per year).

143.    The Enstar GSA was principally negotiated by Mark Slaughter and Defendant Nunes (with input from Elder)—and was approved by Rieck and Degenhardt—to keep outside funding from Cornucopia and FOA's lenders flowing.

144.    But the Enstar GSA—which Rieck, Elder, Degenhardt and Nunes knew at the time far exceeded FOA and Cornucopia's production capacities—provided the Defendants with an additional short-term benefit: it would be used (in part) to justify FOA and Cornucopia's future revenue projections that formed the basis of the NSAI 2017 Report described above.

145.    The Enstar GSA also came with significant mid- and long-term risks: if FOA and Cornucopia were unable to produce the gas called for by the Enstar contract (beginning in April 2018), they were required to purchase gas from third parties at the then-current market prices to supply Enstar.

146.    In addition, the contract called for FOA to "have at least three wells that can be used to produce the volumes of gas contemplated under the [gas supply agreement]" by December 31, 2016, which FOA would begin delivering on April 1, 2018.

147.    The well completion deadline was extended to July 31, 2017. However, two days prior to the deadline, FOA advised Enstar that it would not meet it. As a result of this, and other defaults, Enstar negotiated for a material reduction in the price to be paid upon the commencement of gas deliveries on April 1, 2018.

148.    When FOA and Cornucopia were unable to meet its supply obligations beginning April 2018, they were forced to buy gas on the spot market to cover minimum delivery amounts and took substantial losses supplying Enstar with purchased gas—but not before obtaining the critical NSAI 2017 Report.

## V.    FOA AND CORNUCOPIA'S COLLAPSE

149.    In 2018, pursuant to an agreement between Rieck and ECP, FOA and Cornucopia ceded control to an outside management firm, Ankura Consulting Group, LLC ("Ankura"); and as noted above, PRA was engaged to undertake a technical review of FOA and Cornucopia's business.

150.    By November of that year, PRA and Ankura discovered FOA and Cornucopia's reserves and business prospects were not as had been represented to lenders.

151.    NSAI's next reserve report, dated June 21, 2019 and estimating gas reserves as of December 31, 2018, estimated that FOA and Cornucopia had only 20,367 BCF as of said date, roughly one-third the amount projected in the 2015 and February 2016 Reports, and zero "proved undeveloped" reserves.

152.    Less than two months after the release of this reserve report, FOA and Cornucopia filed voluntary petitions for bankruptcy relief.

41

153.    FOA and Cornucopia sold substantially all of their assets for roughly $5 million, in the resulting chapter 11 cases.

## VI.    FACTS RELATED TO NUNES' EMPLOYMENT BY STONE PIGMAN

154.    In January 2017, Cogan Partners and Stone Pigman entered into an Agreement governed by Louisiana law which was purportedly effective as of January 1, 2017 (the "Agreement").

155.    Under the Agreement, all Cogan Partners became attorneys at Stone Pigman or stopped practicing law at Cogan Partners.  Cogan Partners retained no attorneys to service clients.

> a.  Prior to the Agreement, Cogan Partners had three equity partners: Anthony Nunes, John Cogan Jr., John Cogan Sr.
>
> b.  Nunes and Cogan Jr. became equity members of Stone Pigman and Cogan Sr. retired.
>
> c.  Prior to the Agreement, Cogan Partners had four attorneys in addition to the equity partners.
>
> d.  Pursuant to the Agreement, three attorneys joined Stone Pigman as special counsel, and the remaining attorney became in-house counsel for a former client.

156.    As discussed below, Nunes sent Furie a Stone Pigman engagement letter (the "Stone Pigman Engagement Letter").

157.    The Stone Pigman Engagement Letter is drafted on Stone Pigman letterhead with the Houston address of Cogan Partners.  It stated that "we confirm that

42

you previously paid to Cogan & Partners, LLP a deposit against unpaid legal fees and expenses of $30,000 and the Firm [defined in the Letter as Stone Pigman] continues to hold this deposit for Client's account."  The Stone Pigman Engagement Letter does not mention that any existing liabilities to Furie would remain with Cogan Partners.

158.   The Stone Pigman Engagement Letter states that Nunes performed legal work for Advanced Drilling, and was a minority shareholder and manager of Advanced Drilling's sole member.  It further stated that by signing the letter Furie would agree that Nunes' legal work and business transactions "do not cause a conflict with Mr. Nunes' or the Firm's representation" of Furie, but that if any conflict arose, Stone Pigman would consult with Furie to resolve the conflict and would not perform any work until obtaining the specific consent of Furie.

159.   The Trustee does not have a record of a signed version of the Stone Pigman Engagement Letter, nor of any other signed agreement between Stone Pigman and Furie.

160.   On January 15, 2017, Nunes emailed Furie stating:

> As we have previously discussed, my firm, Cogan & Partners LLP has merged with the Louisiana law firm of Stone Pigman Walther Whittmann LLC, based in New Orleans, effective January 1, 2017. Final details are still being worked out and the merger has still not been publicly announced but will be announced shortly.

161.   He went on to state:

> I will continue to be a partner of the merged firm and will continue to work on Furie matters on the same terms and fixed fee and expense structure that I have done for the last 4 years. The only change is that instead of paying the invoices for my services directly to me, all invoices for those services will be sent by my firm and all payments on those invoices

should be wired to the firm's operating account.… The change should be seamless.

162.   Nunes went on to note that he would send a revised engagement letter "in the new name of the firm" and that the hourly billing rates for the Cogan Partners attorneys would remain the same.

163.   All the Cogan Partners employees transferred to Stone Pigman, including Nunes, continued to provide their services at Cogan Partners' transferred Houston address.

164.   FOA and Cornucopia paid Stone Pigman $843,128.74 between January 19, 2017 and June 1, 2018 (with an additional payment of $83.43 made on October 16, 2018).

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Nunes)

165.   The Trustee restates the preceding paragraphs as though fully set forth herein.

166.   Nunes owed fiduciary duties to FOA and Cornucopia because he was partially seconded to Furie and Cornucopia and served as general counsel to FOA and Cornucopia.

167.   Said fiduciary duties included duties of loyalty, good faith, care, and obedience. The duty of loyalty required Nunes to put FOA and Cornucopia's interest ahead of his individual interests and to avoid the use of any corporate position to further his individual interests.

44

168.     Nunes breached his duties of loyalty and good faith by chartering the Randolph Yost rig from entities he secretly owned, overcharging FOA and Cornucopia and retaining the resulting benefits for himself.

169.     Defendant Nunes breached his fiduciary duties of loyalty, good faith, care, and obedience, by operating FOA and Cornucopia in a manner so as to benefit himself and causing material harm to FOA and Cornucopia.

170.     As a direct and proximate result of such breaches of fiduciary duty, Nunes profited, and FOA and Cornucopia sustained actual and consequential damages which the Trustee is entitled to recover. In addition, Nunes should be required to disgorge all compensation and other benefits and to forfeit all fees and funds received by him in connection with the above-referenced acts.

171.     Judgment should be entered against Nunes on the Trustee's breach of fiduciary duty claim against him, in an amount to be determined at trial, plus pre-judgment interest and attorneys' fees.

## **SECOND CAUSE OF ACTION**

Dismissed by ECF 213 and not repleaded.

## **THIRD CAUSE OF ACTION**

Dismissed by ECF 213 and repleaded in part below.

## **FOURTH CAUSE OF ACTION**

Dismissed by ECF 213 and repleaded in part below.

## FIFTH CAUSE OF ACTION

Dismissed by ECF 213 and repleaded in part below.

## SIXTH CAUSE OF ACTION
## Unjust Enrichment
## (Against Helena)

172.    The Trustee restates the preceding paragraphs as though fully set forth herein.

173.    Through its common ownership by Rieck, Defendant Helena secured multiple benefits from FOA and Cornucopia that would be unconscionable to retain. For instance, Helena, FOA, and Cornucopia shared multiple executives, including Bruce Webb and Mark Slaughter, who upon information and belief were principally compensated by FOA and Cornucopia.

174.    Helena received gas directly from FOA and Cornucopia, for which FOA and Cornucopia either received no compensation or less than fair compensation.

175.    Helena accepted the above-described benefits in such circumstances as reasonably notified Helena that FOA and Cornucopia, in rendering such benefits, reasonably expected to be paid by Helena for same. It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for Helena to retain such sums unlawfully obtained by it.

176.    Judgment should be entered against Helena for the fair value of FOA and Cornucopia's executives' time devoted to work for Helena, the fair value of all FOA and Cornucopia gas received by Helena for which FOA and Cornucopia were not

compensated, and any other benefit received by Helena from FOA and Cornucopia, in an amount to be determined at trial, plus pre-judgment interest.

### SEVENTH CAUSE OF ACTION

Dismissed by ECF 213

### EIGHTH CAUSE OF ACTION

Dismissed as a cause of action by ECF 213

### NINTH CAUSE OF ACTION

Dismissed as a cause of action by ECF 213

### TENTH CAUSE OF ACTION

Dismissed by ECF 213

### ELEVENTH CAUSE OF ACTION

Dismissed by ECF 213

### TWELTH CAUSE OF ACTION

Dismissed by ECF 213

### THIRTEENTH CAUSE OF ACTION
**Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1) and
Texas Bus. & Com. Code § 24.005(a)(1)
(Against Rieck, Hord, Nunes Relating to the Randolph Yost)**

177.   The Trustee restates the preceding paragraphs as though fully set forth herein.

178.   Rieck, Hord, and Nunes received substantial payments from Cornucopia as a result of transfers to companies they owned or controlled in connection with the above-described chartering of the Randolph Yost rig.

179.    These payments were for the benefit of Rieck because he was the ultimate owner of Nordic.

180.    Specifically, Rieck owned ODS, the original charterer of the Randolph Yost rig from Shelf II. ODS assigned its interest in the charter to Kadmas which was a wholly-owned subsidiary of ODS. Kadmas sub-chartered the Randolph Yost rig to Nordic for $220,000 per day while also agreeing to pay Advanced Drilling $55,000 per day to manage the rig.

181.    Advanced Drilling was owned by Nunes initially, and later by Hord and Nunes. Accordingly, the payments were for the benefit of Nunes.

182.    The payments were also for the benefit of Hord since he received consulting fees from Advanced Drilling, served as its CEO, and had an agreement to share in the revenue from Kadmas and Offshore Drilling.

183.    Rieck was the ultimate owner of Nordic and Kadmas and Rieck made all business decisions for Nordic. Rieck also controlled Cornucopia.

184.    Cornucopia paid more than $31,207,339.83 to Nordic for the chartering of the Randolph Yost rig as shown in Exhibit A to this complaint.

185.    Despite the large payments to Nordic, Shelf II was not paid. In August 2017, Cornucopia paid $1.5 million to FOA which then transferred it to Shelf II. This payment was also for the benefit of Rieck, Hord, and Nunes as Nordic, ODS, and Kadmas should have been paying Shelf II.

186.    The payments were made with the actual intent to hinder, delay, or defraud Cornucopia's lenders.

187.     Through the charter of the Randolph Yost rig, Rieck, Hord, and Nunes, intended to have Cornucopia pay $220,000 per day for $75,000 worth of value.

188.     Rieck, Hord, and Nunes took steps to conceal the nature of the transactions by having their attorneys represent that ODS, Kadmas, and Nordic were independent and unrelated companies and developing a scheme to use a trust to own enough of Advanced Drilling to make Hord a minority owner.

189.     The transfers to Nordic bear other badges of fraud including the transfers were made to insiders, Cornucopia had been advised by both of its lenders ECP and ING that it was in default under their respective credit agreements before the overwhelming majority of the transfers were made; and Cornucopia was insolvent when the transfers were made or became insolvent shortly thereafter.

190.     Judgment should be entered against Rieck, Hord, Nunes avoiding and recovering the transfers made to Nordic and Shelf II, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

### FOURTEENTH CAUSE OF ACTION
**Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)(I)-(III)
and Texas Bus. & Com. Code § 24.005(a)(2)(A)-(B) and § 24.006
(Against Rieck, Hord, Nunes Relating to the Randolph Yost)**

191.     The Trustee restates the preceding paragraphs as though fully set forth herein.

192.    Each of the transfers from Cornucopia to Nordic and Shelf II was made without receiving reasonably equivalent value.

193.    Each transfer from Cornucopia to Nordic and Shelf II was made for the benefit of Rieck, Hord, and Nunes. The transfer to Shelf II was made because Rieck's business, Kadmas, had defaulted on its payment obligations to Shelf II despite the fact that Cornucopia was paying Nordic for the Randolph Yost charter.

194.    The payment to Shelf II was made by Cornucopia through FOA despite neither Cornucopia or FOA being obligated to Shelf II.

195.    FOA was being charged $220,000 per day for the charter of the Randolph Yost rig but only receiving $75,000 of value.

196.    For each transfer from Cornucopia to Nordic and Shelf II, Cornucopia was engaged in a business or transaction for which the remaining assets of Cornucopia were unreasonably small in relation to the business or transaction.

197.    For each transfer from Cornucopia to Nordic and Shelf II, Cornucopia intended to incur, believed it would incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.

198.    Judgment should be entered against Rieck, Hord, and Nunes avoiding and recovering the transfers made to Nordic and Shelf II for their benefit and awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

## FIFTEENTH CAUSE OF ACTION
### Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1) and
### Texas Bus. & Com. Code § 24.005(a)(1)
### (Against Rieck for Cornucopia Tax Credits)

199.    The Trustee restates the preceding paragraphs as though fully set forth herein.

200.    Cornucopia transferred Alaska state tax credits to DOGSA and IARI, two other entities owned by Rieck, without consideration.

201.    Rieck benefitted from the transfer of these tax credits by, among other things, DOGSA receiving the proceeds of a bond offering that depended on the company offering the bond having a security interest in Cornucopia's tax credits.

202.    Rieck also benefitted from the transfer of the tax credits to IARI, a bank he owned, because the bank was able to use the tax credits as equity.

203.    Cornucopia made this transfer with actual intent to hinder, delay, or defraud Cornucopia's creditors.

204.    Judgment should be entered against Rieck avoiding and recovering the tax credit transfers made for his benefit, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

## SIXTEENTH CAUSE OF ACTION
### Actual Fraudulent Transfer under 11 U.S.C. § 548(a)(1) and
### Texas Bus. & Com. Code § 24.005(a)(1)
### (Against Hord, Elder, Nunes, Ganer, SPRI, Stone Pigman)

205.    The Trustee restates the preceding paragraphs as though fully set forth herein.

206.    The Trustee seeks to avoid the transfers made out of Cornucopia's bank accounts and FOA's bank accounts as fraudulent transfers by Cornucopia. Funds from FOA's bank accounts were originally received from customers who paid Cornucopia for gas sold or from ECP and ING pursuant to loans on which Cornucopia was a joint borrower with FOA. Both Cornucopia and FOA were obligated to repay the loans from ECP and ING. Further, the funds used to pay the defendants were for services purportedly rendered to Cornucopia and FOA. Therefore, funds transferred to an FOA account and then transferred out to the defendants were also transfers of Cornucopia's property and fraudulent as to Cornucopia's creditors.

207.    During the four-year period preceding the commencement of Cornucopia's bankruptcy case, Cornucopia's COO, Hord, through his now-dissolved company Tom Hord Management Services, LLC, was paid $500,000/year by FOA or Cornucopia.

208.    Hord received total compensation of over $3.9 million from FOA or Cornucopia.

209.    Hord also received a daily fee from Advanced Drilling for managing FOA and Cornucopia's drilling operations.

210.    At least $620,301.80 of Hord's compensation was paid directly by Cornucopia as shown in Exhibit B attached to this Complaint.

211.    At least another $913,812.82 was paid from FOA's bank accounts as shown in Exhibit B.

212.   Elder served as Chief Financial Officer for both Cornucopia and FOA. He was paid at least $250,000 a year to serve as CFO for these companies.

213.   Elder's compensation similarly derived from gas sales where Cornucopia was paid or from loans from ECP and ING where Cornucopia was the borrower.

214.   SPRI received at least $777,606.60 directly from Cornucopia and received another $1.2 million from FOA's Account 6064 where funds were transferred from Cornucopia. As per the above, funds transferred from this account were also transfers of Cornucopia's property and fraudulent as to Cornucopia's creditors.

215.   Nunes received the above-described transfers from FOA's Account 6064.

216.   Stone Pigman received the above-described transfers from FOA's Account 6064.

217.   Each of these transfers from Cornucopia were made for the benefit of Defendants Hord, Elder, Nunes, Ganer, SPRI, and Stone Pigman.

218.   The transfers to the defendants were made with the actual intent to hinder, delay, or defraud Cornucopia's creditors.

219.   Judgment should be entered against Hord, Elder, Nunes, Ganer, SPRI, and Stone Pigman, avoiding and recovering the transfers described above, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

## SEVENTEENTH CAUSE OF ACTION
**Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)(I)-(III)**
**and Texas Bus. & Com. Code § 24.005(a)(2)(A)-(B) and § 24.006(a)**
**(Against Hord, Elder, Nunes, Ganer, SPRI, Stone Pigman)**

220.    The Trustee restates the preceding paragraphs as though fully set forth herein.

221.    The Trustee seeks to avoid the transfers made out of Cornucopia's bank accounts and FOA's bank accounts as fraudulent transfers by Cornucopia. Funds from FOA's bank accounts were originally received from customers who paid Cornucopia for gas sold or from ECP and ING pursuant to loans on which Cornucopia was a joint borrower with FOA. Both Cornucopia and FOA were obligated to repay the loans from ECP and ING. Further, the funds used to pay the defendants were for services purportedly rendered to Cornucopia and FOA. Therefore, funds transferred to an FOA account and then transferred out to the defendants were also transfers of Cornucopia's property and fraudulent as to Cornucopia's creditors.

222.    During the four-year period preceding the commencement of Cornucopia's bankruptcy case, Cornucopia's COO, Hord, through his now-dissolved company Tom Hord Management Services, LLC, was paid $500,000/year by FOA or Cornucopia.

223.    Hord received total compensation of over $3.9 million from FOA or Cornucopia.

224.    Hord also received a daily fee from Advanced Drilling for managing FOA and Cornucopia's drilling operations.

225.   At least $620,301.80 of Hord's compensation was paid directly by Cornucopia as shown in Exhibit B attached to this Complaint.

226.   At least another $913,812.82 was paid from FOA's bank accounts as shown in Exhibit B.

227.   Elder served as Chief Financial Officer for both Cornucopia and FOA. He was paid at least $250,000 a year to serve as CFO for these companies.

228.   Elder's compensation similarly derived from gas sales where Cornucopia was paid or from loans from ECP and ING where Cornucopia was the borrower.

229.   SPRI received at least $777,606.60 directly from Cornucopia and received another $1.2 million from FOA's Account 6064 where funds were transferred from Cornucopia. As per the above, funds transferred from this account were also transfers of Cornucopia's property and fraudulent as to Cornucopia's creditors.

230.   Nunes received the above-described transfers from FOA's Account 6064.

231.   Stone Pigman received the above-described transfers from FOA's Account 6064.

232.   Each of these transfers from Cornucopia were made for the benefit of Defendants Hord, Elder, Nunes, Ganer, SPRI, and Stone Pigman.

233.   Judgment should be entered against Hord, Elder, Nunes, Ganer, SPRI, and Stone Pigman avoiding and recovering the transfers described above, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

### EIGHTEENTH CAUSE OF ACTION
### Insider Fraudulent Transfer under Texas Bus. & Com. Code § 24.006(b)
### (Against Ganer and SPRI)

234.    The Trustee restates the preceding paragraphs as though fully set forth herein.

235.    Each transfer to or for the benefit of SPRI and Ganer was made to an insider of Furie, on account of an antecedent debt, while Furie was insolvent, and the insider had reasonable cause to believe that Furie was insolvent. Such transfers to SPRI and Ganer are included in Exhibit E attached to this Complaint.

236.    Judgment should be entered against Ganer and SPRI avoiding and recovering the transfers made to them, awarding attorneys' fees and costs under Texas Bus. & Com. Code § 24.013, plus pre-judgment interest and granting such other relief as is available under 11 U.S.C. § 550 and Texas Bus. & Com. Code §§ 24.008(a) and 24.009(b).

### CONDITIONS PRECEDENT

237.    All conditions precedent to the right of Plaintiff to recover herein have been performed or have occurred.

### REQUEST FOR JURY TRIAL

238.    Pursuant to TEX. R. CIV. P. 216, Plaintiff hereby demands a trial by jury in this cause, having heretofore paid the required fee.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein; that Plaintiff have judgment according to the law and

the facts as determined by this Honorable Court; that upon final trial and hearing hereof, Plaintiff recover from Defendants, jointly and severally; (i) actual, special, consequential, exemplary and/or punitive damages; (ii) attorneys' fees and expenses incurred herein; (iii) pre-judgment interest at the highest lawful rate; (iv) post-judgment interest at the highest lawful rate from the date of judgment until such judgment is fully and finally paid; (v) disgorgement; (vi) expert witness fees; (vii) all costs of court incurred herein; and (viii) such other and further relief, both general and special, legal and equitable, to which Plaintiff may show itself justly entitled.

Dated: April 18, 2024

Respectfully Submitted,

/s/ Robert M. Corn
Robert M. Corn
State Bar No. 0482600
3131 Eastside St., Suite 440
Houston, Texas 77098-1947
Telephone: 713-229-0055
Facsimile; 713-229-0057
Email: rcorn@corn-law.com


OF COUNSEL:

AMINI LLC
Bijan Amini
Avery Samet
131 West 35th Street, 12th Floor
New York, New York 10001
Telephone: (212) 490-4700
bamini@aminillc.com
asamet@aminillc.com


ATTORNEYS FOR PLAINTIFF CLINGMAN
HANGER MANAGEMENT ASSOCIATES,

LLC, as Trustees of the Furie Litigation Trust

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served upon all counsel of record on April 18, 2024, via ECF.

*/s/ Robert M. Corn*
Robert M. Corn